Any initially capitalized term that is not defined herein but that is defined in the Glossary of Terms for the Plan Documents pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. (hereinafter referred to as "Lummus" or the "Debtor"), attached hereto as *Exhibit A*, shall have the meaning ascribed to such term in the Glossary and each such definition is incorporated herein by reference.

THE COMPANY LISTED BELOW HAS SENT YOU THIS DOCUMENT AND THE ACCOMPANYING MATERIALS (THE "SOLICITATION") BECAUSE YOU MAY BE A CREDITOR ENTITLED TO VOTE ON APPROVAL OF THE COMPANY'S PROPOSED PREPACKAGED PLAN OF REORGANIZATION. IF THE REQUIRED CREDITORS' VOTE TO APPROVE THE PREPACKAGED PLAN OF REORGANIZATION AND IF OTHER PREFILING CONDITIONS ARE MET, THE COMPANY INTENDS TO FILE A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO IMPLEMENT THE PREPACKAGED PLAN OF REORGANIZATION. BECAUSE THE CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. IF THE COMPANY LISTED BELOW FILES THE CHAPTER 11 CASE, IT WILL PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT (A) APPROVING THIS DISCLOSURE STATEMENT AS HAVING CONTAINED ADEQUATE INFORMATION, (B) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (C) CONFIRMING THE PREPACKAGED PLAN OF REORGANIZATION. THE BANKRUPTCY COURT MAY ORDER ADDITIONAL DISCLOSURES. THESE MATERIALS HAVE NOT BEEN REVIEWED OR APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY BODY.

---

## DISCLOSURE STATEMENT FOR THE PREPACKAGED PLAN OF REORGANIZATION OF ABB LUMMUS GLOBAL INC. UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

---

### DATED AUGUST 30, 2005

**THE COMPANY HAS NOT COMMENCED A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME. THIS IS AN IMPORTANT NOTICE FOR HOLDERS OF LUMMUS ASBESTOS PI TRUST CLAIMS AGAINST THE DEBTOR AND/OR THE ASBESTOS PROTECTED PARTIES.**

#### PLEASE READ THE BOX BELOW CAREFULLY

The deadline to accept or reject the Plan is 12:00 pm., E.D.T., on September 26, 2005 (the "Voting Deadline"), unless the Debtor in its sole discretion, and from time to time, extends the Voting Deadline; *provided, however,* that the Debtor reserves the right to file the Chapter 11 Case earlier if it determines at any time, that sufficient votes have been received. In order to be counted, Ballots must be received by Bankruptcy Services LLC (hereinafter "BSI" or the "Voting Agent") on or before the Voting Deadline at:

**Lummus Ballot Processing, c/o BSI, 757 Third Avenue, Third Floor, New York, NY 10017 (for Ballots sent by hand delivery)**

*or*

**Lummus Ballot Processing, c/o BSI, P.O. Box 5014, FDR Station, New York, NY 10150-5014 (for Ballots sent by U.S. mail).**
If you are a Lummus Asbestos PI Trust Claimant and need a Ballot, please contact the Voting Agent or access the Debtor's restructuring-information website at *www.lummus-restructuring.com*.

Please read this Disclosure Statement and the attached documents carefully before voting on the Plan. If the Plan is approved and becomes effective, your right to pursue a Lummus Asbestos PI Trust Claim against the Debtor and any Asbestos Protected Party will be permanently altered. The Debtor may elect not to proceed with the filing of the Chapter 11 Case and instead pursue other alternatives depending on whether certain prefiling conditions are met, including, among others, whether one-hundred percent (100%) of the Lummus Asbestos PI Trust Claimants who cast votes on the Plan, vote to accept the Plan.

The Debtor is providing this Disclosure Statement and the exhibits attached hereto, the accompanying Ballots, and the related Plan Documents delivered herewith pursuant to Section 1126(b) of the Bankruptcy Code, in connection with the

solicitation of votes for the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. (hereinafter the "Plan"), a copy of which is annexed to this Disclosure Statement as *Exhibit B*.

The Debtor is furnishing this Disclosure Statement to each known holder of Lummus Asbestos PI Trust Claims and to any other Entity entitled to vote to accept or reject the Plan. This Disclosure Statement is to be used by each recipient solely in connection with his, her, or its evaluation of the Plan. The Plan does not impair the rights of holders of claims other than holders of Lummus Asbestos PI Trust Claims, Non-Debtor Affiliate Intercompany Claims, and Equity Interests, and, therefore, no other creditors or holders of interests are being asked to vote on the Plan. The use of this Disclosure Statement for any other purpose is prohibited. This Disclosure Statement may not be reproduced or provided to others (other than to those advisors of any recipient of this Disclosure Statement who may review the information contained herein to assist such recipient in his, her, or its evaluation of the Plan), without the prior written consent of the Debtor.

**THE PLAN PROVIDES FOR, AMONG OTHER THINGS, THE ISSUANCE OF THE LUMMUS ASBESTOS PI CHANNELING INJUNCTION UNDER SECTIONS 105 AND 524(g) OF THE BANKRUPTCY CODE THAT RESULTS IN THE CHANNELING OF ALL LUMMUS ASBESTOS PI TRUST CLAIMS OF THE DEBTOR AND CERTAIN OTHER ASBESTOS PROTECTED PARTIES INTO A TRUST AS MORE FULLY DESCRIBED HEREIN. *SEE* SECTION 5.7(e) OF THIS DISCLOSURE STATEMENT.**

As of the date of this Disclosure Statement, the Debtor has not filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. If, however, the Debtor receives the acceptances required to confirm the Plan under Section 1126(c) of the Bankruptcy Code and to obtain the injunctions pursuant to Sections 105 and 524(g) of the Bankruptcy Code, and if all other prefiling conditions are met or not otherwise waived including: (i) the acceptance of the Plan by one-hundred percent (100%) in number of Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan; (ii) the entry of a Final Order confirming the plan of reorganization in the CE Bankruptcy Case; (iii) the entry of certain factual findings by the Bankruptcy Court in the CE Bankruptcy Case described in greater detail herein; (iv) the receipt by the Debtor of the express written agreement by all parties with standing in the Chapter 11 Case that such parties will not object to confirmation of the Plan and will not object to the related Plan Documents; and (v) the Debtor has determined in its sole discretion, that no material change in the case law and legislation pertaining to asbestos, including, but not limited to, the passage of the "Fairness in Asbestos Injury Resolution Act of 2005" (the "FAIR Act") has occurred or will occur which will have the effect of impairing the Debtor's ability to promptly confirm the Plan, the Debtor intends to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court (or such other court as is appropriate), and to seek, as promptly thereafter as is practicable, confirmation of the Plan. In the event that the Debtor does not receive the requisite acceptances to confirm the Plan, or if the prefiling conditions are not met, it may elect not to proceed with the filing of the Chapter 11 Case and may instead pursue other alternatives.

---

The Debtor intends to continue operating its business in the ordinary course during the Chapter 11 Case and to seek to obtain the necessary relief from the Bankruptcy Court to pay its Creditors (other than the holders of Lummus Asbestos PI Trust Claims and Non-Debtor Affiliate Intercompany Claims) in full and in the ordinary course of its business. The holders of Lummus Asbestos PI Trust Claims, Non-Debtor Affiliate Intercompany Claims, and Equity Interests (Classes 5, 6, and 7) are impaired under the Plan. The Claims of the Debtor's other Creditors (Classes 1, 2, 3, and 4) are not impaired, including all such persons holding Priority Claims, Secured Claims, Workers' Compensation Claims, and General Unsecured Claims under the Plan. Because acceptance of the Plan will constitute acceptance of all of the provisions of the Plan, each holder of a Lummus Asbestos PI Trust Claim is urged to carefully consider the information regarding treatment of its Claim contained in this Disclosure Statement and the Plan Documents.

The Debtor does not expect that any of its Affiliates and/or Subsidiaries will become debtors under the Bankruptcy Code, and, therefore, it does not believe that the approval of the Bankruptcy Court will be required for any of its Affiliates to make payments to its respective creditors or employees. The Debtor believes that its Chapter 11 filing will not materially interfere with the business operations or obligations of any of its Affiliates and/or Subsidiaries.

The effectiveness of the Plan is subject to several material conditions precedent, including that the conditions to the effectiveness of the CE Plan shall have been satisfied or waived and the Effective Date of the CE Plan shall have occurred or shall occur concurrently with the Effective Date of the Plan. *See* Section 8.3(h) of this Disclosure Statement for a complete discussion of the conditions to the occurrence of the Effective Date of the Plan. There can be no assurance that those conditions will be satisfied. The Debtor presently intends to seek to consummate the Plan and to cause the Effective Date of the Plan to occur promptly after the Lummus Confirmation Date. There can be no assurance, however, as to when or whether the Lummus Confirmation Date and the Effective Date will actually occur.

Distributions under the Plan to Creditors of the Debtor (other than distributions to holders of Lummus Asbestos PI Trust Claims) will be the responsibility of the Reorganized Debtor. Pursuant to Section 524(g) of the Bankruptcy Code, distributions under the Plan to holders of Lummus Asbestos PI Trust Claims will be the responsibility of the Lummus Asbestos PI Trust, and neither the Reorganized Debtor nor any of the other Asbestos Protected Parties shall have any liability therefor.

The terms of the Plan have been developed in the course of extensive discussions and negotiations among the Debtor; ABB Ltd ("ABB"), the indirect parent of Lummus; Richard B. Schiro, the future claimants' representative for unknown and future holders of Lummus Asbestos PI Trust Claims (the "Lummus Future Claimants' Representative"); an informal committee comprised of representatives of certain cancer claimants with claims against Lummus and Combustion Engineering (the "ACC"); the representatives of certain cancer claimants with claims against Combustion Engineering in the CE Bankruptcy Case (the "CCC"); the official creditors' committee appointed in the CE Bankruptcy Case (the "CE Official Creditors' Committee"), and David Austern, the future claimants' representative appointed in the CE Bankruptcy Case (the "CE Future Claimants' Representative").

The Board of Directors of the Debtor, ABB, the ACC, the Lummus Future Claimants' Representative, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative have approved the Plan and strongly recommend that holders of Claims entitled to vote on the Plan for purposes of Sections 1126 and 524(g) of the Bankruptcy Code vote to accept it. The holders of Non-Debtor Affiliate Intercompany Claims and Equity Interests have indicated their intention to vote in favor of the Plan.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF ITS CREDITORS (INCLUDING THE HOLDERS OF LUMMUS ASBESTOS PI TRUST CLAIMS). ACCORDINGLY, CREDITORS ENTITLED TO VOTE IN FAVOR OF THE PLAN FOR PURPOSES OF SECTIONS 1126 AND 524(g) OF THE BANKRUPTCY CODE ARE URGED TO VOTE IN FAVOR OF THE PLAN. VOTING INSTRUCTIONS ARE SET FORTH IN SECTION 8.1 OF THIS DISCLOSURE STATEMENT — "ACCEPTANCE OR REJECTION OF THE PLAN." TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING AGENT, NO LATER THAN 12:00 P.M., E.D.T., ON SEPTEMBER 26, 2005, UNLESS THE DEBTOR, IN ITS SOLE DISCRETION, AND FROM TIME TO TIME, EXTENDS THE VOTING DEADLINE. CREDITORS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ANNEXED HERETO AS *EXHIBIT B*, AND THE MATTERS DESCRIBED IN ARTICLE 9 OF THIS DISCLOSURE STATEMENT — "RISKS OF THE PLAN" AND ARTICLE 10 OF THIS DISCLOSURE STATEMENT — "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN," PRIOR TO CASTING THEIR VOTES.**

In making a decision to vote for or against the Plan, the holders of Lummus Asbestos PI Trust Claims must rely on their own examination of the Debtor and the terms of the Plan, including the merits and risks involved. The holders of Lummus Asbestos PI Trust Claims should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each holder of a Lummus Asbestos PI Trust Claim should consult with his, her, or its own legal, business, financial, and tax advisors with respect to any such matters concerning this Disclosure Statement, this Solicitation, the Plan, and the transactions contemplated thereby.

This Disclosure Statement has not been filed with or reviewed by the Securities and Exchange Commission or any securities regulatory authority of any state under the Securities Act of 1933, as amended, or under any state securities or "blue sky" laws. This Disclosure Statement, this Solicitation, the Plan, and the transactions contemplated herein and therein shall not be approved or disapproved by the Securities and Exchange Commission, and neither the Securities and Exchange Commission nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein and therein. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer of securities.

This Disclosure Statement contains projected financial information regarding the Debtor and the Reorganized Debtor and certain other forward-looking statements, all of which are based on various estimates and assumptions. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. Forward-looking statements should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein.

No Entity has been authorized by the Debtor in connection with the Plan or this Solicitation to give any information or to make any representation other than as expressly contained in this Disclosure Statement and the exhibits annexed hereto, incorporated by reference, or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized or made by the Debtor.

The statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Estimates, if any, in respect of a Claim set forth in this Disclosure Statement or any exhibit hereto may vary from the amount ultimately allowed in respect of such Claim by the Bankruptcy Court or the Lummus Asbestos PI Trust pursuant to the terms of the Lummus TDP and the Lummus Asbestos PI Trust Agreement.

THE SUMMARIES OF THE PLAN AND THE OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF, THE EXHIBITS THERETO, AND ALL DOCUMENTS DESCRIBED HEREIN AND THEREIN. **Copies of any agreement described herein but not provided herewith shall be available for review following its filing with the clerk of the Bankruptcy Court on Business Days from 9:00 a.m. through 4:00 p.m. E.D.T. at the following address: Clerk of the Court, United States Bankruptcy Court, 824 Market Street, 5th floor, Wilmington, Delaware 19801 or by accessing the Debtor's restructuring information website at: www.lummus-restructuring.com.**

The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, business, and operations of the Debtor, the historical and projected financial information of the Debtor (including the projected results of operations of the Reorganized Debtor) is included for purposes of soliciting the acceptances required to confirm the Plan under Section 1126(c) of the Bankruptcy Code and to obtain the Lummus Asbestos PI Channeling Injunction under Sections 105 and 524(g) of the Bankruptcy Code. As to any contested matters that may arise, however, such information is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION ........................................................................................................................ | 1 |
| OVERVIEW OF THE PROPOSED PLAN................................................................................. | 2 |
| SUMMARY OF THE VOTING PROCEDURES .................................................................... | 7 |
| SUMMARY DESCRIPTION OF CLAIMS AND DESCRIPTION OF DISTRIBUTIONS TO OR TREATMENT OF HOLDERS OF CLAIMS AND EQUITY INTERESTS............................................................... | 9 |
| Article 1 GENERAL INFORMATION AND HISTORICAL BACKGROUND......................................... | 12 |
| 1.1 .............. History and Business Activities of the Debtor. ........................................................... | 12 |
| 1.2 Factors Leading to the Need for Bankruptcy Relief...................................................... | 14 |
| Article 2 THE PRE-PETITION PROCESS AND GENESIS OF THE CHAPTER 11 CASE ..................... | 19 |
| 2.1 The Debtor's Reasons for Negotiating this Pre-Packaged Plan. ................................. | 19 |
| 2.2 Plan Negotiations. ........................................................................................................ | 20 |
| 2.3 Formation of the ACC.................................................................................................... | 22 |
| 2.4 Finalization of the CE Plan and Plan. ......................................................................... | 22 |
| 2.5 Selection of the Lummus Future Claimants' Representative. ..................................... | 23 |
| 2.6 Prefiling Transactions in Contemplation of the Plan. ................................................ | 24 |
| 2.7 Retention of Professionals by the Debtor...................................................................... | 25 |
| 2.8 Agreements with Settling Asbestos Insurance Companies. ........................................ | 26 |
| Article 3 THE COMPANY: CORPORATE STRUCTURE AND MANAGEMENT.................................. | 27 |
| 3.1 Current Management of the Debtor. .............................................................................. | 27 |
| 3.2 Directors and Officers of the Reorganized Debtor........................................................ | 27 |
| 3.3 Debt and Equity Structure. ........................................................................................... | 28 |
| Article 4 ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE.................................................. | 29 |
| 4.1 Commencement of the Chapter 11 Case. ....................................................................... | 29 |
| 4.2 Administration of the Chapter 11 Case. ........................................................................ | 29 |
| 4.3 Creditors' Committee..................................................................................................... | 31 |
| 4.4 Bankruptcy Court Approval of the Selection of the Lummus Future Claimants' Representative. | 31 |
| 4.5 Non-Asbestos Legal Proceedings. ................................................................................. | 31 |
| 4.6 Confirmation Hearing. ................................................................................................... | 31 |
| 4.7 Preferences and Fraudulent Conveyance Actions. ....................................................... | 31 |
| 4.8 Additional Information. .................................................................................................. | 33 |
| Article 5 SUMMARY OF THE PLAN................................................................................................... | 34 |
| 5.1 General........................................................................................................................... | 34 |
| 5.2 Classification.................................................................................................................. | 34 |
| | Page |
| 5.3 Treatment of Administrative Expense Claims and Tax Claims. .................................. | 34 |

5.4 Treatment of Claims and Equity Interests. ................................................................. 35

5.5 Modification, Revocation, or Withdrawal of the Plan. ............................................. 37

5.6 Insurers' Rights. ...................................................................................................... 38

5.7 Implementation of the Plan. ..................................................................................... 38

5.8 Executory Contracts, Unexpired Leases, Insurance Agreements, and Benefits Program. ......... 46

5.9 Retention of Jurisdiction. ......................................................................................... 47

5.10 Miscellaneous Provisions of the Plan. ..................................................................... 49

Article 6 LUMMUS ASBESTOS PI TRUST AND LUMMUS ASBESTOS PI TRUST CLAIMS
   RESOLUTION MATTERS .................................................................................... 54

6.1 The Trustee of the Lummus Asbestos PI Trust. ......................................................... 54

6.2 Appointment of Trust Advisory Committee Members. ............................................... 54

6.3 Funding of the Lummus Asbestos PI Trust. ............................................................... 54

6.4 Indemnification and Release of OGP Protected Parties, Structured Finance Parties, ABB Indemnified
   Parties and Alstom Protected Parties. ....................................................................... 55

6.5 Establishment of the Lummus Asbestos PI Trust Distribution Procedures. .................... 55

Article 7 ESTIMATED CLAIMS BY CLASS .......................................................................... 56

7.1 Claims Other Than Lummus Asbestos PI Trust Claims. ............................................. 56

7.2 Lummus Asbestos PI Trust Claims. .......................................................................... 58

Article 8 VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION AND
   CONSUMMATION OF THE PLAN. ....................................................................... 59

8.1 Acceptance or Rejection of the Plan. ....................................................................... 59

8.2 Confirmation Hearing. ............................................................................................. 61

8.3 Requirements for Confirmation. .............................................................................. 62

Article 9 RISKS OF THE PLAN ........................................................................................... 69

9.1 General. ................................................................................................................... 69

9.2 Voting and Confirmation Risks. ............................................................................... 69

9.3 Ability to Meet Prefiling Conditions. ......................................................................... 69

9.4 Variance from Financial Projections. ........................................................................ 70

9.5 Insurance Coverage for Lummus Asbestos PI Trust Claims. ...................................... 70

9.6 Distributions under the Lummus Asbestos PI Trust Distribution Procedures. ............... 70

9.7 Federal Income Tax Consequences of the Plan. ........................................................ 70

9.8 Federal Income Tax Consequences of the Plan to Affected Claimants. ...................... 71

9.9 Federal Income Tax Consequences of the Plan to the Debtor. ................................... 71

9.10 Risk of Post-Confirmation Default. .......................................................................... 71

Page

9.11    Appointment of Different Asbestos Claimants' Committee and/or Additional Committee. ..... 71

9.12    Appointment of Different Lummus Future Claimants' Representative. ....................... 71

9.13    Potential Adverse Effects of a Prolonged Chapter 11 Proceeding. ........................... 72

9.14      Risks Associated with Business Operations of Lummus. ........................................................... 72

Article 10 ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........... 75

10.1      Liquidation under Chapter 7. .................................................................................................. 75

10.2      Alternative Plan of Reorganization. ...................................................................................... 75

10.3      Dismissal. ................................................................................................................................. 76

Article 11 CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................... 77

11.1      IRS Circular 230 Disclosure. ................................................................................................. 77

11.2      Tax Consequences to the Debtor. ......................................................................................... 77

11.3      Transfers to the Lummus Asbestos PI Trust. ...................................................................... 78

11.4      Tax Consequences to the Lummus Asbestos PI Trust. ...................................................... 78

11.5      Tax Consequences to Holders of Claims. ............................................................................ 79

11.6      Importance of Obtaining Professional Tax Assistance. ..................................................... 79

Article 12 FINANCIAL INFORMATION ........................................................................................ 80

12.1      General. .................................................................................................................................... 80

12.2      Reorganized Debtor's Financial Projections. ...................................................................... 80

Article 13 SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD        USED
........................................................................................................................................................ 81

13.1      Sources of Information. ........................................................................................................... 81

13.2      Accounting Method. ................................................................................................................ 81

## EXHIBITS

| Exhibit Designation | Exhibit Title | |
|---|---|---|
| *Exhibit A* | Glossary of Terms for the Plan Documents Pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. | |
| *Exhibit B* | Prepackaged Plan of Reorganization of ABB Lummus Global Inc. | |
| | **_Plan Exhibit A_** | ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) (with exhibits) |
| | **_Plan Exhibit B_** | Non-Debtor Affiliates |
| | **_Plan Exhibit C_** | Alstom and Alstom NV Affiliates |
| | **_Plan Exhibit D_** | Lummus Asbestos PI Trust Agreement |
| | **_Plan Exhibit E_** | Lummus 524(g) Asbestos PI Trust Distribution Procedures |
| | **_Plan Exhibit F_** | Subject Lummus Insurance Policies |
| | **_Plan Exhibit G_** | Subject Lummus Insurance Settlement Agreements |
| | **_Plan Exhibit H_** | Holders of Settled Asbestos Claims |
| *Exhibit C* | Former Names Used by the Debtor and the Names of Entities Now Dissolved or Merged into the Debtor | |
| *Exhibit D* | Curriculum Vitae of Richard B. Schiro, the Lummus Future Claimants' Representative | |
| *Exhibit E* | Biographical Data on the Proposed Directors and Executive Officers of the Reorganized Debtor | |
| *Exhibit F* | Debtor's Liquidation Analysis | |
| *Exhibit G* | Debtor's Financial Statements for the year ended December 31, 2004 | |
| *Exhibit H* | Debtor's Financial Projections | |

## INTRODUCTION

You have been sent this Disclosure Statement (prior to the commencement of the Chapter 11 Case) because Lummus is asking you to vote on the approval of the Plan attached as *Exhibit B* to this Disclosure Statement. The Debtor and ABB are commencing this Solicitation after extensive discussions with, and the Plan is the product of extensive negotiations with: (a) the ACC; (b) the Lummus Future Claimants' Representative; (c) the CCC; (d) the CE Official Creditors' Committee; and (e) the CE Future Claimants' Representative. The Debtor, ABB, the ACC, the Lummus Future Claimants' Representative, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative support the Plan and strongly urge you to vote to accept the Plan.

If creditors in the Classes affected by the Plan (Classes 5, 6, and 7) vote in sufficient numbers and amounts to allow approval of the Plan under applicable law, and certain prefiling conditions are satisfied, the Debtor intends to seek board approval to file the Chapter 11 Case to implement the Plan. Please consult the Glossary, attached as *Exhibit A* to this Disclosure Statement, for the meaning of defined terms.

This Disclosure Statement is being transmitted to you in order to provide adequate information to enable holders of Lummus Asbestos PI Trust Claims (each a "Lummus Asbestos PI Trust Claimant" and collectively, the "Lummus Asbestos PI Trust Claimants"), holders of Non-Debtor Affiliate Intercompany Claims, and holders of Equity Interests, who are impaired under the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code. In addition, because all Lummus Asbestos PI Trust Claims will be channeled into and addressed by the Lummus Asbestos PI Trust following the Effective Date of the Plan, this Disclosure Statement is being transmitted in order to provide adequate information to enable all holders of Lummus Asbestos PI Trust Claims to make an informed judgment in exercising their right to vote to accept or reject the Plan under Section 524(g) of the Bankruptcy Code.

The Debtor believes that this Solicitation and the pre-packaged Plan will significantly simplify, shorten, and reduce the cost of the administration of, and minimize disputes during, the Chapter 11 Case. The Debtor also believes that this Solicitation and the pre-packaged Plan will (a) minimize any potential disruption of its business, as well as the businesses of its Affiliates, that could result from a traditional bankruptcy case, which could be contested and protracted and (b) maximize the assets available to compensate Lummus Asbestos PI Trust Claimants.

The filing of the Chapter 11 Case is contingent upon the satisfaction of the following prefiling conditions:

- acceptance of the Plan in the amounts and numbers required under Section 1126 and Section 524(g) of the Bankruptcy Code, and, in the Debtor's sole discretion, by one-hundred percent (100%) in number of the Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan;

- the entry of a Final Order in the CE Bankruptcy Case (a) approving the Combustion Engineering disclosure statement (the "CE Disclosure Statement") as having adequate information, (b) approving the Combustion Engineering solicitation procedures as having been in compliance with Section 1126(b) of the Bankruptcy Code, and (c) confirming the Combustion Engineering plan of reorganization (the "CE Plan");

- a finding by the Bankruptcy Court in the CE Bankruptcy Case that the dependency of the CE Effective Date upon the occurrence of the Lummus Effective Date does not render the CE Plan unfeasible;

- the express written agreement by parties with standing in the Chapter 11 Case, including, but not limited to, all representatives of Lummus Asbestos PI Trust Claimants, the Lummus Future Claimants' Representatives, the ACC, and Lummus Asbestos Insurance Entities, that they will not object to confirmation of the Plan and will not object to the related Plan Documents;

- the Debtor has determined, in its sole discretion, that no material change in the case law and legislation pertaining to asbestos, including, but not limited to, the passage of the FAIR Act (collectively, a "Legal Change Event"), has occurred or likely will occur, which will have the effect of impairing the Debtor's ability to promptly confirm the Plan; and

- approval by the Debtor's board of directors to file and implement the Chapter 11 Case.

If the Debtor does not receive one hundred percent (100%) acceptance of the Plan by the Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan or if the other required prefiling conditions that are identified above are not met, the Debtor may elect not to proceed with the filing of the Chapter 11 Case and instead may pursue other alternatives outside of bankruptcy.

## OVERVIEW OF THE PROPOSED PLAN

The following is a brief summary of certain information contained in this Disclosure Statement and the Plan. The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement, the Plan, and the exhibits attached hereto and thereto. Please read this entire Disclosure Statement and the Plan carefully before deciding how to vote because your rights may be affected by the implementation of the Plan.

### A.    WHICH ENTITIES WILL BE INCLUDED IN THE CHAPTER 11 FILING?

ABB Lummus Global Inc. will be the only Debtor in the Chapter 11 Case. No other Affiliates or Subsidiaries of Lummus will be part of the Chapter 11 filing.

### B.    WHAT DOES THE PLAN DO?

If approved, the Plan will implement a prepackaged plan of reorganization that will address the asbestos-related personal injury liabilities of the Debtor and the Asbestos Protected Parties. The Plan provides for the issuance of the Lummus Asbestos PI Channeling Injunction pursuant to Sections 105 and 524(g) of the Bankruptcy Code that will result in the channeling of all asbestos-related personal injury liabilities of Lummus and the other Asbestos Protected Parties, including ABB Lummus Global Construction Co. ("Lummus Construction"), a former Affiliate of Lummus that was merged into Lummus on or about June 28, 2005 and ABB Lummus Global International Corporation ("Lummus International"), a wholly owned Subsidiary of Lummus, into the Lummus Asbestos PI Trust.

### C.    WHAT IS A PREPACKAGED PLAN OF REORGANIZATION?

A prepackaged plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because the solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.

Because the Debtor has not yet filed its Chapter 11 Case, it has the right to choose not to commence the case if the Plan fails to be approved by one-hundred percent (100%) of the Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan or if other prefiling conditions are not met.

### D.    WHY DOES THE DEBTOR NEED TO FILE FOR BANKRUPTCY PROTECTION TO IMPLEMENT THE PLAN?

The Plan is being implemented through a Chapter 11 bankruptcy filing in order for the Debtor to utilize statutory protections available only in bankruptcy and to ensure that the resulting resolution can be global rather than piecemeal.

The Debtor made the decision to file for Chapter 11 as part of a settlement with other parties in interest that will ultimately resolve the independent asbestos-related personal injury liability of the Debtor that otherwise could not be resolved through the plan of reorganization of Combustion Engineering, Inc. (hereinafter referred to as "CE" or "Combustion Engineering"), an Affiliate of the Debtor (bankruptcy case pending before the United States Bankruptcy Court for the District of Delaware, Case Number 03-10495-JKF).

Because of the relationship between the Debtor and CE and the nature of the global settlement, the filing of the Debtor's Chapter 11 Case and the confirmation of the Plan are integrally tied to the confirmation of the CE Plan in the CE Bankruptcy Case. A successful resolution of the CE Bankruptcy Case and the Chapter 11 Case will enable the Debtor, CE, and the other Asbestos Protected Parties to obtain the benefits of the provisions of Sections 105 and 524(g) of the Bankruptcy Code, including injunctive protections that would preclude all present and future claimants from asserting asbestos-related personal injury claims against them.

The Chapter 11 Case will be a related case to the CE Bankruptcy Case.

### E.    IS THE ABILITY TO RESOLVE LUMMUS' ASBESTOS LIABILITY THROUGH A PREPACKAGED PLAN OF REORGANIZATION DEPENDENT UPON THE SUCCESS OF COMBUSTION ENGINEERING'S PLAN OF REORGANIZATION?

Yes. The Chapter 11 filing of Lummus to resolve its asbestos-related personal injury liabilities is dependent upon the entry of a Final Order confirming the CE Plan, in addition to the satisfaction of certain other prefiling conditions.

### F.    WHAT PERSONS WILL BE AFFECTED BY THE PLAN?

If the Plan is approved, confirmed, and becomes Effective, the Plan will affect the rights of:

- persons who have asserted or may assert at some future time a Lummus Asbestos PI Trust Claim against the Debtor;

- persons who have asserted or may assert at some future time a Lummus Asbestos PI Trust Claim against one or more of the other Asbestos Protected Parties arising out of the same or similar conduct or events that gave rise to present claims against the Debtor;

- persons or entities holding Non-Debtor Affiliate Intercompany Claims; and

- persons or entities holding Equity Interests.

All other obligations of the Debtor are unimpaired under the Plan and may be satisfied in accordance with the terms of the Plan and applicable non-bankruptcy law. Prior to the Petition Date, the Debtor intends to make pre-payments to its ordinary course creditors to satisfy contractual debts estimated to be due on or about the filing of the Chapter 11 Case. Alternatively, if the Debtor does not make such pre-payments, the Debtor will file a formal application with the Bankruptcy Court on the Petition Date seeking authorization to pay such pre-petition obligations. Prior to and during the Chapter 11 Case, the Debtor intends to fully honor all foreign and domestic technology-related contracts, licenses, and engineering, procurement, construction, and services contracts with its customers.

## G.    HOW WILL THE PLAN BE ACCOMPLISHED?

The essential elements of the Plan are:

- the creation of the Lummus Asbestos PI Trust which will (a) possess the features of, and upon the confirmation of the Plan, is intended to be established as a QSF in accordance with the Treasury Regulations under Section 468B of the IRC, (b) assume the Debtor's and other Asbestos Protected Parties' liabilities with respect to all Lummus Asbestos PI Trust Claims, and (c) use Lummus Asbestos PI Trust Assets and income to pay Lummus Asbestos PI Trust Claims in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures;

- the funding of the Lummus Asbestos PI Trust with the Lummus Asbestos PI Trust Assets, which are to be delivered to the Lummus Asbestos PI Trust by ABB and Lummus;

- assumption by the Lummus Asbestos PI Trust of all liability for all Lummus Asbestos PI Trust Claims asserted or assertable against the Asbestos Protected Parties (including claims arising by contract or operation of law giving the holder of such claims the right to seek indemnification from one of the Asbestos Protected Parties for asbestos-related personal injury liabilities);

- liquidation of unliquidated Lummus Asbestos PI Trust Claims under the Lummus Asbestos PI Trust Distribution Procedures that will be implemented by the Lummus Asbestos PI Trust;

- the payment of Lummus Asbestos PI Trust Claims by the Lummus Asbestos PI Trust in a manner designed to ensure fair and equitable treatment of present and future holders of Lummus Asbestos PI Trust Claims;

- the procedure for addressing and resolving Disputed Claims;

- discharge of the Debtor from all present and future asbestos-related personal injury liabilities;

- the issuance of the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction barring the assertion of Lummus Asbestos PI Trust Claims (including Claims for indemnification of asbestos-related liabilities against any of the Asbestos Protected Parties);

- the governance and management of the Reorganized Debtor; and

- the retention of jurisdiction by the Bankruptcy Court.

## H.    WHEN WILL THE CHAPTER 11 CASE BE FILED?

The filing of the Chapter 11 Case is contingent upon the satisfaction of a number of prefiling conditions, including:

- acceptance of the Plan in the amounts and numbers required under Section 1126 of the Bankruptcy Code and by one-hundred percent (100%) in number of Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan (which heightened voting requirement may be waived by Lummus in its sole discretion);

- the entry of a Final Order in the CE Bankruptcy Case (a) approving the CE Disclosure Statement, (b) approving the CE solicitation procedures, and (c) confirming the CE Plan;

- a finding by the Bankruptcy Court in the CE Bankruptcy Case that the dependency of the CE Effective Date upon the occurrence of the Lummus Effective Date does not render the CE Plan unfeasible;

- the express written agreement by the parties with standing in the Chapter 11 Case, including, but not limited to, all representatives of Lummus Asbestos PI Trust Claimants, the Lummus Future Claimants' Representatives, the ACC, and Lummus Asbestos Insurance Entities, that they will not object to confirmation of the Plan and will not object to the related Plan Documents;

- the Debtor has determined, in its sole discretion, that no Legal Change Event has occurred or likely will occur which will have the effect of impairing the Debtor's ability to promptly confirm the Plan; and

- approval by the board of directors of the Debtor to file the Chapter 11 Case.

At present, it is expected that these and other prefiling conditions can be satisfied and the Chapter 11 Case will be filed by December 2005. The delay, however, between the Solicitation Date and the filing of the Chapter 11 Case is dependent in large part on how quickly the conditions set forth above are satisfied. Consequently, it will be an indeterminate number of months from the time that you vote on the Plan to the time that the Debtor actually files its Chapter 11 petition.

## I.    WHAT WILL HAPPEN ONCE THE CHAPTER 11 CASE IS FILED?

If the Chapter 11 Case is filed, the Debtor will operate under bankruptcy protection for a period of time, pending a hearing on confirmation of the Plan and approval of this Disclosure Statement and the solicitation procedures used by the Debtor. In a chapter 11 case, a debtor's management typically remains in control of, and continues to operate, the company during this period. The Debtor fully expects that its management will remain in control during the duration of the Chapter 11 Case.

In connection with the Confirmation Hearing, the Bankruptcy Court will set deadlines for objections to (i) the adequacy of information contained in this Disclosure Statement, (ii) the solicitation procedures used by the Debtor, and (iii) confirmation of the Plan. Notice of these deadlines will be posted on the Debtor's restructuring-information website: *www.lummus-restructuring.com* and served on interested parties in accordance with the directives of the Bankruptcy Court. Then, the Court will determine whether the Plan can be confirmed, and if such determination is made, the Court will enter a Lummus Confirmation Order. Shortly, thereafter, if the Lummus Confirmation Order is entered by the Bankruptcy Court, the District Court will be asked to affirm the decision. Once all conditions to the effectiveness of the Plan are met, the Debtor will emerge from bankruptcy.

## J.    WHEN WILL I BE PAID ON MY CLAIM?

If the Plan is confirmed by the Bankruptcy Court and becomes effective, Lummus Asbestos PI Trust Claimants will receive payment on account of their Lummus Asbestos PI Trust Claims from the Lummus Asbestos PI Trust in accordance with the Lummus TDP and the Lummus Asbestos PI Trust Agreement. Because the Plan confirmation process is subject to many contingencies, it is difficult to predict exactly when initial distributions to Lummus Asbestos PI Trust Claimants will be made.

The timing of distributions to individual Lummus Asbestos PI Trust Claimants also is dependent on the completion of the claim liquidation process. Creditors other than Lummus Asbestos PI Trust Claimants will be paid in full (or with other value in accordance with the customary arrangements between the relevant parties) on the Distribution Date or, if later, the date on which such obligations ordinarily would become due in the case of contract claims.

## K.    WHAT IS A LUMMUS TDP?

The Lummus TDP to be established and adopted by the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Trust Agreement will be used to assign a value to all Lummus Asbestos PI Trust Claims that are determined under the Lummus TDP and to determine the timing and amount of payments to be made in respect of Lummus Asbestos PI Trust Claims. In addition to promptly resolving Lummus Asbestos PI Trust Claims, it is anticipated that the Lummus TDP will significantly reduce expenses, which expenses would otherwise reduce the Lummus Asbestos PI Trust Assets that are

available for distribution to holders of Lummus Asbestos PI Trust Claims. All holders of Lummus Asbestos PI Trust Claims will benefit from such cost savings through the maximization of the Lummus Asbestos PI Trust Assets which are to be used for the payment of Lummus Asbestos PI Trust Claims.

**L.    WILL THE DEBTOR BE LIQUIDATED OR GO OUT OF BUSINESS DURING THE CHAPTER 11 CASE?**

No. The Debtor will not be liquidated or go out of business during the course of the Chapter 11 Case. Once the Reorganized Debtor emerges from bankruptcy, it is intended that the Reorganized Debtor will continue to operate as before bankruptcy, but from a more stable and certain business and financial position because the Lummus Asbestos PI Channeling Injunction entered in the Chapter 11 Case will protect Lummus' business from the uncertainty of asbestos-related personal injury claims and all associated litigation.

**M.    WILL THE PLAN OR THE CHAPTER 11 CASE IMPACT NON-U.S. OPERATIONS?**

No. The business operations of the Debtor outside of the United States will continue as if no bankruptcy case was taking place. Non-Debtor operating Subsidiaries or Affiliates of the Debtor will not seek bankruptcy protection or institute liquidation, administration, receivership, or winding-up proceedings outside of the United States.

**N.    WHAT IMPACT WILL THE CHAPTER 11 CASE HAVE ON LUMMUS' EMPLOYEES?**

None. The Debtor's Chapter 11 Case will have no impact on its employees. There will be no employee layoffs resulting from the Chapter 11 filing, and all salaries and benefits, including retirement benefits, will remain untouched and unchanged.

**O.    HOW WILL THE CHAPTER 11 CASE AFFECT LUMMUS' DAY-TO-DAY BUSINESS OPERATIONS?**

The only people that will be affected on a day-to-day basis are the attorneys and the Debtor's other employees who are dedicated solely to resolving the company's asbestos-related issues. The Debtor's business will continue to operate in the normal course of business without interruption.

## SUMMARY OF THE VOTING PROCEDURES

At this time, the Debtor has not commenced its Chapter 11 Case. Rather, the Debtor is soliciting acceptances of the Plan from holders of Class 5 Lummus Asbestos PI Trust Claims, holders of Class 6 Non-Debtor Affiliate Intercompany Claims, and holders of Class 7 Equity Interests, which are the only Classes of Claims entitled or eligible to vote on the Plan.

### A.    WHO CAN VOTE?

Only holders of Class 5 Lummus Asbestos PI Trust Claims, holders of Class 6 Non-Debtor Affiliate Intercompany Claims, and holders of Class 7 Equity Interests are entitled or eligible to vote. The Debtor is sending Ballots with voting instructions and copies of this Disclosure Statement to (a) all known holders of Lummus Asbestos PI Trust Claims for whom it has names and addresses, or the authorized legal representatives of such claimants, (b) holders of Non-Debtor Affiliate Intercompany Claims, and (c) holders of Equity Interests.

Holders of Non-Debtor Affiliate Intercompany Claims in Class 6 and holders of Equity Interests in Class 7 under the Plan have indicated their intention to vote in favor of the Plan.

An individual or entity that has a right whether by contract, warranty, or operation of law to be indemnified by, or seek contribution from, the Debtor for asbestos-related personal injury liabilities asserted against it holds an impaired indirect indemnification claim (a Lummus Derivative Asbestos Personal Injury Claim), which is included within the definition and will receive the treatment afforded Class 5 Lummus Asbestos PI Trust Claimants under the Plan, and, is therefore, entitled or eligible to vote to accept or reject the Plan.

### B.    WHAT IS THE REQUISITE VOTING REQUIREMENT?

If at least two-thirds in amount and more than one-half in number of the Claims of each impaired Class of Claims that have voted on the Plan vote to accept the Plan, and one-hundred percent (100%) of the Lummus Asbestos PI Trust Claims to be channeled into and addressed by the Lummus Asbestos PI Trust that have voted on the Plan vote to accept the Plan, and such votes are received (and not revoked) by the Voting Deadline (the "Requisite Acceptances") and certain other prefiling conditions are satisfied, the Debtor expects to commence its Chapter 11 Case and to seek confirmation of the Plan. If the Debtor does not receive the Requisite Acceptances by the Voting Deadline, it may elect not to proceed with the filing of the Chapter 11 Case and may instead pursue other alternatives.

### C.    WHAT IS THE VOTING DEADLINE?

**IN ORDER TO BE COUNTED FOR VOTING PURPOSES, BALLOTS FOR THE ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PHYSICALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 12:00 P.M., E.D.T., ON SEPTEMBER 26, 2005, UNLESS THE DEBTOR, IN ITS SOLE DISCRETION, AND FROM TIME TO TIME, EXTENDS THE VOTING DEADLINE.**

### D.    WHERE AND HOW DO I RETURN MY BALLOT?

If you have not made written arrangements to vote through your attorney, your Ballot should be returned to the Voting Agent at:

**Lummus Ballot Processing, c/o BSI, 757 Third Avenue, Third Floor, New York, NY 10017 (for Ballots sent by hand delivery or overnight mail)**

*or*

**Lummus Ballot Processing, c/o BSI, P.O. Box 5014, FDR Station, New York, NY 10150-5014 (for Ballots sent by U.S. Mail)**

If you are not having your attorney vote for you, you must sign and return the Ballot accompanying this Disclosure Statement to the Debtor's Voting Agent in order to have your vote count. Any person or Entity entitled to vote for the acceptance or rejection of the Plan may return his, her, or its Ballot by mail, hand delivery, or overnight courier. A self-addressed envelope is included in the solicitation materials for your convenience.

### E.    CAN MY ATTORNEY VOTE FOR ME?

Yes. If you have (a) authorized your attorney to vote for you by executing a power of attorney and (b) not subsequently changed those arrangements, your attorney may vote as your agent. If your attorney votes for you, you do not need to complete a Ballot. If you have not authorized your attorney to vote for you, only you may vote on the Plan.

**F.     IF I AM AN ATTORNEY VOTING ON BEHALF OF MY CLIENT, WHAT DO I NEED TO DO?**

Attorneys voting on behalf of their clients must use and complete the official master Ballot for Class 5 Lummus Asbestos PI Trust Claims. Each master Ballot must be signed by an attorney under penalty of perjury on behalf of his or her firm. Attorneys may vote only for those clients from whom the attorney has obtained authorization to do so. If you need extra copies of this Disclosure Statement for your clients or need to obtain Ballots to enable your clients to vote individually, please contact the Voting Agent or access the Debtor's restructuring-information website at: *www.lummus-restructuring.com*.

Master Ballots cast by an attorney on behalf of his or her clients must be received by the Debtor's Voting Agent at the address listed on the Ballot on or before the Voting Deadline. Attorneys that cast Ballots also must provide copies of any documents that authorize them to vote on behalf of a Claimant (*e.g.*, a valid power of attorney). Master Ballots may be returned by mail, hand delivery, or overnight courier. Please allow enough time for delivery.

**G.     WHAT DO I DO IF I HAVE A RIGHT TO BE INDEMNIFIED BY THE DEBTOR FOR ASBESTOS-RELATED PERSONAL INJURY LIABILITIES ASSERTED AGAINST ME?**

If you have a right whether by contract, warranty, or operation of law to be indemnified by, or seek contribution from, the Debtor for asbestos-related personal injury liabilities asserted against you, your indemnification claim (a Lummus Derivative Asbestos Personal Injury Claim) is included within the definition and will receive the treatment afforded Class 5 Lummus Asbestos PI Trust Claims under the Plan. You are eligible to vote to accept or reject the Plan. To do so, you should complete the Ballot that accompanies this Disclosure Statement and return it to the Voting Agent at the address listed on the Ballot (the same address that is set forth below), so that it is received on or before the Voting Deadline. Ballots may be returned by mail, hand delivery, or overnight courier. A self-addressed envelope is included for your convenience.

**H.     WHAT DO I DO IF I DID NOT RECEIVE A BALLOT WITH MY SOLICITATION PACKAGE OR NEED A REPLACEMENT BALLOT?**

If you are a creditor entitled to vote on the Plan and (1) did not receive a Ballot, (2) received a damaged Ballot, or (3) lost your Ballot (and you are not voting through your attorney), please contact the Debtor's Voting Agent.

Extra Ballots also may be printed or downloaded at no charge to you from the Debtor's restructuring-information website: *www.lummus-restructuring.com*.

You should contact your attorney or the Debtor's Voting Agent if you have any questions about the Plan voting procedures at 1-888-498-7765.

## SUMMARY DESCRIPTION OF CLAIMS AND DESCRIPTION OF DISTRIBUTIONS TO OR TREATMENT OF HOLDERS OF CLAIMS AND EQUITY INTERESTS

The chart below summarizes the treatment of each Class of Claims and Equity Interests. The chart is qualified in its entirety by reference to the more detailed and complete descriptions set forth in the Plan and Section 5.4 of this Disclosure Statement — "Treatment of Claims and Equity Interests." A summary description of the timing of distributions to be made in respect of Lummus Asbestos PI Trust Claims is set forth in Section 6.5 of this Disclosure Statement — "Establishment of the Lummus Asbestos PI Trust Distribution Procedures."

### (a) Unclassified Claims.

| DESCRIPTION OF CLAIMS | DESCRIPTION OF DISTRIBUTION OR TREATMENT UNDER THE PLAN |
|---|---|
| Administrative Expense Claims. | Subject to the provisions of Sections 330(a), 331, and 503 of the Bankruptcy Code, the Allowed Amount of each Administrative Expense Claim shall be paid either (a) in full, in Cash, by the Reorganized Debtor, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be agreed upon by the holder of an Administrative Expense Claim and the Reorganized Debtor or otherwise upon order of the Bankruptcy Court; *provided, however,* that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession on or after the Petition Date or assumed by the Debtor in Possession pursuant to the Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court. |
| Tax Claims. | Each holder of an Allowed Tax Claim shall be paid the Allowed Amount of its Allowed Tax Claim, at the option of the Reorganized Debtor, either (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Tax Claim and the Reorganized Debtor. |
| | Notwithstanding any provision of the Plan or the Lummus Confirmation Order to the contrary, (a) interest shall accrue on IRS Allowed Tax Claims at the rate set forth in 26 U.S.C. § 6621; (b) confirmation of the Plan shall not affect the setoff rights of the United States; and (c) the non-Debtor third party release and injunction provisions set forth in the Plan shall not apply to claims of the United States. |

### (b) Classified Claims and Equity Interests.

| DESCRIPTION OF CLAIMS | DESCRIPTION OF DISTRIBUTION OR TREATMENT UNDER THE PLAN |
|---|---|
| Class 1 – Priority Claims. | Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) the date such Allowed Priority Claim becomes an Allowed Priority Claim unless otherwise agreed to by the Reorganized Debtor and the holder of an Allowed Priority Claim. |

| DESCRIPTION OF CLAIMS | DESCRIPTION OF DISTRIBUTION OR TREATMENT UNDER THE PLAN |
|---|---|
| | Class 1 Claims are unimpaired. The holders of Allowed Claims in Class 1 are deemed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan. |
| Class 2 – Secured Claims. | Each holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of an Allowed Secured Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Sections 1124(2)(A)-(D) of the Bankruptcy Code. |
| | Class 2 Claims are unimpaired. The holders of Claims in Class 2 are deemed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan. |
| Class 3 – Workers' Compensation Claims. | Each holder of an Allowed Claim in Class 3 shall be paid in the ordinary course pursuant to such rights that existed under any state workers' compensation system or laws applicable to such Claims. |
| | Class 3 Claims are unimpaired. The holders of Claims in Class 3 are deemed to have accepted the |

Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

| | |
|---|---|
| **Class 4 – General Unsecured Claims (including Settled Asbestos Claims).** | Each holder of a Claim in Class 4 shall be paid by the Reorganized Debtor in full, in Cash, the Allowed Amount of the General Unsecured Claim on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of a General Unsecured Claim. |
| | Class 4 Claims are unimpaired. The holders of Claims in Class 4 are deemed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan. |
| **Class 5 – Lummus Asbestos PI Trust Claims.** | All Lummus Asbestos PI Trust Claims shall be subject to the Lummus Asbestos PI Channeling Injunction. All Lummus Asbestos PI Trust Claims, other than Settled Asbestos Claims, shall be evaluated, determined, and paid (if and to the extent entitled to payment), pursuant to the terms, provisions, and procedures of the Lummus Asbestos PI Trust Distribution Procedures. The Lummus Asbestos PI Trust will be funded in accordance with the provisions of Article 7 of the Plan and the Lummus Asbestos PI Trust Agreement. |
| | Class 5 Claims are impaired. Each holder of a Claim in Class 5 shall be entitled to vote to accept or reject the Plan. |
| **Class 6 – Non-Debtor Affiliate Intercompany Claims.** | All Non-Debtor Affiliate Intercompany Claims will be paid in full subject to the subordination provisions set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus). |

| DESCRIPTION OF CLAIMS | DESCRIPTION OF DISTRIBUTION OR TREATMENT UNDER THE PLAN |
|---|---|
| | Class 6 Claims are impaired. Each holder of an Allowed Claim in Class 6 shall be entitled to vote to accept or reject the Plan. |
| **Class 7 – Equity Interests.** | On the Effective Date, holders of Class 7 Equity Interests shall retain such interests in the Debtor, subject to the pledge and security interest in fifty-one percent (51%) of the issued and outstanding shares of Capital Stock of the Debtor, which will be held by ABB Oil & Gas as of the Effective Date, to secure the Lummus Note and the guaranty provided by ABB, ABB Holdings, and ABB Oil & Gas with respect to the Debtor's payment obligations under the Lummus Note. |
| | Class 7 is impaired. Each holder of an Allowed Claim in Class 7 shall be entitled to vote to accept or reject the Plan. |

**The Debtor believes that it is in the best interests of creditors in Classes 5, 6, and 7 to vote to accept the Plan because the Plan fairly and equitably treats all holders of Claims by providing the earliest possible and maximum recovery to such persons. In addition, ABB, the ACC, the Lummus Future Claimants' Representative, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative support the Plan and recommend that you vote to accept the Plan.**

## Article 1

## GENERAL INFORMATION AND HISTORICAL BACKGROUND

### 1.1  History and Business Activities of the Debtor.

The Debtor that is the proposed subject of the Chapter 11 Case is a direct subsidiary of ABB Oil & Gas, which is an indirect Subsidiary of ABB. A brief description of the history and business of the Debtor is set forth below, and a list of the principal prior names used by the Debtor and entities merged into the Debtor during its corporate existence, is set forth on *Exhibit C* to this Disclosure Statement. The organizational structure of the Debtor, as it will exist as of the Solicitation Date, will be:*



Legend

■ = Debtor entity

☐ = Non-Debtor entities

---

*   *Not all non-Debtor Affiliates are shown on the organizational chart.* **As of the Solicitation Date, ABB Oil & Gas is a wholly owned subsidiary of ABB Holdings. Prior to the filing of the Chapter 11 Case, however, ABB intends to effectuate an internal corporate restructuring whereby ABB Oil and Gas will be merged into ABB Holdings. *See* section 2.6(b) of this Disclosure Statement — "ABB Holdings and ABB Oil & Gas Merger."**

*(a) ABB Lummus Global Inc.*

*(1) Lummus' Corporate Organizational History.*

Lummus was founded in 1907 as The Walter E. Lummus Company until it was incorporated in Delaware in 1930 as The Lummus Company. Lummus was a provider of engineering and innovative, often proprietary, equipment for distillation, heat transfer, and other operations in petroleum and chemicals processing.

In 1930, Combustion Engineering, Inc., then known as The Locomotive Superheater Company and Babcock & Wilcox ("B&W") each purchased forty-five percent (45%) of the stock of The Lummus Company. The remaining shares, representing ten percent (10%) of the stock, were owned by employees of The Lummus Company. Also in 1930, the Oil Heater Division of The Lummus Company was founded. The Heat Transfer Division of The Lummus Company was formed in 1938. In 1964, these two groups were consolidated and are today known as the Lummus Heat Transfer Division.

In 1957, Combustion Engineering purchased B&W's forty-five percent (45%) interest in The Lummus Company, and in 1966, Combustion Engineering purchased the remaining ten percent (10%) of The Lummus Company from the company's employees. In 1983, The Lummus Company changed its name to Lummus Crest Inc.

As part of the 1990 acquisition of Combustion Engineering by ABB Holdings (as successor by merger to Asea Brown Boveri), Lummus Crest Inc. changed its name to ABB Lummus Crest Inc. In 1995, ABB Lummus Crest Inc. and Lummus Construction, a Subsidiary of ABB Lummus Crest Inc., were sold by Combustion Engineering to ABB Oil & Gas for total consideration in the amount of $200 million. The $200 million sale was comprised of the following transactions: (i) the U.S. subsidiaries were sold to ABB Oil & Gas for $115 million; (ii) the non-American subsidiaries were sold to ABB Oil and Gas Europe BV and ABB Lummus Global BV for $80 million; and (iii) the Lummus trademark was sold to ABB Asea Brown Boveri AS for $5 million. As part of this global transaction, ABB Lummus Crest Inc. changed its name to ABB Lummus Global Inc. simultaneous with the merger of ABB Global Engineering Inc. and ABB Lummus Crest Inc.

In 1998, Lummus became an indirect Subsidiary of ABB Holdings as part of a reconsolidation. Presently, Lummus is a wholly owned Subsidiary of ABB Oil & Gas, which is a direct Subsidiary of ABB Holdings and an indirect Subsidiary of ABB.

*(2) Lummus' Current Business Operations.*

Lummus currently provides contractor services, supplying proprietary technology, project management, and engineering, procurement, and construction services to the oil and gas, refining, and petrochemical industries.

The main divisions of Lummus are:

- <u>*Process Technology ("PT") Division*</u> — The PT division develops, licenses, and engineers proprietary process and heat transfer technologies, systems, and catalysts used for the refining, petrochemical, and gas processing industries. The PT division is focused on the licensing of conversion processes. These technologies are either wholly owned by Lummus or jointly owned through joint venture agreements with other catalyst companies, manufacturers, or other process licensing entities. The technologies are implemented through Lummus' engineering, procurement, and construction operations and/or licensed directly to facility owners or to other engineering, procurement, and construction contractors employed by such facility owners.

- <u>*Heat Transfer ("HT") Division*</u> — The activities of the HT division are particularly integrated in the worldwide licensing of Lummus' process technology through the PT division. The HT division supplies specialized heat transfer equipment and systems to the refining and petrochemical industries. The HT division's activities include the supply of engineering services, fired heaters, and other refining and petrochemical services. The following types of heat transfer equipment are designed by the HT division:

  - fired heaters;

  - shell and tube exchanges; and

  - air cooled exchangers

- <u>*Engineering, Procurement, and Construction ("EPC") Division*</u> — The EPC division is involved in engineering, procurement, and construction in the oil and gas, refining, and petrochemical industries. The EPC division undertakes both downstream and upstream projects under a number of contract structures. The downstream project business primarily covers engineering, procurement, and construction in connection with refineries and petrochemical facilities. The upstream project business focuses on engineering, procurement, and construction related to both onshore and offshore oil and gas production and processing facilities. The majority of the projects that the EPC division undertakes implements Lummus' proprietary processes and often utilizes the technology and products supplied by Lummus' Heat Transfer division. The EPC division also executes and undertakes engineering, procurement, and construction projects that implement owner and third party products and technologies.

Lummus is headquartered in Bloomfield, New Jersey and operates globally through ten wholly owned Subsidiaries and Affiliates. Lummus, including its Subsidiaries, Affiliates, and divisions, employs approximately 2,400 people worldwide.

*(3) Lummus' Relationship with Formerly Existing Oil, Gas, and Petrochemicals Division of ABB.*

Lummus was part of ABB's Oil, Gas, and Petrochemicals division (the "OGP Division"). The OGP Division provided products, systems, and services to the upstream market (oil and gas exploration, development, and operations) and process

technology and project services to the downstream market (refineries and petrochemical plants). Lummus was one operating unit of the OGP Division. The other operating units that comprised the OGP Division were ABB Vetco Gray, ABB Offshore Systems, and ABB OGP Brazil, all of which were sold by ABB.

**1.2    Factors Leading to the Need for Bankruptcy Relief.**

The goal of the Plan is to address in a comprehensive and fair manner, the asbestos-related personal injury liabilities asserted against the Debtor and other Asbestos Protected Parties, including, among others, Lummus International (a wholly owned Subsidiary of Lummus) and Lummus Construction (a former Affiliate of Lummus that was merged into Lummus on June 28, 2005).

*(a) Lummus' Asbestos Liability.*

In 1938, Lummus established a plant facility in Honesdale, Pennsylvania (the "Honesdale Plant") for the manufacture of heat transfer apparatus, including the manufacture of feedwater heaters for the power industry. The Honesdale Plant included complete facilities for the fabrication of all heat transfer and evacuating equipment. For a period of time between the mid-1940's until 1957, asbestos-containing products may have been included in the equipment and materials, including, heat transfer equipment, insulation materials, and gaskets that were used in the manufacture of feedwater heaters at the Honesdale Plant. Lummus provided contractor services for petroleum, chemical and/or petrochemical processing plant clients, at times installing its feedwater heat transfer apparatus at the client's facilities.

In 1957, Lummus sold the Honesdale Plant and all related business operations to Yuba Consolidated Gold Fields ("Yuba") and The Portuguese-American Tin Company, a subsidiary of Yuba. Lummus has had no involvement in the manufacture and sale of feedwater heaters subsequent to the sale of the Honesdale Plant.

The first asbestos-related personal injury cases were filed against Lummus in early 1991. The initial cases that asserted asbestos-related personal injury claims against Lummus were filed in New York and New Jersey and these claims alleged asbestos exposure arising from feedwater heaters that were manufactured at the Honesdale Plant, and, subsequently, installed at third party plant facilities in New York and New Jersey.

In 1997, CVCSC, a wholly owned Subsidiary of an ABB Holdings' Subsidiary, that was employed to handle the processing of the asbestos claims asserted against Lummus and its Affiliates, reached an administrative settlement agreement with two prominent asbestos plaintiffs' firms that represented individuals asserting asbestos-related personal injury claims against Lummus. Pursuant to the settlement agreement, all parties agreed to fixed settlement amounts based on the severity of each plaintiff's disease. The settlement amount payments remained contingent upon adequate product identification.

From 1991 through 1999, Lummus-related asbestos litigation was limited primarily to feedwater allegations in New York and New Jersey. The years following 1999, however, marked a dramatic change in the asbestos-related litigation landscape for Lummus.

*(1) Post 1999 Trends.*

As the universe of potential corporate targets began to shrink due to, among other things, the bankruptcy filings of entities to resolve their asbestos liabilities, Lummus began to be named in increased numbers of lawsuits across the country. After 1999, asbestos-related personal injury claims, which were at one time isolated to the jurisdictions of New York and New Jersey, quickly expanded to other jurisdictions, including, among others, California, Louisiana, and Texas. The majority of the asbestos cases asserting asbestos-related personal injury claims against Lummus are managed by ten asbestos plaintiffs' law firms.

*(2) Non-New York/New Jersey Asbestos-Related Cases.*

Unlike the cases pending or filed in New York and New Jersey, the cases filed in other jurisdictions have alleged that Lummus' liability arises out of its status as an independent contractor rather than as a manufacturer of asbestos-containing products. It is alleged that employees of Lummus and other third parties were exposed to asbestos during the construction of certain refineries and chemical plants. In certain instances, it is alleged that Lummus and/or certain of its Affiliates were involved in either the actual construction of the facilities or the design of the processing plants that allegedly contained asbestos products.

*(3) Asbestos Claims History.*

Since 1991, over 12,790 claims have been filed against Lummus, Lummus Construction, and Lummus International. The number of open asbestos-related personal injury claims pending against Lummus, Lummus International, and Lummus

Construction is approximately 11,011 as of August 25, 2005. The approximate breakdown of the open and pending asbestos-related personal injury claims by jurisdiction as of August 25, 2005 is:

| State | Number of Pending Claims |
|---|---|
| New York | 5,972 |
| New Jersey | 443 |
| Texas | 4,098 |
| Louisiana | 269 |
| California | 195 |
| All other states | 34 |

Lummus and Combustion Engineering are parties to various lawsuits as co-defendants based on their past shared insurance policy coverage for asbestos claims. The shared insurance policies provide Lummus and Combustion Engineering access to the same insurance coverage to reimburse them for defense costs, settlement, and court judgments that they pay to resolve asbestos claims. *See* Section 1.2(e) of this Disclosure Statement — "Lummus' Historical Liability Insurance Program."

### (b) Lummus Construction's and Lummus International's Asbestos Liability.

All of Lummus Construction's and Lummus International's asbestos-related personal injury liabilities are derivative of Lummus' historical business operations. Asbestos liabilities asserted against Lummus Construction and Lummus International consist of claims alleging injuries as a result of exposure to asbestos or asbestos-containing products used on construction and maintenance projects for refineries and chemical plants that were designed, constructed, or overseen by Lummus, Lummus Construction, and/or Lummus International from the 1940's through the 1960's throughout the United States.

#### (1) ABB Lummus Global International Corporation.

Lummus International is a Delaware corporation originally incorporated as ABB Lummus Crest North America, Inc. in 1992. ABB Lummus Crest North America, Inc. changed its name to LGR International Inc., in 1996 and took its current name in 1999. Historically, Lummus International has provided advisory services and operations training for pre- and post commissioned foreign oil and gas, refining, and petrochemical facilities. Presently, Lummus International is providing advisory services in Korea. Lummus International is a wholly owned subsidiary of Lummus.

#### (2) ABB Lummus Global Construction Co.

Lummus Construction was merged into Lummus on June 28, 2005 and such merger is described in greater detail in Section 2.6(a) of this Disclosure Statement. Lummus Construction was a Delaware corporation that was originally incorporated as Lummus Construction Company in 1972. Lummus Construction Company changed its name to ABB Lummus Construction Company in 1990, and thereafter, changed its name to Lummus Construction in 1996. Historically, Lummus Construction provided contractor services, project management, and construction services to the oil and gas, refining, and petrochemical industries when the underlying contracts required the use of unionized labor. In the years leading up to its merger with Lummus, Lummus Construction's business operations had generally been inactive.

### (c) Settled But Unpaid Lummus Asbestos Claims.

As of the Solicitation Date, there are approximately 1,400 claimants who, on or before February 17, 2003, have settled their Lummus Asbestos PI Trust Claims with Lummus pursuant to binding and enforceable settlement agreements (the "Settled Asbestos Claims"). The holders of the Settled Asbestos Claims are set forth on Exhibit H to the Plan. Such individuals have not received payment in satisfaction of such claims. In the majority of these settled-but-unpaid cases, the plaintiffs are represented by the law firm of Wilentz, Goldman & Spitzer P.A. (the "Wilentz Cases"). The Wilentz Cases were approved for payment by Lummus, however, payment was withheld until executed releases were provided to CVCSC. The payments to some other pending settled-but-unpaid cases were withheld once the section 105 injunction was entered in connection with the CE Bankruptcy Case. Settled Asbestos Claims are treated under the Plan as Class 4 General Unsecured Claims and will be paid by the Reorganized Debtor. Holders of Settled Asbestos Claims will have no recourse against the Lummus Asbestos PI Trust. *See* Section 5.4(e) of this Disclosure Statement.

### (d) Indemnification Claims.

In addition to asserted liability related to individual asbestos claimants, the Debtor or its predecessors may have been parties to various contracts that provide indemnification to third parties for asbestos-related liabilities. These may include provisions in corporate purchase and sale agreements, including provisions in Lummus' contacts related to the sale of

feedwater heaters that obligate Lummus to indemnify the contract counterparty for asbestos-related claims asserted against the contract counterparty. The Plan treats these claims as Lummus Derivative Asbestos Personal Injury Claims in Class 5 under the Plan.

As of the Solicitation Date, however, no person or entity has asserted a Lummus Derivative Asbestos Personal Injury Claim based upon a right of contribution, reimbursement, or indemnity (whether arising by contract or operation of law).

Lummus Derivative Asbestos Personal Injury Claims are included within the definition of, and will receive the treatment afforded, Lummus Asbestos PI Trust Claims under the Plan and the Lummus TDP. Lummus Derivative Asbestos Personal Injury Claims will be channeled to the Lummus Asbestos PI Trust, and the holders of such Claims will be permanently enjoined from pursuing such Claims against any Asbestos Protected Party, unless the Debtor has assumed an underlying obligation after authorization of the Bankruptcy Court.

*(e) Lummus' Historical Liability Insurance Program.*

Lummus maintained primary insurance coverage under primary general liability policies issued by the Insurance Company of North America ("INA") in 1952 and Liberty Mutual Insurance Company ("Liberty Mutual") from January 1, 1952 through January 1, 1963. Lummus also maintained excess liability coverage from Lloyds of London and the London Companies (collectively "London") from 1952 through 1962. The Lummus Company (n/k/a Lummus) was the only named insured under the primary general liability and the excess liability coverage policies issued from 1952 through 1962. Under the Plan, Lummus shall retain all rights to the primary and excess liability coverage policies in which Lummus is the only named insured and any proceeds thereof shall be subject to the additional payment conditions set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

Beginning in 1963, Lummus was a named insured under Combustion Engineering's liability insurance program, and ceased to have its own separate liability insurance program. Accordingly, Combustion Engineering and Lummus share the nominal limits for any unexhausted Combustion Engineering insurance policies issued on or after 1963. The CE Plan and the Plan provide for the assignment to the asbestos trust to be established pursuant to the CE Plan of all Combustion Engineering's and Lummus' rights to the proceeds from these Combustion Engineering liability insurance policies. In furtherance of this objective and in connection with the CE Plan, Lummus shall execute and deliver the Insurance Assignment Agreement on the effective date of the CE Plan.

*(1) Lummus' Primary Insurance Policies.*

Lummus does not have copies of the INA primary insurance policy for the 1952 policy year, although Lummus has secondary evidence of the existence and terms of this policy.

In March 2002, Lummus negotiated a settlement agreement with Liberty Mutual (the "March 2002 Settlement Agreement") and a related Indemnification Agreement (the "Indemnification Agreement"). In April 2003, an Assumption and Assignment Agreement among Lummus, Combustion Engineering, Asea Brown Boveri, and Liberty Mutual (the "Assumption and Assignment Agreement") concerning the Indemnification Agreement between Liberty Mutual and Lummus was approved by the Bankruptcy Court in the CE Bankruptcy Case. Among other things, the Assumption and Assignment assigned Lummus' indemnity obligations under the Indemnification Agreement to ABB Holdings Inc. As a result of these various agreements: (i) the Plan does not impair, affect or modify Liberty Mutual's rights under the Indemnification Agreement as modified by the Assumption and Assignment Agreement or any other rights that Liberty Mutual may have; and (ii) the March 2002 Settlement Agreement and the Indemnification Agreement are not assigned to the Lummus Asbestos PI Trust.

The Liberty Mutual policies had different limits of liability that were applicable to different types of covered claims. These policies contained separate "per occurrence" and aggregate limits of coverage for bodily injury and property damage claims that arise from products claims. To the extent that a claim was considered a products claim, there was a specified aggregate limit of liability under each of the primary insurance policies. The Liberty Mutual policies arguably excluded coverage for products claims for the policy periods 1953 through 1960, and provided such coverage for the 1961 and 1962 policy periods.

As noted above, Lummus became insured under Combustion Engineering's liability insurance program in 1963.

*(2) Lummus' Excess Insurance Coverage.*

The London excess policies pay Lummus' ultimate net loss for any covered claim in excess of the applicable limits of the Liberty Mutual primary insurance policies. The London excess policies apply to products claims and "drop down" in place of any underlying Liberty Mutual primary insurance policy that does not provide such coverage, subject to a $25,000

per occurrence deductible. As of the Solicitation Date, there remains approximately $42.5 million in nominal products limits in the London excess policies. A number of insolvent insurers subscribed to various London excess policies issued to Lummus. Coverage under these policies may be limited based on the procedures set forth in the insolvent insurers' respective insolvency proceedings and schemes of liquidation. Based upon the insurer insolvencies and various other factors, the amount that may ultimately be recovered under the London excess policies that were issued to Lummus may be materially less than $42.5 million.

**Article 2**

**THE PRE-PETITION PROCESS AND GENESIS OF THE CHAPTER 11 CASE**

**2.1    The Debtor's Reasons for Negotiating this Pre-Packaged Plan.**

*(a) The Decision to Pursue Bankruptcy Reorganization.*

Faced with the uncertainty in the marketplace caused by current and future asbestos litigation, escalating asbestos litigation costs, the economic decline of its business, and the erosion of the shared insurance between Combustion Engineering and Lummus, Lummus decided to resolve its asbestos liability issues, as well as the asbestos liabilities of its Affiliates through the prepackaged Chapter 11 plan of reorganization of Combustion Engineering, an Affiliate, that was filed on February 17, 2003 (the "Original CE Plan"). Combustion Engineering, ABB, Asea Brown Boveri, and other ABB Affiliates, including Lummus concluded that this global approach would be both fair to tort claimants and reasonable in relation to the potential liabilities of Combustion Engineering, Lummus, and certain other ABB Affiliates.

Initially, the efforts to find a resolution to Lummus' asbestos-related personal injury liabilities focused on the CE Bankruptcy Case. In connection with the Original CE Plan, ABB, Asea Brown Boveri, Lummus, and certain other Affiliates agreed to make cash payments, contributions of capital stock, and to assign certain rights to insurance proceeds to the asbestos trust to be established pursuant to the Original CE Plan in consideration of the provision of a 524(g) channeling injunction and the releases and indemnification protection for the benefit of Combustion Engineering, ABB, Asea Brown Boveri, Lummus, and certain other Affiliates.

The Bankruptcy Court entered (a) Findings of Fact and Conclusions of Law Regarding Core Matters and Proposed Findings of Fact, Conclusions of Law and Recommendations to the District Court with Respect to Non-Core Matters, dated June 23, 2000, (b) an Order Approving Reorganization for Combustion Engineering for Ten Days, dated June 23, 2003; and (c) a Supplemental and Amendatory Order Making Additional Findings and Recommending Confirmation of Plan of Reorganization, dated July 10, 2003 (collectively, the "Bankruptcy Court Orders"). Thereafter, the United States District Court for the Western District of Pennsylvania (the "District Court") entered a Revised Confirmation Order on August 8, 2003, affirming the Bankruptcy Court's findings of fact and conclusions of law contained in the Bankruptcy Court Orders.

On appeal, the United States Court of Appeals for the Third Circuit (the "Third Circuit") in December 2004, vacated and remanded the order of the District Court, holding among other things, that the Original CE Plan would not be able to provide Lummus and other non-debtor affiliates with the benefits of a 524(g) channeling injunction that would discharge these non-debtor entities of non-derivative asbestos liabilities. CE, Lummus, ABB, and certain other Affiliates concluded that the Original CE Plan, as a whole, would require modification in order to address the concerns raised by the Third Circuit and to provide them with a global resolution to their asbestos problems that otherwise could not be achieved through the Original CE Plan.

After considering their options, Combustion Engineering, ABB, Asea Brown Boveri, and Lummus decided to explore the possibility of implementing a settlement with the principal objecting parties in the CE Bankruptcy Case, which they believed would result in an ultimate global resolution. This process led ultimately to the development of a modified plan of reorganization for Combustion Engineering that was filed with the Bankruptcy Court on August 16, 2005, as modified from time to time thereafter (the "Modified CE Plan") and the Plan. Thereafter, on August 25, 2005, Combustion Engineering commenced solicitation of votes on its Modified Plan.

The Plan process involved the following steps:

- The negotiation of an acceptable Modified CE Plan and Plan structure among ABB, CE, Lummus, the CCC, the CE Future Claimants' Representative, and the CE Official Creditors' Committee that was memorialized in the agreement in principle (described below in Section 2.2 of this Disclosure Statement);

- The formation of the ACC comprised of counsel for holders of asbestos-related personal injury claims against the Debtor to serve as a negotiating counterpart to ABB, ABB Holdings, and Lummus in connection with the development of the Plan;

- The selection of the Lummus Future Claimants' Representative to represent and to negotiate on behalf of the interests of future and unknown Lummus Asbestos PI Trust Claimants and to ensure that the contributions to the Lummus Asbestos PI Trust are adequate to satisfy payments to such claimants; and

- The documentation of the Plan and Plan Documents and the preparation of this Disclosure Statement.

*(b) Other Options for the Debtor.*

The Debtor also explored several other options prior to its decision to implement the global consensual resolution resulting in the formulation of the Modified CE Plan and the Plan. First, the Debtor could have filed a petition for relief under Chapter 11 of the Bankruptcy Code, without discussing it with the representatives of the Lummus Asbestos PI Trust Claimants, and attempted to resolve all issues during the pendency of a bankruptcy proceeding. However, the Debtor concluded that this approach would have resulted in a long, protracted, and expensive process, without any assurance of a favorable outcome. Second, the Debtor could have remained out of bankruptcy and continued to defend against asbestos-related personal injury claims in the tort system, while litigating (or arbitrating) its coverage disputes with its insurers. The Debtor believes that this second approach would have resulted in the expenditure of substantial funds in litigation costs, with no assurance of a favorable outcome. As a third option, the Debtor perceived an opportunity to implement a global consensual resolution with the principal objecting parties in the CE Bankruptcy Case that also would maximize the interests of the holders of Lummus Asbestos PI Trust Claims, without incurring the costs of further litigation, through a stand-alone prepackaged Chapter 11 filing.

The Debtor chose the third option as the most efficient means of providing prompt and fair compensation to Lummus Asbestos PI Trust Claimants while preserving the value of its business. Through the prepackaged Chapter 11 approach, the Debtor believes that it will reduce the duration and expense of the contemplated bankruptcy proceeding and the risk that the contemplated bankruptcy proceeding could have an adverse impact upon the Debtor's and its Affiliates' businesses. Lummus, ABB, the Lummus Future Claimants' Representative, the ACC, the CCC, the CE Future Claimants' Representative, and the CE Official Creditors' Committee all strongly support the prepackaged Chapter 11 approach resulting in the formulation of the Plan.

## 2.2   Plan Negotiations.

After preliminary discussions in early 2005, Lummus, Combustion Engineering, ABB, ABB Holdings, the CCC, the CE Future Claimants' Representative, the CE Official Creditors' Committee, and each of their respective professionals, began meeting in person and by phone to work on the essential terms of the Modified CE Plan, a prepackaged plan of reorganization for the Debtor, and the related documents that would govern payments to asbestos-related personal injury claimants under both plans of reorganization.

In connection with the negotiation process, the CCC, the CE Future Claimants' Representative, the CE Official Creditors' Committee, and their respective professionals began a due diligence review of the feasibility of a Modified CE Plan, a plan of reorganization for the Debtor, and alternative plan structures.

After multiple and lengthy negotiations, Lummus, Combustion Engineering, ABB, ABB Holdings, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative reached agreement on an agreement in principle (the "Agreement in Principle"), that would form the basis for a global resolution of Combustion Engineering's and the Debtor's asbestos-related personal injury liabilities. All parties believe that the Plan and the Modified CE Plan that incorporated the principal elements of the Agreement in Principle fully satisfy the concerns expressed in the opinion of the Third Circuit and also reflect the consensual resolution of the issues raised by objecting constituencies to the Original CE Plan.

*(a) Essential Elements of the Agreement in Principle.*

The following are the key elements of the Agreement in Principle that relate to the formulation of the Modified CE Plan and the Plan:

(1) The original elements of the ABB Consideration to fund the Modified CE Plan generally remain unaltered. The principal contributions will be:

- 30,298,913 shares of ABB Capital Stock;

- The original ABB promissory note in the amount of $350 million (the terms of the original ABB promissory note were renegotiated to provide for, among other things, (i) modifications to the promissory note payment schedule and (ii) contingent payments to be based upon the occurrence of certain EBIT Margin Events);

- Assignment of the CE Asbestos Insurance Rights to the asbestos trust established pursuant to the CE Modified Plan;

- ABB Holding's indemnification for the benefit of Combustion Engineering against certain nuclear and environmental claims related to Combustion Engineering's ongoing real estate business; and

- A $5 million indemnity by ABB Holdings in favor of Combustion Engineering's bankruptcy estate respecting certain contingent insurance carrier claims.

(2) The following additional contributions will be made to fund the Modified CE Plan and the Plan:

- ABB shall make an additional contribution to fund the Modified CE Plan which amount shall not exceed $204 million. The additional ABB Consideration is payable from the net proceeds received from the sale of Lummus, but in no event, later than two (2) years after the effective date of the Modified CE Plan;

- Lummus will execute and deliver a promissory note (the "Lummus Note" — Exhibit. A to the Non-Debtor Affiliate Settlement Agreement (Lummus)) to the Lummus Asbestos PI Trust in the amount of $33 million, which provides for a remedy available to the holder thereof and exercisable during the continuance of an event of default thereunder, whereby the holder is entitled to vote 51% of the shares of Capital Stock of Lummus in accordance with the terms of the Pledge and Irrevocable Proxy;

- Lummus shall make additional contributions to the Lummus Asbestos PI Trust that will be paid in accordance with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus);

- ABB, ABB Oil & Gas, and ABB Holdings will execute and deliver the ABB Guaranty, which will guarantee the payment of the Lummus Note and the full amount of the additional contributions;

- ABB Oil & Gas will execute and deliver the Pledge and Irrevocable Proxy pursuant to which 51% of the shares of Capital Stock of Lummus will be pledged to the Lummus Asbestos PI Trust as security for the Lummus Note and the ABB Guaranty, and entitling the holder of the Lummus Note to, among other things, vote such Capital Stock in the event of default under the Lummus Note or the ABB Guaranty; and

- ABB's subordination of the intercompany claim in the approximate amount of $470 million as of the Solicitation Date against Lummus and any indebtedness and liabilities (whether fixed, matured, contingent or otherwise) existing or which may arise to any Entities of the ABB Group for or in respect of letters of credit or credit support arrangements outstanding as of the close of business of the thirty-first (31st) day immediately preceding the Petition Date provided by any such Entities as set forth on Exhibit B to the Lummus Note, including any reimbursement or indemnity obligations or liabilities for amounts drawn or subject to being drawn after the close of business of the thirty-first (31st) day immediately preceding the Petition Date under the letters of credit and other credit support arrangements identified in Exhibit C to the Lummus Note.

(3) The filing of the Lummus Chapter 11 Case is conditioned upon receiving the requisite number of votes in support of the Plan, the entry of a Final Order confirming the CE Plan by the Bankruptcy Court, and the entry of certain factual findings by the Bankruptcy Court in the CE Bankruptcy Case relating to the feasibility of the CE Plan.

(4) The retention of a future claimants' representative to represent the interests of unknown Lummus Asbestos PI Trust Claimants.

## 2.3  Formation of the ACC.

At roughly the same time that discussions were progressing with the Debtor, ABB, the CCC, the CE Future Claimants' Representative, and the CE Official Creditors' Committee, and each of their respective professionals, certain counsel for individual holders of asbestos-related personal injury claims against the Debtor formed the ACC to negotiate the structure and terms of the Plan with the Debtor. The ACC currently consists of the following three members, all of whom serve as counsel for individual holders of asbestos-related personal injury claims against Lummus, as well as Combustion Engineering.

Steven Kazan, Esq.
Kazan, McClain, Edises, Abrams, Fernandez, Lyons & Farrise
171 Twelfth Street, Third Floor
Oakland, CA 94607
Phone: 510-465-7727
Facsimile: 510-835-4913

Perry Weitz, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Phone: 212-558-5500
Facsimile: 212-344-5461

Russell Budd, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Avenue
Dallas, TX 75219
Phone: 214-521-3605
Facsimile: 214-520-1181

Members of the ACC represent a majority of holders of known asbestos-related personal injury claims against the Debtor. In addition to being experienced plaintiffs' lawyers, all of the ACC members have experience serving on ad hoc or official committees in national and regional asbestos-related bankruptcy cases. As part of the post-petition bankruptcy process, the Debtor intends to ask the United States Trustee to appoint the members of the ACC, or clients represented by members of the ACC, to an official claimants' committee in the Chapter 11 Case. The ACC is represented by the law firm of Frank/Gecker LLP.

### 2.4    Finalization of the CE Plan and the Plan.

After negotiation of the Agreement in Principle, the parties continued to meet over the course of the spring and summer of 2005 to finalize the terms of the global settlement, including the related Plan Documents and trust distribution procedures that would govern the liquidation and payment of claims to be channeled to the asbestos trusts in the CE Bankruptcy Case and the Debtor's Chapter 11 Case.

Concurrent with the ongoing negotiations among the Debtor, ABB, ABB Holdings, the ACC, the CCC, the CE Future Claimants' Representative, and the CE Official Creditors' Committee, the Debtor retained Richard B. Schiro to serve as the Lummus Future Claimants' Representative for all holders of future Lummus Asbestos PI Trust Claims against the Debtor. *See* Section 2.5 of this Disclosure Statement — "Selection of the Lummus Future Claimants' Representative." Immediately following his retention, the Lummus Future Claimants' Representative began a due diligence review of: (i) the business affairs of the Debtor; (ii) the asbestos litigation and claims against the Debtor; and (iii) the feasibility of the Plan. Additionally, the Lummus Future Claimants' Representative's expert, Hamilton, Rabinovitz & Alschuler, Inc. independently evaluated the asbestos-related personal injury claims presently asserted against the Debtor and developed a prediction of the likely number, type, and value of asbestos-related personal injury claims to be asserted against the Debtor in the future to determine the adequacy of the proposed contributions to the Lummus Asbestos PI Trust. Following the Lummus Future Claimants' Representative's independent evaluation, and the separately conducted examination by his expert of the Debtor's asbestos liability, negotiations commenced between the Lummus Future Claimants' Representative, the Debtor, and ABB regarding (a) a funding structure for the Lummus Asbestos PI Trust that would be acceptable to the Lummus Future Claimants' Representative and (b) the adequacy of the financial contributions to the Lummus Asbestos PI Trust. After multiple and lengthy negotiations between the Debtor, ABB, the Lummus Future Claimants' Representative, and each of their counsel and experts, the parties agreed to (i) the terms of the $33 million promissory note to be contributed by Lummus to the Lummus Asbestos PI Trust on the Effective Date, (ii) the schedule of certain additional cash payments by Lummus to the Lummus Asbestos PI Trust based upon potential insurance recoveries by Lummus, and (iii) the credit support to be provided by ABB and certain of its Affiliates.

The Debtor, ABB, ABB Holdings, the ACC, the CCC, the Lummus Future Claimants' Representative, the CE Future Claimants' Representative, and the CE Official Creditors' Committee strongly support the resulting Plan and Plan structure.

### 2.5    Selection of the Lummus Future Claimants' Representative.

To ensure that the interests of unknown and future claimants were represented in the Plan negotiation process, the Debtor and ABB, began considering candidates to serve as the Lummus Future Claimants' Representative for unknown and future asbestos-related personal injury claimants. ABB and the Debtor sought a disinterested candidate with recognized excellence in the field of mass torts, complete independence, and a wealth of prior experience serving as a legal representative in asbestos cases. In early April 2005, after considering and reviewing the resumes from several highly qualified candidates, and careful deliberations, the Debtor and ABB asked Richard B. Schiro to serve as the Lummus Future Claimants' Representative.

Mr. Schiro served as the court appointed legal representative in: *Swan Transportation Company*, Case No. 01-11690-JKF, United States Bankruptcy Court for the District of Delaware; *JT Thorpe Company*, Case No. 02-41487-H5-11, United States Bankruptcy Court for the Southern District of Texas, Houston Division; and *Utex Industries, Inc.*, Case No. 04-34427-H4-11, United States Bankruptcy Court for the Southern District of Texas, Houston Division. In his capacity as legal representative, Mr. Schiro has assisted in the settlement of tens of thousands of asbestos-related personal injury claims and reviewed such settlements for their fairness, reasonableness, and adequacy. Mr. Schiro's resume is attached to this Disclosure Statement as *Exhibit D*. Mr. Schiro has no prior association with the Debtor, ABB, or any of their Subsidiaries or Affiliates. Although Mr. Schiro has not yet been appointed by the Bankruptcy Court, he has been asked by the Debtor, and has insisted on the ability, to act independently as if such appointment already had occurred.

In connection with his pre-petition services, Mr. Schiro has been paid an hourly rate of $400 by the Debtor, and is entitled to reimbursement by the Debtor for reasonable out of pocket expenses incurred in connection with his duties. Mr. Schiro also received an initial retainer in the amount of $20,000. As of August 25, 2005, the Debtor had paid Mr. Schiro approximately $90,000 in fees and expenses. In addition, the Debtor has agreed to indemnify and hold Mr. Schiro harmless from any claims by any party, arising out of, or relating to, the performance of his duties as Lummus Future Claimants' Representative; *provided, however*, that Mr. Schiro shall not have such indemnification rights if a court of competent jurisdiction determines pursuant to a final and non-appealable order, that he is liable upon such claim as the sole result of his willful misconduct or gross negligence. It is the intent of the Debtor to request that Mr. Schiro be appointed as Lummus Future Claimants' Representative following the commencement of the Chapter 11 Case on substantially the same terms as his pre-petition engagement.

The Lummus Future Claimants' Representative has retained the law firm of Porter & Hedges, L.L.P., to serve as his bankruptcy counsel. The Lummus Future Claimants' Representative also engaged Hamilton, Rabinovitz & Alschuler, Inc. to serve as an expert to assist the Lummus Future Claimants' Representative in estimating the number and value of likely future asbestos related personal injury claims against the Debtor.

By agreement with the Lummus Future Claimants' Representative, all prefiling and post-petition fees and expenses of his professionals incurred in the scope of their employment have been, and will be, paid by the Debtor subject to Bankruptcy Court approval.

## 2.6   Prefiling Transactions in Contemplation of the Plan.

### (a) Lummus and Lummus Construction Merger.

On or about June 28, 2005, the Debtor and ABB completed a prefiling corporate restructuring. As a result of the restructuring, Lummus Construction was merged into Lummus. Historically, Lummus Construction has had limited business operations, and over recent years, Lummus Construction has been inactive. *See* Section 1.2(b)(2) of this Disclosure Statement for a description of Lummus Construction's historical business operations. The Debtor's and ABB's management determined that it would facilitate ABB's overall organizational and operational structure to consolidate these two entities prior to the filing of the Chapter 11 Case.

### (b) ABB Holdings and ABB Oil & Gas Merger.

Prior to the filing of the Chapter 11 Case, ABB anticipates that it will complete an internal corporate restructuring that will involve the merger of ABB Oil & Gas into ABB Holdings. ABB's management believes that the corporate restructuring will benefit the overall organizational and operational structure of the Domestic Non-Debtor Affiliates.

### (c) Certain Parent Financing Arrangements.

As of the Solicitation Date, ABB and certain of its Affiliates, including Lummus have already begun to negotiate the terms of a debtor in possession credit facility (the "DIP Facility") and a letter of credit facility (the "Letter of Credit Facility"), to ensure that the Debtor will have access to sufficient financing during the Chapter 11 Case. The terms of the DIP Facility and the Letter of Credit Facility will be finalized by Lummus and ABB prior to the filing of the Chapter 11 Case.

(1) *DIP Facility*. The DIP Facility will be provided by ABB Treasury Center Inc. (the "Treasury Center") (a direct Subsidiary of ABB Holdings) and such facility will enable the Debtor's access to additional liquidity during the Chapter 11 Case.

(2) *Letter of Credit Facility*. The Letter of Credit Facility will be entered into by Lummus, and/or one or more Non-Debtor Affiliates prior to the filing of the Chapter 11 Case. The terms, however, of such Letter of Credit Facility have not been determined.

*(d) ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).*

In connection with the proposal of the Plan, the Debtor will enter into an agreement (the "ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)") with ABB, ABB Holdings, ABB Oil & Gas, the Lummus FCR, and the Lummus Asbestos PI Trust. Under the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), ABB, ABB Holdings, and the other Asbestos Protected Parties will be made beneficiaries of the Lummus Asbestos PI Channeling Injunction to be issued in the Chapter 11 Case and will receive a release from the Debtor, the Reorganized Debtor, the Debtor's Bankruptcy Estate, and the Lummus Asbestos PI Trust on the Effective Date of all claims and causes of action, that the Debtor, the Reorganized Debtor, the Bankruptcy Estate, or the Lummus Asbestos PI Trust may have against them.

In connection with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), effective as of the Effective Date:

(1) Lummus will execute and deliver to the Lummus Asbestos PI Trust the Lummus Note, an interest bearing note in the principal amount of $33 million, which note provides for a remedy available to the Lummus Asbestos PI Trust and exercisable during the continuance of an event of default, whereby the Lummus Asbestos PI Trust is entitled to fifty-one percent (51%) of the shares of the Capital Stock of Lummus in accordance with the terms of the Pledge and Irrevocable Proxy;

(2) ABB, ABB Oil & Gas, and ABB Holdings will execute and deliver the ABB Guaranty (as defined in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)), which will guarantee the payment obligations of the Lummus Note;

(3) ABB Oil & Gas will execute and deliver the Pledge and Irrevocable Proxy (as defined in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)) pursuant to which fifty-one percent (51%) of the Capital Stock of Lummus will be pledged to the Lummus Asbestos PI Trust as security for the Lummus Note and the ABB Guaranty, and entitling the holder of the Lummus Note, among other things, to vote such Capital Stock in the event of default and upon the occurrence of certain additional events as set forth under the Lummus Note and the Pledge and Irrevocable Proxy; and

(4) The Asbestos PI Trust shall be entitled to receive the following additional payments:

- The first $7.5 million of Aggregate Insurance Recoveries (as defined in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)) actually received by Lummus prior to the Effective Date from any settlement of any of the Subject Lummus Insurance Policies entered into by Lummus during the period commencing on April 15, 2002 and ending the day immediately preceding the Effective Date, shall be paid to the Lummus Asbestos PI Trust on the Effective Date. Any Aggregate Insurance Recoveries in excess of $7.5 million actually received by the Debtor during this period will be divided equally between the Debtor and the Lummus Asbestos PI Trust and, on the Effective Date, be paid to the Reorganized Debtor and the Lummus Asbestos PI Trust.

- In the event that the amount paid to the Lummus Asbestos PI Trust is less than the Lummus Insurance Recovery Guaranteed Payment, on the Effective Date, the Reorganized Debtor will pay the Lummus Asbestos PI Trust on behalf of the Released Parties, the amount by which the Lummus Insurance Recovery Guaranteed Payment exceeds the amount paid to the Lummus Asbestos PI Trust pursuant to Section 2.2(a) of the Non-Debtor Affiliate Settlement Agreement (Lummus).

- Any Aggregate Insurance Recoveries actually received by the Reorganized Debtor on or after the Effective Date with respect to any settlement of any of the Subject Lummus Insurance Policies, whether such settlement is made prior or subsequent to the Effective Date, will be allocated and paid in accordance with the terms and provisions of Section 2.2(c) of the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

## 2.7 Retention of Professionals by the Debtor.

The Debtor has retained Kirkpatrick & Lockhart Nicholson Graham LLP and Pachulski, Stang, Ziehl, Young, Jones, & Weintraub P.C. as its bankruptcy counsel to advise on bankruptcy matters and to assist them in the formulation of the Plan. Kirkpatrick & Lockhart Nicholson Graham LLP also serves as the Debtor's insurance coverage counsel. Kirkpatrick & Lockhart Nicholson Graham LLP also was retained as bankruptcy counsel to Combustion Engineering in connection with the CE Bankruptcy Case.

The Debtor also has retained (a) FTI Consulting, Inc. to provide financial advisory and accounting services to assist the Debtor in its pre-petition bankruptcy filing preparation, and the satisfaction of all of the Debtor's post bankruptcy filing reporting requirements, (b) The Blackstone Group, L.P. ("Blackstone") to prepare a liquidation analysis that was used in connection with the formation of the Plan, and (c) Bankruptcy Services LLC to serve as the Voting Agent, and (d) Gavin

Anderson & Company to provide public relations assistance to the Debtor. Blackstone also was retained by Combustion Engineering in connection with the CE Bankruptcy Case.

In connection with the negotiation of the Plan and related matters, ABB Holdings Inc. the indirect parent of the Debtor, was represented by the law firm of Kirkland & Ellis LLP.

In a typical Chapter 11 case, court-appointed committees and representatives, such as a legal representative, are entitled to employ professionals and to have those professionals paid by the debtor's estate, subject to court approval. Therefore, the fees of the professionals engaged by the Lummus Future Claimants' Representative, including the fees of Porter & Hedges, L.L.P. and Hamilton, Rabinovitz & Alschuler, Inc. will be paid by the Debtor during the course of the Chapter 11 Case.

## 2.8    Agreements with Settling Asbestos Insurance Companies.

As of the Solicitation Date, the Debtor has not entered into any plan-related settlements with Settling Asbestos Insurance Companies. It is possible, however, that the Debtor may do so prior to the Lummus Confirmation Date and, if so, the Debtor will file a list of such settlements with the clerk of the Bankruptcy Court.

*See* Section 5.7(d) of this Disclosure Statement for information about the injunction that will enjoin certain suits against Settling Asbestos Insurance Companies under the Plan if the Debtor or the Reorganized Debtor reaches any such settlement.

**Article 3**

**THE COMPANY: CORPORATE STRUCTURE AND MANAGEMENT**

**3.1   Current Management of the Debtor.**

The current management of the Debtor is set forth below. Additional biographical information of each of the directors and executive officers of the Debtor also is attached to this Disclosure Statement as *Exhibit E.*

*(a) Lummus.*

Lummus' current directors are:

| Name |
| --- |
| Samir Brikho |
| Jürg Seiler |
| Margaret Duplantier |

Lummus' current senior executive officers are:

| Name | Title |
| --- | --- |
| Samir Brikho | President and Chief Executive Officer |
| Khalid Farid | Executive Vice President |
| Daniel Martin McCarthy | Senior Vice President Lummus Technology |
| Jürg Seiler | Senior Vice President, Treasurer, and Chief Financial Officer |
| Ronald D. Dawson | Senior Vice President Human Resources |
| Margaret Duplantier | Senior Vice President, General Counsel, and Secretary |
| Michael J. Ford | Vice President, Controller, and Assistant Secretary |
| Debra Leary | Assistant Treasurer |
| Michael Blaney | Assistant Secretary |
| Curtis Culver | Assistant Secretary |

**3.2   Directors and Officers of the Reorganized Debtor.**

*(a) Board of Directors.*

On and after the Effective Date, the business and affairs of the Reorganized Debtor will be managed by the board of directors of the Reorganized Debtor serving in such capacity as of the Petition Date in accordance with applicable law and/or constituent corporate organizational documents.

*(b) Officers.*

The officers of the Reorganized Debtor will remain unchanged unless otherwise disclosed in a notice filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

**3.3   Debt and Equity Structure.**

*(a) Description of Lummus Capital Stock.*

As of the Solicitation Date, Lummus had authorized 100,000 shares of common stock. ABB Oil & Gas holds 61,160 shares of the common stock of Lummus, which represents all of the issued and outstanding shares of the corporation. As a common stockholder, ABB Oil & Gas is entitled to one vote per share on all matters to be voted upon by stockholders of the corporation.

*(b) Prohibited Issuance of Non-Voting Equity Stock.*

The Debtor shall file with the Secretary of State of Delaware on or prior to the Effective Date an Amended Certificate of Incorporation. The Amended Certificate of Incorporation shall provide that (i) the Reorganized Debtor is prohibited from issuing non-voting equity securities and (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

**Article 4**

**ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE**

**4.1    Commencement of the Chapter 11 Case.**

The filing of the Chapter 11 Case is dependent upon obtaining the Requisite Acceptances of the Plan (including the unanimous acceptance of the Plan by the Lummus Asbestos PI Trust Claimants) and the satisfaction of certain agreed prefiling conditions, including, among others, the entry of a Final Order in the CE Bankruptcy Case confirming the CE Plan, and approving the solicitation procedures and the adequacy of the CE Disclosure Statement, the written assurance that no party with standing in the Chapter 11 Case will object to the Plan, and the Debtor has determined in its sole discretion that no Legal Change Event has occurred or likely will occur. If the prefiling conditions are met, the Debtor intends to commence the Chapter 11 Case by filing a voluntary petition for bankruptcy relief before the Bankruptcy Court.

If filed, the Chapter 11 Case will be filed as a case under Chapter 11 of the Bankruptcy Code, meaning that the Debtor will continue to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and no trustee will be appointed for the Debtor or its property. The Chapter 11 Case will be a related case to the CE Bankruptcy Case.

**4.2    Administration of the Chapter 11 Case.**

*(a) Retention of Professionals.*

On or about the Petition Date, the Debtor will request that the Bankruptcy Court approve the continued retention of the professional persons who represented the Debtor prior to the filing of its Chapter 11 Case. *See* Section 2.7 of this Disclosure Statement — "Retention of Professionals by the Debtor."

*(b) Payment of Debt Incurred in the Ordinary Course of Business.*

The Debtor expects to request that the Bankruptcy Court enter an order authorizing the Debtor to pay, in its discretion, all undisputed accrued indebtedness and obligations when they become due in the approximate amount of $57 million (other than the Lummus Asbestos PI Trust Claims) which have been and are incurred in the ordinary course of its business and that have not otherwise been pre-paid by the Debtors prior to the Petition Date.

*(c) Payment of Employee Wages and Benefits.*

The Debtor expects to request that the Bankruptcy Court enter an order authorizing the Debtor to pay salaries, wages, benefits, and other amounts owed to its employees and consultants as such obligations become due, including obligations that were, or may have been, incurred prior to the Petition Date.

*(d) Payment of Pre-Petition Taxes.*

The Debtor will request that the Bankruptcy Court enter an order authorizing the Debtor to pay all incurred pre-petition taxes to the appropriate taxing authorities that were not paid as of the Petition Date.

*(e) Assumption of Executory Contracts.*

The Debtor will request the authority of the Bankruptcy Court on the Petition Date to assume (*i.e.,* affirm) all executory contracts except any executory agreements respecting Lummus Asbestos Personal Injury Claims or Settled Asbestos Claims. By separate application, the Debtor also will request the authority of the Bankruptcy court to assume an engineering, procurement, construction, and construction management contract that was entered into between the Debtor and WPT LP on March 23, 2005 and will seek relief from the automatic stay to allow WPT LP to exercise all rights and remedies under such contract other than the rights or remedies arising as a result of the filing of the Chapter 11 Case. The effect of the relief under the United States bankruptcy laws would be to make all assumed contracts the binding obligations of the Bankruptcy Estate and the Reorganized Debtor and to elevate any claim for a future breach of the executory contracts to which the Debtor is a party.

The Debtor fully intends to continue meeting all performance and other obligations under all of its ongoing engineering, procurement, construction, and services contracts and proprietary technology-related contracts in strict accordance with their terms. The Debtor also intends to honor all of its obligations related to the collective bargaining agreement entered into with The Lummus Employees' Association, Inc., effective as of October 1, 2002, in strict accordance with its terms. The collective bargaining agreement will terminate on September 30, 2005. Lummus already has initiated negotiations with The Lummus' Employees' Association Inc. to renew the terms of such agreement. As of this Solicitation

Date, the Debtor does not intend to reject any executory contract and the Plan provides that all executory contracts not previously assumed by the Debtor will be deemed to have been assumed on the Effective Date of the Plan.

The Debtor will not assume any executory contracts related to completed projects or services providing for indemnification for, or a warranty that would cover asbestos-related liabilities and will seek to reject any such agreements before, or in connection with confirmation of the Plan. All claims arising under such agreements related to asbestos-related personal injury liabilities are included within the definition of Lummus Asbestos PI Trust Claims, and will be channeled to, and be paid in accordance with, the terms of the Lummus Asbestos PI Trust. Pursuit of such claims against any of the Asbestos Protected Parties will be permanently enjoined by the Lummus Asbestos PI Channeling Injunction to be issued in connection with the Plan. *See* Section 5.7 of this Disclosure Statement — "Implementation of the Plan" and Section 5.10 of this Disclosure Statement — "Miscellaneous Provisions in the Plan."

*(f) Asset Sales.*

As of the Solicitation Date, the Debtor does not intend to sell or otherwise dispose of any assets out of the ordinary course during the course of the Chapter 11 Case. If, however, the Debtor decides to sell or otherwise dispose of any assets outside the ordinary course of its business during the Chapter 11 Case, it will seek court orders authorizing the specific transactions after notice and a hearing.

*(g) DIP Financing and Cash Management System.*

As part of the Chapter 11 Case, the Debtor intends to seek the approval of the Bankruptcy Court for the DIP Facility to be provided by the Treasury Center, as well as the approval of the continuation of certain cash management systems and procedures, most of which will enable the Debtor to have access to additional liquidity during the pendency of the Chapter 11 Case. *See* Section 2.6(b)(1) of this Disclosure Statement — "DIP Facility." Under the DIP Facility, the Treasury Center will make loans to the Debtor on a revolving basis for working capital, capital expenditures, and general corporate purposes.

The DIP Facility will mature on the Effective Date of the Plan and will not be required to be prepaid or cash collateralized prior to maturity absent an event of default. The DIP Facility will include certain affirmative and negative covenants. *See* Section 2.6(c) of this Disclosure Statement above — "Certain Parent Financing Arrangements."

The Debtor's internal cash management system provides a highly centralized treasury function that covers all of the Debtor's and its respective non-debtor direct and indirect subsidiaries and joint ventures. Approval of this cash management system by the Bankruptcy Court will ensure that the Debtor's integrated financial accounting system will continue to facilitate the timely and efficient collection, disbursement, concentration, and management of funds used by the Debtor and its Affiliates during the Chapter 11 Case.

*(h) Bar Date.*

As of the Solicitation Date, the Debtor does not intend to seek the establishment of any bar dates in the Chapter 11 Case (other than the Administrative Claims Bar Date) or otherwise require creditors to file proofs of claim in the Chapter 11 Case. However, if deemed appropriate, the Debtor may seek to establish one or more bar dates to facilitate administration of the Chapter 11 Case.

**4.3  Creditors' Committee.**

The Debtor intends to request the appointment of the members of the ACC, or clients represented by such members, to an official committee of asbestos claimants.

If appointed, the Debtor understands that the ACC, if its composition remains the same, will request the retention of Frank/Gecker LLP to serve as its legal counsel. If this retention is approved, the professionals will seek approval from the Bankruptcy Court of their fees and expenses. If these fees and expenses are approved by the Bankruptcy Court, such fees and expenses will be borne by the Debtor as an administrative expense.

**4.4  Bankruptcy Court Approval of the Selection of the Lummus Future Claimants' Representative.**

The Debtor intends to request that the Bankruptcy Court approve the Debtor's selection of Richard B. Schiro as the Lummus Future Claimants' Representative in the Chapter 11 Case to represent the interests of future and unknown holders of asbestos-related personal injury Demands against the Debtor. Mr. Schiro's qualifications to serve as the Lummus Future Claimants' Representative, and the process by which the Debtor selected him, are described in Section 2.5 of this Disclosure Statement. Mr. Schiro's resume is attached to this Disclosure Statement as *Exhibit D*. The Debtor anticipates that Mr. Schiro

will continue to be compensated for his services on substantially the same terms as in effect immediately prior to the Chapter 11 filing. The terms of his compensation also are discussed more fully in Section 2.5 of this Disclosure Statement.

If Mr. Schiro is appointed as the Lummus Future Claimants' Representative, the Debtor understands that he will request authority from the Bankruptcy Court to retain Porter & Hedges, L.L.P. as bankruptcy counsel and Hamilton, Rabinovitz & Alschuler, Inc. as expert on terms similar to the terms on which the firms were employed prior to the Petition Date, subject to Bankruptcy Court review and allowance of fees and expenses. If approved by the Bankruptcy Court, such fees and expenses will be borne by the Debtor as an administrative expense.

**4.5    Non-Asbestos Legal Proceedings.**

As of this Disclosure Statement, the Debtor is a party to certain pending legal proceedings (other than proceedings relating to asbestos-related personal injury claims). The Debtor believes, however, that none of the proceedings will individually or in the aggregate have a material adverse effect on its financial condition or results of operation. The Debtor intends to waive the automatic stay to allow all pending non-asbestos litigation to proceed during the course of the Chapter 11 Case.

**4.6    Confirmation Hearing.**

On or about the Petition Date, the Debtor will seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the pre-petition Solicitation procedures, including this Disclosure Statement and confirmation of the Plan. Notice of the confirmation hearing will be published in *The Wall Street Journal — National Edition*, the *Newark Star-Ledger*, and the *Houston Chronicle*, and will be mailed to all known holders of Claims, at least twenty-five (25) days before the date by which objections to the Plan must be filed, unless the Bankruptcy Court specifies otherwise. *See* Section of this Disclosure Statement 8.2 — "Confirmation Hearing." Section 524(g) of the Bankruptcy Code requires that any confirmation order containing an injunction must be issued or affirmed by the District Court. If the Lummus Confirmation Order is not issued by the District Court exercising its bankruptcy jurisdiction, the Debtor will seek to have the Lummus Confirmation Order affirmed promptly by the District Court.

**4.7    Preferences and Fraudulent Conveyance Actions.**

*(a) Preferences.*

The Debtor believes that it will have no preference actions that it or anyone acting on its behalf should pursue in the Chapter 11 Case. A preference is a transfer to a creditor in payment of an existing debt made within certain statutorily determined time periods before the commencement of the Chapter 11 case. The trustee or the debtor in possession may recover preferences for the benefit of all creditors of the estate in order to prohibit the debtor from favoring some creditors over others on the eve of bankruptcy and frustrating the Bankruptcy Code's goal of equitable distribution to all creditors. To establish a preference and recover funds paid out to creditors, the trustee or the estate must prove that a transfer of a debtor's property was made:

(1) To or for the benefit of a creditor;

(2) On account of an existing debt;

(3) While the debtor was insolvent;

(4) Within ninety (90) days (one year, if to an "insider") before the debtor's bankruptcy petition was filed; and

(5) So as to enable the creditor to receive more than it would have received if the transfer had not been made, the debtor was liquidated under Chapter 7 and the creditor received the distributions it would have received in a Chapter 7 case.

The preference statute excepts payments made "in the ordinary course of business" according to ordinary business terms, and these payments are not recoverable from creditors. Also excepted are payments made for new value or a substantially contemporaneous exchange of money and goods.

Under these standards, if a debtor makes a payment when it is solvent or the payee does not receive more than it would receive in a Chapter 7 liquidation of that debtor, the payment will not be avoidable as preferential. Because the Plan provides for the payment in full of all creditors of the Debtor, the Debtor believes its prefiling payments will not cause unsecured creditors in the Chapter 11 Case to receive more favorable treatment than other similarly situated creditors.

Most payments made to creditors within ninety (90) days prior to the Petition Date will be payments to vendors and other trade creditors in the ordinary course of the Debtor's business. The Debtor believes the ordinary course defense provided by Section 547(c)(2) of the Bankruptcy Code would protect these payments from avoidance.

### (b) Fraudulent Transfer Laws.

The Debtor also believes that there will be no fraudulent transfer or conveyance actions that it or anyone else acting on behalf of its unsecured creditors should pursue in the Chapter 11 Case. Under the Plan, confirmation of the Plan will extinguish claims the Debtor and its creditors, including holders of Lummus Asbestos PI Trust Claims, might have under the applicable state fraudulent transfer or conveyance laws and the corresponding provisions of Section 548 of the Bankruptcy Code against the Debtor and the Non-Debtor Affiliates.

In the case of the Debtor, intercompany transactions between one or more of them and Non-Debtor Affiliates could be subject to review and then, upon the required showing, avoided under the applicable fraudulent transfer law. A fraudulent transfer action involving any prefiling restructuring, pre-petition payments, or other transactions could be brought in the Bankruptcy Court or, if the Chapter 11 Case is not filed, in a lawsuit filed in another court of appropriate jurisdiction.

The successful prosecution of a claim by or on behalf of a debtor or its creditors under the applicable fraudulent transfer law generally would require a determination that the debtor effected a transfer of an asset or incurred an obligation to an entity either:

(1) With an actual intent to hinder, delay, or defraud its existing or future creditors (a case of "actual fraud"); or

(2) In exchange for other than for a "reasonably equivalent" value or a "fair consideration," when the debtor:

- Was insolvent or rendered insolvent by reason of the transfer or incurrence;

- Was engaged or about to engage in a business or transaction for which its remaining assets would constitute unreasonably small capital; or

- Intended to incur, or believed that it would incur, debts beyond its ability to pay as they mature

(each a case of "constructive fraud").

In the case of either actual fraud or constructive fraud involving a transfer of assets, the unpaid creditors affected thereby might be entitled to equitable relief against the transferee of the assets in the form of a recovery of the lesser of (i) the relevant value of the avoided transfer or (ii) the amount necessary to satisfy its claims. The relief in the case of an avoided obligation might take the form of a subordination of that obligation to the claims of creditors entitled to relief.

The measure of insolvency for purposes of a constructive fraud action would depend on the fraudulent transfer law being applied. Generally, a transferor is insolvent if, at the relevant time, either:

(1) The sum of its debts and liabilities, including contingent liabilities, was greater than the value of its assets at a fair valuation; or

(2) The fair salable value of its assets was less than the amount required to pay the probable liability on its total existing debts and other liabilities, including contingent liabilities, as they became absolute and mature.

The transactions of the Debtor that could be subject to review and, upon the required showing, avoided under the applicable fraudulent transfer law would be limited to those occurring within the relevant limitations period. In the case of actions under Section 548 of the Bankruptcy Code, that period would be the twelve (12) month period ending on the Petition Date. In the case of actions under a state fraudulent transfer law, the limitations period ranges from one (1) year to six (6) or more years after the questioned transfer or incurrence of an obligation is effected. Under most laws, including the laws of Delaware, the limitations period generally would be four (4) years.

The Debtor did not, and does not, intend to hinder, delay, or defraud its creditors through any of the prefiling transactions. The objective of the prefiling transactions was to facilitate the organizational, financial, and operational aspects of the Debtor's business. The Debtor believes that the prefiling transactions will improve operating efficiencies. After giving effect to the completion of the prefiling transactions, the Debtor believes that it will:

(1) Continue to pay its debts and other liabilities as they become absolute and mature; and

(2) Not have unreasonably small capital to carry on its business.

The Debtor believes that a court would confirm its positions with respect to these issues.

**4.8    Additional Information.**

Additional information and copies of key documents and notices can be obtained at no cost at the Debtor's restructuring-information website: *www.lummus-restructuring.com*. Please check the Debtor's restructuring-information website regularly for updates on the status of the Chapter 11 Case.

The Debtor believes that a court would confirm its positions with respect to these issues.

**4.8   Additional Information.**

Additional information and copies of key documents and notices can be obtained at no cost at the Debtor's restructuring-information website: *www.lummus-restructuring.com*. Please check the Debtor's restructuring-information website regularly for updates on the status of the Chapter 11 Case.

## Article 5

## SUMMARY OF THE PLAN

### 5.1 General.

The following is a summary intended as a brief overview of certain provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is attached to this Disclosure Statement as *Exhibit B*. Other provisions of the Plan not summarized in Article 5 of this Disclosure Statement may be summarized elsewhere in this Disclosure Statement. The holders of Claims and Equity Interests are respectfully encouraged to review the Plan and this Disclosure Statement with their counsel, or other advisors.

### 5.2 Classification.

#### (a) Generally.

Article II of the Plan sets forth an explanation of Claims that are not classified under the Plan. Article III of the Plan sets forth a designation of Classes of Claims and Equity Interests.

#### (b) Unclassified Claims.

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Tax Claims are not classified and are excluded from the Classes established in Article III of the Plan. The treatment accorded Administrative Expense Claims and Tax Claims is set forth in Article II of the Plan.

#### (c) Classes.

For purposes of the Plan, the Claims against, and Equity Interests in, the Debtor are grouped into the following Classes in accordance with Section 1122(a) of the Bankruptcy Code:

Class 1 — Priority Claims

Class 2 — Secured Claims

Class 3 — Workers' Compensation Claims

Class 4 — General Unsecured Claims (including Settled Asbestos Claims)

Class 5 — Lummus Asbestos PI Trust Claims

Class 6 — Non-Debtor Affiliate Intercompany Claims

Class 7 — Equity Interests

### 5.3 Treatment of Administrative Expense Claims and Tax Claims.

#### (a) Administrative Expense Claims.

Subject to the provisions of Sections 330(a), 331, and 503 of the Bankruptcy Code, the Allowed Amount of each Administrative Expense Claim shall be paid either (a) in full, in Cash by the Reorganized Debtor, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be agreed upon by the holder of an Administrative Expense Claim and the Reorganized Debtor or otherwise upon order of the Bankruptcy Court; *provided, however*, this Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession on or after the Petition Date or assumed by the Debtor in Possession pursuant to this Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court.

#### (b) Tax Claims.

Each holder of an Allowed Tax Claim shall be paid the Allowed Amount of its Allowed Tax Claim, at the option of the Reorganized Debtor, either (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Tax Claim and the Reorganized Debtor.

Notwithstanding any provision of the Plan or the Lummus Confirmation Order to the contrary: (a) interest shall accrue on IRS Tax Claims at a rate set forth in 26 U.S.C. § 6621; (b) confirmation of the Plan shall not affect the setoff rights of the

United States; and (c) the non-Debtor third party release and injunction provisions set forth in the Plan shall not apply to claims of the United States.

**5.4    Treatment of Claims and Equity Interests.**

*(a) Treatment of Claims and Equity Interests.*

Claims and Equity Interests, as classified in Article III of the Plan, shall be treated in the manner set forth in Article III of the Plan. The following constitutes a summary of such treatment:

*(b) Class 1 — Priority Claims.*

*(1) Impairment and Voting.*

Class 1 is unimpaired by the Plan. Each holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

*(2) Treatment.*

Each holder of a Priority Claim shall be paid the Allowed Amount of its Priority Claim in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) the date such Priority Claim becomes an Priority Claim unless otherwise agreed to by the Reorganized Debtor and the holder of a Priority Claim.

*(c) Class 2 — Secured Claims.*

*(1) Impairment and Voting.*

Class 2 is unimpaired by the Plan. Each holder of a Secured Claim in Class 2 is conclusively deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

*(2) Treatment.*

Each holder of a Secured Claim shall be paid the Allowed Amount of its Secured Claim (i) in full, in Cash, on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of an Secured Claim, or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Sections 1124(2)(A)-(D) of the Bankruptcy Code.

*(d) Class 3 — Workers' Compensation Claims.*

*(1) Impairment and Voting.*

Class 3 is unimpaired by the Plan. Each holder of a Claim in Class 3 is conclusively deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

*(2) Treatment.*

Each holder of a Claim in Class 3 shall be paid in the ordinary course pursuant to such rights that existed under any state workers' compensation system or laws applicable to such Claims.

*(e) Class 4 — General Unsecured Claims.*

*(1) Impairment and Voting.*

Class 4 is unimpaired by the Plan. Each holder of a Claim in Class 4 is conclusively deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

*(2) Treatment.*

Each holder of a Claim in Class 4 shall be paid by the Reorganized Debtor in full, in Cash, the Allowed Amount of the General Unsecured Claim on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of a General Unsecured Claim.

With respect to Settled Asbestos Claims, all Settled Asbestos Claims shall be subject to the Lummus Asbestos PI Channeling Injunction. The sole recourse of a holder of a Settled Asbestos Claim on account of such Settled Asbestos Claim

shall be to receive payment from the Reorganized Debtor pursuant to the provisions of an applicable settlement agreement with the Debtor; *provided, however*, that no holder of a Settled Asbestos Claim shall be entitled to receive such a payment unless and until such holder complies with all requirements and conditions to payment under such applicable settlement agreement.

### (f) Class 5 — Lummus Asbestos PI Trust Claims.

#### (1) Impairment and Voting.

Class 5 is impaired. Each holder of a Claim in Class 5 is entitled to vote to accept or reject the Plan under Sections 524(g) and 1126 of the Bankruptcy Code.

#### (2) Treatment.

All Lummus Asbestos PI Trust Claims shall be subject to the Lummus Asbestos PI Channeling Injunction. All Lummus Asbestos PI Trust Claims shall be evaluated, determined, and paid (if and to the extent entitled to payment), pursuant to the terms, provisions, and procedures of the Lummus Asbestos PI Trust, Lummus Asbestos PI Trust Agreement and the Lummus TDP. The Lummus Asbestos PI Trust will be funded in accordance with the provisions of Article 7 of the Plan and the Lummus Asbestos PI Trust Agreement.

Further, the holder of a non-malignant Lummus Asbestos Personal Injury Claim (other than a holder of a Settled Asbestos Claim) may, from and after the Effective Date, assert a Claim against the Lummus Asbestos PI Trust for a malignant disease described in the Lummus TDP as disease levels V-VIII (a "Subsequent Malignancy Claim"). With respect to a holder of a non-malignant Settled Asbestos Claim, such holder's right to assert a Subsequent Malignancy Claim shall be governed by the provision(s) of the applicable settlement agreement between such holder and the Debtor, which agreement was binding and enforceable on or before February 17, 2003, provided that the applicable agreement preserved such holder's right to assert a Subsequent Malignancy Claim and Connecticut Valley Claims Services Company, Inc. so certifies to the Lummus Asbestos PI Trust. Any Subsequent Malignancy Claim so submitted by holders of Lummus Asbestos Personal Injury Claims or Settled Asbestos Claims to the Lummus Asbestos PI Trust shall be required to satisfy the conditions for approval set forth in the Lummus Asbestos PI Trust Agreement and Lummus TDP, and shall be evaluated, determined, and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Trust Agreement and Lummus TDP.

### (g) Class 6 — Non-Debtor Affiliate Intercompany Claims.

#### (1) Impairment and Voting.

Class 6 is impaired by the Plan. Each holder of a Claim in Class 6 is entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

#### (2) Treatment.

All Non-Debtor Affiliate Intercompany Claims will be paid in full subject to the subordination provisions set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

### (h) Class 7 — Equity Interests.

#### (1) Impairment and Voting.

Class 7 is impaired by the Plan. Each holder of a Claim in Class 7 is entitled to vote to accept or reject the Plan under Section 1126 of the Bankruptcy Code.

#### (2) Treatment.

On the Effective Date, holders of Equity Interests shall retain such interests in the Debtor, subject to the pledge and security interest in 51% of the issued and outstanding shares of Capital Stock of the Debtor, which will be held by ABB Oil & Gas as of the Effective Date, to secure the Lummus Note and the guaranty provided by ABB, ABB Holdings, and ABB Oil & Gas with respect to Lummus' payment obligations under the Lummus Note.

**5.5    Modification, Revocation, or Withdrawal of the Plan.**

*(a) Modification of the Plan.*

The Debtor, with the consent of the ACC, if appointed, the CCC, and the Lummus FCR, may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code or any other Plan Document at any time prior to the Lummus Confirmation Date so long as the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code. After the Lummus Confirmation Date, and prior to the Effective Date, the Debtor, with the consent of the ACC, if appointed, the CCC and the Lummus FCR, may alter, amend, or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code

*(b) Revocation or Withdrawal.*

*(1) Right to Revoke.*

The Plan may be revoked or withdrawn by the Debtor, prior to the Lummus Confirmation Date.

*(2) Effect of Withdrawal or Revocation.*

If the Plan is revoked or withdrawn prior to the Lummus Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor.

*(3) Amendment of Plan Documents.*

From and after the Effective Date, the authority to amend, modify, or supplement the exhibits to the Plan or any attachments thereto shall be as provided in such exhibits and their respective attachments.

*(c) Disallowed Claims and Disallowed Equity Interests.*

On and after the Effective Date, the Debtor shall be fully and finally discharged of any liability or obligation in respect of a Disallowed Claim or a Disallowed Equity Interest, and any order creating a Disallowed Claim or a Disallowed Equity Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Lummus Confirmation Order, except as otherwise provided herein, or unless the Bankruptcy Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Lummus Asbestos PI Trust Claims) and Equity Interests to the extent such Claims and Equity Interests are not allowable under any provision of Section 502 of the Bankruptcy Code, including time-barred Claims and Equity Interests, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

**5.6    Insurers' Rights.**

Notwithstanding anything to the contrary in the Plan or any of the Plan Documents, except as expressly provided in Section 3.2.4.4 of the Plan, nothing in the Plan or any of the Plan Documents (including any provision or exhibit other than Section 3.2.4.4 of the Plan, that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable, or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Lummus Insurance Policies or Subject Lummus Insurance Settlement Agreements, as applicable. Notwithstanding any other provision in Section 3.2.4.4 of the Plan, or any provision of any Subject Lummus Insurance Policies or Subject Lummus Insurance Settlement Agreements, nothing in the Plan, any Plan Document, or the Confirmation Order shall permit the assertion of claims, including, but not limited to, subrogation claims, defenses, rights, or causes of action, against Asbestos Protected Parties, which are otherwise channeled to the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Channeling Injunction.

Except as provided in the Lummus Asbestos Insurance Entity Injunction, nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all Claims, defenses, rights, or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Lummus Insurance Settlement Agreement. Nothing in the Plan or Lummus Confirmation Order shall be deemed to waive any Claims, defenses, rights, or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses, and/or exclusions contained in the Subject Lummus Insurance Policies and the Subject Lummus Insurance Settlement Agreements, including

any and all such Claims, defenses, rights, or causes of action based upon or arising out of Lummus Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

### 5.7   Implementation of the Plan.

#### (a) Transfer of ABB Consideration and Related Consideration.

On the Effective Date, Lummus, ABB, ABB Holdings, and ABB Oil & Gas shall provide the following contributions to the Lummus Asbestos PI Trust, which also are set forth in greater detail in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) (attached as Exhibit A to the Plan): (i) the execution and delivery of the Lummus Note; (ii) the delivery of the related guaranties by ABB, ABB Holdings and ABB Oil & Gas; (iii) the execution and delivery of the Pledge and Irrevocable Proxy pursuant to which fifty-one percent (51%) of the Capital Stock of Lummus will be pledged to the Lummus Asbestos PI Trust as security for the Lummus Note and the related guaranties; (iv) the subordination of ABB's intercompany claim against Lummus; and (v) the Lummus Insurance Recovery Guaranteed Payment and other payments with respect to the Subject Lummus Insurance Policies as more fully set forth in the Non-Debtor Affiliate Settlement Agreement (Lummus).

#### (b) Establishment of the Lummus Asbestos PI Trust.

On the Effective Date, the Lummus Asbestos PI Trust shall be established in accordance with the Plan Documents and the Lummus Asbestos PI Trust Documents. *See* Article 6 of this Disclosure Statement — "LUMMUS ASBESTOS PI TRUST AND LUMMUS ASBESTOS PI TRUST CLAIMS RESOLUTION MATTERS" for a description of the Lummus Asbestos PI Trust.

#### (c) Provisions for the Treatment of Disputed Claims.

##### (1) Objections to Claims and Prosecution of Disputed Claims; Lummus Asbestos PI Trust Claims.

Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to the allowance of Claims (other than Lummus Asbestos PI Trust Claims) shall be served and filed no later than ninety (90) days after the later of the Effective Date or the date the proof of claim was filed, subject to any extensions granted pursuant to a further order of the Bankruptcy Court. Nothing in the Plan shall be construed to limit, after the Effective Date, the Reorganized Debtor's right to object to the allowance of Claims filed with the Bankruptcy Court or any other Claims (other than Lummus Asbestos PI Trust Claims) to be resolved pursuant to the Plan with respect to which the Reorganized Debtor dispute liability in whole or in part. The Debtor reserves the right to designate any Claim (other than Lummus Asbestos PI Trust Claims) as a Disputed Claim on or before the Lummus Confirmation Date.

All Lummus Asbestos PI Trust Claims shall be evaluated, determined and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures. Only the Lummus Asbestos PI Trust shall have the right to object to Lummus Asbestos PI Trust Claims.

##### (2) Distribution on Account of Disputed Claims.

Notwithstanding Section 5.1 of the Plan, a Distribution shall be made to the holder of a Disputed Claim only when, and to the extent that, such Disputed Claim becomes allowed and pursuant to the appropriate provisions of the Plan covering the class of which such Disputed Claim is a part. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 of the Plan.

#### (d) Lummus Asbestos Insurance Entity Injunction.

##### (1) Purpose and Provisions.

In order to protect the Debtor and the Lummus Asbestos PI Trust and to preserve its assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the Lummus Asbestos Insurance Entity Injunction as described in Section 7.3.2 of the Plan.

##### (2) Terms.

All Entities (not including the Reorganized Debtor) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action (including any Lummus Asbestos PI Trust Claim), against any Lummus Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Lummus Asbestos PI Trust Claim, Demand, Lummus Asbestos PI Insurance Rights, Subject Lummus Insurance Policies, or Subject

Lummus Insurance Settlement Agreements whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

- commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, Demand, or cause of action against any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;

- enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;

- creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Lummus Asbestos Insurance Entity, or the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;

- except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action; and

- taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents relating to such Claim, Demand, or cause of action.

provided, however, that (i) the Lummus Asbestos Insurance Entity Injunction shall not impair in any way the rights, claims, or causes of action of the Debtor or the Reorganized Debtor; (ii) the Debtor or the Reorganized Debtor shall have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Lummus Asbestos Insurance Entity Injunction with respect to any Lummus Asbestos Insurance Entity upon express written notice to such Lummus Asbestos Insurance Entity; and (iii) the Lummus Asbestos Insurance Entity Injunction is issued solely for the benefit of the Debtor and the Reorganized Debtor, and is not issued for the benefit of any Lummus Asbestos Insurance Entity, and no Lummus Asbestos Insurance Entity is a third-party beneficiary of the Lummus Asbestos Insurance Entity Injunction.

*(3) Reservations.*

Notwithstanding anything to the contrary above, this Lummus Asbestos Insurance Entity Injunction shall not enjoin the rights, if any:

- of Entities to the treatment accorded them under the Plan, including the rights of Entities with Lummus Asbestos PI Trust Claims to assert such Lummus Asbestos PI Trust Claims against the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP;

- of Entities to assert any claim, debt, obligation, or liability for payment of Lummus Asbestos PI Trust Expenses against the Lummus Asbestos PI Trust;

- of the Debtor or the Reorganized Debtor to prosecute any action based on or arising from Lummus Asbestos Insurance Rights; and

- of the Debtor or the Reorganized Debtor to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Entity based on or arising from the Lummus Asbestos Insurance Rights.

*(e) Lummus Asbestos PI Channeling Injunction.*

Subject to Section 7.14.2 of the Plan, on and after the Effective Date, the Lummus Asbestos PI Channeling Injunction shall apply to all present holders of Settled Asbestos Claims, and present and future holders of Lummus Asbestos PI Trust Claims, and all present holders of Settled Asbestos Claims and all present and future holders of Lummus Asbestos PI Trust Claims shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Settled Asbestos Claim or Lummus Asbestos PI Trust Claims, other than from the Lummus Asbestos PI Trust in the case of Lummus Asbestos

PI Trust Claims (in accordance with the applicable trust distribution or payment procedures) or in the case of Settled Asbestos Claims from the Reorganized Debtor (in accordance with the applicable settlement agreements):

- commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party, or any Settling Lummus Asbestos Insurance Company;

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company, or any property or interests in property of any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company;

- setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company; and

- proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Lummus Asbestos PI Trust, except in conformity and compliance with the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures.

The sole recourse of the holder of a Lummus Asbestos PI Trust Claim on account of such Lummus Asbestos PI Trust Claim shall be to the Lummus Asbestos PI Trust pursuant to the provisions of the Plan, Lummus Asbestos PI Channeling Injunction, Lummus Asbestos PI Trust Agreement, and Lummus Asbestos PI Trust Distribution Procedures, and such holder shall have no right whatsoever at any time to assert its Lummus Asbestos PI Trust Claim against the Debtor, Reorganized Debtor, any Settling Lummus Asbestos Insurance Company, or any Asbestos Protected Party, or any property or interest in property of the Debtor, the Reorganized Debtor, any other Asbestos Protected Party, or any Settling Lummus Asbestos Insurance Company.

The sole recourse of a holder of a Settled Asbestos Claim on account of such Settled Asbestos Claim shall be to the Reorganized Debtor pursuant to the terms of the applicable settlement agreement with the Debtor which agreement was binding and enforceable prior to February 17, 2003, and such holder shall have no right to assert his or her Settled Asbestos Claim against the Lummus Asbestos PI Trust, any Settling Asbestos Insurance Company, or any Asbestos Protected Party (other than the Reorganized Debtor), or any property or interest of the Lummus Asbestos PI Trust, any Settling Asbestos Insurance Company, or any Asbestos Protected Party (other than the Reorganized Debtor).

Notwithstanding the terms of the Lummus Asbestos PI Channeling Injunction or any other provision in the Plan, any other Plan Document, or the Lummus Confirmation Order to the contrary (i) no holder of a Lummus Asbestos PI Trust Claim or Subsequent Malignancy Claim shall be enjoined from asserting, on or after the Effective Date, such claim against the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP, and any such Lummus Asbestos PI Trust Claim or Subsequent Malignancy Claim shall be evaluated, determined and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Trust Agreement and the Lummus TDP, and (ii) no holder of a Settled Asbestos Claim shall be enjoined from asserting, on or after the Effective Date, such claim against the Reorganized Debtor in accordance with the applicable settlement agreement with the Debtor which agreement was binding and enforceable prior to February 17, 2003, and any such Settled Asbestos Claim shall be evaluated, delivered, and paid (if and to the extent entitled to payment) by the Reorganized Debtor pursuant to the terms of such settlement agreements.

Anything in the Plan, any Plan Document, the Confirmation Order or the Lummus Asbestos PI Channeling Injunction or otherwise to the contrary notwithstanding, upon the entry of an order of the Bankruptcy Court finding that an Injunction Default has occurred, (i) the Lummus Asbestos PI Channeling Injunction, the provisions of Sections 3.2.5.2, 7.2.7 (as to clause (2)), 7.2.9, 7.14.1, 11.2, 11.6 (to the extent necessary to the assertion and prosecution of the claims referred to below), 11.7.2, 11.7.3, and 11.8 of the Plan, the provisions of Section 7.2.5 of the Plan to the extent necessary to permit the assertion of Lummus Asbestos PI Trust Claims and claims to enforce the Plan and the Plan Documents and all obligations and liabilities arising thereunder or in connection therewith, the provisions of Sections 3.4 and 4.4 of the Lummus Asbestos PI Trust Agreement, the provisions of Sections 3.1 and 3.3 of the ABB and Non-Debtor Affiliate Settlement Agreement

(Lummus) and any other release, exculpation, injunction, indemnity or other limitation or any provision of the Plan or any Plan Document or the Confirmation Order effecting or purporting to effect any release, exculpation, injunction, indemnity or other limitation, relating to Lummus Asbestos PI Trust Claims and claims to enforce the Plan and the Plan Documents and all obligations and liabilities arising thereunder or in connection therewith, shall forthwith automatically and without further order or action whatsoever terminate and be of no force or effect with respect to ABB, ABB Oil & Gas, ABB Holdings, any other obligor in respect of any obligation or liability arising under or in respect of the Plan or any Plan Documents, and any Guarantor who or which, on the date of the Injunction Default, was an Affiliate of ABB or ABB Holdings, (ii) thereupon and at all times thereafter (subject to the right of the Trustee of the Lummus Asbestos PI Trust to request that the Court reinstate the Lummus Asbestos PI Channeling Injunction if, in the Trustee's absolute discretion, he or she deems such reinstatement to be in the best interests of the Lummus Asbestos PI Trust), Lummus Asbestos PI Trust Claims and claims to enforce the Plan and the Plan Documents and all obligations and liabilities arising hereunder or thereunder or in connection therewith may be freely asserted against ABB, ABB Holdings, and/or any Guarantor who or which was, on the date of the Injunction Default, an Affiliate of ABB or ABB Holdings, and (iii) none of ABB, ABB Holdings, or any Guarantor who or which was, on the date of the Injunction Default, an Affiliate of ABB or ABB Holdings shall be entitled or have the right to be indemnified by, make or assert a claim against or otherwise recover from the Lummus Asbestos PI Trust (or any other Entity to the extent giving rise to any claim against or recovery from the Lummus Asbestos PI Trust) for, on account of or in respect of any such Claim or Demand. Notwithstanding the foregoing, an Injunction Default shall not be deemed to have occurred (i) solely as a result of a failure by ABB, ABB Holdings, or ABB Oil & Gas to make a payment of Aggregate Insurance Recoveries pursuant to Section 2.2 of the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) based solely upon ABB's reasonable assertion in good faith that an event which gives rise to an obligation to make such payment has not occurred or is disputed (a "Disputed Payment"), or (ii) failure on the part of the Debtor, the Reorganized Debtor, ABB, ABB Holdings, or ABB Oil & Gas to make a payment on account of Aggregate Insurance Recoveries as a result of a good faith effort on the part of such Entity (a "Missed Payment") unless within ten (10) days after the resolution of such Disputed Payment or such Missed Payment (whether by agreement of the parties or an order becomes a Final Order determining that such Disputed Payment or Missed Payment is due), ABB (or an entity acting on ABB's behalf) fails to pay such Disputed Payment or Missed Payment in full together with, unless the parties agree to the contrary, interest at a rate equal to the sum of (x) the Wall Street Journal—National Edition daily prime rate plus (y) four (4) percent, from the date such Disputed Payment or Missed Payment was originally due without regard to any dispute or error until the date such amount is paid in full. If it is determined that all or any portion of such Disputed Payment or Missed Payment is due, ABB, ABB Holdings, or ABB Oil & Gas shall also promptly pay the reasonable costs and expenses (including reasonable attorneys' fees) paid or incurred by the Lummus Asbestos PI Trust in connection with such dispute or error or the resolution thereof.

No other provision of the Plan, any Plan Document, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction or otherwise shall, or shall be deemed to, limit, modify, override or supersede the provisions of Section 7.14.2 of the Plan.

With respect to Lummus Asbestos PI Trust Claims, anything in the Plan, any Plan Documents, the Lummus Confirmation Order or the Lummus Asbestos PI Channeling Injunction or otherwise to the contrary notwithstanding, the Lummus Asbestos PI Channeling Injunction shall operate and be construed to stay, restrain, and enjoin Lummus Asbestos PI Trust Claims and Demands (subject also to the other limitations set forth in the Plan and Plan Documents) only to the extent such Lummus Asbestos PI Trust Claims and Demands (whether now existing or hereafter arising) based upon the Debtor's direct or indirect liability or alleged liability. For the sake of clarity, Lummus Asbestos PI Trust Claims and Demands "based upon the Debtor's direct or indirect liability or alleged liability" include Lummus Asbestos PI Trust Claims and Demands (whether now existing or hereafter arising) against any Alstom Protected Party which is (i) a former Affiliate of the Debtor, or (ii) a direct or indirect successor to, or transferee of assets of, the Debtor or a former Affiliate of the Debtor (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and Demands and such liability is asserted to exist as a result of its becoming such a transferee or successor)) in either case to the extent such Lummus Asbestos PI Trust Claims and Demands arise as a consequence of the acts, omissions, products, business, or operations of an Entity when such Entity was an Affiliate of the Debtor.

*(f) Term of Certain Injunctions and Automatic Stay; Injunction Default.*

All of the injunctions and/or the automatic stay provided for in or in connection with the Chapter 11 Case, whether pursuant to Section 105, Section 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Lummus Confirmation Date shall remain in full force and effect until the injunctions set forth in the Plan become effective, and thereafter if so provided by the Plan, the Lummus Confirmation Order, or as otherwise provided by the Bankruptcy Code. In addition, on and after the Lummus Confirmation Date, the Reorganized Debtor may seek such

further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Lummus Confirmation Date and the Effective Date.

Unless otherwise provided in the Plan or an order issuing the Lummus Asbestos PI Channeling Injunction, each of the injunctions contained in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or in the injunctions. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Lummus Confirmation Date and the Effective Date.

In the event that the Lummus Asbestos PI Trust determines that an Injunction Default may have occurred, the Lummus Asbestos PI Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court, or if such court lacks jurisdiction, the District Court, that an Injunction Default has occurred. Upon entry of an order by the Bankruptcy Court (or as the case may be, the District Court) finding that an Injunction Default has occurred, the provisions of 7.14.2 shall apply, in addition to all other remedies available at law, in equity, or under any of the Plan Documents.

*(g) No Successor Liability; No Liability For Certain Released Claims.*

Except as otherwise expressly provided in the Plan with respect to the Debtor, the Reorganized Debtor, and the Lummus Asbestos PI Trust, the Debtor, the Reorganized Debtor, the other Asbestos Protected Parties, and the Lummus Asbestos PI Trust do not, pursuant to the Plan, assume, agree to perform, pay, or indemnify creditors or any other Entity for any liabilities or obligations of the Debtor, relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Lummus Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtor, nor the Lummus Asbestos PI Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtor and the Lummus Asbestos PI Trust shall assume the obligations specified in the Plan and the Lummus Confirmation Order.

Except as otherwise expressly provided in the Plan, effective on the Effective Date, the Released Parties, their respective Representatives and the Additional Indemnitees shall unconditionally and irrevocably be fully released from any and all claims and causes of action arising under Section 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar claims arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of its businesses or operations that occurred or existed prior to the Effective Date.

*(h) Non-Dischargeable Environmental Liability.*

Nothing in the Plan shall be deemed as discharging or otherwise affecting the rights of Governmental Units to assert claims or causes of action against the Reorganized Debtor on account of or arising under applicable environmental laws to the extent that such rights are not otherwise dischargeable under the provisions of the Bankruptcy Code.

Nothing in the Plan or any related document shall be deemed to discharge, impair, or otherwise adversely affect the police and regulatory rights and claims of Governmental Units on account of or arising under applicable environmental laws and such regulatory rights and the claims of Governmental Units against the Debtor and the Reorganized Debtor shall survive the Chapter 11 Case and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated, if the Debtor had not commenced its Chapter 11 Case.

*(i) Rights Against Non-Debtor under Environmental Laws.*

Notwithstanding anything to the contrary contained in the Plan, the injunction set forth in Sections 7.3 and 7.14 of the Plan shall not impair the rights or causes of action of the United States of America against non-Debtor parties under applicable environmental laws.

*(j) Filing of Amended Certificate of Incorporation.*

The Amended Certificate of Incorporation for the Reorganized Debtor shall be filed with the Secretary of State of Delaware on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date. The Amended Certificate of Incorporation shall provide (a) that the Reorganized Debtor is prohibited from issuing nonvoting equity securities, and (b) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference

over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends.

*(k) Transfer of ABB Consideration.*

On the Effective Date, the ABB Consideration shall be delivered to the Lummus Asbestos Pi Trust as set forth more fully in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

*(l) Transfer of Claims and Demands to the Lummus Asbestos PI Trust.*

On the Effective Date, all liabilities, obligations, and responsibilities relating to all Lummus Asbestos PI Trust Claims shall be channeled to the Lummus Asbestos PI Trust.

*(m) Books and Records.*

The Lummus Asbestos PI Trust and its Representatives shall have access to all of the books and records of the Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates who are domiciled in the United States (the "Domestic Non-Debtor Affiliates") to the extent that such books or records relate to any Lummus Asbestos PI Trust Assets or any Lummus Asbestos PI Trust Claims (the "Asbestos Books"). The Asbestos Books may be used by the Lummus Asbestos PI Trust and its Representatives to assist in the processing and determination of, objection to, and otherwise in connection with, Lummus Asbestos PI Trust Claims pursuant to the Lummus TDP. Except to the extent necessary or desirable, in the processing and determination of, objection to, or otherwise in connection with, Lummus Asbestos PI Trust Claims, as determined by the Lummus Asbestos PI Trust in its sole discretion, the information contained in he Asbestos Books shall be treated as confidential. Access shall be afforded by the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates upon receipt of reasonable advance notice and during normal business hours. The Reorganized Debtor shall be responsible for the costs and expenses incurred in providing access to the Asbestos Books pursuant to Section 7.2.6 of the Plan. The Lummus Asbestos PI Trust shall be responsible for all other costs and expenses of copying or reproduction of the Asbestos Books. If the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall desire to dispose of any of the Asbestos Books, such parties shall, prior to such disposition, give a reasonable opportunity to the Lummus Asbestos PI Trust to segregate and remove such Asbestos Books as the Lummus Asbestos PI Trust may select. In addition, the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall permit the Lummus Asbestos PI Trust and its Representatives to conduct reasonable interviews of officers and employees concerning matters reasonably related to the Asbestos Books. The Lummus Asbestos PI Trust shall bear the burden of any costs or expenses incurred by it from the review of the Asbestos Books by it or its Representatives.

*(n) Discharge of Liabilities to Holders of Lummus Asbestos PI Trust Claims.*

Except as provided in the Plan Documents and the Lummus Confirmation Order, the transfer to, vesting in, and assumption by the Lummus Asbestos PI Trust of the Lummus Asbestos PI Trust Assets as contemplated by the Plan and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), among other things, on the Effective Date shall (1) discharge the Debtor and the Reorganized Debtor for and in respect of all Lummus Asbestos PI Trust Claims and (2) release and extinguish all obligations and liabilities of the Released Parties for and in respect of all Lummus Asbestos PI Trust Claims. On the Effective Date, the Lummus Asbestos PI Trust shall assume all Lummus Asbestos PI Trust Claims and on and after the Effective Date shall pay the Lummus Asbestos PI Trust Claims in accordance with and to the extent entitled to payment by the Lummus TDP.

*(o) Institution and Maintenance of Legal and Other Proceedings.*

As of the Effective Date, the Lummus Asbestos PI Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Lummus Asbestos PI Trust.

*(p) Indemnification by the Lummus Asbestos PI Trust.*

As and to the extent provided in the Lummus Asbestos PI Trust Agreement or the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) and in accordance with the procedures set forth therein, the Lummus Asbestos PI Trust will indemnify and hold harmless each of (i) the Debtor and the Reorganized Debtor and their respective Subsidiaries and their respective past, present, and future Representatives, in their capacities as such; and (ii) the Released Parties.

### (q) Distributions Under the Plan.

#### (1) Plan Distributions.

With respect to all Allowed Claims (other than Lummus Asbestos PI Trust Claims), each Distribution shall be made by the Reorganized Debtor on the related Distribution Date (unless otherwise provided herein or ordered by the Bankruptcy Court). With respect to Lummus Asbestos PI Trust Claims, Distributions to holders of Lummus Asbestos PI Trust Claims shall be made by the Lummus Asbestos PI Trust in accordance with the terms of the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures if and to the extent entitled to payment thereunder.

#### (2) Timing of Plan Distributions.

Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### (r) Delivery of Distributions and Undeliverable or Unclaimed Distributions.

#### (1) Delivery of Distributions in General.

Distributions to holders of Claims (other than Lummus Asbestos PI Trust Claims) shall be made at the address of the holder of such Claim as indicated on records of the Debtor.

#### (2) Undeliverable Distributions.

Any Cash, assets, and other properties to be distributed under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one (1) year after distribution or (b) one-hundred twenty (120) calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and delivered free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity without further action of any Entity, and all rights with respect to such assets and properties shall be vested in and enforceable by (i) the Lummus Asbestos PI Trust for the benefit of the holders of Lummus Asbestos PI Trust Claims in the case of unclaimed distributions from the Lummus Asbestos PI Trust and all rights with respect to such assets and properties shall be enforceable by the Lummus Asbestos PI Trust; or (ii) the Reorganized Debtor in the case of all other remaining unclaimed distributions and all rights with respect to such assets and properties shall be enforceable by the Reorganized Debtor. In such event, such Entity's Claim shall no longer be deemed to be allowed, and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such distribution, and shall not participate in any further distributions under the Plan with respect to such Claim.

### (s) Manner of Payment Under the Plan.

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Reorganized Debtor or the Lummus Asbestos PI Trust shall be made, at the election of the Reorganized Debtor or the Lummus Asbestos PI Trust, respectively, by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 5.8    Executory Contracts, Unexpired Leases, Insurance Agreements, and Benefits Program.

### (a) Assumption or Rejection of Executory Contracts and Unexpired Leases.

Except for executory contracts that the Debtor rejects prior to the Effective Date or designates as being subject to rejection in connection with the Effective Date, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to Section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Reorganized Debtor on the Effective Date, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Lummus Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to Section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, the Bankruptcy Estate and all parties in interest in the Chapter 11 Case. Notwithstanding the foregoing, any executory agreements respecting Lummus Asbestos Personal Injury Claims or Settled Asbestos Claims are not assumed under the terms of the Plan. With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtor, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtor with respect to the assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtor's business promptly after any such default becomes known to the Debtor and, if disputed, established

pursuant to applicable law, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amount, all defaults of the Debtor existing as of the Lummus Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

Executory contracts and unexpired leases previously assumed by the Debtor during the Chapter 11 Case pursuant to Section 365 of the Bankruptcy Code shall be governed by and subject to the provisions of the order of the Bankruptcy Court authorizing the assumption thereof.

*(b) Compensation and Benefits Program.*

Unless otherwise agreed to by the affected parties or modified by order of the Court, all of the Debtor's obligations under employment and severance policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

**5.9    Retention of Jurisdiction.**

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction to the fullest extent provided by applicable law over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Case or the Plan for which the reference has not been withdrawn to the District Court, or (c) that relates to the following:

*(a) Plan Documents.*

To interpret, enforce, and administer the terms of the Plan, the Plan Documents, and all annexes and exhibits thereto;

*(b) Executory Contracts and Unexpired Leases.*

To hear and determine any and all motions or applications pending on the Lummus Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Lummus Confirmation Date;

*(c) Causes of Action.*

To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor or the Lummus Asbestos PI Trust after the Effective Date, including any claims to recover assets for the benefit of the Debtor's Bankruptcy Estate that have not otherwise been released pursuant to the terms of the Plan;

*(d) Disputed Claims Allowance/Disallowance.*

To hear and determine any objections to the allowance of Claims (except those involving Lummus Asbestos PI Trust Claims), and Settled Asbestos Claims, including to hear and determine any objections to the classification of any Claim or Settled Asbestos Claim and to allow or disallow any Disputed Claim or Settled Asbestos Claim in whole or in part;

*(e) Enforcement/Modification of the Plan.*

(1) To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by Section 1142 of the Bankruptcy Code;

(2) To consider and approve any modifications of the Plan or the Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Lummus Confirmation Order in accordance with the provisions of the Bankruptcy Code;

(3) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(4) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus);

(5) To hear and determine all objections to the termination of the Lummus Asbestos PI Trust;

(6) To determine such other matters that may be set forth in the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction, or the Lummus Asbestos PI Trust Agreement, or that may arise in connection with the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction, or the Lummus Asbestos PI Trust Agreement;

(7) To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Lummus Asbestos PI Channeling Injunction or the Lummus Asbestos Insurance Entity Injunction;

(8) To enter an order or final decree closing the Chapter 11 Case;

(9) To hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(10) To enter such orders as are necessary to implement and enforce the injunctions described herein, including orders extending the protections afforded by Section 524(g) of the Bankruptcy Code to the Settling Lummus Asbestos Insurance Entities; and

(11) To enter orders authorizing immaterial modifications to the Plan and to hear and determine any issue or proceeding involving the Lummus Asbestos PI Trust, in order to comply with Section 468B of the IRC.

*(f) Compensation of Professionals.*

To hear and determine all applications for allowances of compensation and reimbursement from the Debtor's estate of expenses of professionals under Sections 330, 331, and 503 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

*(g) Settlements.*

To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtor's Bankruptcy Estate;

*(h) Taxes.*

To hear and determine matters concerning state, local, and Federal taxes, fines, penalties, or additions to taxes for which the Debtor or Debtor in Possession may be liable, directly or indirectly, in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

*(i) Specific Purposes.*

To hear and determine such other matters and for such other purposes as may be provided in the Lummus Confirmation Order, the Plan, or the other Plan Documents; and

*(j) Insurance Matters.*

To hear and determine matters concerning insurance; however, the Bankruptcy Court shall have non-exclusive jurisdiction over such matters.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters specified in Article 9 of the Plan, the reference to the "Bankruptcy Court" in Article 9 of the Plan shall be deemed to be replaced by the "District Court." Notwithstanding anything in Article 9 of the Plan to the contrary, the satisfaction of Lummus Asbestos PI Trust Claims and the forum in which such Lummus Asbestos PI Trust Claims will be determined will be governed by the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures.

**5.10    Miscellaneous Provisions of the Plan.**

*(a) Discharge of the Debtor and Waiver of Injunction Protection.*

Except as otherwise provided in the Plan, the rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtor and the Debtor in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date all Claims against and Equity Interests in the Debtor and the Debtor in Possession **(including any based on**

acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the Debtor, or any conduct for which the Debtor may be deemed to have strict liability under any applicable law to the extent such claims may be discharged under applicable law and jurisprudence existing on the Lummus Confirmation Date) shall be satisfied, discharged, and released in full. The Reorganized Debtor shall not be responsible for any obligations of the Debtor or the Debtor in Possession except those expressly imposed upon or assumed by the Reorganized Debtor pursuant to or in accordance with the Plan. Except as expressly provided in the Plan, all Entities shall be precluded and forever barred from asserting against the Lummus Asbestos PI Trust and the Asbestos Protected Parties, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

Any non-Debtor Entity may, by express written instrument, waive or limit any protection or benefit afforded to it with respect to a third party under the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction or otherwise under the Plan or any order issued in furtherance of the Plan, and any claims or legal actions of such third party against the non-Debtor Entity executing the waiver that are permitted by reason of such waiver or limitation shall be deemed to be expressly allowed under the terms of the Plan.

*(b) Rights of Action.*

Except to the extent released or assigned pursuant to the Plan or any other Plan Document, any rights, claims, or causes of action accruing to the Debtor or the Debtor in Possession pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any avoidance or recovery actions under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of, or which provides indemnity or liability payments to or on behalf of, the Debtor or the Debtor in Possession, and any rights, claims, and causes of action against third parties related to or arising out of allowed Claims, shall, on the Effective Date, be retained by the Reorganized Debtor.

Except to the extent inconsistent with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) or otherwise inconsistent with the Plan, any rights or Claims to the extent required for the Lummus Asbestos PI Trust to realize the benefit therefrom shall be assigned to the Lummus Asbestos PI Trust or if deemed necessary shall be pursued in the name of the Debtor or the Reorganized Debtor, or in the name of any other party transferring such rights for the benefit of the Lummus Asbestos PI Trust. Nothing in Section 11.3 of the Plan, however, shall be deemed to be a transfer by the Debtor or the Reorganized Debtor of any claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtor to conduct its business in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by the Plan, the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), or other Plan Documents, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights, claims, causes of action, or defenses against any parties, including Creditors and holders of Equity Interests which are not otherwise treated under the Plan.

*(c) Third Party Agreements.*

The Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect.

*(d) Dissolution of the ACC; Retention of the Future Claimants' Representative; Creation of the Trust Advisory Committee.*

On the Effective Date, the ACC, if appointed, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case. The ACC shall thereupon be deemed dissolved; provided, however, that, (i) in the event that the Effective Date occurs prior to the Lummus Confirmation Order becoming a Final Order, the ACC may, at its option, continue to serve and function for the purpose of participating in any appeal of the Lummus Confirmation Order until such time as the Confirmation Order becomes a Final Order and (ii) if the Effective Date occurs prior to the conclusion of any outstanding litigation or adversary proceedings in the Chapter 11 Case or prior to the entry of a Final Order with respect to final fee applications of professionals retained by order of the Bankruptcy Court during the Chapter 11 Case, the ACC may, at its option, continue to serve until a Final Order is entered with respect to such proceedings. On the Confirmation Date, effective upon the Effective Date, the Trust Advisory Committee shall be appointed as provided in Section 7.2.3 of the Plan. The Lummus Future Claimants' Representative shall continue to serve as provided in the Lummus Asbestos PI Trust Agreement in order to perform the functions required by and as set forth in that agreement. Upon termination of the Lummus Asbestos PI Trust, (i) the Trust Advisory Committee for the Lummus Asbestos PI Trust and the Lummus Future Claimants' Representative shall thereupon be released and discharged of

and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case, and (ii) the Trust Advisory Committee for the Lummus Asbestos PI Trust shall be deemed dissolved and the Lummus Future Claimants' Representative's employment shall be deemed terminated. All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Trust Advisory Committee for the Lummus Asbestos PI Trust and the Lummus Future Claimants' Representative shall be paid by the Lummus Asbestos PI Trust in accordance with the terms of the Lummus Asbestos PI Trust Agreement. If there shall be any dispute regarding the payment of such fees and expenses, the parties shall attempt to resolve such dispute in good faith and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

*(e) Exculpation.*

Except for their obligations expressly set forth in the Plan or the other Plan Documents, none of the Debtor, the Reorganized Debtor, the ABB Indemnified Parties, the Alstom Protected Parties, the Trustees of the Lummus Asbestos PI Trust, the Additional Indemnitees, the Lummus Future Claimants' Representative, the ACC, the CE FCR, the CCC or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the negotiation of the Plan, the CE Plan, or any Plan Documents related thereto or proposed in connection with the Chapter 11 Case, negotiation of the settlement provided in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), the pursuit of confirmation of the Plan, the CE Plan, or any Plan Documents related thereto or proposed in connection with the Chapter 11 Case, the consummation of the Plan or the settlement provided in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), or the administration of the Plan, the CE Plan or the property to be distributed under the Plan (including any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities based on conduct that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct — but not, in the case of any natural person included among the Entities to which Section 11.6 of the Plan applies, any claims against that person based on intentional misconduct of that person that directly resulted in the unjust enrichment of that person — of any of the Debtor, the Reorganized Debtor, the ABB Indemnified Parties, the Trustees of the Lummus Asbestos PI Trust, the Additional Indemnitees or any of their respective Representatives or any conduct for which any of those Entities may be deemed to have strict liability under any applicable law). In all respects, the foregoing Entities will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or any of the Plan Documents proposed in the Chapter 11 Case.

*(f) Releases and Indemnities.*

*(1) Release of Representatives of the Debtor and Non-Debtor Affiliates.*

To the extent permitted by law applicable to cases under title 11 of the United States Code as of the Effective Date, except as otherwise specifically provided in the Plan and the other Plan Documents, for good and valuable consideration, the receipt and sufficiency of which is acknowledged in the Plan, all current and former Representatives of the Debtor, and all current and former Representatives of the Non-Debtor Affiliates, on and after the Effective Date, are released from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based in whole or in part, upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for claims or liabilities resulting from their services as officers or directors of the Debtor or, to the extent such claims or liabilities relate to the business, operations, or management of the Debtor prior to the Effective Date or any of the matters referred to in Section 11.6 of the Plan, any of the Non-Debtor Affiliates.

*(2) Indemnities.*

The Reorganized Debtor shall defend, hold harmless, and indemnify to the fullest extent permitted by applicable law: (i) its own current and former Representatives; (ii) the current and former Representatives of the Non-Debtor Affiliates; (iii) the ABB Indemnified Parties; (iv) the Alstom Protected Parties, (v) the Structured Finance Protected Parties, (vi) the OGP Protected Parties, and all other releasees and indemnitees pursuant to the provisions of, and to the extent set forth in, the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) or the Plan on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 11.7.1 of the Plan. In each case, with respect to any such claim or liability, and, in connection therewith, if and whenever any indemnified party described herein is, or is threatened to be made, a party to any action, suit, arbitration, investigation, or other proceeding that might give rise to a right of indemnification under Section 11.7.2 of the Plan, the indemnifying party shall, to the extent permitted by applicable law, advance to that indemnified party all expenses (including attorneys' fees) reasonably incurred by or on behalf of that indemnified party in connection therewith within ten (10) days after the indemnifying party receives a statement or statements from that indemnified party requesting an advance or

advances from time to time, whether prior to or after final disposition of such action, suit, arbitration, investigation, or other proceeding.

### (3) Specific Releases by Holders of Claims.

To the extent permitted by law applicable to cases under title 11 of the United States as of the Effective Date, other than rights to the treatment provided in Article III of the Plan or as otherwise provided herein, on and after the Effective Date, each holder of a Claim (i) who has accepted the Plan or (ii) who is entitled to receive a Distribution of property under the Plan, shall be deemed to have unconditionally released the Released Parties, the ACC, the Lummus Future Claimants' Representative, the CCC, and their current and former Representatives from any and all claims (as defined in Section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtor or the Reorganized Debtor, the Chapter 11 Case, or the negotiation, formulation, and preparation of the Plan or any related agreements, instruments, or other documents.

### (4) Limitation on Plan Releases.

With respect to Lummus Asbestos PI Trust Claims and Demands, anything in the Plan, any Plan Document, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction or otherwise to the contrary notwithstanding, the releases, exculpatory provisions, injunctions, and indemnifications provided to or afforded any Released Party shall operate and be construed to release, exculpate, benefit, or indemnify such Released Party (subject also to the other limitations set forth in the Plan and Plan Documents) only as to such Lummus Asbestos PI Trust Claims or Demands (whether now existing or hereafter arising) based upon the Debtor's direct or indirect liability or alleged liability. For the sake of clarity, Lummus Asbestos PI Trust Claims and Demands "based upon the Debtor's direct or indirect liability or alleged liability" include Lummus Asbestos PI Trust Claims and Demands (whether now existing or hereafter arising) against any Alstom Protected Party which is (i) a former Affiliate of the Debtor, or (ii) a direct or indirect successor to, or transferee of assets of, the Debtor or a former Affiliate of the Debtor (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and Demands and such liability is asserted to exist as a result of its becoming such a transferee or successor)) in either case to the extent such Lummus Asbestos PI Trust Claims and Demands arise as a consequence of the acts, omissions, products, business, or operations of an Entity when such Entity was an Affiliate of the Debtor.

### (5) Non-Dischargeable ERISA Liability.

The Debtor is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act ("ERISA") applies ("Pension Plans"). Nothing contained in the Plan, the Lummus Confirmation Order, the Bankruptcy Code (including Section 1141 thereof), or any other document filed in Debtor's Chapter 11 Case shall be construed to discharge, release or relieve the Debtor, or any other party, in any capacity, from any liability or responsibility with respect to the Pension Plans under any law, governmental policy, or regulatory provision. No Entity, including the Pension Benefit Guaranty Corporation ("PBGC") and the Pension Plans shall be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan, (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Lummus Confirmation Order, the Bankruptcy Code (and Section 1141 thereof), or any other document filed in Debtor' Chapter 11 Case. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any such liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Lummus Asbestos PI Trust or any of the Lummus Asbestos PI Trust Assets.

### (g) Title to Assets; Discharge of Liabilities.

On the Effective Date, title to all of the Lummus Asbestos PI Trust Assets shall vest in the Lummus Asbestos PI Trust free and clear of all Claims, Demands, Equity Interests, Encumbrances and other interests of any Entity without further action of any Entity and all rights with respect to such assets and properties shall be vested in and enforceable by the Lummus Asbestos PI Trust. Except as otherwise provided in the Plan, on the Effective Date, title to all of the Debtor's assets and properties and interests in property shall vest in the Reorganized Debtor, other than the ABB Consideration, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity without further action of any Entity

and all rights with respect to such assets and properties shall be vested in and enforceable by the Reorganized Debtor, and the Lummus Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtor.

### (h) *Exemption from Transfer Taxes.*

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in Section 1146(c).

### (i) *Compliance with Tax Requirements.*

In connection with the Plan, the Debtor, the Reorganized Debtor and the Lummus Asbestos PI Trust, will comply with all withholding and reporting requirements imposed by Federal, state, local and foreign taxing authorities, and all Distributions thereunder shall be subject to such withholding and reporting requirements.

### (j) *Governing Law.*

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the principles of conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

### (k) *Further Assurances*

The Debtor, the Reorganized Debtor, ABB, the Non-Debtor Affiliates, the Lummus Asbestos PI Trust, the Lummus FCR, the CCC, and all holders of Claims entitled to receive Distributions under the Plan, all holders of Lummus Asbestos PI Trust Claims and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the Plan and the other Plan Documents as may be necessary to effectuate the provisions and intent of the Plan and the other Plan Documents, with each such Entity to bear its own costs incurred in connection therewith except as otherwise agreed.

### (l) *Execution of CE Plan Documents.*

On the Effective Date, the Debtor shall execute, be bound by, and deliver to the CE Asbestos PI Trust, in connection with the closing of the transactions contemplated by the CE Plan, the Insurance Assignment Agreement and the Contribution Agreement.

## Article 6

## LUMMUS ASBESTOS PI TRUST AND LUMMUS ASBESTOS
## PI TRUST CLAIMS RESOLUTION MATTERS

**THE FOLLOWING IS A SUMMARY OF CERTAIN SIGNIFICANT FEATURES OF THE LUMMUS ASBESTOS PI TRUST. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE COMPLETE TEXT OF THE LUMMUS ASBESTOS PI TRUST DOCUMENTS AND THE PLAN.**

Establishment and Purpose of the Lummus Asbestos PI Trust shall be created in accordance with the Plan Documents. The Lummus Asbestos PI Trust will, upon confirmation of the Plan, be a QSF in accordance with the Treasury Regulations under Section 468B of the IRC. The purpose of the Lummus Asbestos PI Trust will be to assume all Lummus Asbestos PI Trust Claims (whether now existing or arising at any time thereafter) and to use the Lummus Asbestos PI Trust Assets to pay holders of Lummus Asbestos PI Trust Claims in accordance with (if and to the extent entitled to payment thereunder) the Lummus Asbestos PI Trust Agreement and the Lummus TDP and in such a way that provides reasonable assurance that the Lummus Asbestos PI Trust will value and be in a position to pay present and future Lummus Asbestos PI Trust Claims, that involve similar claims in substantially the same manner and to otherwise comply in all respects with the requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code. On the Effective Date, all right, title, and interest in and to the Lummus Asbestos PI Trust Assets and any proceeds or causes of action thereunder shall be transferred to and vested in the Lummus Asbestos PI Trust, free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity without any further action of any Entity.

A copy of the Lummus Asbestos PI Trust Agreement, in substantially the form that will be executed, is attached as *Exhibit D* to the Plan.

### 6.1  The Trustee of the Lummus Asbestos PI Trust.

The Lummus FCR, the CCC, and the ACC, if appointed, will nominate a candidate to serve as the Trustee of the Asbestos PI Trust subject to the approval of the Court. The initial Trustee so nominated shall be set forth on a schedule to be filed prior to the Confirmation Date.

### 6.2  Appointment of Trust Advisory Committee Members.

Prior to or on the Lummus Confirmation Date, the Debtor, the CCC, the ACC, if appointed, and the Lummus Future Claimants' Representative, acting jointly, will nominate candidates to serve as members of the TAC subject to the approval of the Court. The initial candidates so nominated shall be set forth in a schedule to be filed with the Bankruptcy Court prior to the Confirmation Date.

### 6.3  Funding of the Lummus Asbestos PI Trust.

In consideration of the provision of the Lummus Asbestos PI Channeling Injunction and the releases and indemnification protection to be provided pursuant to the Plan and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), on behalf of ABB, ABB Holdings, ABB Oil & Gas, and the other Asbestos Protected Parties, subject to the satisfaction (or waiver by the appropriate party or parties) of the conditions set forth in Article 4 of the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), and effective as of the Effective Date, contributions will be made as previously described in Section 2.6(c) above — "ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)."

### 6.4  Indemnification and Release of OGP Protected Parties, Structured Finance Parties, ABB Indemnified Parties and Alstom Protected Parties.

ABB's OGP operating companies include certain entities that were owned directly or indirectly by an Affiliate of the Debtor. Although the Debtor does not believe that any entity in the OGP Division, other than itself, would be liable for Lummus Asbestos PI Trust Claims, protection of the OGP Division and any purchaser of the OGP Division as Asbestos Protected Parties under the Plan and as a Released Party under the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) is likely to enhance the value of ABB's enterprise, which the Debtor believes will inure to the benefit of all parties in interest, including holders of Lummus Asbestos PI Trust Claims.

In 2002, an Affiliate of the Debtor and a direct or indirect Subsidiary of ABB sold ABB's structured finance business to certain direct and indirect Subsidiaries of General Electric Company. Although the Debtor does not believe that any of the entities comprising the "Structured Finance Protected Parties" have any asbestos-related liabilities as a result of their own operations and does not believe that any entity in the Structured Finance Protected Parties otherwise would be liable for

Lummus Asbestos PI Trust Claims, ABB undertook in connection with such sale to, among other things, include the Structured Finance Protected Parties within the scope of the Lummus Asbestos PI Channeling Injunction.

The Reorganized Debtor will indemnify, release, and hold harmless each of the ABB Indemnified Parties, the Alstom Protected Parties, the OGP Protected Parties, the Structured Finance Protected Parties, and all other releasees and indemnitees pursuant to the provisions of, and to the extent set forth in, the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) or the Plan.

## 6.5    Establishment of the Lummus Asbestos PI Trust Distribution Procedures.

On the Effective Date, the Trustee shall promptly proceed to establish and implement the Lummus Asbestos PI Trust Distribution Procedures. The Lummus Asbestos PI Trust Distribution Procedures shall incorporate a compensable disease matrix, medical criteria, location of exposure, and other criteria as a basis for resolving Lummus Asbestos PI Trust Claims. The Lummus Asbestos PI Trust Distribution Procedures also shall provide mechanisms such as structured, periodic or supplemental payments, pro rata distributions, or periodic review of estimates of the numbers and values of present Lummus Asbestos PI Trust Claims and future Demands, or other comparable mechanisms, that provide reasonable assurance that the Lummus Asbestos PI Trust will value and be in a financial position to pay similar Lummus Asbestos PI Trust Claims in substantially the same manner.

## Article 7

## ESTIMATED CLAIMS BY CLASS

The Debtor estimates that the claims against it as of the Petition Date (assuming a December 2005 filing) would be as follows:

### 7.1  Claims Other Than Lummus Asbestos PI Trust Claims.

The table below estimates the aggregate amounts of Claims anticipated in each Class of Claims (other than Lummus Asbestos PI Trust Claims), as well as, the estimated recovery for each such class.

| CLASS OF CLAIMS | ESTIMATION OF AMOUNT OF CLAIM | ESTIMATION OF POTENTIAL RECOVERY |
| --- | --- | --- |
| **Administrative Expense Claims (excluding post-petition debt incurred in the ordinary course of business)** | The Debtor estimates that the cost of the Chapter 11 Case will likely total $6 million, including the cost of professionals engaged during the Chapter 11 Case. | 100% |
| **Tax Claims** | $1 million | 100% |
| **Class 1 — Priority Claims** | $0 | 100% |
| **Class 2 — Secured Claims** | $0 | 100% |
| **Class 3 — Workers' Compensation Claims** | $0 | 100% |
| **Class 4 — General Unsecured Claims (including Settled Asbestos Claims)** | Approximately $57 million | 100% |
| **Class 6 — Non-Debtor Affiliate Intercompany Claims** | Approximately $470 million as of the Solicitation Date against Lummus as set forth on Exhibit B to the Lummus Note and any indebtedness and liabilities (whether fixed, matured, contingent or otherwise) existing or which may arise to any Entities of the ABB Group for or in respect of letters of credit or credit support arrangements outstanding as of the close of business of the thirty-first (31st) day immediately preceding the Petition Date provided by any such Entities, including any reimbursement or indemnity obligations or liabilities for amounts drawn or subject to being drawn after the close of business of the thirty-first (31st) day immediately preceding the Petition Date under the letters of credit and other credit support arrangements identified in Exhibit C to the Lummus Note. | 100% |
| **Class 7 — Equity Interests** | All such interests are being retained. | 0% |

Some or all of the Claims in unimpaired Classes may be paid prior to the Effective Date pursuant to an order of the Bankruptcy Court. The estimate of Class 4 General Unsecured Claims does not include litigation claims. The estimate of General Unsecured Claims (Class 4 Claims) assumes the pre-payment of accrued pre-petition debts owed to ordinary course creditors. Actual claims may vary if the actual Chapter 11 filing occurs later than December 2005.

### (a) Note on Estimated Administrative Expense Claims.

Estimated Administrative Expense Claims consist primarily of professional fees. The estimate of Administrative Expense Claims below assumes that the Petition Date is in December 2005 and that the Effective Date occurs in April, 2006.

However, the actual length of the Chapter 11 Case could be longer, depending on factors such as the date the Chapter 11 Case is actually is filed, the Bankruptcy Court's scheduling of the Confirmation Hearing, and whether there is an appeal from the Lummus Confirmation Order. Assuming that the Chapter 11 Case is filed in December 2005, the Debtor estimates (based on information provided by the anticipated professionals) that professional fees will be approximately:

- *The Debtor's Professionals*:

| | | |
|---|---|---|
| Kirkpatrick & Lockhart Nicholson Graham LLP, counsel to the Debtor .............. | $ | 750,000 |
| Pachulski, Stang, Ziehl, Young, Jones, & Weintraub P.C., local counsel to the Debtor ..................................................................................................... | $ | 500,000 |
| The Blackstone Group L.P., financial consultants to the Debtor ........................... | $ | 600,000 |
| FTI Consulting, Inc., reorganization consultants to the Debtor ............................. | $ | 500,000 |
| Bankruptcy Services LLC., balloting, claims, and notice agent for the Debtor..... | $ | 400,000 |
| Gavin Anderson & Company, public relations consultants to the Debtor ............. | $ | 150,000 |

- *ACC Member and Professionals*:

| | | |
|---|---|---|
| ACC Member Expenses........................................................................................ | $ | 300,000 |
| Frank/Gecker LLP, national counsel to the ACC ................................................ | $ | 500,000 |
| Delaware local counsel to the ACC ..................................................................... | $ | 50,000 |

- *Lummus Future Claimants' Representative and Retained Professionals*:

| | | |
|---|---|---|
| Richard B. Schiro, Lummus Future Claimants' Representative ............................ | $ | 100,000 |
| Porter & Hedges, LLP, national counsel to the Lummus Future Claimants' Representative...................................................................................................... | $ | 300,000 |
| Delaware local counsel to the Lummus Future Claimants' Representative............ | $ | 35,000 |
| Hamilton, Rabinovitz & Alschuler, Inc., expert for the Lummus Future Claimants' Representative...................................................................................................... | $ | 100,000 |

## 7.2   **Lummus Asbestos PI Trust Claims.**

The table below estimates the aggregate amount of anticipated Lummus Asbestos PI Trust Claims, as well as the estimated recovery for such Class of Claims.

| CLASS OF CLAIMS | ESTIMATION OF AMOUNT OF CLAIMS | ESTIMATION OF POTENTIAL RECOVERY |
|---|---|---|
| Class 5 — Lummus Asbestos PI Trust Claims | Estimated to be $33 million | The estimated recovery for this Class is 100% of the Scheduled Claim amounts set forth in the Lummus TDP; however, such recovery depends on the total number and amount of Lummus Asbestos PI Trust Claims and the value of the Lummus Asbestos PI Trust Assets. The Debtor believes that the amount paid through the Chapter 11 Case will be greater than through a non-prepackaged plan proceeding under Chapter 11 of the Bankruptcy Code or liquidation under Chapter 7 of the Bankruptcy Code. |

In light of the information presently available to the Debtor, and the uncertainties and difficulties inherent in estimating the number and amount of Lummus Asbestos PI Trust Claims, the Debtor believes that the classification and treatment provided by the Plan complies with applicable Federal and state law and is fair and equitable to Class 5 Claimants.

*(a) Estimated Number and Amount of Lummus Asbestos PI Trust Claims.*

Lummus Asbestos PI Trust Claims against the Debtor's Bankruptcy Estate consist of (a) settled and otherwise liquidated claims, (b) unsettled and unliquidated claims; and (c) future Demands.

The Lummus FCR retained the firm of Hamilton, Rabinovitz & Alschuler, Inc. ("HR&A"), a nationally recognized expert in the field, to assist in estimating Lummus' asbestos liability for pending and future Lummus Asbestos PI Trust Claims. HR&A reviewed a database of historic asbestos claims information provided by CVCSC and adjusted it to remove the effect of certain claims and resolution patterns which appeared to have been influenced by the pending Combustion Engineering negotiations or other anomalous events unlikely to recur in the future. The methodology used by HR&A to project future asbestos claims and costs is based largely on Lummus' experience during the two years prior to the commencement of the CE Bankruptcy Case for claims filed, settled, and resolved. Lummus was subject to claims from two different kinds of exposures, from the production of products containing asbestos which were installed in feedwater heaters and from the design and construction of refineries and other industrial facilities where asbestos products may have been used. Because these two different kinds of exposures produced different filing and settlement patterns, HR&A estimated the two streams of liability separately. Lummus' experience was then compared to the results of widely accepted epidemiological studies estimating the number of people likely to develop asbestos related malignant diseases. Those studies were undertaken in connection with national analyses by the Mt. Sinai group of the population of workers believed to have been exposed to asbestos, and are known as the "'Nicholson" estimates. Settlement values were inflated at 3% per annum starting in 2003 and discounted at 6% to arrive at the Net Present Value (NPV) of the liability. Using that information, and adding estimates for costs and expenses for claim resolution in the future, HR&A estimated the number of future claims that would be filed, as well as likely related settlement or indemnity costs that would be incurred to 2050 to resolve those claims were they to remain in the tort system.

**Article 8**

**VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION AND CONSUMMATION OF THE PLAN**

Approval of the Plan is a three-step process. The first step involves solicitation of votes on the Plan from impaired creditors. If the Plan receives the required votes and the Chapter 11 Case is filed, the second step involves the setting of a hearing date by the Bankruptcy Court to consider the confirmation of the Plan and the adequacy of this Disclosure Statement and the solicitation procedures. The last step is the occurrence of the Confirmation Hearing, where the Bankruptcy Court will determine whether the Plan can be confirmed both under the Bankruptcy Code and the conditions contained in the Plan.

**8.1    Acceptance or Rejection of the Plan.**

*(a) Persons Entitled to Vote on the Plan.*

Pursuant to Section 1126 of the Bankruptcy Code, only Classes of Claims and Equity Interests that are impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Under Section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan of reorganization unless, with respect to each claim or interest in such class, the plan in question:

(1) Leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after a default occurs:

(i) cures that default, if other than a default of the kind in Section 365(b)(2) of the Bankruptcy Code specifies,

(ii) reinstates the maturity of that claim or interest as it existed prior to that default;

(iii) compensates the holder of that claim or interest for any damages that holder incurs as a result of that holder's reasonable reliance on that contractual provision or applicable law; and

(iv) otherwise does not alter the legal, equitable, or contractual rights to which such claim or interest entitles its holder.

Under the Plan, Classes 1, 2, 3, and 4 are unimpaired. Therefore, the holders of Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. The Debtor will not solicit acceptances of the Plan from holders of such Claims.

Classes 5, 6, and 7 under the Plan are impaired. Therefore, the holders of Claims and Equity Interests in such Classes are entitled to vote to accept or reject the Plan. Section 524(g) of the Bankruptcy Code permits supplementary injunctions to be issued, which channel all future Claims to a trust if, among other things, the Classes of Claimants whose Claims are addressed by the Lummus Asbestos PI Trust (Class 5) vote, by at least seventy-five percent (75%) of those voting, in favor of the Plan. Because the Claims of Class 5 are to be channeled into and addressed by the Lummus Asbestos PI Trust, the Debtor is soliciting acceptances of the Plan for purposes of Section 524(g) from this Class. The Debtor may not file the Chapter 11 Case unless it receives one-hundred percent (100%) in number of the Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan.

*(b) Voting Instructions.*

*(1) Ballots.*

Unless (i) you have made arrangements in writing with your attorney to authorize him or her to vote directly on your behalf and (ii) wish to keep those arrangements in place, please use only the Ballot sent to you with this Disclosure Statement in voting for or against the Plan. Holders of Claims in Class 5 will receive a Ballot. The Debtor may provide master Ballots to parties holding proxies or powers of attorney to vote on behalf of multiple Claimants. All persons holding proxies or powers of attorneys to vote on behalf an impaired Claimant must provide copies of all applicable documentation that evidences such authority in order to cast a Ballot for a vote for or against the Plan. Unless you have made arrangements in writing with your attorney to authorize him or her to vote directly on your behalf, you must follow the procedures outlined below in order to properly complete your Ballot.

*(2) Class 5 Ballots.*

If you are a holder of a Lummus Asbestos PI Trust Claim you will receive a form of Ballot and you must indicate the amount and basis of your Lummus Asbestos PI Trust Claim. The information you enter relating to the amount and basis of your Lummus Asbestos PI Trust Claim will be used solely for the purpose of identifying your Lummus Asbestos PI Trust Claim and may be used for calculating votes to accept or reject the Plan. This information does not establish the amount of your Claim and does not constitute a proof of claim.

(i) Indicate on the Ballot, by checking the appropriate box, whether you are voting to accept or reject the Plan. If your Ballot does not indicate either an acceptance or a rejection of the Plan, or if it indicates both an acceptance and a rejection, it will be deemed an acceptance.

(ii) Sign and date the Ballot, and return it to the Voting Agent prior to 12:00 p.m., E.D.T., on September 26, 2005, unless such date has been extended by the Debtor.

*(3) Other Claims' Ballots.*

The Holder of Equity Interests and the Non-Debtor Affiliate Intercompany Claims also shall receive a form of Ballot.

(i) Indicate on the Ballot, by checking the appropriate box, whether you are voting in favor of or against the Plan. If your Ballot does not indicate either an acceptance or a rejection of the Plan, or if it indicates both an acceptance and a rejection, it will not be counted.

(ii) Sign and date the Ballot, and return it to the Voting Agent prior to 12:00 p.m., E.D.T., on September 26, 2005, unless such date has been extended by the Debtor.

*(4) Returning Ballots.*

**UNLESS YOU HAVE MADE ARRANGEMENTS IN WRITING WITH YOUR ATTORNEY TO AUTHORIZE HIM OR HER TO VOTE DIRECTLY ON YOUR BEHALF, PLEASE USE THE BALLOT SENT TO YOU WITH THIS DISCLOSURE STATEMENT IN VOTING FOR OR AGAINST THE PLAN. YOU SHOULD COMPLETE AND SIGN THE BALLOT AND RETURN IT TO THE VOTING AGENT AT THE APPROPRIATE ADDRESS SET FORTH IN THE VOTING INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT, ON OR BEFORE 12:00 P.M., E.D.T. ON SEPTEMBER 26, 2005, UNLESS SUCH DATE HAS BEEN EXTENDED BY THE DEBTOR. ALL BALLOTS WILL BE TABULATED BY THE VOTING AGENT.**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE PHYSICALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE 12:00 P.M., E.D.T. ON SEPTEMBER 26, 2005, UNLESS SUCH DATE HAS BEEN EXTENDED BY THE DEBTOR, AT THE APPROPRIATE ADDRESS SET FORTH IN THE VOTING INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT.**

*(5) Incomplete or Irregular Ballots.*

**BALLOTS THAT ARE NOT SIGNED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT EXPRESSLY VOTE FOR EITHER THE ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED AN ACCEPTANCE IN FAVOR OF THE PLAN.**

*(6) The Debtor's Right to Extend this Solicitation Period.*

The period for Solicitation (the "Solicitation Period") with respect to the Plan will expire at **12:00 P.M., E.D.T. on September 26, 2005,** unless the Debtor, in its sole discretion, extends the period of time for which Ballots will be accepted. Except to the extent allowed by the Bankruptcy Court, Ballots that are received after the Solicitation Period may not be accepted or used by the Debtor in connection with its request for confirmation of the Plan or any modification thereof.

The Debtor expressly reserves its rights, at any time or from time to time, to extend the period of time during which Ballots will be accepted by making a public announcement of the extension no later than **4:00 P.M., E.D.T. on September 25, 2005.** Without limiting the manner in which the Debtor may choose to make any public announcement, the Debtor will not have any obligation to publish, advertise or otherwise communicate any such public announcement. There can be no assurance that the Debtor will exercise its right to extend the Solicitation Period for the receipt of Ballots.

*(7) Ballot Retention.*

The original Ballots of holders of Claims and Equity Interests shall be maintained by the Voting Agent for a period of six (6) months following the Effective Date, after which they may be destroyed.

*(c) Class Acceptance Requirement.*

Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan for it to be confirmed by the Bankruptcy Court. Instead, the Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by holders of at least two-thirds in amount and more than one-half in number of the Claims of that Class that have voted on the Plan, excluding any holders of Claims designated pursuant to Section 1126(e) of the Bankruptcy Code. Acceptance by a Class of Equity Interests is defined as acceptance by holders of at least two-thirds in amount of the Equity Interests of that Class held by holders of such Equity Interests that have voted on the Plan, excluding any holders of Equity Interests designated pursuant to Section 1126(e) of the Bankruptcy Code. Section 1126(e) provides that a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that an Entity's acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith, or in accordance with the provisions of the Bankruptcy Code.

*(d) Acceptance Pursuant to Section 524(g) of the Bankruptcy Code.*

In addition to the class acceptance requirement pursuant to Section 1126(e) of the Bankruptcy Code, Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, also requires that the holders of Claims that are addressed by the Lummus Asbestos PI Trust vote, by at least seventy-five percent (75%) in favor of the Plan in order for the Bankruptcy Court to issue a supplemental injunction.

## 8.2   Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the court, after notice, to hold a hearing on confirmation of the Plan. As promptly as practicable after the Petition Date, the Debtor will request the Bankruptcy Court to schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be (a) in writing, (b) conform to the Bankruptcy Rules, (c) set forth the name of the objecting party, (d) identify the nature and amount of Claims or interests held or asserted by the objectant against Debtor or its property, (e) state the basis for the objection and the specific grounds therefor, (f) be filed with the clerk of the Bankruptcy Court, together with proof of service, and (g) be served, so as to be received no later than the date and time for service of the objections upon:

- Jeffrey N. Rich, Kirkpatrick & Lockhart Nicholson Graham LLP, 599 Lexington Avenue, New York, New York 10022 (Facsimile: 212-536-3901);

- Philip H. Hecht, Kirkpatrick & Lockhart Nicholson Graham LLP, 1800 Massachusetts Avenue, N.W. Suite 200, Washington, DC 20036 (Facsimile: 202-778-9100);

- Laura Davis Jones, Pachulski, Stang, Ziehl, Yong, Jones & Weintraub P.C., 919 North Market Street, Post Office Box 8705, Wilmington, Delaware 19899 (Facsimile: 302-652-4400);

- Theodore L. Freedman, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022 (Facsimile: 212-446-4900);

- Adam C. Paul, Kirkland & Ellis LLP, 200 East Randolph Street, Chicago, Illinois 60601 (Facsimile: 312-861-2200);

- Richard B. Schiro, Law Offices of Richard B. Schiro, Regency Plaza, Suite 1350, 3710 Rawlins Street, Dallas, Texas 75219 (Facsimile: 713-521-4994);

- John F. Higgins, Porter & Hedges, LLP, Reliant Energy Plaza, 1000 Main Street, 36th Floor, Houston, Texas 77002 (Facsimile: 713-226-6248);

- Joseph D. Frank, Frank/Gecker LLP, 325 North LaSalle — Suite 625, Chicago, Illinois 60610 (Facsimile: 312-276-0035); and

- Natalie D. Ramsey, Montgomery, McCraken, Walker & Rhoads, LLP 123 South Broad Street, Avenue of the Arts, Philadelphia, Pennsylvania 19109 (Facsimile: 215-731-3910).

## 8.3    Requirements for Confirmation.

### (a) Consensual Confirmation Under Section 1129(a) of the Bankruptcy Code.

At the Confirmation Hearing, the Bankruptcy Court will be asked to determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. These requirements include, among other judicial findings that:

(1) The Plan complies with the applicable provisions of the Bankruptcy Code;

(2) The Debtor has complied with the applicable provisions of the Bankruptcy Code;

(3) The Plan has been proposed in good faith and not by any means forbidden by law;

(4) Any payment made or promised by the Debtor to any Entity for services, costs, or expenses in connection with its Chapter 11 Case or the Plan has been approved by or is subject to the approval of, the Bankruptcy Court as reasonable;

(5) The Debtor has disclosed the identity and affiliations of any individual proposed to serve as a director or an officer of the Reorganized Debtor after confirmation of the Plan and that the appointment to, or continuance in, such office by such individual is consistent with the interests of holders of Claims and Equity Interests and with public policy;

(6) The Plan is in the best interests of the holders of Claims and Equity Interests; that is, each holder of a Claim or Equity Interest either has accepted the Plan or will receive or retain on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date;

(7) Each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

(8) Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full on the Effective Date and that Tax Claims will be either paid in full on the Effective Date or will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims.

(9) At least one impaired Class of Claims has accepted the Plan, without regard to the votes of any insiders;

(10) That the Plan is feasible; that is, confirmation is not likely to be followed by the need for liquidation or further reorganization of the Reorganized Debtor;

(11) All fees payable under Section 1930 of Title 28 of the United States Code, if and to the extent due, have been paid on or prior to the Effective Date;

(12) The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, without modification by the Plan, thereby complying with Section 1114 of the Bankruptcy Code.

The Plan is the product of extensive arms-length negotiations and has been proposed in good faith. The Debtor believes that the Plan satisfies all applicable requirements of Section 1129(a) of the Bankruptcy Code. A discussion of the reasons why the Debtor believes the Plan satisfies certain of such requirements is set forth below.

### (b) Best Interests Test.

Under the best interests test, the Plan is confirmable if, with respect to each impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such Class either:

(1) Has accepted the Plan; or

(2) Will receive or retain under the Plan, on account of its Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was to be liquidated under Chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired Class would receive if the Debtor was to be liquidated under Chapter 7, the Bankruptcy Court must estimate the dollar amount that would be generated from the liquidation of the Debtor's assets and properties by a Chapter 7 trustee. The cash amount that would be available for satisfaction of the Claims and Equity Interests of the Debtor would consist of the proceeds resulting from the disposition of the assets of the Debtor, augmented by the cash of the Debtor at the time of the commencement of the Chapter 7 case. That cash amount would be reduced by the costs and expenses of liquidation under Chapter 7 and by any additional Administrative Expense Claims that would result from the termination of the Debtor's business and the use of Chapter 7 proceedings for the purposes of liquidation. The Liquidation Analysis prepared by the Debtor's retained professionals is attached as *Exhibit F* to this Disclosure Statement.

As the Debtor's Liquidation Analysis demonstrates and as described in greater detail in Section 10.1 of this Disclosure Statement, the estimated distributions that would be made in a Chapter 7 case would be smaller than the distributions contemplated by the Plan. In a high recovery case, an unsecured creditor would receive approximately 31.8% of the estimated allowed amount of its Claims, and in a low-case scenario, an unsecured creditor would receive approximately 24.6% of the estimated allowed amount of its Claims. By contrast, the Debtor believes that the Plan provides a 100% payment to all creditors, including holders of Lummus Asbestos PI Trust Claims liquidated under the Lummus TDP. The Debtor, therefore, believes that the Plan is in the best interests of all holders of Claims and Equity Interests.

*(c) Feasibility of the Plan.*

In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible — that is, that the need for further reorganization or a subsequent liquidation of the Debtor is not likely to result following confirmation of the Plan. In determining whether a plan of reorganization is feasible, a court will consider:

(1) The adequacy of the proposed capital structure of the reorganized entity;

(2) The earning power of that entity;

(3) The overall economic conditions in which that entity will operate;

(4) The capability of its management;

(5) The continuity of its management; and

(6) Any other factors the court deems relevant to the successful operation of the reorganized entity to perform the provisions of the plan of reorganization.

The Reorganized Debtor will be discharged from all current and future Lummus Asbestos PI Trust Claims. The Debtor will retain its assets and it anticipates that the cash flow generated thereby will be sufficient to pay its ongoing business expenses. *See Exhibit H* to this Disclosure Statement (Reorganized Debtor's Financial Projections). Accordingly, the Debtor believes that the Plan is feasible.

*(d) Nonconsensual Confirmation Under Section 1129(b) of the Bankruptcy Code.*

Although Section 1129(a)(8) of the Bankruptcy Code requires that the Plan be accepted by each Class that is impaired by such Plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtor if all requirements of Section 1129(a) other than Section 1129(a)(8) are met and if, with respect to each Class of Claims or Equity Interests that is impaired under the Plan and has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." If a plan is confirmed on the basis of this provision, it is commonly referred to as a "cramdown" plan. A cramdown plan is only available pursuant to Section 1129(a)(10) of the Bankruptcy Code if at least one (1) impaired Class of Claims accepts the Plan. In the event there is no impaired accepting Class, the Debtor could not seek cramdown confirmation of the Plan because the Plan would not comply with the requirements of Section 1129(a)(10) of the Bankruptcy Code. In any event, the Debtor does not intend to seek confirmation of the Plan if the voting requirements of Section 524(g) of the Bankruptcy Code are not met with respect to the relevant Claims.

*(e) Injunctions Under Sections 524(g) and 105 of the Bankruptcy Code.*

Section 524(g) of the Bankruptcy Code authorizes the Bankruptcy Court to enjoin Entities from taking action to collect, recover or receive payment or recovery with respect to any Claim or Demand that is to be paid in whole or in part by a trust created by a plan of reorganization that satisfies the requirements of Section 524(g) of the Bankruptcy Code. The injunction may also bar any action based on such Claims or Demands against the Debtor that are directed at third parties.

To obtain the injunction, a trust must be established that:

(1) Assumes the Lummus Asbestos PI Trust Claims;

(2) Is funded in whole or in part by securities of the Debtor and with an obligation by the Debtor to make future payments;

(3) Owns or is entitled, if specified contingencies occur, to a majority of the voting shares of the Debtor; and

(4) Uses its assets or income to satisfy Claims and Demands.

As a requirement before issuing an injunction under Section 524(g) of the Bankruptcy Code, the Bankruptcy Court must determine that:

(1) The Debtor is likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that give rise to the Claims that are addressed by the injunction;

(2) The actual amounts, numbers, and timing of such Demands cannot be determined;

(3) Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and Demands; and

(4) The Lummus Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Claims and Demands, or other comparable mechanisms that provide reasonable assurance that the Lummus Asbestos PI Trust will value, and be in a financial position to pay, Claims and Demands that involve similar Claims in substantially the same manner.

The Bankruptcy Court also must ensure that the terms of any proposed Section 524(g) injunction are set forth in the Plan and this Disclosure Statement and that such Classes vote, by at least seventy-five percent (75%) of those voting in such Class, in favor of the Plan with respect to a Class of Claims. Moreover, the injunction will be valid and enforceable as to future Lummus Asbestos PI Trust Claimants only if a legal representative is appointed to protect their rights in the proceedings and if the Bankruptcy Court determines that applying the injunction to future Lummus Asbestos PI Trust Claimants in favor of the beneficiaries of the Lummus Asbestos PI Channeling Injunction is fair and equitable with respect to the Entities that might subsequently assert such Demands, in light of the benefits provided, or to be provided, to the Lummus Asbestos PI Trust on behalf of the Debtor.

The order confirming the Plan must be issued or affirmed by the District Court that has jurisdiction over the Chapter 11 Case. After the expiration of the time for appeal of the order, the injunction becomes valid and enforceable.

The Debtor believes that it will be able to satisfy all of the requirements of the Bankruptcy Code, to the extent that the requisite numbers of Lummus Asbestos PI Trust Claimants in Class 5 vote in favor of the Plan.

Under the statutory jurisdictional scheme applicable to bankruptcy courts, jurisdiction over bankruptcy cases and proceedings arising under the Bankruptcy Code or arising in or related to bankruptcy cases is vested in the District Courts. However, the District Courts may refer them to the bankruptcy judges of the district. In most districts, the District Court has entered a standing order referring all such matters to the bankruptcy judges.

The Debtor presently anticipates filing its Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware. In that judicial district, the District Court has a standing order referring all bankruptcy cases to the Bankruptcy Court. Because Section 524(g) requires, however, that any Lummus Confirmation Order containing a supplemental injunction must be issued or affirmed by the District Court, the reference may be withdrawn and the Chapter 11 Case might proceed before a District Court judge. If the Chapter 11 Case is assigned to a bankruptcy judge, he or she could conduct the Confirmation Hearing and enter the Lummus Confirmation Order. In that instance, the Section 524(g) injunctions would not be enforceable until the Lummus Confirmation Order was affirmed by a District Court judge.

The Debtor also intends to request that the Bankruptcy Court supplement the Section 524(g) injunction by issuing an injunction under Section 105 of the Bankruptcy Code. Section 105 of the Bankruptcy Code permits a bankruptcy court to issue any order that is necessary to carry out the provisions of the Bankruptcy Code. *See* Section 5.6(d) and (e) of this Disclosure Statement — "Lummus Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction."

*(f) Effect of Confirmation.*

Upon the Bankruptcy Court's entry of the Lummus Confirmation Order (and, if affirmed by the District Court as required by Section 524(g) of the Bankruptcy Code), and assuming the Effective Date occurs, the Plan will be binding upon the Debtor, all holders of Claims and Equity Interests and all other parties in interest, regardless of whether they have accepted the Plan.

*(g) Conditions to Confirmation of the Plan.*

The following shall constitute conditions to confirmation of the Plan:

(1) The Bankruptcy Court shall make the following findings of fact and/or conclusions of law in connection with the confirmation of the Plan, each of which shall be expressly set forth in the Lummus Confirmation Order:

(2) The Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

- The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are to be implemented in accordance with the Plan and the Lummus Asbestos PI Trust Documents;

- As of the Petition Date, the Debtor has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

- The Lummus Asbestos PI Trust is to be funded in part by securities of the Debtor and by the obligations of the Debtor to make future payments;

- The Lummus Asbestos PI Trust, on the Effective Date, by the exercise of rights granted under the Plan, would be entitled to own if specific contingencies occur, the majority of the voting shares of the Reorganized Debtor;

- The Lummus Asbestos PI Trust is to use its assets and income to pay Lummus Asbestos PI Trust Claims in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP;

- The Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Lummus Asbestos PI Trust Claims, which are addressed by the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction;

- The actual amounts, numbers, and timing of Demands cannot be determined;

- Pursuit of Demands outside the procedures prescribed by the Plan and the Lummus Asbestos PI Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Lummus Asbestos PI Trust Claims;

- The terms of the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Plan and described in the Disclosure Statement;

- Pursuant to court orders, the Lummus Asbestos PI Trust Distribution Procedures, or otherwise, the Lummus Asbestos PI Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Lummus Asbestos PI Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Lummus Asbestos PI Trust shall value, and be in a financial position to pay, present and future Lummus Asbestos PI Trust Claims that involve similar claims in substantially the same manner;

- The Lummus Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Lummus Asbestos PI Channeling Injunction and the Lummus

Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that would constitute Lummus Asbestos PI Trust Claims and are addressed in the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction and transferred to the Lummus Asbestos PI Trust;

- The Lummus Asbestos PI Trust will be funded with a sufficient and reliable pool of assets that will allow the Lummus Asbestos PI Trust to adequately pay Lummus Asbestos PI Trust Claims.

- In light of the benefits provided, or to be provided, to the Lummus Asbestos PI Trust on behalf of each Asbestos Protected Party, the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert Demands that would constitute Lummus Asbestos PI Trust Claims against any Asbestos Protected Party;

- The ABB Consideration and other benefits provided in the Plan for payment of Claims, including Lummus Asbestos PI Trust Claims, constitute substantial assets of the Plan, and

- The Plan and its acceptance otherwise comply with the Bankruptcy Code including, without limitation, Section 524(g).

(3) The Lummus Asbestos PI Trust shall have the sole and exclusive authority as of the Effective Date to assert the rights and defenses of Asbestos Protected Parties with respect to all Lummus Asbestos PI Trust Claims other than any such rights against any Released Parties;

(4) The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts; and

(5) The contribution by ABB, ABB Holdings, ABB Oil & Gas, and the Debtor of the ABB Consideration to the Lummus Asbestos PI Trust constitutes substantial assets of the Plan and the reorganization.

The Plan shall not be confirmed and the Lummus Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtor, the Lummus Future Claimants' Representative, the CCC, and the ACC, if appointed, acting jointly, and with the consent of ABB with respect to the conditions set forth in paragraphs 7.9.1.1(a); 7.9.1.1(n); 7.9.1.3; and 7.9.1.4 of the Plan.

(6) The Lummus Confirmation Order shall be, in form and substance, acceptable to the Debtor, ABB, the Lummus Future Claimants' Representative, the CCC, and the ACC, if appointed.

(7) The Court has entered an order in form and substance acceptable to the Debtor, ABB, the Lummus Future Claimants' Representative, the CCC, and the ACC, if appointed, approving the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), and authorizing the Debtor to enter into such agreement.

(8) The CE Confirmation Order shall have been entered.

*(h) Conditions for Effective Date.*

Notwithstanding any other provision of the Plan or the Lummus Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived by the Debtor, ABB, the Lummus Future Claimants' Representative, the CCC, and the ACC, if appointed and the Effective Date of the Modified CE Plan shall have occurred or shall occur concurrently with the Effective Date of the Plan:

(1) The Lummus Confirmation Order shall have been issued or affirmed by the District Court, and the Lummus Confirmation Order shall have become a Final Order; provided, however, that the Effective Date may occur at a point in time when the Lummus Confirmation Order is not a Final Order at the option of the Debtor, with the consent of the ACC, if appointed, the CCC, and the Lummus Future Claimants' Representative, unless the effectiveness of the Lummus Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the option of the Debtor, with the consent of ACC, if appointed, the CCC, and the Lummus Future Claimants' Representative, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(2) The District Court shall have entered or affirmed an order or orders entering the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction.

(3) The Court shall have entered or affirmed an order or orders approving the Plan and all Plan Documents and such order or orders shall have become Final Orders.

(4) The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction shall be in full force and effect.

(5) The Debtor and the Trustee have executed the Lummus Asbestos PI Trust Agreement.

(6) The Debtor, ABB, the CCC, the Lummus Future Claimants' Representative, and the ACC, if appointed, shall have approved all of the Plan Documents.

(7) All Lummus Asbestos PI Trust Assets and Plan Documents that are to be delivered or executed and delivered, as applicable, to the Lummus Asbestos PI Trust on the Effective Date shall have been delivered, or executed and delivered, as applicable to the Lummus Asbestos PI Trust in accordance with the requirements of all applicable Plan Documents.

(8) All parties to the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) have executed and delivered counterparts of same, and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) shall be in full force and effect.

(9) The Amended Certificates of Incorporation shall be in full force and effect.

(10) The Debtor shall have delivered such decisions, opinions, or assurances to the effect that the Lummus Asbestos PI Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC and the regulations issued pursuant thereto satisfactory to the Debtor, ABB, ABB Holdings, the CCC, the ACC, if appointed, and the Lummus FCR.

(11) The conditions to the effectiveness of the CE Plan shall have been satisfied or waived and the "Effective Date" (as used in Section 1129 of the Bankruptcy Code) of the CE Plan shall have occurred or shall occur concurrently with the Effective Date.

The Effective Date shall not occur unless and until each of the foregoing conditions is either satisfied or waived by the Debtor, ABB, the Lummus Future Claimants' Representative, the CCC, and the ACC, if appointed; *provided, however*, that the condition set forth in Section 7.10.10 of the Plan may be waived by the Lummus FCR, the CCC, and the ACC, if appointed, the Debtor, ABB, and ABB Holdings, acting together. Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived in accordance with the Plan shall: (1) be signed by the Debtor and each Entity whose consent is required pursuant to the Plan; (2) state the date of the Effective Date; and (3) be filed with the Bankruptcy Court by the Debtor's counsel.

## Article 9

## RISKS OF THE PLAN

### 9.1    General.

The following is intended as a summary of certain risks associated with the Plan. This summary, however, is not exhaustive and should be supplemented by careful analysis and evaluation of the Plan and this Disclosure Statement as a whole by each holder of an impaired Claim under the Plan with such holder's own counsel and other advisors.

### 9.2    Voting and Confirmation Risks.

For the Plan to be confirmed, each impaired Class is given the opportunity to vote to accept or reject the Plan. With regard to the impaired Classes which vote on the Plan, the Plan will be deemed accepted by each of the impaired Classes if the Plan is accepted by holders of Claims of such Class who hold at least two-thirds in dollar amount and more than one-half in number (50% + 1) of the total Claims of such Class actually voting on the Plan. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

In addition, to obtain a Section 524(g) injunction relating to Lummus Asbestos PI Trust Claims, at least seventy-five percent (75%) of those claimants in Class 5 who vote must vote to accept the Plan. Nevertheless, as an express precondition to the filing of the Chapter 11 Case, and in order to facilitate the prompt confirmation of the Plan, the Debtor requires that all (meaning one-hundred percent (100%)) of the Asbestos PI Trust Claimants vote in favor of the Plan, rather than the seventy five percent (75%) normally needed under Section 524(g) of the Bankruptcy Code. If holders of Claims in Class 5 vote unanimously in favor of the Plan, the Debtor intends to seek board approval to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan. However, there is no guarantee that these thresholds will be reached or, if the Chapter 11 Case is filed, that the Bankruptcy Court will concur with the vote tally.

To confirm the Plan, the Debtor must satisfy the requirements of the Bankruptcy Code, including Sections 1129(a) and 524(g). Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that the Lummus Confirmation Order, if challenged on appeal, will be affirmed. If the Plan does not receive the required support from creditors, the Debtor may elect not to file the Chapter 11 Case or to amend the Plan to provide alternative treatment to a dissenting Class. If the Plan cannot be confirmed or does not become effective, the Debtor could ask that the Chapter 11 Case be dismissed and that the Parties be returned to the prefiling status quo.

Any objection to the Plan by a party-in-interest also could either prevent, or delay for a significant period of time, confirmation of the Plan.

### 9.3    Ability to Meet Prefiling Conditions.

The filing of the Chapter 11 Case and confirmation of the Plan are conditioned upon (a) acceptance of the Plan by one-hundred percent (100%) in number of the Lummus Asbestos PI Trust Claimants voting in Class 5 under the Plan, (b) the entry of a Final Order by the Bankruptcy Court confirming the CE Plan, and approving the adequacy of the solicitation procedures and the CE Disclosure Statement, which order has become a Final Order, (c) a finding by the Bankruptcy Court in the CE Bankruptcy Case that the dependency of the CE Effective Date upon the occurrence of the Lummus Effective Date does not render the CE Plan unfeasible, (d) the receipt of written assurance by the Debtor that parties with standing, including, but not limited to, all representatives of Lummus Asbestos PI Trust Claimants, the Lummus Future Claimants' Representative, the ACC, and the Lummus Asbestos Insurance Entities, will not object to confirmation of the Plan and will not object to the related Plan Documents, and (e) a determination by the Debtor in its sole discretion, that no material change in the case law and legislation pertaining to asbestos, including, but not limited to, the passage of the FAIR Act has occurred or will likely occur which will have the effect of impairing the Debtor's ability to promptly confirm the Plan. If these conditions are not satisfied, the Debtor may elect not to file the Chapter 11 Case.

### 9.4    Variance from Financial Projections.

The information contained in the Reorganized Debtor's Financial Projections contained in *Exhibit H* to this Disclosure Statement, are estimates by the Debtor's management based on what is currently believed to be reasonable assumptions regarding the future earnings of the Reorganized Debtor. Unanticipated events and circumstances occurring subsequent to the preparation of these financial projections may affect the actual financial results of the Reorganized Debtor. Although the Debtor's management believes that the financial projections are reasonable and attainable, some or all of the estimates will vary from actual results, and variations between the actual financial results and those projected may be material and adverse.

The Pro Forma Financial Projections are based upon numerous assumptions regarding (a) the tax consequences of the Plan, (b) the anticipated future performance of the Reorganized Debtor, (c) confirmation and consummation of the Plan in accordance with its terms, (d) the general business and economic conditions, and (e) certain other matters, many of which are beyond the control of the Debtor. There can be no assurance that such assumptions will prove to be valid. The effect of any variance from the projections may be material and adverse and may adversely affect Reorganized Debtor's ability to meet its obligations to the Lummus Asbestos PI Trust.

## 9.5    Insurance Coverage for Lummus Asbestos PI Trust Claims.

A discussion of the insurance coverage available for Lummus Asbestos PI Trust Claims is provided in Section 1.2(e) of this Disclosure Statement — "Lummus' Historical Liability Insurance Program." As described in this Disclosure Statement, estimating the insurance recovery is inherently uncertain and depends on a number of factors, including the potential for disputes over coverage issues with the insurance carriers, the principles of law which would be likely to apply in resolving such disputes, the timing and amount of Lummus Asbestos PI Trust Claims which may be made in the future, the financial solvency of the underlying insurance providers, and the amount which may be paid to settle or otherwise dispose of those claims. These factors are beyond the control of the Debtor and changes in these factors could materially affect the Debtor's insurance recoveries and its ability to fund the Lummus Asbestos PI Trust.

## 9.6    Distributions under the Lummus Asbestos PI Trust Distribution Procedures.

Payments that will be made on Lummus Asbestos PI Trust Claims shall be determined under the Lummus Asbestos PI Trust Distribution Procedures and shall be based, on the one hand, upon estimates of the number, types, and amount of present and expected future Lummus Asbestos PI Trust Claims and, on the other hand, on the value of the Lummus Asbestos PI Trust, the liquidity of the Lummus Asbestos PI Trust, the Lummus Asbestos PI Trust's expected future expenses and income, as well as other material matters that are reasonable and likely to affect the sufficiency of funds to pay all holders of Lummus Asbestos PI Trust Claims. There can be no certainty as to the precise amounts that will be distributed by the Lummus Asbestos PI Trust in any particular time period or when Lummus Asbestos PI Trust Claims will be paid by the Lummus Asbestos PI Trust.

## 9.7    Federal Income Tax Consequences of the Plan.

A private letter ruling may be requested from the Internal Revenue Service confirming, among other things, that the Lummus Asbestos PI Trust is a QSF pursuant to Section 468B of the Internal Revenue Code and the United States Treasury regulations thereunder, and that the Debtor is a qualified transferor thereto. Pursuant to Section 7.10.11 of the Plan, the Effective Date shall not occur, unless, among other things, the Debtor receives this private letter ruling from the IRS, or, in the alternative, obtains opinions and assurances regarding the tax consequences of the Plan, deemed satisfactory by the Debtor, ABB, ABB Holdings, the Lummus Future Claimants' Representative, and the Committee, if appointed. The IRS may decline to rule on some of the Federal income tax aspects of the Plan. If the desired rulings or satisfactory opinions and assurances cannot be obtained, the Effective Date of the Plan may not occur.

## 9.8    Federal Income Tax Consequences of the Plan to Affected Claimants.

The Plan also will have material tax consequences for Claimants in Class 5 under the Plan. *See* Section 11.5 of this Disclosure Statement for a discussion of the tax consequences for such Claimants. All Claimants are strongly advised to consult their tax advisors with respect to the tax treatment under the Plan for their particular Claim.

## 9.9    Federal Income Tax Consequences of the Plan to the Debtor.

The Plan also will have material tax consequences for the Debtor. *See* Section 11.2 of this Disclosure Statement for a discussion of the tax consequences of the Plan on the Debtor.

## 9.10    Risk of Post-Confirmation Default.

Although no guarantees can be given, the Debtor believes that the cash flow generated by its business and assets will be sufficient to meet the Reorganized Debtor's ongoing business obligations and operating requirements and that such cash flow will be sufficient to make the payments to the Lummus Asbestos PI Trust required under the Plan, including all obligations with respect to the Lummus Note. Projected Reorganized Debtor's operating cash flow is set forth in the Financial Projections attached to this Disclosure Statement as *Exhibit H*. At the Confirmation Hearing, the Bankruptcy Court will be required to make a judicial determination that the Plan is feasible.

**9.11  Appointment of Different Asbestos Claimants' Committee and/or Additional Committee.**

Once the Chapter 11 Case is filed, the Debtor will request that the members of the informal asbestos claimants' committee, or clients for such members, be appointed as the official committee. However, the United States Trustee may choose to appoint a different committee, or different members to the committee, to represent the interests of the Lummus Asbestos PI Trust Claimants. Additionally, a differently constituted committee could choose to retain different legal counsel. If new committees are formed or if new legal counsel is retained, then the Chapter 11 Case could be prolonged, and the Debtor's ability to implement the Plan could be adversely affected.

The United States Trustee also may appoint, or be directed to appoint additional committees, such as committees of other tort claimants, trade creditors, or equity holders. The appointment of additional committees could delay the Chapter 11 Case. If appointed, such committees would be entitled to retain professionals, subject to the Bankruptcy Court approval, and to participate in the Chapter 11 Case.

**9.12  Appointment of Different Lummus Future Claimants' Representative.**

Once the Chapter 11 Case is filed, the Debtor will request that Richard B. Schiro, the acting Lummus Future Claimants' Representative, be formally appointed as the official Lummus Future Claimants' Representative to represent the interests of persons who might in the future assert asbestos-related Demands. However, the Bankruptcy Court may decline to appoint Mr. Schiro. In that event, a different Lummus Future Claimants' Representative would need to be selected, which may result in a delay of the Chapter 11 Case. The appointment of a different Lummus Future Claimants' Representative could adversely affect the Debtor's ability to implement the Plan.

**9.13  Potential Adverse Effects of a Prolonged Chapter 11 Proceeding.**

A prolonged Chapter 11 proceeding could adversely affect the Debtor's relationship with its customers, suppliers, and employees, which in turn could adversely affect the Debtor's competitive position, financial condition, and results of operations. A weakening of the Debtor's financial condition and results of operations could adversely affect the Debtor's ability to implement the Plan.

**9.14  Risks Associated with Business Operations of Lummus.**

The ability of Lummus and ABB to honor their obligations under the Plan Documents, including the obligations set forth in the Plan and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) is dependent, in part, on the performance of ABB and Lummus, and the corresponding marketplace valuation of the companies. The risk factors set forth below are equally applicable to ABB's business operations.

*Lummus may continue to experience losses under some long-term contracts.*

Lummus continues to be party to long-term fixed price contracts. Some of these contracts have resulted in losses due to, among other things, its inability to make proper estimates during the tendering process, and weaknesses in project execution that have caused cost overruns. To address the weaknesses that Lummus believed contributed to these losses, in 2002 Lummus adopted a selective bidding approach aimed at reducing project risks and securing better margins. However, the new approach may not be successful and the company may continue to experience losses on the contracts that were entered into prior to adopting the new approach until they expire or are terminated.

*Lummus operates in very competitive markets and could be adversely affected if it fails to keep pace with technological changes.*

Lummus operates in very competitive environments in several specific respects, including developing integrated systems and applications that address the business challenges faced by its customers, pricing, new product introduction, and customer service. The relative importance of these factors differs across the geographic markets and areas that Lummus serves. The markets for Lummus' services are characterized by evolving industry standards, rapidly changing technology, and increased competition. Additionally, the continued development of advanced technologies for product enhancements is an important way in which Lummus maintains acceptable pricing levels. If Lummus fails to keep pace with technological changes in the industrial sectors that it serves, it may experience price erosion and lower profit margins.

All of Lummus' competitors are sophisticated companies with significant resources that may adapt more quickly than Lummus to new technologies, industry changes, or evolving customer requirements. Lummus' failure to anticipate or respond quickly to technological developments or customer requirements could adversely affect its business, results of operations, financial condition, and liquidity.

*Industry consolidation could result in more powerful competitors and fewer customers.*

Competitors of all Lummus' business divisions are consolidating. As competitors consolidate, they likely will increase their market share, gain economies of scale that enhance their ability to compete with Lummus and/or acquire additional processes and technologies that could displace Lummus' offerings. Lummus' customer base also is undergoing consolidation. Consolidation among Lummus' customers' industries could affect Lummus' customers and their relationships with Lummus. If Lummus' competitors' customers acquire any of Lummus' customers, Lummus may lose its business share.

*Lummus' business is affected by the global economic and political climate. A major terrorist event or prolonged military action could adversely affect Lummus' business, financial condition, and results of operation.*

Lummus' business has been adversely affected by the global economic downturn, particularly by depressed economic conditions in Europe and the United States. The business environment is influenced by numerous political uncertainties, which will continue to affect the global economy and the international capital markets. The threat of a major terrorist attack and the fear of prolonged military action have exacerbated volatility in the financial markets and caused consumer, corporate, and financial confidence to weaken. As a result, many companies have experienced difficulties in achieving their revenue goals and have cancelled or delayed investments, expansions, and recruitment.

In periods of slow growth or decline, Lummus' customers are more likely to decrease expenditures on the types of processes and systems Lummus supplies and as a result, Lummus is more likely to experience decreased revenues. If the current global economic and political climate fails to improve, this could have a material adverse effect on Lummus' business, financial condition, results of operations, and liquidity.

*Operations in emerging markets expose Lummus to risks associated with conditions in those markets.*

An increasing amount of Lummus' operations are conducted in the emerging markets of Asia, China, the Middle East, Africa, and Latin America. Operations in emerging markets present risks that are not encountered in countries with well-established economic and political systems, including:

- Economic instability, which could make it difficult for Lummus to anticipate future business conditions in these markets, cause delays in the placement of orders for projects that it has been awarded, and subject it to volatile markets;

- Political or social instability, which makes Lummus' customers less willing to make investments in such regions and complicates its dealings with governments regarding permits or other regulatory matters, local businesses, and workforces;

- Boycotts and embargoes that may be imposed by the international community on countries in which Lummus operates, which could adversely affect the ability of Lummus' operations in those countries to obtain the materials necessary to fulfill contracts and its ability to pursue business or establish operations in those countries;

- Significant fluctuations in interest rates and currency exchange rates;

- The imposition of unexpected taxes or other payments on Lummus' revenue in these markets; and

- The introduction of exchange controls and other restrictions by foreign governments.

In addition, the legal and regulatory systems of the emerging markets identified above are less developed and less well-enforced than in industrialized countries. Therefore, Lummus' ability to protect its contractual and other legal rights in underdeveloped regions could be limited. No assurances can be made that exposure to conditions in emerging markets will not adversely affect Lummus' business, financial conditions, results of operation, and liquidity.

*Lummus is subject to environmental laws and regulations in the countries in which it operates. Costs are incurred to comply with such regulations, and ongoing operations may expose the company to environmental liabilities.*

Lummus' operations are subject to United States, European, and other laws and regulations governing the discharge of materials into the environment or otherwise relating to environmental protection. Lummus may be subject to liabilities for environmental contamination if it does not comply with applicable laws regulating such hazardous substances, and such liabilities can be substantial. All of Lummus' projects are subject to ongoing compliance costs in respect of environmental matters and the associated capital expenditure requirements.

Lummus may be subject to significant fines and penalties if it does not comply with environmental laws and regulations. Some environmental laws provide for joint and several strict liability for remediation of releases of hazardous substances, which could result in Lummus' liability for environmental damage without regard to its negligence or fault. Such laws and regulations could expose Lummus to liability arising out of the conduct of operations or conditions caused by others, or for its acts which were in compliance with all applicable laws at the time the acts were performed. Additionally, Lummus may be subject to claims alleging personal injury or property damage as a result of alleged exposure to hazardous substances. Changes in the environmental laws and regulations, or claims for damages to persons, property, natural resources, or the environment, could result in substantial costs and liabilities.

*International operations expose ABB and Lummus to the risk of fluctuations in currency exchange rates.*

The results of operations and financial position of most of ABB's non-United States Subsidiaries are reported in the currencies of countries in which those Subsidiaries reside. That financial information is then translated into U.S. dollars at the applicable exchange rates for inclusion in ABB's Consolidated Financial Statements. The exchange rates between foreign currencies and the U.S. dollar fluctuate substantially, which has a significant effect on ABB's reported consolidated results of operations and financial position.

Currency risk exposure also affects Lummus' operations when sales are denominated in currencies that are different from those in which Lummus' costs are incurred. If after the time that the parties agree on a price, the value of the currency in which the purchase price is to be paid weakens relative to the currency in which Lummus incurs costs, there would be a negative impact on the profit margin for any such transaction.

Currency exchange rate fluctuations in those currencies in which Lummus incurs its principal manufacturing expenses may distort competition between Lummus and its competitors whose costs are incurred in other currencies. If Lummus' principal currencies appreciate in value against such other currencies, Lummus' competitiveness may be weakened.

**Article 10**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Chapter 11 Case is filed but the Plan is not confirmed and consummated, alternatives to the Plan include: (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; (b) an alternative plan of reorganization; and (c) dismissal of the Chapter 11 Case.

**10.1    Liquidation under Chapter 7.**

If the Plan cannot be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recovery of holders of Claims and Equity Interests and the Debtor's liquidation analysis is set forth in Section 8.3(b) of this Disclosure Statement — "Best Interests Test" above. The Debtor believes that liquidation under Chapter 7 would result in the distributions under a Chapter 7 case to be delayed and the amount of distributions would be materially less than the distributions contemplated by the Plan.

The Liquidation Analysis prepared by the Debtor is attached to this Disclosure Statement as *Exhibit F*. As indicated in the assumptions listed in the Liquidation Analysis, the principal assumptions underlying the results of the Liquidation Analysis are that the liquidation of Lummus and its subsidiaries is effected through the orderly sales of the businesses as going concerns. Because the Lummus Asbestos PI Channeling Injunction would not be available in a Chapter 7 liquidation, the values realized from the orderly sale of the businesses would in all likelihood be reduced as a result of buyers' concerns regarding the risk of asbestos liability in the acquisition of assets. In addition, the lack of the Lummus Asbestos PI Channeling Injunction may preclude the orderly sale of the businesses as going concerns, in which case, an actual liquidation of the assets would be required. If an actual liquidation of assets did occur, the Debtor believes the values realized would be further reduced and claims against the estate increased. Furthermore, the sale of businesses would take place on an accelerated basis with the attended time pressure and adverse publicity and sold "as is" without representations and warranties, resulting in substantial discounts to any going concern value. The Liquidation Analysis is based upon a number of estimates and assumptions which, while considered reasonable, are inherently beyond the control of the Debtor or any Chapter 7 Trustee. There can be no assurances that the values reflected in the Liquidation Analysis would be realized if the Debtor were to undergo such liquidation. In addition, any liquidation would necessarily take place in the future under circumstances that presently cannot be predicted. Accordingly, if the Bankruptcy Estate was liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth in *Exhibit F* to this Disclosure Statement, and no representation or warranty can be made with respect to the actual proceeds that could be received in a Chapter 7 liquidation proceeding.

The Debtor believes that the confirmation and implementation of the Plan is preferable to any of the liquidation alternatives because it should provide greater recoveries than those available in liquidation.

**10.2    Alternative Plan of Reorganization.**

If the Plan is not confirmed, the Debtor, or if the Debtor's exclusive period in which to file a Plan has expired, any other party-in-interest could attempt to formulate a different Plan. However, the Plan is the product of extensive negotiations among the Debtor, ABB, the Lummus Future Claimants' Representative, the ACC, the CCC, the CE Future Claimants' Representative, and the CE Official Creditors' Committee that reflects a delicate balance of the competing and conflicting interests held by those parties. Any attempt to propose an alternative plan of reorganization containing different terms for any of these parties would threaten to disrupt the balance established by the global settlement agreement and the Plan.

**10.3    Dismissal.**

If the Plan cannot be confirmed or if all conditions to the effectiveness of the Plan are not met, the Debtor could request dismissal of the Chapter 11 Case, the effect of which would be to return the Debtor to its prefiling status as a non-debtor. The Bankruptcy Court would determine whether dismissal was appropriate.

**THE DEBTOR BELIEVES THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES BECAUSE THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OF THE ABOVE-MENTIONED APPROACHES.**

## Article 11

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The Plan will have material tax consequences to the Debtor and to holders of Claims in Class 5. The following discussion is a summary of certain U.S. Federal income tax aspects of the Plan, is for general information only, and therefore should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. No ruling has or will be requested or obtained from the IRS with respect to any of the tax aspects of the Plan. Accordingly, no representations or assurances are being made with respect to the Federal income tax consequences as described herein.

The following discussion is based upon existing provisions of the IRC and current administrative rulings and court decisions as in effect on the date hereof. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification to the statements expressed herein. Any such changes or interpretations may be retroactive, and could significantly affect the U.S. Federal income tax consequences discussed below.

**NO RULING HAS BEEN REQUESTED OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. ACCORDINGLY, NO ASSURANCES CAN BE MADE THAT THE IRS WILL NOT CHALLENGE THE TAX CONSEQUENCES DESCRIBED IN THIS SECTION OR THAT SUCH CHALLENGE, IF MADE, WOULD NOT BE SUCCESSFUL.**

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE FEDERAL TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN PERSONS, VARIOUS REGULATED FINANCIAL ORGANIZATIONS, AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

### 11.1    IRS Circular 230 Disclosure.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this summary (including any attachments hereto) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. Tax advice contained in this summary (including any attachments is written to support the description of the transactions or matters addressed by the summary. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

### 11.2    Tax Consequences to the Debtor.

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of debt income ("COD Income") realized during the taxable year. Section 108(a)(1)(A) of the IRC provides an exception to this rule when a taxpayer is subject to the jurisdiction of a bankruptcy court and where the discharge of indebtedness is granted by that court or is effected pursuant to a plan approved thereby, subject to the condition, imposed by Section 108(b) of the IRC, that the income realized from the indebtedness discharge be applied to reduce certain tax attributes of the taxpayer in the following order: net operating losses, tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and foreign tax credit carry forwards (the "Tax Attributes"). Section 108(b)(5) of the IRC provides that a taxpayer may elect to first apply the reduction to the basis of the taxpayer's assets, with any remaining balance applied to the other Tax Attributes. Section 108(e)(2) of the IRC provides a further exception, to the effect that the taxpayer will be deemed not to have realized COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to an income tax deduction. The effect of Section 108(e)(2) of the IRC, where applicable, is to allow the taxpayer to discharge indebtedness without recognizing income and avoid any reduction of its Tax Attributes.

Under the Plan, holders of Administrative Expense Claims, Tax Claims, and holders of Claims in Classes 1, 2, 3, and 4 of the Plan will be paid the full amount of their Claims, and such Claims will be unimpaired. As such, the Plan should not give rise to COD Income to the Debtor (except to the extent that any interest previously accrued and deducted by the Debtor is not required to be paid) with respect to Administrative Expense Claims, Tax Claims, and Claims in Classes 1, 2, 3, and 4.

The satisfaction and discharge of Claims in Class 5, 6, and 7 typically will not result in COD Income pursuant to Section 108(e)(2) because payment of the Claims would have given rise to income tax deductions to the Debtor. Therefore, any discharge relating to these Claims will not result in income to or a reduction of its Tax Attributes. Notwithstanding the foregoing, COD Income could result, and the Debtor, therefore, could be required to reduce its Tax Attributes, if the Debtor has previously deducted amounts incurred as liabilities with respect to Class 5, 6, and 7 Claims. However, the Debtor has not previously claimed any deductions with respect to Claims that will be satisfied by the Lummus Asbestos PI Trust.

## 11.3  Transfers to the Lummus Asbestos PI Trust.

Assuming that the Lummus Asbestos PI Trust receives certain approvals from the Bankruptcy Court, the Lummus Asbestos PI Trust will qualify as a QSF under the Treasury Regulations under Section 468B of the IRC.

The regulations promulgated under section 468B of the IRC provide that a fund, account, or trust will be a QSF if three (3) conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested Claims that have resulted or may result from an event or related series of events that has occurred and that has given rise to at least one Claim asserting liability arising, among other things, out of a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

If, as expected, the Lummus Asbestos PI Trust is a QSF, the transferor Debtor will generally be entitled to a deduction equal to the amount of the payments to the Lummus Asbestos PI Trust (including payments of stock) once the Debtor has satisfied the usual requirements imposed on accrual basis taxpayers with respect to the satisfaction of liabilities. The Debtor will contribute to the Lummus Asbestos PI Trust certain additional cash payments related to the recovery of proceeds from future insurance settlements. To the extent such transfers result in income to the Debtor; it should be entitled to a corresponding deduction equal to the fair market value of such amounts transferred to the Lummus Asbestos PI Trust. In addition, on the Effective Date, the Debtor will contribute a promissory note to the Lummus Asbestos PI Trust. The Debtor will not be entitled to a current income tax deduction upon contribution of Lummus Note to the Lummus Asbestos PI Trust. Instead, under Section 468B of the IRC, a taxpayer will become entitled to income tax deductions as payments are made on Lummus Note.

## 11.4  Tax Consequences to the Lummus Asbestos PI Trust.

The Lummus Asbestos PI Trust will qualify as a QSF under the Treasury Regulations under Section 468B of the IRC and the Debtor and the Reorganized Debtor will be treated as qualified transferors to the Lummus Asbestos PI Trust. The Lummus Asbestos PI Trust will be required to pay taxes on modified gross income as defined within the IRC (generally at the highest rate applicable to estates and trusts). As a QSF, the Lummus Asbestos PI Trust will generally not be required to include in income amounts transferred to it by the Debtor, except that interest on the Lummus Note to the Lummus Asbestos PI Trust from the Debtor as it accrues will be includible in income by the Lummus Asbestos PI Trust. The Lummus Asbestos PI Trust will not be entitled to deduct for Federal income tax purposes amounts paid out to holders of Claims (however, the Lummus Asbestos PI Trust will be entitled to deduct amounts paid for administrative costs and other incidental costs of the Lummus Asbestos PI Trust).

The basis of the Lummus Asbestos PI Trust in the assets transferred to the trust will generally be the fair market value of such assets at the time of transfer.

## 11.5  Tax Consequences to Holders of Claims.

To the extent that payments from the Lummus Asbestos PI Trust to holders of Claims constitute damages received by holders of such Claims on account of personal injuries, such payments should not constitute gross income to such recipients under Section 104 of the IRC, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year. To the extent that payments from the Lummus Asbestos PI Trust to holders of Claims constitute damages received by holders of such Claims on account of claims other than personal injuries (such as lost wages), such payments will be includible in gross income to such holders.

The tax consequences of payments received by holders of Claims will depend upon the individual nature of each Claim and the particular circumstances and facts applicable to the holder of the Claim at the time each such payment is made. The Debtor anticipates that the Lummus Asbestos PI Trust will issue Form 1099s to each holder of a Lummus Asbestos PI Trust Claim for each year during which payments are made to such holder, in the full amount of such payment. All distributions to

holders of Claims will be subject to any applicable withholding and backup withholding. The Lummus Asbestos PI Trust, the Debtor, and the Reorganized Debtor will not attempt to allocate amounts paid with respect to Claims between physical and non-physical injuries.

**11.6    Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES ALSO MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED STRONGLY TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.

## Article 12

### FINANCIAL INFORMATION

**12.1** <u>General</u>.

An analysis of the Debtor's current financial condition appears in the Financial Statements attached to this Disclosure Statement as *Exhibits G*. This information is provided to inform Claimants of the Debtor's financial condition.

Upon the commencement of its Chapter 11 Case, the Debtor will be required to file monthly operating reports with the Bankruptcy Court. Such financial information will be on file with the Bankruptcy Court and publicly available for review (a) between the hours of 9:00 a.m. and 4:00 p.m., E.D.T., Monday through Friday (excluding Federal holidays) at the United States Bankruptcy Court, 824 Market Street, 15th Floor, Wilmington, Delaware 19801, (b) for a fee, on the Bankruptcy Court's public website: **www.deb.uscourts.gov**, or (c) online at the Debtor's restructuring-information website: *www.lummus-restructuring.com*.

**12.2** <u>Reorganized Debtor's Financial Projections</u>.

The Debtor also has prepared the Reorganized Debtor's Financial Projections, a summary of which is attached to this Disclosure Statement as *Exhibits H*. Variances in the forecasted financial information contained therein may result from unforeseen factors. However, the Reorganized Debtor's Financial Projections represent the Debtor's present judgment of the projected business operations of the Reorganized Debtor and its ability to meet its obligations to the Lummus Asbestos PI Trust.

**WHILE THE DEBTOR BELIEVES THAT THE PROJECTED PRO FORMA FINANCIALS ARE REASONABLE IN LIGHT OF CURRENT FACTS AND CIRCUMSTANCES KNOWN TO THE DEBTOR'S MANAGEMENT, THE PROJECTIONS ARE BASED ON A NUMBER OF ASSUMPTIONS AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES THAT ARE BEYOND THE CONTROL OF THE REORGANIZED DEBTOR. THEREFORE, THERE CAN BE NO ASSURANCE THAT THESE PROJECTIONS WILL BE REALIZED AND ACTUAL OPERATING RESULTS MAY BE MATERIALLY HIGHER OR LOWER THAN FORECAST.**

## Article 13

### SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD USED

**13.1**   <u>Sources of Information.</u>

The financial information in *Exhibits G and H* to this Disclosure Statement was provided by the Debtor or is based upon data generated by the Debtor.

**13.2**   <u>Accounting Method.</u>

The Debtor maintains its books and records in accordance with generally accepted accounting principles.

## RECOMMENDATION AND CONCLUSION

The Debtor, ABB, the ACC, the Lummus Future Claimants' Representative, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative strongly recommend that all holders of Claims in Classes 5, 6, and 7 vote to accept the Plan, and urge them to evidence such acceptance and approval, by instructing the holders of any proxies for them to vote to accept the Plan on their behalf, or by returning their Ballot so that it will be received on or before the Voting Deadline.

In the view of the Debtor, ABB, the ACC, the Lummus Future Claimants' Representative, the CCC, the CE Official Creditors' Committee, and the CE Future Claimants' Representative, the Plan provides the best available alternative for providing the equitable and expeditious distributions to holders of Lummus Asbestos PI Trust Claims. Your support of the Plan will enable its implementation and help insure its success.

## SIGNATURES

The undersigned has executed this Disclosure Statement as of the 30th day of August, 2005.

Respectfully submitted,

ABB LUMMUS GLOBAL INC.

BY: /s/  MARGARET DUPLANTIER
Name:Margaret Duplantier
Title: Senior Vice President and Secretary

PACHULSKI, STANG, ZIEHL,
YOUNG, JONES, & WEINTRAUB P.C.

BY:/s/   LAURA DAVIS JONES
Laura Davis Jones (Bar No. 2436)
919 N. Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19801-8705
Tel: (302) 652-4100
Fax: (302) 652-4400
Courier (19801)

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

BY:/s/   JEFFREY N. RICH
Jeffrey N. Rich, Esq.
Philip H. Hecht, Esq.
599 Lexington Avenue
New York, NY 10022-60030
Tel.: (212) 536-3900
Fax: (212) 536-3901

**Exhibit A**
**to Disclosure Statement**

**Glossary of Terms for the Plan Documents**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No.: 05-[    ]    (JFK) |
| ABB LUMMUS GLOBAL INC., | ) | |
| | ) | |
| Debtor. | ) | |

## GLOSSARY OF TERMS FOR THE PLAN DOCUMENTS
## PURSUANT TO THE PREPACKAGED PLAN OF REORGANIZATION OF ABB LUMMUS GLOBAL INC.

KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, P.C.

Jeffrey N. Rich
Philip H. Hecht
Elizabeth H. Singer
Jennifer Anne Mo
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

Laura Davis Jones (Bar No. 2436)
919 N. Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Attorneys for ABB Lummus Global Inc.

# GLOSSARY

Unless the context requires otherwise, the following terms, when used in initially capitalized form in the Disclosure Statement, related exhibits, Plan, and Plan Documents shall have the following meanings. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined herein but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term by the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity). The rules of construction set forth herein and in Section 102 of the Bankruptcy Code shall apply. All references to the "Plan" shall be construed, where applicable, to include references to the Plan and all of its exhibits, appendices, schedules, and annexes (and any amendments made in accordance with their terms or applicable law).

| | |
|---|---|
| *ABB* | shall mean ABB Ltd, a corporation organized and existing under the laws of Switzerland, and the indirect, ultimate parent of the Debtor. |
| *ABB and Non-Debtor Affiliate Settlement Agreement (Lummus)* | shall mean the settlement agreement among the Lummus Asbestos PI Trust, ABB, ABB Holdings, ABB Oil & Gas, Lummus FCR, and the Debtor in substantially the form attached as *Exhibit A* to the Plan. |
| *ABB Consideration* | shall mean: (i) the Lummus Note; (ii) the related guaranty by ABB, ABB Holdings, and ABB Oil & Gas and the related pledge and security interest in 51% of the issued and outstanding shares of the Capital Stock of Lummus which, as of the Effective Date, will be held by ABB Oil & Gas; and (iii) the right to receive the Lummus Insurance Recovery Guaranteed Payment and other payments with respect to the Subject Lummus Insurance Policies as more fully described in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus). |
| *ABB Holdings* | shall mean ABB Holdings Inc., the successor by merger to Asea Brown Boveri, and indirect parent of the Debtor. |
| *ABB Indemnified Parties* | shall mean (i) ABB; (ii) all Non-Debtor Affiliates; (iii) all future Affiliates of ABB; (iv) all of the respective Representatives of the Entities described in clauses (i) through (iii) of this definition; and (v) all of the respective past, present, and future Representatives of the Debtor and its Subsidiaries. |
| *ABB Oil & Gas* | shall mean ABB Oil and Gas USA, Inc., a corporation organized and existing under the laws of Delaware, and the direct parent of the Debtor. |
| *ACC* | shall mean the Asbestos Claimants' Committee. |
| *Additional Indemnitees* | shall mean (i) the ACC and each past, present, and future member of the Asbestos Claimants' Committee; (ii) each past, present, and future member of the TAC; (iii) each past, present, and future Lummus FCR; and (iv) all of the respective past, present, and future Representatives of the Entities described in clauses (i) through (iii) of this definition. |
| *Administrative Expense Claim* | shall mean any claim constituting a cost or expense of administration in the Chapter 11 Case under Sections 503(b), 507(a)(1), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) any actual and necessary postpetition costs or expenses of preserving the estate of the Debtor; (ii) any and all reasonable fees and expenses of (a) the Lummus FCR and his Representatives, (b) the ACC, if appointed, and its Representatives, (iii) any actual and necessary postpetition costs or expenses of operating the |
| | business of the Debtor; (iv) any indebtedness or obligation incurred or assumed by the Debtor on or after the Petition Date (under the executory contracts of the Debtor assumed pursuant to Section 365 of the Bankruptcy Code by order of the Bankruptcy Court or the Plan) in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services; (v) any allowed compensation or reimbursement of expenses awarded or allowed under Sections 330(a), 331, or 503 of the Bankruptcy Code; and (vi) any fees or charges assessed against the estate of the Debtor under 28 U.S.C. § 1930. |
| *Affiliate* | shall mean, as to any specified Entity, (i) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with the specified Entity and (ii) any Entity that is an "affiliate" (within the meaning of Section 101(2) of the Bankruptcy Code) of a specified Entity will be deemed an Affiliate of that specified Entity for purposes of the Plan. As used in clause (i) of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an Entity (whether through ownership of Capital Stock of that Entity, by contract or otherwise). |

*Aggregate Insurance Recoveries* shall mean recoveries received by the Debtor or Reorganized Debtor after April 15, 2002, under the Subject Lummus Insurance Policies on account of asbestos-related liabilities, regardless of whether those proceeds are received through settlements, litigation, or payments in the ordinary course of business from its insurers, or otherwise.

*Allowed* shall mean:

a) With respect to an Administrative Expense Claim

    (i) that represents a Claim of a professional person employed under Section 327, 328, 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code, such Claim to the extent it is allowed by a Final Order of the Bankruptcy Court under Sections 330 or 331 of the Bankruptcy Code;

    (ii) other than with respect to a Claim described in clause (a)(i) of this definition,

        (X) that represents an actual or necessary expense of preserving the estate or operating the business of the Debtor, any such Claim to the extent that the Debtor or the Reorganized Debtor determines it to constitute an Administrative Expense Claim,

        (Y) that the Reorganized Debtor does not believe constitutes an Administrative Expense Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Section 503 or 1114 of the Bankruptcy Code; and

    b)    With respect to any Claim other than a Lummus Asbestos PI Trust Claim or an Administrative Expense Claim, to the extent that it is (i) allowed in whole or in part by a Final Order of the Bankruptcy Court; (ii) expressly allowed in the Plan; or (iii) listed in the Debtor's Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated.

*Allowed Amount* of a Claim (excluding Lummus Asbestos PI Trust Claims) shall mean the lesser of (i) the dollar amount of such Claim as Allowed, (ii) the estimated amount of such Claim, or (iii) the dollar amount agreed to by the Debtor in Possession. Unless otherwise specified herein or by Final Order of the Bankruptcy Court or District Court, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Petition Date.

*Alstom* shall mean ALSTOM, a corporation organized and existing under the laws of France.

*Alstom NV* shall mean ALSTOM NV, a corporation organized and existing under the laws of the Netherlands.

*Alstom Protected Parties* shall mean (i) Alstom; (ii) Alstom NV; (iii) their Affiliates as of July 6, 2005, listed on *Exhibit C* to the Plan; (iv) all of the respective future Affiliates of Alstom and/or Alstom NV; and (v) all of the respective past, present, and future Representatives of the Entities described in clauses (i) through (iv) of this definition.

*Amended Certificate of Incorporation* shall mean the amended certificate of incorporation of the Debtor, substantially in form satisfactory to the Debtor, ABB, the FCR, and the ACC, if appointed, to be filed on or prior to the Effective Date.

*Asbestos Books* shall have the meaning set forth in Section 7.2.6 of the Plan.

*Asbestos Claimants' Committee* shall mean the informal asbestos claimants' committee created prior to the Petition Date, and, if the context requires, an official asbestos claimants' committee appointed in the Chapter 11 Case.

*Asbestos Insurance Actions* shall mean actions for the pursuit of Lummus Asbestos Insurance Rights.

*Asbestos Protected Party* shall mean any of the following:

    (a)   the Debtor;

(b)  the Reorganized Debtor;

(c)  the Subsidiaries of the Debtor;

(d)  predecessors of the Debtor and Subsidiaries of the Debtor;

(e)  the ABB Indemnified Parties;

(f)  the Alstom Protected Parties;

(g)  any Entity (other than a Settling Lummus Asbestos Insurance Company) that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtor, the Reorganized Debtor, any of the

Subsidiaries of the Debtor, any of the ABB Indemnified Parties, any of the Alstom Protected Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor);

(h)  any Entity that, pursuant to the Plan or otherwise after the Effective Date, makes a loan to the Debtor, the Reorganized Debtor, any of the Subsidiaries of the Debtor, any of the ABB Indemnified Parties, any of the Alstom Protected Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, the Lummus Asbestos PI Trust, or to a successor to, or transferee of any of the respective assets of, the Debtor, the Reorganized Debtor, any of the Subsidiaries of the Debtor, any of the ABB Indemnified Parties, any of the Alstom Protected Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or the Lummus Asbestos PI Trust (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or being granted a security interest in connection with the foregoing);

(i)  any Entity, including each of the respective past, present, and future Affiliates, Subsidiaries, and Representatives of the Debtor, the Reorganized Debtor, any of the Subsidiaries of the Debtor, any of the ABB Indemnified Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or any of the Alstom Protected Parties but only to the extent any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims;

(j)  the Additional Indemnitees;

(k)  the Structured Finance Protected Parties; and

(l)  the OGP Protected Parties.

| | |
|---|---|
| *Asea Brown Boveri* | shall mean Asea Brown Boveri Inc., a Delaware corporation, the predecessor by merger of ABB Holdings. |
| *Ballot* | shall mean the form or forms distributed to holders of impaired Claims and Equity Interests by which such holders may indicate acceptance or rejection of the Plan. |
| *Bankruptcy Code* | shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, as applicable to the Chapter 11 Case. |
| *Bankruptcy Court* | shall mean the United States Bankruptcy Court for the District of Delaware. |
| *Bankruptcy Estate* | shall mean the estate of the Debtor created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code. |
| *Bankruptcy Rules* | shall mean the Federal Rules of Bankruptcy Procedure, as amended, from time to time, promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, and any applicable local rules of the Bankruptcy Court. |
| *Board of* | shall mean the Board of Directors of the Debtor, or of the Reorganized Debtor, as the case may be, as it may |

| | |
|---|---|
| *Directors* | exist from time to time. |
| *Business Day* | shall mean any day which is not a Saturday, Sunday, or federal holiday in the United States (as that term is defined in Bankruptcy Rule 9006(a)). |
| *Capital Stock* | shall mean, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in that corporation; and (ii) any other Entity, any share, membership or other percentage interest, unit of participation or other equivalent (however designated) of any equity interest in that Entity. |
| *Cash* | shall mean cash, Cash Equivalents, and other readily marketable securities or instruments, including, without limitation, direct obligations of the United States and certificates of deposit issued by federally insured banks. |
| *Cash Equivalents* | shall mean (a) securities issued or fully guaranteed or insured by the United States government or any agency thereof, (b) certificates of deposit, eurodollar time deposits, overnight bank deposits and bankers' acceptances of any commercial bank organized under the laws of the United States of America, any state thereof, the District of Columbia, any foreign bank, or its branches or agencies (fully protected against currency fluctuations) which, at the time of acquisition, are rated at least "A-1" by Standard & Poors Corporation ("S&P") or "P-1" by Moody's Investor Services, Inc. ("Moody's"), and (c) commercial paper of an issuer rated at least "A-1" by S&P or "P-1" by Moody's, and (d) shares of any money market fund that (i) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (a) through (c) above, (ii) has net assets of not less than $500,000,000 and (iii) is rated at least "A-1" by S&P or "P-1" by Moody's; *provided, however*, that the maturities of all obligations of the type specified in clauses (a) through (c) above shall not exceed 180 days. |
| *Causes of Action* | shall mean, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtor and/or the Bankruptcy Estate, arising under any provision of the Bankruptcy Code or other applicable law. |
| *CCC* | shall mean those persons identified in the "Sixth Supplemental Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure Concerning Multiple Representation of Creditors" filed by Montgomery, McCracken, Walker & Rhoads, LLP and Elizabeth Wall Magner, Esquire with the Bankruptcy Court in the CE Bankruptcy Case on July 3, 2003 [Docket #977] or the present or future personal representatives of the cancer victims, comprised of (a) persons suffering from cancers caused by exposure to asbestos contained in the Debtor's boilers or their present or future lawful personal representatives to the extent that such named persons have become or in the future become deceased or incapacitated to act on their own behalf or (b) personal representatives of the estates of individuals whose deaths were wrongfully caused by exposure to the Debtor's asbestos, or any persons that have become or become in the |
| | future the replacement lawful personal representatives for the estates of those deceased. The CCC shall act by and through Steven Kazan, Esquire with respect to any consent or waiver required by the CCC under this Plan. |
| *CE* | shall mean Combustion Engineering, Inc., a Delaware corporation, and a Subsidiary of ABB Holdings. |
| *CE Bankruptcy Case* | shall mean the CE chapter 11 bankruptcy case pending before the Bankruptcy Court, Case No. 03-10495 (JKF). |
| *CE Confirmation Order* | shall mean the order or orders entered by the Court confirming the CE Plan and entering the channeling injunction pursuant to the CE Plan. |
| *CE Plan* | shall mean the Combustion Engineering Plan of Reorganization as modified through August 17, 2005. |
| *Chapter 11 Case* | shall mean the case commenced by the Debtor's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date. |
| *Claim* | shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. |
| *Class* | shall mean any group of Claims or Equity Interests classified by the Plan pursuant to Section 1122(a)(1) of the Bankruptcy Code. |
| *Confirmation* | shall mean the hearing held by the Court to consider confirmation of the Plan pursuant to Section 1129 of |

| | |
|---|---|
| *Hearing* | the Bankruptcy Code, as such hearing may be adjourned or continued from time to time. |
| *Contribution Agreement* | shall mean that certain contribution agreement entered in connection with the CE Plan, substantially in the form attached *as Exhibit B* to the ABB and Non-Debtor Affiliate Settlement Agreement among CE, the CE 524(g) Asbestos PI Trust, ABB, ABB Asea Brown Boveri Ltd, ABB Inc., ABB Oil & Gas, ABB Holdings, and Lummus. |
| *Court* | shall mean either the Bankruptcy Court or the District Court, as appropriate. |
| *Creditor* | shall mean any Entity that holds a Claim against the Debtor or Debtor in Possession. |
| *Debtor* | shall mean Lummus. |
| *Debtor in Possession* | shall mean the Debtor, in its capacity as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. |
| *Demand* | shall mean a demand for payment against the Debtor as defined by Section 524(g)(5) of the Bankruptcy Code. |
| *Disallowed* | shall mean with respect to a Claim (other than a Lummus Asbestos PI Trust Claim) or Equity Interest, as the case may be, that is disallowed in its entirety in the Plan or by a Final Order of the Bankruptcy Court, District Court, or any other court of competent jurisdiction. |
| *Disclosure Statement* | shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, filed with the Bankruptcy Court in connection with the Plan pursuant to Section 1125 of the Bankruptcy Code, together with any amendments and supplements thereto. |
| *Disputed* | shall mean with respect to a Claim (other than a Lummus Asbestos PI Trust Claim) a Claim that is neither Allowed nor Disallowed. |
| *Disputed Payments* | shall have the meaning set forth in Section 7.14.2 of the Plan. |
| *Distribution* | shall mean the payment, distribution, or assignment under the Plan by the Reorganized Debtor of property or interests in property to any holder of an Allowed Claim (other than a Lummus Asbestos PI Trust Claim). |
| *Distribution Date* | shall mean, when used with respect to an Allowed Claim (other than a Lummus Asbestos PI Trust Claim), the date which is as soon as reasonably practicable after the later of (a) the Effective Date and (b) the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter. |
| *District Court* | shall mean the United States District Court for the District of Delaware. |
| *Domestic Non-Debtor Affiliate* | shall mean the Non-Debtor Affiliates who are domiciled in the United States. |
| *Effective Date* | shall mean the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.11 therein have been satisfied or waived in writing, or, if a stay of the Lummus Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay. |
| *Encumbrance* | shall mean with respect to any property (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation. |
| *Entity* | shall have the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code. |
| *Environmental Law* | shall mean (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.*; (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, *et seq.*; (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*; (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq.*; (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*; (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be |

amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control, and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials; and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

| | |
|---|---|
| *Equity Interest* | shall mean any interest in the Debtor pursuant to an "equity security" within the meaning of Section 101(16) of the Bankruptcy Code. |
| *Final Order* | shall mean (i) an order as to which the time to appeal, petition for certiorari, or otherwise seek appellate review or to move for reargument or rehearing has expired and as to which no appeal, petition for writ of certiorari, or other proceedings for reargument or rehearing shall then be pending, (ii) an order as to which any right to appeal, petition for writ of certiorari, reargue, or rehear shall have been waived in writing by the Entity possessing such right, or (iii) in the event of an appeal, petition for writ of certiorari, or reargument or rehearing thereof (a) such order shall have been affirmed by the highest court to which such order was appealed, (b) petition for writ of certiorari has been denied with respect to such order, or (c) such order shall have been affirmed by the Court from which reargument or rehearing was sought, and the time to take any further appeal, petition for writ of certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order. |
| *Financial Projections and Feasibility Analysis* | shall mean that certain Financial Projection and Feasibility Analysis substantially in the form attached to the Disclosure Statement as *Exhibit H*. |
| *Financial Statements* | shall mean the analysis of the Debtor's financial condition, in substantially the form attached to the Disclosure Statement as *Exhibit G*. |
| *General Unsecured Claim* | shall mean any Claim that is not an Administrative Expense Claim, Tax Claim, Priority Claim, Secured Claim, Workers' Compensation Claim, Lummus Asbestos PI Trust Claim, Non-Debtor Affiliate Intercompany Claim, or Equity Interest. Notwithstanding the foregoing, General Unsecured Claims include Settled Asbestos Claims. |
| *Glossary* | shall mean this Glossary of Terms for the Plan Documents Pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc., as the same may be modified from time to time. |
| *Governmental Unit* | shall have the meaning ascribed to that term in Section 101(27) of the Bankruptcy Code. |
| *Impaired Class* | shall mean a Class that is impaired within the meaning of Section 1124 of the Bankruptcy Code. |
| *Injunction Default* | shall mean any failure by the Debtor, the Reorganized Debtor, ABB, ABB Oil & Gas, or ABB Holdings, to timely perform or pay any liability or monetary obligation to or for the benefit of the Lummus Asbestos PI Trust when due after giving effect to any applicable grace periods; *provided, however*, an Injunction Default shall not be deemed to have occurred solely as a result of (i) a failure by the Debtor, the Reorganized Debtor, ABB, ABB Holdings, or ABB Oil & Gas to make a payment of Aggregate Insurance Recoveries pursuant to Section 2.2 of the Non-Debtor Affiliate Settlement Agreement (Lummus) based solely upon a Disputed Payment; or a Missed Payment unless within ten (10) days after the resolution of a |
| | Disputed Payment or Missed Payment (whether by agreement of the parties or when an order becomes a Final Order determining that such Disputed Payment or Missed Payment is due), ABB (or an entity acting on ABB's behalf) fails to pay such Disputed Payment or Missed Payment in full together with, unless the parties agree to the contrary, interest at a rate equal to the sum of (x) the Wall Street Journal — National Edition daily prime rate plus (y) four (4) percent, from the date such Disputed Payment or Missed Payment was originally due without regard to any dispute until the date such amount is paid in full. |
| *Insurance Assignment Agreement* | shall mean that certain insurance assignment agreement substantially in the form attached as *Exhibit B* to the CE Plan. |
| *Internal Revenue* | shall mean the Internal Revenue Code of 1986, as amended. |

| | |
|---|---|
| *Code or IRC* | |
| *IRS* | shall mean the United States Internal Revenue Service. |
| *Liquidation Analysis* | shall mean the liquidation analysis attached as *Exhibit F* to the Disclosure Statement. |
| *Lummus* | shall mean ABB Lummus Global Inc., a Delaware corporation and successor by merger to Lummus Construction. |
| *Lummus Asbestos Insurance Entity* | shall mean any Entity, including, but not limited to, any insurance company, broker, or guaranty association, that has issued, or that has actual or potential liability, duties, or obligations with respect to, any Subject Lummus Insurance Policy or any Subject Lummus Insurance Settlement Agreement. |
| *Lummus Asbestos Insurance Entity Injunction* | shall mean the injunction described in Section 7.3 of the Plan. |
| *Lummus Asbestos Insurance Rights* | shall mean any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action related to the Subject Lummus Insurance Policies or the Subject Lummus Insurance Settlement Agreements whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including, but not limited to: |

(i) any and all rights to pursue or receive payments with respect to Lummus Asbestos PI Trust Claims under any Subject Lummus Insurance Policy or Subject Lummus Insurance Settlement Agreement whether for liability, defense, or otherwise;

(ii) any and all rights to pursue or receive payments related to any Subject Lummus Insurance Policy or Subject Lummus Insurance Settlement Agreement that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement, or any other form of proceeding; and

(iii) any and all rights to pursue or receive payments related to any Subject Lummus Insurance Policy or Subject Lummus Insurance Settlement Agreement from any state insurance guaranty association in connection with any state insurance guaranty association statute;

*provided, however,* that Lummus Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtor is a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

| | |
|---|---|
| *Lummus Asbestos Personal Injury Claim* | shall mean a Claim, Demand, or allegation against, or any debt, liability, or obligation of, the Debtor or any other Asbestos Protected Party, whether now existing or hereafter arising, whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty for, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or other personal injuries, physical, emotional or otherwise, to persons, caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos — including asbestos-containing products, boiler systems, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed or in any way used by the Debtor or any other Entity for whose products or operations the Debtor has liability or is alleged to have liability — to the extent arising directly or indirectly, from acts, omissions, business, or operations of the Debtor (including, the acts, omissions, business, or operations of any other Entity for whose products or operations the Debtor has liability to the extent of the Debtor's liability for such acts, omissions, business, or operations) **(including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor or any other Entity for whose products or operations the Debtor has liability or is alleged to have liability, or any conduct for which the Debtor or any other Entity for whose products or operations the Debtor has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law)** including all related claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and |

special damages) and punitive damages; *provided, that* Lummus Asbestos PI Claims shall not include Workers' Compensation Claims. Lummus Asbestos Personal Injury Claims also shall include, without limitation, all Claims and Demands (whether now existing or hereafter arising), arising out of, resulting from, or relating to, directly or indirectly, death, bodily injury, sickness, disease or other personal injuries caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos, against any Alstom Protected Party which is (i) a former Subsidiary of CE, or (ii) a direct or indirect successor to, or transferee of assets of CE, or a former Subsidiary of CE (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a transferee or successor)), to the extent such Claims and

> Demands are asserted to arise as a consequence of the products, business or operations of an Entity when such Entity was a Subsidiary of CE. To the extent the Released Parties include future Affiliates of an Entity, Lummus Asbestos PI Claims shall include, with respect to such future Affiliate (as such), only Claims and Demands (whether now existing or hereafter arising), arising out of, resulting from, or relating to, directly or indirectly, death, bodily injury, sickness, disease, or other personal injuries caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos as to which such future Affiliate is, or is alleged to be, directly or indirectly or derivatively liable for the acts, omissions, business, products, or operations of the Debtor (including the acts, omissions, business, products, or operations of any other Entity for whose acts, omissions, business, products, or operations the Debtor has liability, to the extent of the Debtor's liability for such acts, omissions, business, products, or operations) as a consequence of a contractual, transactional, corporate, or control relationship between a Released Party, excluding such future Affiliate, on the one hand, and such future Affiliate, on the other hand.

*Lummus Asbestos PI Channeling Injunction* shall mean the injunction described in Section 7.14.1 of the Plan.

*Lummus Asbestos PI Claim* shall mean Lummus Asbestos Personal Injury Claim.

*Lummus Asbestos PI Trust* shall mean the ABB Lummus Global Inc. 524(g) Asbestos PI Trust established in accordance with the Plan, the Confirmation Order, the Lummus Asbestos PI Trust Agreement, and the Lummus TDP, which will be treated as a "qualified settlement fund" under Section 468B of the IRC.

*Lummus Asbestos PI Trust Agreement* shall mean the agreement governing the creation of the Lummus Asbestos PI Trust, effective as of the Effective Date, in substantially the form attached as *Exhibit D* to the Plan.

*Lummus Asbestos PI Trust Assets* shall mean the ABB Consideration, all other assets, rights, and benefits assigned, transferred, or conveyed to the Lummus Asbestos PI Trust in connection with the Plan or any Plan Document, and the Proceeds thereof.

*Lummus Asbestos PI Trust By-Laws* shall mean the Lummus Asbestos PI Trust By-Laws, effective as of the Effective Date, to be adopted pursuant to Section 3.1(c)(viii) of the Lummus Asbestos PI Trust Agreement, as the same may be modified from time to time.

*Lummus Asbestos PI Trust Claimant* shall mean the holder of a Lummus Asbestos PI Trust Claim.

*Lummus Asbestos PI Trust Claims* shall mean all Lummus Asbestos Personal Injury Claims, Lummus Derivative Asbestos Personal Injury Claims, Subsequent Malignancy Claims, and Demands.

*Lummus Asbestos PI Trust Distribution Procedures* shall mean the trust distribution procedures for the Lummus Asbestos PI Trust in substantially the form attached as *Exhibit E* to the Plan, as such procedures may be modified from time to time in accordance with the terms thereof, the Lummus Asbestos PI Trust Agreement, and the Plan.

*Lummus Asbestos PI Trust Documents* shall mean the Lummus Asbestos PI Trust Agreement, the Lummus PI Trust By-Laws, and the other agreements, instruments, and documents governing the establishment, administration, and operation of the Lummus Asbestos PI Trust, as the same may be amended or modified from time to time, in accordance with the Plan and the terms of such documents.

| | |
|---|---|
| *Lummus Asbestos PI Trust Expenses* | shall mean any of the liabilities, costs, or expenses of, or imposed upon, or assumed by the Lummus Asbestos PI Trust (other than liabilities to holders of Lummus Asbestos PI Trust Claims in respect of such Lummus Asbestos PI Trust Claims), as incurred in accordance with the provisions of the Lummus Asbestos PI Trust Agreement. |
| *Lummus Confirmation Date* | shall mean the date on which the Confirmation Order for the Plan is entered or affirmed by the District Court. |
| *Lummus Confirmation Order* | shall mean the order or orders entered or affirmed by the Court on the Lummus Confirmation Date confirming the Plan and entering the Lummus Asbestos PI Channeling Injunction. |
| *Lummus Construction* | shall mean ABB Lummus Global Construction Co., a Delaware corporation and predecessor by merger into the Debtor. |
| *Lummus Derivative Asbestos Personal Injury Claims or Lummus Derivative Asbestos PI Claims* | shall mean those cross-claims, contribution claims, subrogation claims, reimbursement claims, indemnity claims, and other similar derivative Claims, Demands, or allegations against the Debtor, whether or not any such Claim, Demand, debt, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement, or indemnity or any other theory of law, equity, or admiralty for, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos — including asbestos-containing products, boiler systems, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by the Debtor or any Entity for whose products or operations of the Debtor has liability or is alleged to have liability — to the extent arising directly or indirectly from acts, omissions, business, or operations of the Debtor (including the acts, omissions, business, or operations of any other Entity for whose products or operations the Debtor has liability to the extent of the Debtor's liability for such acts, omissions, business, or operations) **(including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor or any other Entity for whose products or operations the Debtor has liability or is alleged to have liability or any conduct for which the Debtor or any other Entity for whose products or operations the Debtor has liability or is alleged to have liability, may be deemed to** |

**have strict liability under any applicable law)** including all claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; *provided, however,* that Lummus Derivative Asbestos Personal Injury Claims shall not include Workers' Compensation Claims. To the extent the Released Parties include future Affiliates of an Entity, Lummus Derivative Asbestos Personal Injury Claims shall include, with respect to such future Affiliate (as such), only Claims and Demands (whether now existing or hereafter arising), arising out of, resulting from, or relating to, directly or indirectly, death, bodily injury, sickness, disease, or other personal injuries caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos as to which such future Affiliate is, or is alleged to be, directly or indirectly or derivatively liable for the acts, omissions, business, products, or operations of the Debtor (including the acts, omissions, business, products, or operations of any other Entity for whose acts, omissions, business, products, or operations the Debtor has liability, to the extent of the Debtor's liability for such acts, omissions, business, products, or operations) as a consequence of a contractual, transactional, corporate, or control relationship between a Released Party, excluding such future Affiliate, on the one hand, and such future Affiliate, on the other hand.

| | |
|---|---|
| *Lummus FCR* | shall mean Lummus Future Claimants' Representative. |
| *Lummus Future Claimants* | shall mean the holder or holders of Demands, which would constitute Lummus Asbestos PI Trust Claims. |

| Lummus Future Claimants' Representative | shall mean Richard B. Schiro (or any court-appointed successor), as the legal representative for holders of future Demands, and not individually, for the purpose of protecting the interests of persons that may subsequently assert Lummus Asbestos PI Trust Claims channeled to the Lummus Asbestos PI Trust. |
|---|---|
| Lummus Insurance Recovery Guaranteed Payment | shall mean $5,000,000. |
| Lummus International | shall mean ABB Lummus Global International Corporation, a Delaware corporation. |
| Lummus Note | shall mean an interest-bearing promissory note executed by Lummus in the original principal amount of $33 million, payable to the Lummus Asbestos PI Trust and guaranteed by ABB, ABB Holdings, and ABB Oil & Gas, as set forth more fully in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), secured by a security interest in 51% of the issued and outstanding shares of Capital Stock of Lummus which, as of the Effective Date, will be held by ABB Oil & Gas. |
| Lummus TDP | shall mean the Lummus Asbestos PI Trust Distribution Procedures. |
| Missed Payment | shall have the meaning set forth in Section 7.14.2 of the Plan. |
| Non-Compensatory Damages | shall mean any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, exemplary, vindictive, imaginary, or presumptive damages. |
| Non-Debtor Affiliate | shall mean each of the Entities identified on Exhibit B to the Plan. |
| Non-Debtor Affiliate Intercompany Claim | shall mean any Claim against the Debtor by any Non-Debtor Affiliates. |
| OGP Business | shall mean the business conducted by ABB's "Oil, Gas and Petrochemicals" operating division which includes the manufacturing and supply of products, systems and services to the global oil, gas and petrochemicals industries, from the development of onshore and offshore exploration technologies to the design and supply of production facilities, refineries and petrochemicals plants, including, without limitation, the following products, systems and services: (i) engineering, procurement and construction projects for refineries and petrochemical plants, subsea and floating production and compressor stations; (ii) production and assembly of offshore production equipment, including specialized subsea equipment for production, controls and power distribution; (iii) production of onshore and offshore pressure-containing equipment; (iv) assembly of gas treatment and processing systems and heat transfer equipment; (v) provision of project management and procurement services; (vi) licensing of process technologies; and (vii) modification and maintenance services for both offshore and onshore facilities. |
| OGP Protected Parties | shall mean (a) any present or former Subsidiary or Affiliate of ABB, in their capacity as such, that makes up or has made up part of, or contains or has contained assets used in or relating to the operation of, the OGP Business, including, without limitation, the following entities, whether presently or formerly owned or otherwise: (i) ABB Vetco Gray Inc. (n/k/a Vetco Gray Inc.); (ii) ABB Vetco Gray U.K. Ltd. (n/k/a Vetco Gray UK Ltd.); (iii) West Africa Completion Services Ltd.; (iv) ABB Vetco Gray Italia S.R.L. (n/k/a Vetco Gray Italia S.R.L.); (v) ABB Petroleum Equipment Industries Company (n/k/a Petroleum Equipment Industries Company); (vi) ABB Vetco Gray Argentina S.A. (n/k/a Vetco Gray Argentina SA); (vii) ABB Vetco Gray Australia Pty Ltd. (n/k/a Vetco Gray Australia Pty Ltd.); (viii) ABB Vetco Gray France S.A.R.L. (n/k/a Vetco Gray France S.A.R.L.); (ix) PT Vetco Gray Indonesia; (x) ABB Vetco Gray (Hong Kong) Limited (n/k/a Vetco Gray Hong-Kong Limited); (xi) Vetco Gray Petroleum Equipment (Shanghai) Co. Ltd; (xii) ABB Vetco Gray Mexico S.A. de C.V. (n/k/a Vetco Gray Mexico S.A. de C.V.); (xiii) FIP International S.A. de C.V.; (xiv) Vetco Gray Delcom Sdn. Bhd; (xv) Satellite Services International Inc.; (xvi) ABB Vetco Gray de Venezuela C.A. (n/k/a Vetco Gray de Venezuela C.A.); (xvii) ABB Servicios Vetco Gray de Venezuela C.A. (n/k/a Vetco Gray Servicios de Venezuela C.A.); (xviii) ABB Offshore Systems Inc. (n/k/a Vetco Gray Controls Inc.); (xix) ABB Offshore Systems Pte. Ltd. (n/k/a Vetco Gray Controls Pte. Ltd.); (xx) ABB Offshore Systems Canada Inc. (n/k/a Offshore Systems Canada Inc.); (xxi) Koomey Companies International Inc.; (xxii) ABB Vetco Gray Canada, Inc. (n/k/a Vetco Gray Canada Inc.); (xxiii) ABB Vetco Gray Pte. Ltd. (n/k/a Vetco Gray Pte. Ltd.); (xxiv) |

Vetco Overseas N.V.; (xxv) Vetco Gray Nigeria Ltd.; (xxvi) ABB Lummus Global Inc. and its Subsidiaries; (xxvii) ABB Lummus Global Nigeria Ltd. (n/k/a Vetco Aibel Nigeria Ltd.); (xxviii) EPT (PNG) Ltd. (n/k/a Vetco Aibel PNG Limited); (xxix) ABB

Offshore Systems AS (n/k/a Vetco Aibel AS); (xxx) ABB Equatorial Guinea AS (n/k/a Vetco Aibel Equatorial Guinea AS); (xxxi) ABB Consultancy Services Ltd. (n/k/a Vetco Aibel UK Ltd.); (xxxii) ABB Gas Technology AS (n/k/a Vetco Gas Technology AS); (xxxiii) Intervent AS; (xxxiv) ABB Offshore Danmark A/S (n/k/a Vetco Aibel Denmark AS); (xxxv) ABB Vetco Gray AS (n/k/a Vetco Gray AS); (xxxvi) J.P. Kenny AS; (xxxvii) ABB Offshore Systems Iran AS (n/k/a Vetco Aibel Iran AS); (xxxviii) ABB Offshore Systems Kazakhstan AS (n/k/a Vetco Aibel Services AS); (xxxix) ABB Offshore Systems Ltd. (n/k/a Vetco Gray Controls Limited); (xl) Syntheseas Ltd.; (xli) Koomey Companies International Ltd.; (xlii) CMS Associates Ltd.; (xliii) ABB Oleo e Gas, Manutencao e Modificacao, Ltda. (n/k/a Vetco Aibel do Brasil Ltda.); (xliv) ABB Oleo e Gas Ltda. (n/k/a Vetco Gray Oleo e Gas Ltda.); (xlv) Empresa Angolana de Metalomecanicas S.A.R.L; (xlvi) ABB Oil and Gas Europe BV and its Subsidiaries; (xlvii) ABB Lummus Global Ltd and its Subsidiaries; and (b) any Affiliate of any of the foregoing Entities; (c) any direct or indirect purchaser, transferee of, successor to, or acquiror of all or any portion of the OGP Business (including, but not limited to, any purchaser of any equity interest in, or assets of, any of the Entities described in clause (a) above) and its Subsidiaries and Affiliates (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a purchaser, transferee, successor, or acquiror), and (d) any present or past Representative of any of the foregoing Entities to the extent he, she, or it is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims.

| | |
|---|---|
| *Pension Plans* | shall have the meaning set forth in Section 11.7.5 of the Plan. |
| *Petition Date* | shall mean the date on which the Debtor commences its Chapter 11 Case. |
| *Plan* | shall mean the prepackaged plan of reorganization of ABB Lummus Global Inc. either in its present form or as it may be amended, supplemented, or otherwise modified from time to time by the Debtor, and the exhibits, and schedules to the foregoing, as the same may be in effect from time to time. |
| *Plan Documents* | shall mean the Plan, all of the exhibits and schedules attached to the Plan (and the exhibits to such exhibits), and the Glossary. |
| *Priority Claim* | shall mean any Claim, other than an Administrative Expense Claim or Tax Claim, to the extent such claim is entitled to priority in right of payment under Section 507 of the Bankruptcy Code. |
| *Priority Tax Claim* | shall mean any Claim to the extent that such Claim is entitled to a priority in payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *Proceeds* | shall mean, with respect to any property, (i) any other property that is acquired upon the sale, lease, license, exchange, or other disposition of such property or the Proceeds, directly or indirectly, of such property; (ii) any principal, interest, dividends, fees, premiums, make-whole payments, other amounts or other property that is collected on, or distributed on account of, such property or the Proceeds, directly or indirectly, of such property; (iii) rights arising out of or relating to such property or the Proceeds, directly or |
| | indirectly, of such property; (iv) claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to such property or the Proceeds, directly or indirectly, of such property; (v) insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to such property or the Proceeds, directly or indirectly, of such property. |
| *QSF* | shall mean "qualified settlement fund" within the meaning of Section 468B of the IRC and the Treasury Regulations promulgated thereunder. |
| *Released Claims* | shall have the meaning set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus). |
| *Released Parties* | shall have the meaning set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus). |
| *Reorganized Debtor* | shall mean the Debtor, or any successors in interest thereto, from and after the Effective Date. |
| *Representatives* | shall mean, with respect to any Entity, the directors, officers, employees, accountants (including |

94

independent certified public accountants), attorneys, consultants, or other agents of that Entity, or any other professionals of that Entity in their respective capacities as such.

*Requisite Acceptances* shall mean the number of acceptances required to confirm the Plan under Sections 1126(c) and 524(g) of the Bankruptcy Code, as applicable.

*Schedules* shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor in Possession with the Bankruptcy Court, as required by Section 521 of the Bankruptcy Code and the Bankruptcy Rules, as such schedules and statements may be amended by the Debtor in Possession from time to time in accordance with Bankruptcy Rule 1009.

*Secured Claim* shall mean (a) a Claim that is secured by an Encumbrance on a property in which the Debtor has an interest, which Encumbrance is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code, or (b) a Claim Allowed under the Plan as a Secured Claim.

*Settled Asbestos Claims* shall mean the Lummus Asbestos Personal Injury Claims of the individuals set forth on *Exhibit H* to the Plan to the extent such claims are subject to a settlement agreement with the Debtor which agreement was binding and enforceable on or before February 17, 2003.

*Settling Lummus Asbestos Insurance Company* shall mean any Lummus Asbestos Insurance Entity that has entered into a settlement that is sufficiently comprehensive, as determined by the Lummus Future Claimants' Representative, the ACC, if appointed, and the Debtor, to warrant treatment under Section 524(g) of the Bankruptcy Code and that is included on a schedule of Settling Lummus Asbestos Insurance Companies filed with the Court by the Debtor at any time prior to the Lummus Confirmation Date.

*Solicitation Date* shall mean August 31, 2005 which is the date on which mailing solicitation of acceptances of the Plan commenced.

*Structured Finance Protected Parties* shall mean (i) ABB Structured Finance S.r.l., Xerox Noleggi S.p.A., ABB Credit Holding B.V., ABB Structured Finance B.V., ABB Credit B.V., ABB Structured Finance Limited, ABB Structured Finance Sweden AB, ABB Structured Finance (Americas) Inc., and ABB Structured Finance International Limited, and any present or former Affiliate of ABB that owns or owned assets used in the operations of, the business by such Entities; (ii) any Affiliate of any of the Entities described in clause (i) above; (iii) General Electric Company, General Electric Capital Corporation, General Electric Railcar Services Corporation, SFG XVII Inc., GESF - XVII LLC, GE Capital Services S.r.l., GE Capital Structured Finance Group, Inc., GE Capital Leasing a.s., and GE Capital Commercial Real Estate Financing & Services United Trust, acting by GE Capital Finance Pty Ltd, and their respective Subsidiaries and Affiliates, but only to the extent any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of any of the foregoing Entities' direct or indirect acquisition of any of the Entities described in clause (i) or any of their assets; (iv) any direct or indirect purchaser of, transferee of, successor to, or acquirer of all or any portion of the assets owned or business conducted by the Entities described in clause (i) above (including, but not limited to, any purchaser of any equity interest in, or assets of, any of the Entities described in clause (i) above) and its Affiliates (but only to the extent that any of such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a purchaser, transferee, successor, or acquirer) and (v) any present or past Representative of any of the foregoing Entities (but only to the extent he, she, or it is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims).

*Subject Lummus Insurance Policies* shall mean the insurance policies described on the schedule attached as *Exhibit F* to the Plan, as such Exhibit may be amended by the Debtor from time to time prior to the Effective Date with the consent of the Lummus FCR and the ACC, if appointed, and any other insurance policies, whether known or unknown, that potentially provide insurance coverage for Lummus Asbestos PI Trust Claims; *provided, however,* that Subject Lummus Insurance Policies shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtor is a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

The fact of inclusion of an insurance policy on *Exhibit F* to the Plan does not constitute a determination as to whether any particular insurance policy provides coverage for any matter resolved by the Plan or

for any other matter.

| | |
|---|---|
| *Subject Lummus Insurance Settlement Agreements* | shall mean the agreements listed on the schedule attached as *Exhibit G* to the Plan, as such Exhibit may be amended by the Debtor from time to time prior to the Effective Date with the consent of the Lummus FCR, and the |
| | ACC, if appointed, and any other agreements between a Lummus Asbestos Insurance Entity and a Settling Lummus Asbestos Insurance Company concerning or relating to any Subject Lummus Insurance Policy. |
| *Subsequent Malignancy Claim* | shall have the meaning set forth in Section 3.2.5.2 of the Plan. |
| *Subsidiary* | shall mean, with respect to any specified Entity at any time, any Entity a majority of the Capital Stock of which the specified Entity owns or controls at that time, directly or indirectly through another Subsidiary of the specified Entity. |
| *TAC* | shall mean the Trust Advisory Committee. |
| *Tax Claim* | shall mean a Claim against the Debtor that is of a kind specified in Sections 502(i) or 507(a)(8) of the Bankruptcy Code. |
| *Trust Advisory Committee* | shall mean the Trust Advisory Committee established pursuant to the terms of the Plan and the Lummus Asbestos PI Trust Agreement. |
| *Trustee* | shall mean any individual confirmed by the Bankruptcy Court to serve as one of the trustees of the Lummus Asbestos PI Trust pursuant to the terms of the Plan and the Lummus Asbestos PI Trust Agreement or who subsequently may be appointed pursuant to the terms of the Lummus Asbestos PI Trust Agreement. |
| *Trust Termination Date* | shall mean that certain date upon which the Lummus Asbestos PI Trust shall automatically terminate pursuant to Section 8.2(a) of the Lummus Asbestos PI Trust Agreement. |
| *United States Trustee (or U.S. Trustee)* | shall mean the United States Trustee for the District of Delaware. |
| *Voting Agent* | shall mean Bankruptcy Services LLC or such other voting agent as may be designated by Lummus. |
| *Workers' Compensation Claims* | shall mean Claims for (i) benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtor and its predecessors are receiving, or may in the future have a right to receive, and/or (ii) reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims. |

**Exhibit B**
to Disclosure Statement

**Prepackaged Plan of Reorganization**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABB LUMMUS GLOBAL INC., | ) | |
| | ) | Case No. 05-_____ (JFK) |
| Debtor. | ) | |

### *PREPACKAGED PLAN OF REORGANIZATION*

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTIONS 105 AND 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED PERSONAL INJURY LIABILITIES**

Dated: August 30, 2005

KIRKPATRICK & LOCKHART
   NICHOLSON GRAHAM LLP

Jeffrey N. Rich
Philip H. Hecht
Elizabeth H. Singer
Jennifer Anne Mo
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

PACHULSKI, STANG, ZIEHL, YOUNG,
   JONES & WEINTRAUB, P.C.

Laura Davis Jones (Bar No. 2436)
919 N. Market Street
16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

# Table of Contents

**ARTICLE 1. DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS**
....................................................................................................................................................... 1
1.1 Defined Terms ................................................................................................... 1
1.2 Other Terms/Interpretation ............................................................................... 1
1.3 Exhibits. ............................................................................................................ 1
1.4 Ancillary Documents ........................................................................................ 1

**ARTICLE 2. PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND TAX CLAIMS**.................................................................................................................... 2
2.1 Payment of Allowed Administrative Expense Claims ...................................... 2
2.2 Tax Claims........................................................................................................ 2

**ARTICLE 3. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**...... 2
3.1 Summary............................................................................................................ 2
3.2 Classification and Treatment ............................................................................ 3

**ARTICLE 4. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**....................... 6
4.1 Modification of the Plan .................................................................................... 6
4.2 Revocation or Withdrawal ................................................................................ 6
4.3 Disallowed Claims and Disallowed Equity Interests ....................................... 6

**ARTICLE 5. PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS** ......................................... 6
5.1 Objections to Claims and Prosecution of Disputed Claims; Lummus Asbestos PI Trust Claims ........... 6
5.2 Distribution on Account of Disputed Claims .................................................... 7

**ARTICLE 6. ACCEPTANCE OR REJECTION OF THE PLAN**.............................................................. 7
6.1 Impaired Classes to Vote .................................................................................. 7
6.2 Acceptance by Impaired Classes of Claims ...................................................... 7
6.3 Presumed Acceptance of Plan ........................................................................... 7
6.4 Acceptance Pursuant to Section 524(g) of the Bankruptcy Code ..................... 7
6.5 Nonconsensual Confirmation............................................................................. 7

**ARTICLE 7. IMPLEMENTATION OF THE PLAN**.................................................................................. 8
7.1 Corporate Governance of the Debtor ................................................................. 8
7.2 The Lummus Asbestos PI Trust......................................................................... 8
7.3 Lummus Asbestos Insurance Entity Injunction ................................................. 10
7.4 ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) .................... 11
7.5 The Lummus Asbestos PI Channeling Injunction.............................................. 11
7.6 Distributions Under the Plan.............................................................................. 11
7.7 Delivery of Distributions and Undeliverable or Unclaimed Distributions......... 11
7.8 Manner of Payment Under the Plan ................................................................... 12
7.9 Occurrence of the Lummus Confirmation Date .................................................. 12
7.10 Occurrence of the Effective Date ...................................................................... 14
7.11 Management of the Reorganized Debtor ............................................................ 15
7.12 Corporate Action................................................................................................ 15
7.13 Effectuating Documents and Further Transactions ............................................ 15
7.14 Lummus Asbestos PI Channeling Injunction..................................................... 15
7.15 Term of Certain Injunctions and Automatic Stay; Injunction Default .............. 18
7.16 No Successor Liability; No Liability For Certain Released Claims .................... 18
7.17 Non-Dischargeable Environmental Liability...................................................... 18

**ARTICLE 8. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**............................................. 19
8.1 Assumption of Executory Contracts and Unexpired Leases .............................. 19
8.2 Compensation and Benefits Program ................................................................. 19

**ARTICLE 9. RETENTION OF JURISDICTION**................................................................ **19**
9.1   Plan Documents..................................................................................................... 19
9.2   Executory Contracts and Unexpired Leases ......................................................... 20
9.3   Causes of Action .................................................................................................. 20
9.4   Disputed Claims Allowance/Disallowance ........................................................... 20
9.5   Enforcement/Modification of the Plan ................................................................. 20
9.6   Compensation of Professionals ............................................................................ 21
9.7   Settlements ........................................................................................................... 21
9.8   Taxes .................................................................................................................... 21
9.9   Specific Purposes ................................................................................................. 21
9.10  Insurance Matters ................................................................................................. 21

**ARTICLE 10. PROPERTY HELD IN TRUST AND AUTHORITY OF THE DEBTOR**.................. **21**
10.1  Certain Property Held in Trust by the Reorganized Debtor ................................... 21
10.2  Authority of the Debtor ........................................................................................ 22

**ARTICLE 11. MISCELLANEOUS PROVISIONS**.............................................................. **22**
11.1  Payment of Statutory Fees.................................................................................... 22
11.2  Discharge of the Debtor and Waiver of Injunction Protection .............................. 22
11.3  Rights of Action ................................................................................................... 22
11.4  Third Party Agreements ....................................................................................... 23
11.5  Dissolution of the ACC; Retention of the Future Claimants' Representative; Creation of the Trust Advisory Committee ........................................................................................................... 23
11.6  Exculpation.......................................................................................................... 23
11.7  Releases and Indemnities ..................................................................................... 24
11.8  Title to Assets; Discharge of Liabilities ............................................................... 26
11.9  Notice................................................................................................................... 26
11.10 Headings............................................................................................................... 28
11.11 Severability.......................................................................................................... 28
11.12 Governing Law..................................................................................................... 28
11.13 Filing of Additional Documents........................................................................... 28
11.14 Compliance with Tax Requirements ..................................................................... 28
11.15 Exemption from Transfer Taxes........................................................................... 28
11.16 Further Assurances............................................................................................... 28
11.17 Further Authorizations ......................................................................................... 29
11.18 Execution of CE Plan Documents ........................................................................ 29

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **ABB LUMMUS GLOBAL INC.,** | ) | Case No.: 05-_____ (JFK) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### *PREPACKAGED PLAN OF REORGANIZATION*

ABB Lummus Global Inc. (the "Debtor"), hereby proposes the following Prepackaged Plan of Reorganization pursuant to the provisions of Chapter 11 of title 11 of the United States Bankruptcy Code:

### ARTICLE 1.

### DEFINITIONS, CONSTRUCTION OF TERMS,
### EXHIBITS AND ANCILLARY DOCUMENTS

#### 1.1   Defined Terms.

All capitalized terms used herein shall have the respective meanings specified herein or in the Glossary for this Plan attached as *Exhibit A* to the Disclosure Statement, or in the Disclosure Statement filed in connection herewith, unless the context otherwise requires.

#### 1.2   Other Terms/Interpretation.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan. The word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word, and the words "shall" and "will" are used interchangeably and have the same meaning. An initially capitalized term used herein that is not defined herein or in the Glossary shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require. The descriptive headings contained in this Plan are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Plan. The language used in this Plan will be deemed to be the language that the Debtor has chosen to express its intent.

#### 1.3   Exhibits.

All exhibits and schedules to this Plan, to the extent not annexed hereto, and any agreements referred to herein and therein shall be available for review following their filing with the clerk of the Court on Business Days from 9:00 a.m. through 5:00 p.m. (Prevailing Eastern Time) at the following address:

> Kirkpatrick & Lockhart Nicholson Graham LLP
> 599 Lexington Avenue
> New York, NY 10022-6030
> Attention: Jeffrey N. Rich, Esq.

Copies of such documents following their filing with the clerk of the Court may be obtained from counsel for the Debtor by a written request sent to the above address or by accessing the Debtor's restructuring information website at: *www.lummus-restructuring.com*.

#### 1.4   Ancillary Documents.

Each of the schedules and exhibits to the Plan and Glossary are (i) an integral part of this Plan, (ii) hereby incorporated by reference, and (iii) made a part of this Plan.

## ARTICLE 2.

## PROVISIONS FOR PAYMENT OF
## ADMINISTRATIVE EXPENSE CLAIMS AND TAX CLAIMS

### 2.1    Payment of Allowed Administrative Expense Claims.

Subject to the provisions of Sections 330(a), 331, and 503 of the Bankruptcy Code, the Allowed Amount of each Allowed Administrative Expense Claim shall be paid either (a) in full, in Cash by the Reorganized Debtor, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be agreed upon by the holder of an Allowed Administrative Expense Claim and the Reorganized Debtor or otherwise upon order of the Bankruptcy Court; *provided, however,* that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession on or after the Petition Date or assumed by the Debtor in Possession pursuant to this Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court.

### 2.2    Tax Claims.

Each holder of an Allowed Tax Claim shall be paid the Allowed Amount of its Allowed Tax Claim, at the option of the Reorganized Debtor, either (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Tax Claim and the Reorganized Debtor.

Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, (a) interest shall accrue on IRS Allowed Tax Claims at the rate set forth in 26 U.S.C. § 6621; (b) confirmation of the Plan shall not affect the setoff rights of the United States; and (c) the non-debtor third party release and injunction provisions set forth in the Plan shall not apply to the claims of the United States.

## ARTICLE 3.

## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS

### 3.1    Summary.

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code, as follows:

| CLASSIFICATION | DESCRIPTION | VOTING STATUS |
|---|---|---|
| Class 1 | Priority Claims | Unimpaired — not entitled to vote. |
| Class 2 | Secured Claims | Unimpaired — not entitled to vote. |
| Class 3 | Workers' Compensation Claims | Unimpaired — not entitled to vote. |
| Class 4 | General Unsecured Claims | Unimpaired — not entitled to vote. |
| Class 5 | Lummus Asbestos PI Trust Claims | Impaired — entitled to vote. |
| Class 6 | Non-Debtor Affiliate Intercompany Claims | Impaired — entitled to vote. |
| Class 7 | Equity Interests in the Debtor | Impaired — entitled to vote. |

### 3.2    Classification and Treatment.

#### 3.2.1 *Class 1.    Priority Claims.*

3.2.1.1 Classification

Class 1 consists of all Priority Claims against the Debtor.

3.2.1.2 Treatment

Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, or (ii) the date such Allowed Priority Claim becomes an Allowed Priority Claim unless otherwise agreed to by the Reorganized Debtor and the holder of an Allowed Priority Claim.

### 3.2.1.3 Status

Class 1 is unimpaired. The holders of the Allowed Claims in Class 1 are deemed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

### 3.2.2 *Class 2.   Secured Claims.*

#### 3.2.2.1 Classification

Class 2 consists of all Secured Claims against the Debtor.

#### 3.2.2.2 Treatment

Each holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of an Allowed Secured Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Sections 1124(2)(A)-(D) of the Bankruptcy Code.

#### 3.2.2.3 Status

Class 2 is unimpaired. The holders of the Allowed Claims in Class 2 are deemed to have accepted this Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

### 3.2.3 *Class 3.   Workers' Compensation Claims.*

#### 3.2.3.1 Classification

Class 3 consists of all Workers' Compensation Claims against the Debtor.

#### 3.2.3.2 Treatment

Each holder of an Allowed Claim in Class 3 shall be paid in the ordinary course pursuant to such rights that existed under any state workers' compensation system or laws applicable to such Claims.

#### 3.2.3.3 Status

Class 3 is unimpaired. The holders of Allowed Claims in Class 3 are deemed to have accepted this Plan and, accordingly, are not entitled to vote on this Plan.

### 3.2.4 *Class 4.   General Unsecured Claims.*

#### 3.2.4.1 Classification

Class 4 consists of all General Unsecured Claims against the Debtor.

#### 3.2.4.2 Treatment

Each holder of an Allowed Claim in Class 4 shall be paid by the Reorganized Debtor in full, in Cash, the Allowed Amount of the General Unsecured Claim on the Effective Date or as soon as practicable thereafter unless otherwise agreed to by the Reorganized Debtor and the holder of a General Unsecured Claim.

With respect to Settled Asbestos Claims, all Settled Asbestos Claims shall be subject to the Lummus Asbestos PI Channeling Injunction. The sole recourse of a holder of a Settled Asbestos Claim on account of such Settled Asbestos Claim shall be to receive payment from the Reorganized Debtor pursuant to the provisions of an applicable settlement agreement with the Debtor, which agreement was binding and enforceable on or before February 17, 2003; *provided, however*, that no holder of a Settled Asbestos Claim shall be entitled to receive such a payment unless and until such holder complies with all requirements and conditions to payment under such applicable settlement agreement.

#### 3.2.4.3 Status

Class 4 is unimpaired. The holders of the Claims in Class 4 are deemed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

#### 3.2.4.4 Insurers' Rights

Notwithstanding anything to the contrary in the Plan or any of the Plan Documents, except as expressly provided in this Section 3.2.4.4, nothing in the Plan or any of the Plan Documents (including any provision or exhibit other than this Section 3.2.4.4 that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable, or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Lummus Insurance Policies or Subject Lummus Insurance Settlement Agreements, as applicable. Notwithstanding any other provision in this Section 3.2.4.4, or any provision of any Subject Lummus Insurance Policies or Subject Lummus Insurance Settlement Agreements, nothing in this Plan, any Plan Document or the Confirmation Order shall permit the assertion of claims, including, but not limited to, subrogation claims, defenses, rights, or causes of action, against Asbestos Protected Parties, which are otherwise channeled to the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Channeling Injunction.

Except as provided in the Lummus Asbestos Insurance Entity Injunction, nothing in the Plan or in the Lummus Confirmation Order shall preclude any Entity from asserting in any proceeding any and all Claims, defenses, rights, or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Lummus Insurance Settlement Agreement. Nothing in the Plan or Lummus Confirmation Order shall be deemed to waive any Claims, defenses, rights, or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses, and/or exclusions contained in the Subject Lummus Insurance Policies and the Subject Lummus Insurance Settlement Agreements, including any and all such Claims, defenses, rights, or causes of action based upon or arising out of Lummus Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

#### 3.2.5 *Class 5.   Lummus Asbestos PI Trust Claims.*

##### 3.2.5.1 Classification

Class 5 consists of all Lummus Asbestos PI Trust Claims other than Settled Asbestos Claims.

##### 3.2.5.2 Treatment

All Lummus Asbestos PI Trust Claims shall be subject to the Lummus Asbestos PI Channeling Injunction. All Lummus Asbestos PI Trust Claims, other than Settled Asbestos Claims, shall be evaluated, determined, and paid (if and to the extent entitled to payment), pursuant to the terms, provisions, and procedures of the Lummus Asbestos PI Trust, Lummus Asbestos PI Trust Agreement, and the Lummus TDP. The Lummus Asbestos PI Trust will be funded in accordance with the provisions of Article 7 of this Plan and the Lummus Asbestos PI Trust Agreement.

Further, the holder of a non-malignant Lummus Asbestos Personal Injury Claim (other than a holder of a Settled Asbestos Claim) may, from and after the Effective Date, assert a Claim against the Lummus Asbestos PI Trust for a malignant disease described in the Lummus TDP as disease levels V-VIII (a "Subsequent Malignancy Claim"). With respect to a holder of a non-malignant Settled Asbestos Claim, such holder's right to assert a Subsequent Malignancy Claim shall be governed by the provision(s) of the applicable settlement agreement between such holder and the Debtor, which agreement was binding and enforceable on or before February 17, 2003, provided that the applicable agreement explicitly preserved such holder's right to assert a Subsequent Malignancy Claim and Connecticut Valley Claims Services Company, Inc. so certifies to the Lummus Asbestos PI Trust. Any Subsequent Malignancy Claim so submitted by holders of Lummus Asbestos Personal Injury Claims or Settled Asbestos Claims to the Lummus Asbestos PI Trust shall be required to satisfy the conditions for approval set forth in the Lummus Asbestos PI Trust Agreement and Lummus TDP, and shall be evaluated, determined, and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Trust Agreement and Lummus TDP.

##### 3.2.5.3 Status

Class 5 is impaired. Each holder of a Claim in Class 5 shall be entitled to vote to accept or reject this Plan.

#### 3.2.6 *Class 6.   Non-Debtor Affiliate Intercompany Claims.*

##### 3.2.6.1 Classification

Class 6 consists of all Non-Debtor Affiliate Intercompany Claims.

3.2.6.2 Treatment

All Non-Debtor Affiliate Intercompany Claims will be paid in full subject to the subordination provisions set forth in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

3.2.6.3 Status

Class 6 is impaired. Each holder of an Allowed Claim in Class 6 shall be entitled to vote to accept or reject this Plan.

3.2.7 *Class 7.   Equity Interests.*

3.2.7.1 Classification

Class 7 consists of all Equity Interests.

3.2.7.2 Treatment

On the Effective Date, holders of Class 7 Equity Interests shall retain such interests in the Debtor, subject to the pledge and security interest in 51% of the issued and outstanding shares of Capital Stock of the Debtor, which will be held by ABB Oil & Gas as of the Effective Date, to secure the Lummus Note and the guaranty provided by ABB, ABB Holdings, and ABB Oil & Gas with respect to the Debtor's payment obligations under the Lummus Note.

3.2.7.3 Status

Class 7 is impaired. Each holder of an Allowed Claim in Class 7 shall be entitled to vote to accept or reject this Plan.

ARTICLE 4.

MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**4.1   Modification of the Plan.**

The Debtor, with the consent of the ACC, if appointed, the CCC, and the Lummus FCR, may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code or any other Plan Document at any time prior to the Lummus Confirmation Date so long as the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code. After the Lummus Confirmation Date, and prior to the Effective Date, the Debtor, with the consent of the ACC, if appointed, the CCC, and the Lummus FCR, may alter, amend, or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code.

**4.2   Revocation or Withdrawal.**

4.2.1 *Right to Revoke*

This Plan may be revoked or withdrawn by the Debtor, prior to the Lummus Confirmation Date.

4.2.2 *Effect of Withdrawal or Revocation*

If the Plan is revoked or withdrawn prior to the Lummus Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor.

4.2.3 *Amendment of Plan Documents*

From and after the Effective Date, the authority to amend, modify, or supplement the exhibits to the Plan or any attachments thereto shall be as provided in such exhibits and their respective attachments.

**4.3   Disallowed Claims and Disallowed Equity Interests.**

On and after the Effective Date, the Debtor shall be fully and finally discharged of any liability or obligation in respect of a Disallowed Claim or a Disallowed Equity Interest, and any order creating a Disallowed Claim or a Disallowed Equity Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for

reconsideration of such order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Lummus Confirmation Order, except as otherwise provided herein, or unless the Bankruptcy Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Lummus Asbestos PI Trust Claims) and Equity Interests to the extent such Claims and Equity Interests are not allowable under any provision of Section 502 of the Bankruptcy Code, including time-barred Claims and Equity Interests, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

## ARTICLE 5.

## PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

### 5.1   Objections to Claims and Prosecution of Disputed Claims; Lummus Asbestos PI Trust Claims.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to the allowance of Claims (other than Lummus Asbestos PI Trust Claims) shall be served and filed no later than ninety (90) days after the later of the Effective Date or the date the proof of claim was filed, subject to any extensions granted pursuant to a further order of the Bankruptcy Court. Nothing herein shall be construed to limit, after the Effective Date, the Reorganized Debtor's right to object to the allowance of Claims filed with the Bankruptcy Court or any other Claims (other than Lummus Asbestos PI Trust Claims) to be resolved pursuant to this Plan with respect to which the Reorganized Debtor disputes liability in whole or in part. The Debtor reserves the right to designate any Claim (other than Lummus Asbestos PI Trust Claims) as a Disputed Claim on or before the Lummus Confirmation Date.

All Lummus Asbestos PI Trust Claims shall be evaluated, determined and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust and the Lummus Asbestos PI Trust Distribution Procedures. Only the Lummus Asbestos PI Trust shall have the right to object to Lummus Asbestos PI Trust Claims.

### 5.2   Distribution on Account of Disputed Claims.

Notwithstanding Section 5.1 hereof, a Distribution shall be made to the holder of a Disputed Claim only when, and to the extent that, such Disputed Claim becomes Allowed and pursuant to the appropriate provisions of the Plan covering the class of which such Disputed Claim is a part. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 hereof.

## ARTICLE 6.

## ACCEPTANCE OR REJECTION OF THE PLAN

### 6.1   Impaired Classes to Vote.

Each holder of a Claim in an impaired class of Claims shall be entitled to vote to accept or reject the Plan.

### 6.2   Acceptance by Impaired Classes of Claims.

Acceptance of the Plan by any impaired class of Claims shall be determined in accordance with the Bankruptcy Code.

### 6.3   Presumed Acceptance of Plan.

Class 1, 2, 3, and 4 Claims are unimpaired. Under Section 1126(f) of the Bankruptcy Code, the holders of Claims in such Classes are conclusively presumed to have voted to accept the Plan.

### 6.4   Acceptance Pursuant to Section 524(g) of the Bankruptcy Code.

The Plan shall have been accepted by holders of Class 5 Claims as required by Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

### 6.5   Nonconsensual Confirmation.

With respect to any impaired Equity Interests and any impaired class of Claims, including classes of Claims created pursuant to amendments to the Plan, that fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Debtor intends to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code with respect to such non-accepting classes, in which case the Plan shall constitute a motion for such relief.

## ARTICLE 7.

## IMPLEMENTATION OF THE PLAN

### 7.1 Corporate Governance of the Debtor.

#### 7.1.1 *Filing of Amended Certificate of Incorporation*

The Amended Certificate of Incorporation for the Reorganized Debtor shall be filed with the Secretary of State of Delaware on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date. The Amended Certificate of Incorporation shall provide (a) that the Reorganized Debtor is prohibited from issuing nonvoting equity securities, and (b) as to any classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends.

### 7.2 The Lummus Asbestos PI Trust.

#### 7.2.1 *Creation of the Lummus Asbestos PI Trust*

On the Effective Date, the Lummus Asbestos PI Trust shall be created in accordance with the Plan Documents. The Lummus Asbestos PI Trust shall be a "qualified settlement fund" within the meaning of Section 468B of the IRC and the regulations issued thereunder. The purpose of the Lummus Asbestos PI Trust shall be to assume all Lummus Asbestos PI Trust Claims (whether now existing or arising at any time hereafter) and to use the Lummus Asbestos PI Trust Assets to pay holders of Lummus Asbestos PI Trust Claims in accordance with (if and to the extent entitled to payment thereunder) the Lummus Asbestos PI Trust Agreement and the Lummus TDP, and in such a way that provides a sufficient and reliable pool of assets to pay future Lummus Asbestos PI Trust Claims, provides reasonable assurance that the Lummus Asbestos PI Trust will value and be in a financial position to pay present and future Lummus Asbestos PI Trust Claims that involve similar claims in substantially the same manner, and otherwise complies in all respects with the requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code. On the Effective Date, all right, title, and interest in and to the Lummus Asbestos PI Trust Assets and any proceeds or causes of action thereunder shall be transferred to and vested in the Lummus Asbestos PI Trust, free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity without any further action of any Entity.

#### 7.2.2 *Appointment of Trustee*

The Lummus FCR, the CCC, and the ACC, if appointed, will nominate a candidate to serve as the Trustee of the Lummus Asbestos PI Trust subject to the approval of the Court. The initial Trustee so nominated shall be set forth on a schedule to be filed prior to the Confirmation Date.

#### 7.2.3 *Appointment of Trust Advisory Committee Members*

Prior to or on the Lummus Confirmation Date, the Debtor, the CCC, the ACC, if appointed, and the Lummus FCR, acting jointly, shall nominate candidates to serve as members of the TAC subject to the approval of the Court. The initial candidates so nominated shall be set forth in a schedule to be filed with the Court prior to the Confirmation Date.

#### 7.2.4 *Transfer of ABB Consideration*

On the Effective Date, the ABB Consideration shall be delivered to the Lummus Asbestos PI Trust as set forth more fully in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

#### 7.2.5 *Transfer of Claims and Demands to the Lummus Asbestos PI Trust*

On the Effective Date, all liabilities, obligations, and responsibilities relating to all Lummus Asbestos PI Trust Claims shall be channeled to the Lummus Asbestos PI Trust.

#### 7.2.6 *Books and Records*

The Lummus Asbestos PI Trust and its Representatives shall have access to all of the books and records of the Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates who are domiciled in the United States (the "Domestic Non-Debtor Affiliates") to the extent that such books or records relate to any Lummus Asbestos PI Trust Assets or any Lummus Asbestos PI Trust Claims (the "Asbestos Books"). The Asbestos Books may be used by the Lummus

Asbestos PI Trust and its Representatives to assist in the processing and determination of, objection to, and otherwise in connection with, Lummus Asbestos PI Trust Claims pursuant to the Lummus TDP. Except to the extent necessary or desirable, in processing and determination of, objection to, or otherwise in connection with, Lummus Asbestos PI Trust Claims, as determined by the Lummus Asbestos PI Trust in its sole discretion, the information contained in the Asbestos Books shall be treated as confidential. Access shall be afforded by the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates upon receipt of reasonable advance notice and during normal business hours. The Reorganized Debtor shall be responsible for the costs and expenses incurred in providing access to the Asbestos Books pursuant to this Section 7.2.6. The Lummus Asbestos PI Trust shall be responsible for all other costs and expenses of copying or reproduction of the Asbestos Books. If the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall desire to dispose of any of the Asbestos Books, such parties shall, prior to such disposition, give a reasonable opportunity to the Lummus Asbestos PI Trust to segregate and remove such Asbestos Books as the Lummus Asbestos PI Trust may select. In addition, the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall permit the Lummus Asbestos PI Trust and its Representatives to conduct reasonable interviews of officers and employees concerning matters reasonably related to the Asbestos Books. The Lummus Asbestos PI Trust shall bear the burden of any costs or expenses incurred by it from the review of the Asbestos Books by it or its Representatives.

### 7.2.7 *Discharge of Liabilities to Holders of Lummus Asbestos PI Trust Claims*

Except as provided in the Plan Documents and the Lummus Confirmation Order, the transfer to, vesting in, and assumption by the Lummus Asbestos PI Trust of the Lummus Asbestos PI Trust Assets as contemplated by the Plan and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), among other things, on the Effective Date shall (1) discharge the Debtor and the Reorganized Debtor for and in respect of all Lummus Asbestos PI Trust Claims, and (2) release and extinguish all obligations and liabilities of the Released Parties for and in respect of all Lummus Asbestos PI Trust Claims. On the Effective Date, the Lummus Asbestos PI Trust shall assume all Lummus Asbestos PI Trust Claims and on and after the Effective Date shall pay the Lummus Asbestos PI Trust Claims in accordance with and to the extent entitled to payment by the Lummus Asbestos PI Trust Agreement and the Lummus TDP.

### 7.2.8 *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Lummus Asbestos PI Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Lummus Asbestos PI Trust.

### 7.2.9 *Indemnification by the Lummus Asbestos PI Trust*

As and to the extent provided in the Lummus Asbestos PI Trust Agreement or the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) and in accordance with the procedures set forth therein, the Lummus Asbestos PI Trust will indemnify and hold harmless each of (i) the Debtor and the Reorganized Debtor and their respective Subsidiaries and their respective past, present, and future Representatives, in their capacities as such; and (ii) the Released Parties.

## 7.3    Lummus Asbestos Insurance Entity Injunction.

### *7.3.1 Purpose and Provisions*

*In order to protect the Debtor and the Lummus Asbestos PI Trust and to preserve their assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the Lummus Asbestos Insurance Entity Injunction as described in Section 7.3.2 of the Plan.*

### *7.3.2 Terms*

*All Entities (not including the Reorganized Debtor) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action (including any Lummus Asbestos PI Trust Claim), against any Lummus Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Lummus Asbestos PI Trust Claim, Demand, Lummus Asbestos PI Insurance Rights, Subject Lummus Insurance Policies, or Subject Lummus Insurance Settlement Agreements whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:*

*(a) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, Demand, or cause of action against any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;*

*(b) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;*

*(c) creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Lummus Asbestos Insurance Entity, or the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action;*

*(d) except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Lummus Asbestos Insurance Entity, or against the property of any Lummus Asbestos Insurance Entity, with respect to any such Claim, Demand, or cause of action; and*

*(e) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents relating to such Claim, Demand, or cause of action.*

*provided, however, that (i) the Lummus Asbestos Insurance Entity Injunction shall not impair in any way the rights, claims, or causes of action of the Debtor or the Reorganized Debtor; (ii) the Debtor or the Reorganized Debtor shall have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Lummus Asbestos Insurance Entity Injunction with respect to any Lummus Asbestos Insurance Entity upon express written notice to such Lummus Asbestos Insurance Entity; and (iii) the Lummus Asbestos Insurance Entity Injunction is issued solely for the benefit of the Debtor, and the Reorganized Debtor, and is not issued for the benefit of any Lummus Asbestos Insurance Entity, and no Lummus Asbestos Insurance Entity is a third-party beneficiary of the Lummus Asbestos Insurance Entity Injunction.*

### 7.3.3 Reservations

*Notwithstanding anything to the contrary above, this Lummus Asbestos Insurance Entity Injunction shall not enjoin the rights, if any:*

*(a) of Entities to the treatment accorded them under this Plan, including the rights of Entities with Lummus Asbestos PI Trust Claims to assert such Lummus Asbestos PI Trust Claims against the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP;*

*(b) of Entities to assert any claim, debt, obligation, or liability for payment of Lummus Asbestos PI Trust Expenses against the Lummus Asbestos PI Trust;*

*(c) of the Debtor or the Reorganized Debtor to prosecute any action based on or arising from Lummus Asbestos Insurance Rights; and*

*(d) of the Debtor or the Reorganized Debtor to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Entity based on or arising from the Lummus Asbestos Insurance Rights.*

### 7.3.4 Rights Against Non-Debtors Under Environmental Laws

Notwithstanding anything to the contrary contained herein, the injunctions set forth in Sections 7.3 and 7.14 herein, shall not impair the rights or causes of action of the United States against non-debtor parties under applicable environmental laws.

## 7.4    ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

On or before the Effective Date, the parties to the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) shall execute and deliver the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), which shall be binding on each party thereto.

**7.5**    **The Lummus Asbestos PI Channeling Injunction.**

Pursuant to and in connection with the Lummus Confirmation Order, the District Court shall enter or affirm the Lummus Asbestos PI Channeling Injunction.

**7.6**    **Distributions Under the Plan.**

### 7.6.1 *Plan Distributions*

With respect to all Allowed Claims, each Distribution shall be made by the Reorganized Debtor on the related Distribution Date (unless otherwise provided herein or ordered by the Bankruptcy Court). With respect to Lummus Asbestos PI Trust Claims (other than Settled Asbestos Claims), Distributions to holders of Lummus Asbestos PI Trust Claims shall be made by the Lummus Asbestos PI Trust in accordance with the terms of the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures if and to the extent entitled to payment thereunder.

### 7.6.2 *Timing of Plan Distributions*

Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

**7.7**    **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

### 7.7.1 *Delivery of Distributions in General*

Distributions to holders of Allowed Claims (other than Lummus Asbestos PI Trust Claims) shall be made at the address of the holder of such Claim as indicated on records of the Debtor.

### 7.7.2 *Undeliverable Distributions*

Any Cash, assets, and other properties to be distributed under this Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one (1) year after distribution or (b) one-hundred twenty (120) calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in and delivered to, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity without any further action of any Entity, and all rights with respect to such assets and properties shall be vested in and enforceable by (i) the Lummus Asbestos PI Trust for the benefit of the holders of Lummus PI Trust Claims in the case of unclaimed distributions from the Lummus Asbestos PI Trust or (ii) the Reorganized Debtor in the case of all other remaining unclaimed distributions. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such distribution, and shall not participate in any further distributions under the Plan with respect to such Claim.

**7.8**    **Manner of Payment Under the Plan.**

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Reorganized Debtor or the Lummus Asbestos PI Trust shall be made, at the election of the Reorganized Debtor or the Lummus Asbestos PI Trust, respectively, by check drawn on a domestic bank or by wire transfer from a domestic bank.

**7.9**    **Occurrence of the Lummus Confirmation Date.**

The following shall constitute conditions to confirmation of the Plan:

7.9.1 The Bankruptcy Court shall make the following findings of fact and/or conclusions of law in connection with the confirmation of the Plan, each of which shall be expressly set forth in the Lummus Confirmation Order:

7.9.1.1 The Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

(a) The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are to be implemented in accordance with the Plan and Lummus Asbestos PI Trust Documents;

(b) As of the Petition Date, the Debtor has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(c) The Lummus Asbestos PI Trust is to be funded in part by securities of the Debtor and by the obligations of the Debtor to make future payments;

(d) The Lummus Asbestos PI Trust, on the Effective Date, by the exercise of rights granted under the Plan, would be entitled to own if specific contingencies occur, the majority of the voting shares of the Reorganized Debtor;

(e) The Lummus Asbestos PI Trust is to use its assets and income to pay Lummus Asbestos PI Trust Claims in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP;

(f) The Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Lummus Asbestos PI Trust Claims, which are addressed by the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction;

(g) The actual amounts, numbers, and timing of Demands cannot be determined;

(h) Pursuit of Demands outside the procedures prescribed by the Plan and the Lummus TDP is likely to threaten the Plan's purpose to deal equitably with Lummus Asbestos PI Trust Claims;

(i) The terms of the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Plan and described in the Disclosure Statement;

(j) Pursuant to court orders, the Lummus TDP, or otherwise, the Lummus Asbestos PI Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Lummus Asbestos PI Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Lummus Asbestos PI Trust shall value, and be in a financial position to pay, present and future Lummus Asbestos PI Trust Claims that involve similar claims in substantially the same manner;

(k) The Lummus FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that would constitute Lummus Asbestos PI Trust Claims and are addressed in the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction and transferred to the Lummus Asbestos PI Trust;

(l) The Lummus Asbestos PI Trust will be funded with a sufficient and reliable pool of assets that will allow the Lummus Asbestos PI Trust to adequately pay Lummus Asbestos PI Trust Claims.

(m) In light of the benefits provided, or to be provided, to the Lummus Asbestos PI Trust on behalf of each Asbestos Protected Party, the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert Demands that would constitute Lummus Asbestos PI Trust Claims against any Asbestos Protected Party;

(n) The ABB Consideration and other benefits provided in this Plan for payment of Claims, including Lummus Asbestos PI Trust Claims, constitute substantial assets of this Plan, and

(o) The Plan and its acceptance otherwise comply with the Bankruptcy Code including, without limitation, Section 524(g).

7.9.1.2 The Lummus Asbestos PI Trust shall have the sole and exclusive authority as of the Effective Date to assert the rights and defenses of Asbestos Protected Parties with respect to all Lummus Asbestos PI Trust Claims other than any such rights against any Released Parties;

7.9.1.3 The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts; and

7.9.1.4 The contribution by ABB, ABB Holdings, ABB Oil & Gas, and the Debtor of the ABB Consideration to the Lummus Asbestos PI Trust constitutes substantial assets of the Plan and the reorganization.

The Plan shall not be confirmed and the Lummus Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtor, the Lummus FCR, the CCC, and the ACC, if appointed, acting jointly, and with the consent of ABB with respect to the conditions set forth in paragraphs 7.9.1.1(a), 7.9.1.1(n), 7.9.1.3, and 7.9.1.4 above.

7.9.2 The Lummus Confirmation Order shall be, in form and substance, acceptable to the Debtor, ABB, the Lummus FCR, the CCC, and the ACC, if appointed.

7.9.3 The Court has entered an order in form and substance acceptable to the Debtor, ABB, the Lummus FCR, the CCC, and the ACC, if appointed, approving the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), and authorizing the Debtor to enter into such agreement.

7.10.4 The CE Confirmation Order shall have been entered.

**7.10    Occurrence of the Effective Date.**

The "effective date of the plan," as used in Section 1129 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

7.10.1 The Lummus Confirmation Order shall have been issued or affirmed by the District Court, and the Lummus Confirmation Order shall have become a Final Order; provided, however, that the Effective Date may occur at a point in time when the Lummus Confirmation Order is not a Final Order at the option of the Debtor, with the consent of the ACC, if appointed, the CCC, and the Lummus FCR, unless the effectiveness of the Lummus Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the option of the Debtor, with the consent of ACC, if appointed, the CCC, and the Lummus FCR, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

7.10.2 The District Court shall have entered or affirmed an order or orders entering the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction.

7.10.3 The Court shall have entered or affirmed an order or orders approving the Plan and all Plan Documents and such order or orders shall have become Final Orders.

7.10.4 The Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction shall be in full force and effect.

7.10.5 The Debtor and the Trustee have executed the Lummus Asbestos PI Trust Agreement.

7.10.6 The Debtor, ABB, the CCC, the Lummus FCR, and the ACC, if appointed, shall have approved all of the Plan Documents.

7.10.7 All Lummus Asbestos PI Trust Assets and Plan Documents that are to be delivered or executed and delivered, as applicable, to the Lummus Asbestos PI Trust on the Effective Date shall have been delivered or executed and delivered, as applicable, to the Lummus Asbestos PI Trust in accordance with the requirements of all applicable Plan Documents.

7.10.8 All parties to the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) have executed and delivered counterparts of same, and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) shall be in full force and effect.

7.10.9 The Amended Certificate of Incorporation shall be in full force and effect.

7.10.10 The Debtor shall have delivered such decisions, opinions, or assurances to the effect that the Lummus Asbestos PI Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC and the regulations issued

pursuant thereto satisfactory to the Debtor, ABB, ABB Holdings, the CCC, the ACC, if appointed, and the Lummus FCR.

7.10.11 The conditions to the effectiveness of the CE Plan shall have been satisfied or waived and the "Effective Date" (as used in Section 1129 of the Bankruptcy Code) of the CE Plan shall have occurred or shall occur concurrently with the Effective Date.

The Effective Date shall not occur until and unless each of the foregoing conditions is either satisfied or waived by the Debtor, ABB, the Lummus FCR, the CCC, and the ACC, if appointed; *provided, however*, that the condition set forth in Section 7.10.10 may be waived by the Lummus FCR, the CCC, the ACC, if appointed, Debtor, ABB, and ABB Holdings, acting together. Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived in accordance with this Plan shall: (1) be signed by the Debtor and each Entity whose consent is required pursuant to this Plan; (2) state the date of the Effective Date; and (3) be filed with the Bankruptcy Court by the Debtor's counsel.

**7.11    Management of the Reorganized Debtor.**

On and after the Effective Date, the business and affairs of the Reorganized Debtor will be managed by the Board of Directors of the Reorganized Debtor.

**7.12    Corporate Action.**

On or prior to the Effective Date, the Debtor shall adopt the Amended Certificate of Incorporation, and such corporate action shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of the Debtor, the Debtor in Possession, or the Reorganized Debtor. On the Effective Date, the approval and effectiveness of matters provided under the Plan involving the corporate structure of the Reorganized Debtor or any corporate action taken by or required of the Debtor, the Debtor in Possession, or the Reorganized Debtor shall be deemed to have occurred, be authorized, and approved, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of the Debtor, the Debtor in Possession, or the Reorganized Debtor. Notwithstanding the foregoing, nothing in this Section 7.12 shall excuse the Debtor from timely performing its obligations under this Plan or other documents entered into by the Debtor in furtherance of this Plan.

**7.13    Effectuating Documents and Further Transactions.**

Each of the officers of the Debtor and the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the Board of Directors and by-laws of the Debtor and the Reorganized Debtor, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate, for and on behalf of the Debtor and the Reorganized Debtor, to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to this Plan.

**7.14    Lummus Asbestos PI Channeling Injunction.**

*7.14.1 Subject to Section 7.14.2, on and after the Effective Date, the Lummus Asbestos PI Channeling Injunction shall apply to all present holders of Settled Asbestos Claims, and present and future holders of Lummus Asbestos PI Trust Claims, and all present holders of Settled Asbestos Claims, and present and future holders of Lummus Asbestos PI Trust Claims shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Settled Asbestos Claim or Lummus Asbestos PI Trust Claim, other than from the Lummus Asbestos PI Trust in the case of Lummus Asbestos PI Trust Claims (in accordance with the applicable trust distribution or payment procedures) or in the case of Settled Asbestos Claims from the Reorganized Debtor (in accordance with the applicable settlement agreements):*

*(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party, or any Settling Lummus Asbestos Insurance Company;*

*(b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party, or Settling Lummus Asbestos Insurance Company;*

(c) *creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company, or any property or interests in property of any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company;*

(d) *setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party or Settling Lummus Asbestos Insurance Company; and*

(e) *proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Lummus Asbestos PI Trust, except in conformity and compliance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP.*

*The sole recourse of the holder of a Lummus Asbestos PI Trust Claim on account of such Lummus Asbestos PI Trust Claim shall be to the Lummus Asbestos PI Trust pursuant to the provisions of the Plan, Lummus Asbestos PI Channeling Injunction, Lummus Asbestos PI Trust Agreement, and Lummus Asbestos PI Trust Distribution Procedures, and such holder shall have no right whatsoever at any time to assert its Lummus Asbestos PI Trust Claim against the Debtor, Reorganized Debtor, any Settling Lummus Asbestos Insurance Company, or any Asbestos Protected Party, or any property or interest in property of the Debtor, the Reorganized Debtor, any other Asbestos Protected Party, or any Settling Lummus Asbestos Insurance Company.*

*The sole recourse of a holder of a Settled Asbestos Claim on account of such Settled Asbestos Claim shall be to the Reorganized Debtor pursuant to the terms of the applicable settlement agreement with the Debtor which agreement was binding and enforceable prior to February 17, 2003, and such holder shall have no right to assert his or her Settled Asbestos Claim against the Lummus Asbestos PI Trust, any Settling Asbestos Insurance Company, or any Asbestos Protected Party (other than the Reorganized Debtor), or any property or interest of the Lummus Asbestos PI Trust, any Settling Asbestos Insurance Company, or any Asbestos Protected Party (other than the Reorganized Debtor).*

*Notwithstanding the terms of this Lummus Asbestos PI Channeling Injunction or any other provision in the Plan, any other Plan Document, or the Lummus Confirmation Order to the contrary (i) no holder of a Lummus Asbestos PI Trust Claim or Subsequent Malignancy Claim shall be enjoined from asserting, on or after the Effective Date, such claim against the Lummus Asbestos PI Trust in accordance with the Lummus Asbestos PI Trust Agreement and the Lummus TDP, and any such Lummus Asbestos PI Trust Claim or Subsequent Malignancy Claim shall be evaluated, determined and paid (if and to the extent entitled to payment) by the Lummus Asbestos PI Trust pursuant to the Lummus Asbestos PI Trust Agreement and the Lummus TDP, and (ii) no holder of a Settled Asbestos Claim shall be enjoined from asserting, on or after the Effective Date, such claim against the Reorganized Debtor in accordance with the applicable settlement agreement with the Debtor which agreement was binding and enforceable prior to February 17, 2003, and any such Settled Asbestos Claim shall be evaluated, delivered, and paid (if and to the extent entitled to payment) by the Reorganized Debtor pursuant to the terms of such settlement agreements.*

*7.14.2 Anything in this Plan, any Plan Document, the Confirmation Order or the Lummus Asbestos PI Channeling Injunction or otherwise to the contrary notwithstanding, upon the entry of an order finding that an Injunction Default has occurred, (i) the Lummus Asbestos PI Channeling Injunction, the provisions of Sections 3.2.5.2, 7.2.7 (as to clause (2)), 7.2.9, 7.14.1, 11.2, 11.6 (to the extent necessary to the assertion and prosecution of the claims referred to below), 11.7.2, 11.7.3 and 11.8 of this Plan, the provisions of Section 7.2.5 of this Plan to the extent necessary to permit the assertion of Lummus Asbestos PI Trust Claims and claims to enforce this Plan and the Plan Documents and all obligations and liabilities arising thereunder or in connection therewith, the provisions of Sections 3.4 and 4.4 of the Asbestos PI Trust Agreement, the provisions of Sections 3.1 and 3.3 of the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) and any other release, exculpation, injunction, indemnity or other limitation or any provision of this Plan or any Plan Document or the Confirmation Order effecting or purporting to effect any release, exculpation, injunction, indemnity or other limitation, relating to Lummus Asbestos PI Trust Claims and claims to enforce this Plan and the Plan Documents and all obligations and liabilities arising thereunder or in connection therewith, shall forthwith automatically and without further order or action whatsoever terminate and be of no force or effect with respect to ABB, ABB Oil & Gas, ABB Holdings, any other obligor in respect of any obligation or liability arising under or in respect of the Plan or any Plan Documents, and any Guarantor who or which, on the date of the Injunction Default, was an Affiliate of ABB or ABB Holdings, (ii) thereupon and at all times thereafter (subject to the right of the Trustee of the Lummus Asbestos PI Trust to request that the Court reinstate the Lummus Asbestos PI Channeling Injunction if, in the Trustee's absolute discretion, he or she deems such reinstatement to be in the best interests of the Lummus Asbestos PI Trust), Lummus Asbestos PI Trust Claims and claims to enforce this Plan*

*and the Plan Documents and all obligations and liabilities arising hereunder or thereunder or in connection therewith may be freely asserted against ABB, ABB Holdings, and/or any Guarantor who or which was, on the date of the Injunction Default, an Affiliate of ABB or ABB Holdings, and (iii) none of ABB, ABB Holdings, or any Guarantor who or which was, on the date of the Injunction Default, an Affiliate of ABB or ABB Holdings shall be entitled or have the right to be indemnified by, make or assert a claim against or otherwise recover from the Lummus Asbestos PI Trust (or any other Entity to the extent giving rise to any claim against or recovery from the Lummus Asbestos PI Trust) for, on account of or in respect of any such Claim or Demand. Notwithstanding the foregoing, an Injunction Default shall not be deemed to have occurred solely as a result of (i) a failure by the Debtor, the Reorganized Debtor, ABB, ABB Holdings, or ABB Oil & Gas to make a payment of Aggregate Insurance Recoveries pursuant to Section 2.2 of the Non-Debtor Affiliate Settlement Agreement (Lummus) based solely upon ABB's reasonable assertion in good faith that an event which gives rise to an obligation to make such payment has not occurred or is disputed (a " Disputed Payment"); or (ii) a failure on the part of the Debtor, the Reorganized Debtor, ABB, ABB Holdings, or ABB Oil & Gas to make a payment on account of Aggregate Insurance Recoveries as the result of a good faith error on the part of such Entity (a "Missed Payment") unless within ten (10) days after the resolution of such Disputed Payment or such Missed Payment (whether by agreement of the parties or an order becomes a Final Order determining that such Disputed Payment or Missed Payment is due), ABB (or an entity acting on ABB's behalf) fails to pay such Disputed Payment or Missed Payment in full together with, unless the parties agree to the contrary, interest at a rate equal to the sum of (x) the Wall Street Journal — National Edition daily prime rate plus (y) four (4) percent, from the date such Disputed Payment or Missed Payment was originally due without regard to any dispute or error until the date such amount is paid in full. If it is determined that all or any portion of such Disputed Payment or Missed Payment is due, ABB, ABB Holdings, or ABB Oil & Gas shall also promptly pay the reasonable costs and expenses (including reasonable attorneys' fees) paid or incurred by the Lummus Asbestos PI Trust in connection with such dispute or error or the resolution thereof.*

*7.14.3 No other provision of this Plan, any Plan Document, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction or otherwise shall, or shall be deemed to, limit, modify, override or supersede the provisions of Section 7.14.2.*

*7.14.4 With respect to Lummus Asbestos PI Trust Claims, anything in the Plan, any Plan Documents, the Confirmation Order or the Channeling Injunction or otherwise to the contrary notwithstanding, the Channeling Injunction shall operate and be construed to stay, restrain and enjoin Lummus Asbestos PI Trust Claims (subject also to the other limitations set forth in the Plan and Plan Documents) only to the extent such Lummus Asbestos PI Trust Claims (whether now existing or hereafter arising) are based upon the Debtor's direct or indirect liability or alleged liability. For the sake of clarity, Lummus Asbestos PI Trust Claims "based upon the Debtor's direct or indirect liability or alleged liability" include Lummus Asbestos PI Trust Claims (whether now existing or hereafter arising) against any Alstom Protected Party which is (i) a former Affiliate of the Debtor, or (ii) a direct or indirect successor to, or transferee of assets of, the Debtor or a former Affiliate of the Debtor (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a transferee or successor)) in either case to the extent such Lummus Asbestos PI Trust Claims arise as a consequence of the acts, omissions, products, business or operations of an Entity when such Entity was an Affiliate of the Debtor.*

### 7.15   Term of Certain Injunctions and Automatic Stay; Injunction Default.

7.15.1 All of the injunctions and/or the automatic stay provided for in or in connection with the Chapter 11 Case, whether pursuant to Section 105, Section 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Lummus Confirmation Date shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by the Plan, the Lummus Confirmation Order, or as otherwise provided by the Bankruptcy Code. In addition, on and after the Lummus Confirmation Date, the Reorganized Debtor may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Lummus Confirmation Date and the Effective Date.

7.15.2 Unless otherwise provided in this Plan or an order issuing the Lummus Asbestos PI Channeling Injunction, each of the injunctions contained in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or in the injunctions. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Lummus Confirmation Date and the Effective Date.

7.15.3 In the event that the Lummus Asbestos PI Trust determines that an Injunction Default may have occurred, the Lummus Asbestos PI Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court, or if such court lacks jurisdiction, the District Court, that an Injunction Default has occurred. Upon entry of an order by the Bankruptcy Court (or as the case may be, the District Court) finding that an Injunction Default has occurred, the provisions of 7.14.2 shall apply, in addition to all other remedies available at law, in equity, or under any of the Plan Documents.

## 7.16    No Successor Liability; No Liability For Certain Released Claims.

7.16.1 Except as otherwise expressly provided in this Plan with respect to the Debtor, the Reorganized Debtor, and the Lummus Asbestos PI Trust, the Debtor, the Reorganized Debtor, the other Asbestos Protected Parties, and the Lummus Asbestos PI Trust do not, pursuant to this Plan, assume, agree to perform, pay, or indemnify creditors or any other Entity for any liabilities or obligations of the Debtor, relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Lummus Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtor, nor the Lummus Asbestos PI Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtor and the Lummus Asbestos PI Trust shall assume the obligations specified in this Plan and the Lummus Confirmation Order.

7.16.2 Except as otherwise expressly provided in this Plan, effective on the Effective Date, the Released Parties, their respective Representatives and the Additional Indemnities shall unconditionally and irrevocably be fully released from any and all claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar claims arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of its businesses or operations that occurred or existed prior to the Effective Date.

## 7.17    Non-Dischargeable Environmental Liability.

Nothing herein shall be deemed as discharging or otherwise affecting the rights of Governmental Units, to assert claims or causes of action against the Reorganized Debtor on account of or arising under applicable environmental laws to the extent that such rights are not otherwise dischargeable under the provisions of the Bankruptcy Code.

Nothing in this Plan or any related document shall be deemed to discharge, impair, or otherwise adversely affect the police and regulatory rights and claims of Governmental Units on account of or arising under applicable environmental laws and such regulatory rights and the claims of Governmental Units against the Debtor and the Reorganized Debtor shall survive the Chapter 11 Case and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated, if the Debtor had not commenced its Chapter 11 Case.

## ARTICLE 8.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## 8.1    Assumption of Executory Contracts and Unexpired Leases.

8.1.1 Except for executory contracts that the Debtor rejects prior to the Effective Date or designates as being subject to rejection in connection with the Effective Date, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to Section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Reorganized Debtor on the Effective Date, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Lummus Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to Section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, its estate, and all parties in interest in the Chapter 11 Case. Notwithstanding the foregoing, any executory agreements respecting Lummus Asbestos Personal Injury Claims or Settled Asbestos Claims are not assumed under the terms of this Plan. With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtor, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtor with respect to the assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtor's business promptly after any such default becomes known to the Reorganized Debtor and, if disputed, established pursuant to applicable law, and the assumed executory contracts or leases shall be binding and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure

amount all defaults of the Debtor existing as of the Lummus Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

8.1.2 Executory Contracts and unexpired leases previously assumed by the Debtor during the Chapter 11 Case pursuant to Section 365 of the Bankruptcy Code shall be governed by and subject to the provisions of the order of the Bankruptcy Court authorizing the assumption thereof.

## 8.2   Compensation and Benefits Program.

Unless otherwise agreed to by the affected parties or modified by order of the Court, all of the Debtor's obligations under employment and severance policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

## ARTICLE 9.

## RETENTION OF JURISDICTION

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction to the fullest extent provided by applicable law over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Case or the Plan, or (c) that relates to the following:

## 9.1   Plan Documents.

To interpret, enforce, and administer the terms of the Plan, the Plan Documents, and all annexes and exhibits thereto;

## 9.2 Executory Contracts and Unexpired Leases.

To hear and determine any and all motions or applications pending on the Lummus Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Lummus Confirmation Date;

## 9.3 Causes of Action.

To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor or the Lummus Asbestos PI Trust after the Effective Date, including any claims to recover assets for the benefit of the Debtor's estate that have not otherwise been released pursuant to the terms of this Plan;

## 9.4   Disputed Claims Allowance/Disallowance.

To hear and determine any objections to the allowance of Claims (except those involving Lummus Asbestos PI Trust Claims) and Settled Asbestos Claims, including to hear and determine any objections to the classification of any Claim or Settled Asbestos Claim and to allow or disallow any Disputed Claim or Settled Asbestos Claim in whole or in part;

## 9.5   Enforcement/Modification of the Plan.

9.5.1 To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by Section 1142 of the Bankruptcy Code;

9.5.2 To consider and approve any modifications of the Plan or the Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Lummus Confirmation Order in accordance with the provisions of the Bankruptcy Code;

9.5.3 To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

9.5.4 To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus);

9.5.5 To hear and determine all objections to the termination of the Lummus Asbestos PI Trust;

9.5.6 To determine such other matters that may be set forth in the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction, or the Lummus Asbestos PI Trust Agreement, or that may arise in connection with the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction, or the Lummus Asbestos PI Trust Agreement;

9.5.7 To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Lummus Asbestos PI Channeling Injunction or the Lummus Asbestos Insurance Entity Injunction;

9.5.8 To enter an order or final decree closing the Chapter 11 Case;

9.5.9 To hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

9.5.10 To enter such orders as are necessary to implement and enforce the injunctions described herein, including orders extending the protections afforded by Section 524(g) of the Bankruptcy Code to the Settling Lummus Asbestos Insurance Entities; and

9.5.11 To enter orders authorizing immaterial modifications to the Plan, and to hear and determine any issue or proceeding involving the Lummus Asbestos PI Trust, in order to comply with Section 468B of the IRC.

**9.6    Compensation of Professionals.**

To hear and determine all applications for allowances of compensation and reimbursement from the Debtor's estate of expenses of professionals under Sections 330, 331, and 503 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

**9.7    Settlements.**
To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Bankruptcy Estate;

**9.8    Taxes.**

To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtor or Debtor in Possession may be liable, directly or indirectly, in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

**9.9    Specific Purposes.**

To hear and determine such other matters and for such other purposes as may be provided in the Lummus Confirmation Order, the Plan, or the other Plan Documents; and

**9.10    Insurance Matters.**

To hear and determine matters concerning insurance; however, the Bankruptcy Court shall have non-exclusive jurisdiction over such matters.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters specified in this Article 9, the reference to the "Bankruptcy Court" in this Article 9 shall be deemed to be replaced by the "District Court." Notwithstanding anything in this Article 9 to the contrary, the satisfaction of Lummus Asbestos PI Trust Claims and the forum in which such Lummus Asbestos PI Trust Claims will be determined will be governed by the Lummus Asbestos PI Trust Agreement and the Lummus Asbestos PI Trust Distribution Procedures.

## ARTICLE 10.

## PROPERTY HELD IN TRUST AND AUTHORITY OF THE DEBTOR

**10.1    Certain Property Held in Trust by the Reorganized Debtor.**

If, and to the extent that, any property of the Reorganized Debtor specified herein, under applicable law or any binding contractual provision, cannot be effectively transferred and assigned to the appropriate party pursuant to the Plan or any Plan Document, or if for any reason after the Effective Date, the Reorganized Debtor shall retain or receive any property that is

owned by the Reorganized Debtor or the Debtor (as the case may be) and is to be transferred to another party pursuant to the Plan or any Plan Document, then the Reorganized Debtor shall hold such property (and any proceeds thereof) in trust for the benefit of the appropriate party, shall promptly advise such party that the Reorganized Debtor is holding such property and shall promptly take all such actions with respect to such property (and any proceeds thereof) as such other party shall direct in writing.

### 10.2   Authority of the Debtor.

On the Lummus Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement effectively (i) the provisions of this Plan, and (ii) the creation of the Lummus Asbestos PI Trust.

### ARTICLE 11.

### MISCELLANEOUS PROVISIONS

### 11.1   Payment of Statutory Fees.

All fees payable pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtor or the Reorganized Debtor as the case may be on or before the Effective Date.

### 11.2   Discharge of the Debtor and Waiver of Injunction Protection.

Except as otherwise provided in this Plan, the rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtor and the Debtor in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date all Claims against and Equity Interests in the Debtor and the Debtor in Possession **(including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor, or any conduct for which the Debtor may be deemed to have strict liability under any applicable law to the extent such claims may be discharged under applicable law and jurisprudence existing on the Lummus Confirmation Date)** shall be satisfied, discharged, and released in full. The Reorganized Debtor shall not be responsible for any obligations of the Debtor or the Debtor in Possession except those expressly imposed upon or assumed by the Reorganized Debtor pursuant to or in accordance with this Plan. Except as expressly provided in this Plan, all Entities shall be precluded and forever barred from asserting against the Lummus Asbestos PI Trust and the Asbestos Protected Parties, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

Any non-Debtor Entity may, by express written instrument, waive or limit any protection or benefit afforded to it with respect to a third party under the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction or otherwise under this Plan or any order issued in furtherance of this Plan, and any claims or legal actions of such third party against the non-Debtor Entity executing the waiver that are permitted by reason of such waiver or limitation shall be deemed to be expressly allowed under the terms of this Plan.

### 11.3   Rights of Action.

Except to the extent released or assigned pursuant to the Plan or any other Plan Document, any rights, claims, or causes of action accruing to the Debtor or the Debtor in Possession pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any avoidance or recovery actions under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of, or which provides indemnity or liability payments to or on behalf of, the Debtor or the Debtor in Possession, and any rights, claims, and causes of action against third parties related to or arising out of Allowed Claims, shall, on the Effective Date, be retained by the Reorganized Debtor.

Except to the extent inconsistent with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) or otherwise inconsistent with this Plan, any rights or Claims to the extent required for the Lummus Asbestos PI Trust to realize the benefit therefrom shall be assigned to the Lummus Asbestos PI Trust or if deemed necessary shall be pursued in the name of the Debtor or the Reorganized Debtor, or in the name of any other party transferring such rights for the benefit of the Lummus Asbestos PI Trust. Nothing in this Section 11.3, however, shall be deemed to be a transfer by the Debtor or the Reorganized Debtor of any claims, causes of action, or defenses relating to assumed executory contracts or otherwise which

are required by the Reorganized Debtor to conduct their business in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by the Plan, the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), or other Plan Documents, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights, claims, causes of action, or defenses against any parties, including Creditors and holders of Equity Interests which are not otherwise treated under the Plan.

### 11.4   Third Party Agreements.

The Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect.

### 11.5   Dissolution of the ACC; Retention of the Future Claimants' Representative; Creation of the Trust Advisory Committee.

On the Effective Date, the ACC, if appointed, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case. The ACC shall thereupon be deemed dissolved; *provided, however,* that, (i) in the event that the Effective Date occurs prior to the Lummus Confirmation Order becoming a Final Order, the ACC may, at its option, continue to serve and function for the purpose of participating in any appeal of the Lummus Confirmation Order until such time as the Confirmation Order becomes a Final Order and (ii) if the Effective Date occurs prior to the conclusion of any outstanding litigation or adversary proceedings in the Chapter 11 Case or prior to the entry of a Final Order with respect to final fee applications of professionals retained by order of the Bankruptcy Court during the Chapter 11 Case, the ACC may, at its option, continue to serve until a Final Order is entered with respect to such proceedings. On the Effective Date, the Trust Advisory Committee shall be appointed as provided in Section 7.2.3 of this Plan. The Lummus FCR shall continue to serve as provided in the Lummus Asbestos PI Trust Agreement in order to perform the functions required by and as set forth in that agreement. Upon termination of the Lummus Asbestos PI Trust, (i) the Trust Advisory Committee for the Lummus Asbestos PI Trust and the Lummus FCR shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case, and (ii) the Trust Advisory Committee for the Lummus Asbestos PI Trust shall be deemed dissolved and the Lummus FCR's employment shall be deemed terminated. All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Trust Advisory Committee for the Lummus Asbestos PI Trust and the Lummus FCR shall be paid by the Lummus Asbestos PI Trust in accordance with the terms of the Lummus Asbestos PI Trust Agreement. If there shall be any dispute regarding the payment of such fees and expenses, the parties shall attempt to resolve such dispute in good faith and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

### 11.6   Exculpation.

Except for their obligations expressly set forth in the Plan or the other Plan Documents, none of the Debtor, the Reorganized Debtor, the ABB Indemnified Parties, the Alstom Protected Parties, the Trustees, the Additional Indemnitees, the Lummus FCR, the ACC, the CE FCR, the CCC or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the negotiation of this Plan, the CE Plan, or any Plan Documents related thereto or proposed in connection with the Chapter 11 Case, negotiation of the settlement provided in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), the pursuit of confirmation of this Plan, the CE Plan, or any Plan Documents related thereto or proposed in connection with the Chapter 11 Case, the consummation of this Plan or the settlement provided in the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), or the administration of this Plan, the CE Plan, or the property to be distributed under this Plan **(including any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities based on conduct that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct — but not, in the case of any natural person included among the Entities to which this Section 11.6 applies, any claims against that person based on intentional misconduct of that person that directly resulted in the unjust enrichment of that person — of any of the Debtor, the Reorganized Debtor, the ABB Indemnified Parties, the Trustees of the Lummus Asbestos PI Trust, the Additional Indemnitees or any of their respective Representatives or any conduct for which any of those Entities may be deemed to have strict liability under any applicable law).** In all respects, the foregoing Entities will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan or any of the Plan Documents proposed in the Chapter 11 Case.

**11.7**    <u>Releases and Indemnities</u>.

### 11.7.1 *Releases*

#### 11.7.1.1 Release of Representatives of the Debtor and Non-Debtor Affiliates

To the extent permitted by law applicable to cases under title 11 of the United States Code in the District of Delaware as of the Effective Date, except as otherwise specifically provided in this Plan and the other Plan Documents, for good and valuable consideration, the receipt and sufficiency of which is acknowledged in this Plan, all current and former Representatives of the Debtor, and all current and former Representatives of the Non-Debtor Affiliates, on and after the Effective Date, are released from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based in whole or in part, upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for claims or liabilities resulting from their services as officers or directors of the Debtor or, to the extent such claims or liabilities relate to the business, operations, or management of the Debtor prior to the Effective Date or any of the matters referred to in Section 11.6, any of the Non-Debtor Affiliates.

### 11.7.2 *Indemnities*

The Reorganized Debtor shall defend, hold harmless, and indemnify to the fullest extent permitted by applicable law: (i) its own current and former Representatives; (ii) the current and former Representatives of the Non-Debtor Affiliates; (iii) the ABB Indemnified Parties; (iv) the Alstom Protected Parties, (v) the Structured Finance Protected Parties, (vi) the OGP Protected Parties, and all other releases and indemnities pursuant to the provisions of, and to the extent set forth in, the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) or this Plan on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 11.7.1 herein. In each case, with respect to any such claim or liability, and, in connection therewith, if and whenever any indemnified party described herein is, or is threatened to be made, a party to any action, suit, arbitration, investigation, or other proceeding that might give rise to a right of indemnification under this Section 11.7.2, the indemnifying party shall, to the extent permitted by applicable law, advance to that indemnified party all expenses (including attorneys' fees) reasonably incurred by or on behalf of that indemnified party in connection therewith within ten (10) days after the indemnifying party receives a statement or statements from that indemnified party requesting an advance or advances from time to time, whether prior to or after final disposition of such action, suit, arbitration, investigation, or other proceeding.

### 11.7.3 *Specific Releases by Holders of Claims*

To the extent permitted by law applicable to cases under title 11 of the United States Code in the District of Delaware as of the Effective Date, other than rights to the treatment provided in Article III of this Plan or as otherwise provided herein, on and after the Effective Date, each holder of a Claim (i) who has accepted the Plan or (ii) who is entitled to receive a Distribution of property under the Plan, shall be deemed to have unconditionally released the Released Parties, the ACC, the Lummus FCR, the CCC, and their current and former Representatives from any and all claims (as defined in Section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtor or the Reorganized Debtor, the Chapter 11 Case, or the negotiation, formulation, and preparation of the Plan or any related agreements, instruments, or other documents.

### 11.7.4 *Limitation on Plan Releases*

With respect to Lummus Asbestos PI Trust Claims, anything in the Plan, any Plan Document, the Confirmation Order, the Channeling Injunction or otherwise to the contrary notwithstanding, the releases, exculpatory provisions, injunctions, and indemnifications provided to or afforded any Released Party shall operate and be construed to release, exculpate, benefit, or indemnify such Released Party (subject also to the other limitations set forth in the Plan and Plan Documents) only to the extent such Lummus Asbestos PI Trust Claims (whether now existing or hereafter arising) are based upon the Debtor's direct or indirect liability or alleged liability. For the sake of clarity, Lummus Asbestos PI Trust Claims "based upon the Debtor's direct or indirect liability or alleged liability" include Lummus Asbestos PI

Trust Claims (whether now existing or hereafter arising) against any Alstom Protected Party which is (i) a former Affiliate of the Debtor, or (ii) a direct or indirect successor to, or transferee of assets of, the Debtor or a former Affiliate of the Debtor (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a transferee or successor)) in either case to the extent such Lummus Asbestos PI Trust Claims arise as a consequence of the acts, omissions, products, business or operations of an Entity when such Entity was an Affiliate of the Debtor.

### 11.7.5 *Non-Dischargeable ERISA Liability*

The Debtor is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act ("ERISA") applies ("Pension Plans"). Nothing contained in the Plan, the Lummus Confirmation Order, the Bankruptcy Code (including Section 1141 thereof), or any other document filed in Debtor's Chapter 11 Case shall be construed to discharge, release or relieve the Debtor, or any other party, in any capacity, from any liability or responsibility with respect to the Pension Plans under any law, governmental policy, or regulatory provision. No Entity, including the Pension Benefit Guaranty Corporation ("PBGC") and the Pension Plans shall be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan, (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Lummus Confirmation Order, the Bankruptcy Code (and Section 1141 thereof), or any other document filed in Debtor's Chapter 11 Case. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any such liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Lummus Asbestos PI Trust or any of the Lummus Asbestos PI Trust Assets.

### 11.8    Title to Assets; Discharge of Liabilities.

On the Effective Date, title to all of the Lummus Asbestos PI Trust Assets shall vest in the Lummus Asbestos PI Trust free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity without further action of any Entity and all rights with respect to such assets and properties shall be vested in and enforceable by the Lummus Asbestos PI Trust. Except as otherwise provided in the Plan, on the Effective Date, title to all of the Debtor's assets and properties and interests in property shall vest in the Reorganized Debtor, other than the ABB Consideration, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity without further action of any Entity, and all rights with respect to such assets and properties shall be vested in and enforceable by the Reorganized Debtor, and the Lummus Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtor.

### 11.9    Notice.

Any notice, statement, or other report required or permitted by this Agreement must be (i) in writing and is deemed given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent by facsimile before 5:00 p.m. Prevailing Eastern Time on a Business Day with a copy of such facsimile sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (c) five (5) days after deposit in the United States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) and (ii) addressed to the parties to whom such notice, statement or report is directed (and, if required, its counsel) at the addresses set forth below, or at such other address as such party may designate from time to time in writing in accordance with this Section 11.9.

| | |
|---|---|
| **If to the Debtor:** | ABB Lummus Global Inc. |
| | 3010 Briarpark Drive |
| | Houston, TX 77042 |
| | Attn: V.P. Controller/ Chief Financial Officer |
| | Phone: (713) 821-5000 |
| | Fax: (713) 821-3595 |
| **with a copy to (which copy shall not constitute notice):** | Kirkpatrick & Lockhart Nicholson Graham LLP |
| | 599 Lexington Avenue |
| | New York, NY 10022-6030 |
| | Attn: Jeffrey N. Rich, Esq. |
| | Phone: (212) 536-3900 |
| | Fax: (212) 536-3901 |

| | |
|---|---|
| **If to the Lummus FCR:** | Law Offices of Richard B. Schiro<br>Regency Plaza, Suite 1350<br>3710 Rawlins Street<br>Dallas, TX 75219<br>Attn: Richard B. Schiro, Esq.<br>Phone: (214) 521-4994<br>Fax: (214) 521-3838 |
| **with a copy to (which copy shall not constitute notice):** | Porter & Hedges, L.L.P.<br>1000 Main Street<br>36ᵗʰ Floor<br>Houston, TX 77002<br>Attn: John F. Higgins, Esq.<br>Phone: (713) 226-6648<br>Fax: (713) 226-6248 |
| **If to ABB:** | ABB Ltd<br>Affolternstrasse 44<br>CH-8050 Zurich<br>Switzerland<br>Attn: General Counsel<br>Phone: +41-43-317-67-36<br>Fax: +41-43-317-79-92 |
| **with a copy to (which shall not constitute notice):** | Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53ʳᵈ Street<br>New York, NY 10022<br>Attn: Theodore L. Freedman, Esq.<br>Phone: (212) 446-4800<br>Fax: (212) 446-4900 |
| **If to the ACC (if appointed):** | Baron & Budd, P.C.<br>3102 Oak Lawn Avenue<br>Suite 1100<br>Dallas, TX 75219<br>Attn: Russell W. Budd<br>Phone: 214-521-3605<br>Fax: 214-520-1181<br><br>and<br><br>Kazan, McClain, Abrams, Fernandez, Lyons & Farrise<br>171 Twelfth Street, Third Floor<br>Oakland, CA 94607<br>Attn: Steven Kazan<br>Phone: 510-465-7728<br>Fax: 510-835-4913<br><br>and<br><br>Weitz & Luxenberg<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Perry Weitz<br>Phone: 212-558-5500<br>Fax: 212-344-5461 |
| **with a copy to (which shall not constitute notice):** | Frank/Gecker LLP<br>325 N. LaSalle Street<br>Suite 625 |

123

Chicago, IL 60610
Attention: Joseph D. Frank
Phone: (312) 276-1400
Fax: (312) 276-0035

**11.10   Headings.**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**11.11   Severability.**

At the option of the Debtor, ABB, the Lummus FCR, and the ACC, if appointed, acting jointly, any provision of the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction or any of the Exhibits to the Plan that are determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction shall, as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated, be ineffective to the extent of such prohibition, unenforceability, or invalidation without invalidating the effectiveness of the remaining provisions of the Plan, the Lummus Confirmation Order, the Lummus Asbestos PI Channeling Injunction, the Lummus Asbestos Insurance Entity Injunction, and the exhibits to the Plan or affecting the validity or enforceability of such provisions in any other jurisdiction.

**11.12   Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

**11.13   Filing of Additional Documents.**

On or before the Lummus Confirmation Date, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**11.14   Compliance with Tax Requirements.**

In connection with the Plan, the Debtor, the Reorganized Debtor, and the Lummus Asbestos PI Trust will comply with all withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements.

**11.15   Exemption from Transfer Taxes.**

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in such Section 1146(c).

**11.16   Further Assurances.**

The Debtor, the Reorganized Debtor, ABB, the Non-Debtor Affiliates, the Lummus Asbestos PI Trust, the Lummus FCR, the CCC, and all holders of Claims entitled to receive Distributions under the Plan, all holders of Lummus Asbestos PI Trust Claims and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the Plan and the other Plan Documents as may be necessary to effectuate the provisions and intent of the Plan and the other Plan Documents, with each such Entity to bear its own costs incurred in connection therewith except as otherwise agreed.

**11.17   Further Authorizations.**

The Debtor, and, after the Effective Date, the Lummus Asbestos PI Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that it deems necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, the Plan and the other Plan Documents.

**11.18   Execution of CE Plan Documents.**

On the Effective Date, the Debtor shall execute, be bound by, and deliver to the CE 524(g) Asbestos PI Trust, in connection with the closing of the transactions contemplated by the CE Plan, the Insurance Assignment Agreement and the Contribution Agreement.

|  |  |
|---|---|
| Wilmington, Delaware<br>Dated: August 30, 2005 | Respectfully submitted,<br>ABB LUMMUS GLOBAL INC. |

By: /s/  MARGARET DUPLANTIER
Name: Margaret Duplantier, Esq.
Title: Senior Vice President, General Counsel, and Secretary

KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP
Jeffrey N. Rich
Philip H. Hecht
Elizabeth Singer
Jennifer Anne Mo
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-3900
Facsimile: (212) 536-3901
and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES, & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
919 N. Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Attorneys for ABB Lummus Global Inc.
Debtor and Debtor in Possession

**PLAN EXHIBIT A**

**ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT (LUMMUS)**

**ABB AND NON-DEBTOR AFFILIATE SETTLEMENT AGREEMENT (LUMMUS)**

This ABB AND NON-DEBTOR AFFILIATE SETTLEMENT AGREEMENT (LUMMUS) (this "*Agreement*") is made as of _____ , 2005, and is effective on the Effective Date, by and among ABB Ltd, a corporation organized and existing under the laws of Switzerland ("*ABB*"); ABB Holdings Inc. ("*ABB Holdings*"), a Delaware corporation, and a successor in interest by merger to Asea Brown Boveri Inc.; ABB Lummus Global, Inc. ("*Lummus*" or the "*Debtor*"), a Delaware corporation and an indirect, wholly owned subsidiary of ABB Holdings; ABB Oil and Gas USA, Inc. ("*ABB Oil & Gas*"), a Delaware corporation; the Lummus FCR; and the Lummus Asbestos PI Trust. Certain capitalized terms used herein are defined in Article 1 below, and capitalized terms used herein without definition shall have the meanings given to such terms in the Glossary of Terms for the Plan Documents pursuant to the Plan of Reorganization of ABB Lummus Global Inc. (the "*Glossary*").

## RECITALS

WHEREAS, on _____ , the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") with the Court;

WHEREAS, ABB, ABB Holdings, ABB Oil & Gas, the Debtor, the Lummus FCR, and the Lummus Asbestos PI Trust have agreed to a settlement of the outstanding disputes among them concerning various issues, as reflected in this Agreement, and it is a condition to the effectiveness of the Plan that the parties enter into this Agreement;

WHEREAS, as part of the settlement, the parties have agreed, among other things, to cause the Lummus Asbestos PI Trust to be established for the benefit of asbestos personal injury claimants and settlement of Lummus Asbestos PI Trust Claims, and to provide certain protections to ABB, ABB Holdings, ABB Oil & Gas, the Debtor, and certain other entities, in light of the benefits to be provided to such claimants by means of the Lummus Asbestos PI Trust, pursuant to this Agreement and the other Plan Documents;

WHEREAS, ABB, ABB Holdings, ABB Oil & Gas, and the Debtor have concluded it is in their respective best interests and the Lummus FCR and the Lummus Asbestos PI Trust have concluded it is in the best interests of the beneficiaries of the Lummus Asbestos PI Trust to enter into this Agreement and to effect the settlement reflected in this Agreement and the other Plan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1    *Definitions.* The following capitalized terms used herein shall have the meanings set forth below:

"*ABB*" has the meaning set forth in the Preamble.

"*ABB Group*" means ABB and its Subsidiaries from time to time.

"*ABB Guaranty*" means the guarantee of payment obligations of the Lummus Note, annexed hereto as *Exhibit B* of ABB, ABB Holdings, and ABB Oil & Gas.

"*ABB Holdings*" has the meaning set forth in the Preamble.

"*ABB Indemnified Parties*" has the meaning set forth in the Glossary.

"*ABB Oil & Gas*" has the meaning set forth in the Preamble.[1]

"*ABB Treasury*" means ABB Treasury Center (USA) Inc., a Delaware corporation.

"*Affiliate*" has the meaning set forth in the Glossary.

"*Aggregate Insurance Recoveries*" means recoveries received by the Debtor or Reorganized Debtor after April 15, 2002 under the Subject Lummus Insurance Policies on account of asbestos-related liabilities, regardless of whether those proceeds are received through settlements, litigation, or payments in the ordinary course of business from its insurers, or otherwise.

"*Agreement*" has the meaning set forth in the Preamble.

"*Alstom Protected Parties*" has the meaning set forth in the Glossary.

"*Asbestos Books*" has the meaning set forth in the Glossary.

"*Asbestos Insurance Actions*" has the meaning set forth in the Glossary.

"*Asbestos Protected Party*" has the meaning set forth in the Glossary.

"*Bankruptcy Code*" has the meaning set forth in the Glossary.

"*Bankruptcy Estate*" has the meaning set forth in the Glossary.

"*Capital Stock*" has the meaning set forth in the Glossary.

"*Chapter 11 Case*" has the meaning set forth in the Recitals.

"*Claims*" has the meaning set forth in the Glossary.

"*Court*" has the meaning set forth in the Glossary.

"*Damage*" to any specified Person means (x) any cost, damage (including any consequential, exemplary, punitive, or treble damage) or expense (including reasonable fees and actual disbursements by attorneys, consultants, experts, or other Representatives and costs of litigation) to, any fine of or penalty on or any liability (including loss of earnings or profits) of any other nature of that Person; or (y) any fine or penalty imposed by any Governmental Authority upon that Person.

"*Debtor*" has the meaning set forth in the Preamble.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

---

[1]    ABB Oil and Gas is scheduled to be merged into ABB Holdings Inc. during the third or fourth quarter of 2005, with ABB Holdings Inc. as the surviving entity. References to ABB Oil and Gas may have to be updated accordingly.
"*Exit Financing*" [to come][2]

"*Glossary*" has the meaning set forth in the Preamble.

"*Governmental Authority*" means any federal, state, county, municipal or other government, domestic or foreign, or any agency, board, bureau, commission, court, department or other instrumentality of any such government.

"*Lummus*" has the meaning set forth in the Preamble.

"*Lummus Asbestos PI Channeling Injunction*" has the meaning set forth in the Glossary.

"*Lummus Asbestos PI Trust*" has the meaning set forth in the Glossary.

"*Lummus Asbestos PI Trust Agreement*" has the meaning set forth in the Glossary.

"*Lummus FCR*" has the meaning set forth in the Glossary.

"*Lummus Insurance Recovery Guaranteed Payment*" has the meaning set forth in the Glossary.

"*Lummus Note*" has the meaning set forth in the Glossary. The Lummus Note will be in substantially the form attached hereto as *Exhibit A*.

---

[2]    "Exit Financing" will be defined as an amount to be equal to the amount of any financing (whether for borrowed money or credit support), provided by any Entity (including any Entity of the ABB Group) to Lummus and any Subsidiaries of Lummus, on or after the "Effective Date" of the Lummus plan of reorganization pursuant to one or more "exit" financing facilities and including any refinancing, amendment or modification thereof.
       Such financing facilities will be unsecured and in an aggregate amount determined by Lummus, which amount, if so determined by Lummus, may be at least equal to the sum of (A) the Pre-petition Short-Term Working Capital Financing; (B) any financing (whether for borrowed money or credit support) provided to Lummus and any Subsidiaries of Lummus on or after the Petition Date pursuant to a debtor-in-possession credit facility under §364 of

the Bankruptcy Code; and (C) any additional financing requirements (whether for borrowed money or credit support) of Lummus and any Subsidiaries of Lummus on and after the Effective Date of the Lummus plan of reorganization. Whether the Exit Financing is provided by an Entity of the ABB Group or by another Entity, the terms and conditions thereof shall include subordination provisions identical in all material respects with the terms set forth in Section 3.2 of this Agreement.

For purposes of the Exit Financing, "Pre-petition Short-Term Working Capital Financing" means the indebtedness (whether for borrowed money or credit support) for principal, interest and other fees, costs and expenses outstanding as of the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus, for advances or loans made by any Entity of the ABB Group to Lummus and its Subsidiaries between the close of business of the thirty-first (31st) consecutive calendar day prior to the Petition Date (the "Cutoff Date") and the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus.

For the sake of clarity, "Pre-petition Working Capital" shall include all contingent obligations of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support provided to Lummus or its Subsidiaries incurred between the Cutoff Date and the moment in time immediately prior to the filing for relief pursuant to Chapter 11 by Lummus, but shall not include obligations (contingent or otherwise) of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support obligations created or incurred prior to the Cutoff Date.

"OGP Protected Parties" has the meaning set forth in the Glossary.

"Person" means any natural person, Entity, estate, trust, or Governmental Authority.

"Plan" has the meaning set forth in the Glossary.

"Plan Documents" has the meaning set forth in the Glossary.

"Pledge and Irrevocable Proxy" means the Pledge and Irrevocable Proxy executed by ABB Oil & Gas in favor of the Lummus Asbestos PI Trust and annexed as Exhibit A to the ABB Oil & Gas Guaranty.

"Post Effective Date Insurance Recoveries" has the meaning set forth in Section 2.2(c) hereof.

"Released Claims" has the meaning set forth in Section 3.1 herein.

"Released Parties" means the following: (a) the ABB Indemnified Parties; (b) the Alstom Protected Parties; (c) the Structured Finance Protected Parties; (d) the OGP Protected Parties; (e) any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any of the ABB Indemnified Parties, any of the Alstom Protected Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); (f) any Entity that, pursuant to the Plan or otherwise after the Effective Date, makes a loan to any of the ABB Indemnified Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or any of the Alstom Protected Parties, or to a successor to, or transferee of any of the respective assets of, any of the ABB Indemnified Parties, any of the Structured Finance Protected Parties, any of the OGP Protected Parties, or any of the Alstom Protected Parties (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or being granted a security interest in connection with the foregoing); or (g) any Entity, including each of the respective past, present and future Affiliates, subsidiaries, officers, directors, employees, consultants, agents, attorneys, and other Representatives of each of the ABB Indemnified Parties, each of the Structured Finance Protected Parties, each of the OGP Protected Parties, or each of the Alstom Protected Parties, to the extent he, she, or it is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims.

"Representatives" has the meaning set forth in the Glossary.

"Structured Finance Protected Parties" has the meaning set forth in the Glossary.

"Subject Lummus Insurance Policies" has the meaning set forth in the Glossary.

"Subordinated Intercompany Indebtedness'" means the amounts owed by Lummus or any of its Subsidiaries, in respect of (i) indebtedness for borrowed money provided by ABB Treasury or any Entity of the ABB Group and in an aggregate principal amount of [approximately $470,000,000] which indebtedness and liabilities are identified in Exhibit B to the Lummus Note, and (ii) any indebtedness and liabilities (whether fixed, matured, contingent or otherwise) existing or which may arise to any Entities of the ABB Group for or in respect of letters of credit or credit support arrangements outstanding as of the close of business of the thirty-first (31st) day immediately preceding the Petition Date provided by any such Entities, which letters of credit or credit

<sup></sup> The maximum amount in this definition will equal the intercompany indebtedness for borrowed money and credit support owed by Lummus and its Subsidiaries as of the close of business in New York on the thirty-first (31st) consecutive calendar day prior to the Petition Date to ABB Treasury and other ABB Entities.

support arrangements are identified on Exhibit C to the Lummus Note, including any reimbursement or indemnity obligations or liabilities for amounts drawn or subject to being drawn after the close of business on the thirty first (31ˢᵗ) day immediately preceding the Petition Date hereafter under the letters of credit and other credit enhancements identified in Exhibit C to the Lummus Note.

"*Subsidiary*" has the meaning set forth in the Glossary.

"*Trustee*" has the meaning set forth in the Glossary.

"*Unmatured Contingent Obligations*" has the meaning set forth in the Pledge and Irrevocable Proxy.

"*U.S.*" means the United States of America.

1.2   *Other Definitional Provisions.*

(a) This Agreement uses the words "herein," "hereof," and "hereunder" and words of similar import to refer to this Agreement as a whole and not to any provision of this Agreement, and the words "Article," "Section," "Recitals," "Schedule," and "Exhibit" refer to Articles and Sections of, the Recitals to, and Schedules and Exhibits to, this Agreement unless otherwise specified.

(b) Whenever the context so requires, the singular number includes the plural and vice versa, and a reference to one gender includes the other gender and the neuter.

(c) Except where the context otherwise requires, the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word, and the words "shall" and "will" are used interchangeably and have the same meaning.

(d) The term "business day" means any day other than a Saturday, Sunday, or U.S. federal holiday.

(e) All references to "$" or "dollars" are to U.S. dollars.

(f) The language this Agreement uses will be deemed to be the language the parties hereto have chosen to express their mutual intent, and no rule of strict construction will be applied against any party hereto.

1.3   *Captions.* This Agreement includes captions to Articles, Sections and subsections of, and Schedules and Exhibits to, this Agreement for convenience of reference only, and these captions do not constitute a part of this Agreement for any other purpose or in any way affect the meaning or construction of any provision of this Agreement.

### ARTICLE 2

### CONTRIBUTIONS TO THE LUMMUS ASBESTOS PI TRUST

2.1   *ABB Consideration and Lummus Consideration.* In consideration of the provision of the Lummus Asbestos PI Channeling Injunction and the releases and indemnification protection to be provided pursuant to the Plan and this Agreement, on behalf of ABB, ABB Holdings, ABB Oil & Gas, Lummus, and the other Asbestos Protected Parties, subject to the satisfaction (or waiver by the appropriate party or parties) of the conditions set forth in Article 4 herein and effective as of the Effective Date:

(a) Lummus will execute and deliver the Lummus Note, which note provides for a remedy available to the holder thereof and exercisable during the continuance of an event of default thereunder, whereby the holder is entitled to vote 51% of the shares of the common stock of Lummus in accordance with the terms of the Pledge and Irrevocable Proxy;

(b) ABB, ABB Oil & Gas and ABB Holdings will execute and deliver the ABB Guaranty guaranteeing the payment of the Lummus Note; and

(c) ABB Oil & Gas will execute and deliver the Pledge and Irrevocable Proxy pursuant to which 51% of the Capital Stock of Lummus will be pledged to the Lummus Asbestos PI Trust as security for the Lummus Note and the ABB Guaranty, and entitling the holder of the Lummus Note, among other things, to vote such Capital Stock in the event of a default and upon the occurrence of certain additional events as set forth under the Lummus Note and the Pledge and Irrevocable Proxy.

2.2   *Additional Payments.*

(a) The first $7.5 million of Aggregate Insurance Recoveries actually received by the Debtor prior to the Effective Date from any settlement of any of the Subject Lummus Insurance Policies entered into by the Debtor during the period commencing on April 15, 2002 and ending on the day immediately preceding the Effective Date (the "Pre-Effective Date Period") shall, on the Effective Date, be paid to the Lummus PI Trust and any Aggregate Insurance Recoveries in excess of $7.5 million actually received by the Debtor during the Pre-Effective Date Period shall be divided equally between the Debtor and the Lummus Asbestos PI Trust and, on the Effective Date, be paid to the Reorganized Debtor and the Lummus Asbestos PI Trust.

(b) In the event that the amount paid to the Lummus Asbestos PI Trust pursuant to Section 2.2(a) hereof is less than the Lummus Insurance Recovery Guaranteed Payment, on the Effective Date, the Reorganized Debtor will pay to the Lummus Asbestos PI Trust on behalf of the Released Parties, the amount by which the Lummus Insurance Recovery Guaranteed Payment exceeds the amount paid to the Lummus Asbestos PI Trust pursuant to Section 2.2(a) hereof.

(c) Any Aggregate Insurance Recoveries actually received by the Reorganized Debtor on or after the Effective Date with respect to any settlement of any of the Subject Lummus Insurance Policies (the "Post Effective Date Insurance Recoveries"), whether such settlement is made prior or subsequent to the Effective Date, will be allocated and paid as follows:

(i) The Reorganized Debtor shall first retain an amount equal to the lesser of the Post Effective Date Insurance Recoveries or the amount, if any, paid by the Reorganized Debtor to the Lummus Asbestos PI Trust pursuant to Section 2.2(b) hereof.

(ii) To the extent that the Post Effective Date Insurance Recoveries exceed the amount retained pursuant to Section 2.2(c)(i) hereof, the Reorganized Debtor shall pay to the Lummus Asbestos PI Trust, an amount equal to the lesser of such excess or the amount by which $7,500,000 exceeds the aggregate amount paid to the Lummus Asbestos PI Trust pursuant to Sections 2.2(a) and (b).

(iii) To the extent that the Post Effective Date Insurance Recoveries exceed the amounts paid pursuant to Section 2.2(c)(i) and (ii), the Reorganized Debtor shall retain the next Post Effective Date Insurance Recoveries until the amount so retained equals the reasonable and actual out of pocket fees and expenses of the Reorganized Debtor and its Affiliates incurred on or subsequent to the Effective Date in connection with the Post Effective Date Insurance Recoveries.

(iv) To the extent that the Post Effective Date Insurance Recoveries exceed the amounts paid pursuant to Section 2.2(c)(i),(ii) and (iii), such excess shall be shared equally by the Reorganized Debtor and the Lummus Asbestos PI Trust.

2.3   *Control, Prosecution, and Defense of Asbestos Insurance Actions.*

(a) The Reorganized Debtor shall retain and shall have the right to control, prosecute, and defend any and all Asbestos Insurance Actions related to the Subject Lummus Insurance Policies; *provided, that* the Reorganized Debtor shall use reasonable commercial efforts to diligently pursue Asbestos Insurance Actions related to the Subject Lummus Insurance Policies. The Reorganized Debtor shall not settle or compromise any Asbestos Insurance Action or rights under the Subject Lummus Insurance Policies without the prior written approval of the Lummus Asbestos PI Trust, which approval shall not be unreasonably withheld, conditioned, or delayed. Subject to the proviso in the first sentence of this clause (a), the Reorganized Debtor's rights to control, prosecute and defend any and all Asbestos Insurance Actions shall include, but not be limited to, the right to decide (i) whether to file Asbestos Insurance Actions, (ii) the manner in which any Asbestos Insurance Action is to be conducted, and (iii) selection of counsel.

(b) The Reorganized Debtor shall report quarterly to the Lummus Asbestos PI Trust regarding (a) the status of the Asbestos Insurance Actions, including the status of any settlements or settlement negotiations related thereto, and (b) any other events that may materially affect amounts payable to the Lummus Asbestos PI Trust under Section 2.2 above.

(c) The Reorganized Debtor shall be solely responsible for the costs of prosecuting, defending, and settling any Asbestos Insurance Actions, except that the Reorganized Debtor shall not be responsible or have any liability for the costs incurred by the Lummus Asbestos PI Trust in monitoring the Asbestos Insurance Actions.

2.4    *No Assignment of Rights Under Subject Lummus Insurance Policies.*

Nothing in this Agreement or the Plan is or shall be deemed to be an assignment of any rights by the Debtor or Reorganized Debtor to the Lummus Asbestos PI Trust of any rights or obligations under the Subject Lummus Insurance Policies.

# ARTICLE 3

## RELEASE, SUBORDINATION, AND INDEMNIFICATION

3.1    *General Release.*

(a) Subject to the satisfaction (or waiver by the appropriate party or parties) of the conditions set forth in Article 4 herein and to the provisions of Section 7.14.2 of the Plan, (i) the Debtor, the Reorganized Debtor, the Debtor's Bankruptcy Estate, and the Lummus Asbestos PI Trust hereby release each of the Released Parties; and (ii) the Lummus Asbestos PI Trust hereby releases each of the Debtor, the Reorganized Debtor, and the Debtor's Bankruptcy Estate, to the fullest extent permitted by applicable law, from any and all past, present, or future claims, demands, causes of action, liabilities, and obligations whatsoever (whether any such claims, demands, causes of action, liabilities or obligations are reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, and whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) arising out of, resulting from or relating to, directly or indirectly, the business or operations of the Debtor, the ownership of the Debtor, any contract, agreement, arrangement, or understanding with the Debtor, or any of its past or present Subsidiaries in effect prior to the Effective Date, any affiliation or relationship with the Debtor, or any of its past or present Subsidiaries prior to the Effective Date, and/or any legal or equitable claims or causes of action of any kind held by the Debtor and/or the Bankruptcy Estate, relating to any period prior to the Effective Date **(including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct, of any of the Released Parties or any conduct for which any of the Released Parties may be deemed to have strict liability under any applicable law)** (collectively, the *"Released Claims"*), including:

(i) any and all past, present, or future claims, demands, causes of action, liabilities, or obligations arising out of, resulting from or relating to, directly or indirectly, exposure to products, equipment, or materials completed, products, equipment, or materials in the process of construction, or products, equipment, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, fabricated, serviced, specified, selected, repaired, removed, replaced, released, distributed, or used at any time by (A) the Debtor or any of its past or present Subsidiaries, (B) any predecessor of the Debtor or any of its past or present Subsidiaries, or (C) any other Entity for whose products or operations any of the Entities referred to in the immediately preceding clauses (A) and (B) allegedly has liability or is otherwise liable, including any such claim, demand, cause of action, liability, or obligation (1) for compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages) and punitive damages, (2) for reimbursement, indemnification, subrogation, and contribution, or (3) under any settlement entered into by or on behalf of any of the Entities referred to in the immediately preceding clauses (A) through (C) prior to the commencement of the Chapter 11 Case;

(ii) any and all claims, demands, causes of action, liabilities, or obligations arising out of, resulting from, or relating to, directly or indirectly, any and all other intercompany dealings between ABB and/or its past and present Affiliates (other than the Debtor and its past or present Subsidiaries) on the one hand, and the Debtor and any of its past or present Subsidiaries, on the other hand, prior to the Effective Date;

(iii) any and all claims, demands, causes of action, liabilities, or obligations arising from or relating to insurance or the placement of insurance coverage under which the Debtor or any of its past or present Subsidiaries is or was an insured or additional insured, including all claims for contribution, indemnity, retrospective premiums, insurance coverages owed and reinsurance coverages owed;

(iv) any and all other claims, demands, causes of action, liabilities, or obligations which may be or could have been asserted against any of the Released Parties, including claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims arising under state or any other law, including, but not limited to, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor or the Non-Debtor Affiliates (or any of their respective predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

(b) Anything herein or in any other Plan Document to the contrary notwithstanding, the Released Claims shall not include obligations, liabilities, or duties of the Debtor, the Reorganized Debtor, ABB, ABB Holdings, ABB Oil & Gas, and the Released Parties under this Agreement and the Plan, the Lummus Note, the ABB Guaranty, the Pledge and Irrevocable Proxy, and the other Plan Documents, and the provisions of this Section 3.1 are subject to Section 3.4 of this Agreement and Section 7.14.2 of the Plan.

3.2  *Subordination.*

(a) *Subordination of the Subordinated Intercompany Indebtedness and the Exit Financing.* The Lummus Asbestos PI Trust shall be entitled to receive payment in full in cash of the obligations to be paid pursuant to the provisions of the Lummus Note (other than Unmatured Contingent Obligations) prior to any Entity of the ABB Group claiming by, through or under any Entity of the ABB Group receiving any payment or distribution in respect of (i) the Subordinated Intercompany Indebtedness and (ii) (A) during the continuation of an Event of Default (as defined in the Lummus Note) pursuant to the Lummus Note, or (B) if upon the consummation of the first to occur, if any, of (x) a Complete Asset Disposition (as defined in the Lummus Note), or (y) a Stock Disposition (as defined in the Lummus Note), and after giving effect to the Mandatory Prepayments (as defined in the Lummus Note) required to be made following such Complete Asset Disposition or Stock Disposition and to any Optional Payments (as defined in the Lummus Note) paid prior to such time, the amounts owed in respect of principal and interest under the Lummus Note have not been paid in full, in respect of the Exit Financing.

(b) *Liquidation; Dissolution; Bankruptcy.* Upon any distribution to the creditors of the Reorganized Debtor in a future liquidation or dissolution of the Reorganized Debtor or in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Reorganized Debtor or its property, in an assignment for the benefit of creditors or any marshalling of the Reorganized Debtor's assets and liabilities:

(i) the Lummus Asbestos PI Trust shall be entitled to receive payment in full in cash of the obligations to be paid pursuant to the provisions of the Lummus Note (other than Unmatured Contingent Obligations) prior to any Entity of the ABB Group claiming by, through or under any Entity of the ABB Group receiving any payment or distribution in respect of the Subordinated Intercompany Indebtedness or Exit Financing; and

(ii) until all obligations to be paid to the Lummus Asbestos PI Trust pursuant to the provisions of the Lummus Note (other than Unmatured Contingent Obligations) are paid in full, any distribution to which any Entity of the ABB Group or any Person claiming by, through or under any Entity of the ABB Group or any such Subsidiary would be entitled but for this Section 3.2 shall be made to the Lummus Asbestos PI Trust.

(c) *When Distributions Must Be Paid Over.* Should any payment or distribution prohibited by Section 3.2(a) herein be received by any Entity of the ABB Group, the receiving Entity of the ABB Group, to the extent principal is outstanding and/or interest has accrued but is unpaid under the Lummus Note, shall receive and hold the same in trust for the benefit of the Lummus Asbestos PI Trust and to forthwith upon the earlier of (A) request in writing of the Lummus Asbestos PI Trust or (B) such Entity having actual knowledge that such payment or distribution is prohibited by Section 3.2(a) herein, deliver the same to the Lummus Asbestos PI Trust, in the form received (accompanied by the endorsement or assignment of any Entity of the ABB Group, as applicable, where necessary), for application to the amount remaining under the Lummus Note, whether or not then due. Each relevant Entity of the ABB Group shall mark its books, records and any chattel paper or instruments documenting the Subordinated Intercompany Indebtedness and the Exit Financing, with a conspicuous legend stating that payments and distributions in respect of such obligations are subject to certain restrictions and terms of subordination pursuant to this Agreement.

(d) *Transfer of the Subordinated Intercompany Indebtedness.* Without the prior written consent of the Lummus Asbestos PI Trust, ABB Treasury and [          ]⁴ will not sell, assign, transfer or otherwise dispose of its interest in the Subordinated Intercompany Indebtedness, whether in whole or in part, unless the acquirer of such interest is an Entity of the ABB Group and agrees in a manner reasonably acceptable to the Lummus Asbestos PI Trust to subordination terms identical in all material respects to the subordination terms contained in this Agreement with respect to such Subordinated Intercompany Indebtedness.

(e) *No Implied Obligations.* With respect to the Subordinated Intercompany Indebtedness or the Exit Financing, as applicable, the Entities of the ABB Group that are parties hereto undertake to perform only the obligations specifically set forth in this Agreement, and no implied covenants or obligations with respect to the Subordinated Intercompany Indebtedness or the Exit Financing, as applicable, will be read into this Agreement against the Entities of the ABB Group that are parties hereto or any other Entity of the ABB Group. Neither the Entities of the ABB Group that are parties hereto nor any other Entity of the ABB Group will be deemed to owe any fiduciary duties to the Lummus Asbestos PI Trust or any other Entity pursuant to this Section 3.2.

3.3  *Indemnification.*

(a) Subject to the provisions of Section 7.14.2 of the Plan, from and after the Effective Date, the Lummus Asbestos PI Trust shall protect, indemnify, and hold harmless, to the fullest extent permitted by applicable law, the Debtor and each of the Released Parties from and against: (i) any of the Released Claims, to the extent they are channeled to the Lummus Asbestos PI Trust pursuant to the Plan or the Lummus Asbestos PI Channeling

---

[4]  Will identify any ABB Entity that is a creditor of the credit support obligations included in the Subordinated Intercompany Indebtedness.

Injunction; (ii) all Damages relating to Lummus Asbestos PI Trust Claims referred to in the Lummus Asbestos PI Channeling Injunction, to the extent such Lummus Asbestos PI Trust Claims are brought in jurisdictions outside the United States of America or are not otherwise, for any reason, subject to the Lummus Asbestos PI Channeling Injunction; and (iii) any and all Claims that have been or hereafter may be made by any claimant, insurer, or other Person other than the Debtor or a Released Party under the Subject Lummus Insurance Policies and/or any settlement, coverage-in-place, insurance, reinsurance or other agreement relating to any of the Subject Lummus Insurance Policies which has been specifically approved by the Lummus Asbestos PI Trust pursuant to Section 2.3(a). If there shall be pending any claim against the Lummus Asbestos PI Trust for indemnification under this Section 3.3, the Lummus Asbestos PI Trust shall maintain sufficient assets (as determined in good faith by the Trustee) to fund any payments in respect of that claim for indemnification. Any Entity seeking indemnification pursuant to this Section 3.3(a) for any Claim described above shall give the Lummus Asbestos PI Trust reasonably prompt written notice thereof, but in any event not later than 20 days after receipt of notice of such Claim. Such notice by the Entity seeking indemnification will describe the Claim in reasonable detail, will include copies of all available material written evidence thereof and will indicate the estimated amount, if reasonably, estimable, of the Damages that have been or may be sustained by the Entity seeking indemnification. The Lummus Asbestos PI Trust will have the right to participate in, or, by giving written notice to the Entity seeking indemnification, to assume, the defense of any such Claim at the Lummus Asbestos PI Trust's own expense and by the Lummus Asbestos PI Trust's own counsel (which will be reasonably satisfactory to the Entity seeking indemnification), and the Entity seeking indemnification will cooperate in good faith in such defense. If, within 20 days after giving notice of a Claim to the Lummus Asbestos PI Trust, an Entity seeking indemnification receives written notice from the Lummus Asbestos PI Trust that the Lummus Asbestos PI Trust has elected to assume the defense of such Claim as provided herein, the Lummus Asbestos PI Trust will not be liable for any legal expenses subsequently incurred by the Entity seeking indemnification in connection with the defense thereof; provided, however, that if Lummus Asbestos PI Trust fails to take reasonable steps necessary to defend diligently such Claim within ten days after receiving written notice from the Entity seeking indemnification or if the Entity seeking indemnification reasonably believes the Lummus Asbestos PI Trust has failed to take such steps or if the Lummus Asbestos PI Trust has not undertaken fully to indemnify the Entity seeking indemnification in respect of all Damages relating to the matter, the Entity seeking indemnification may assume its own defense, and the Lummus Asbestos PI Trust will be liable for all reasonable costs and expenses paid or incurred in connection therewith; provided, further, that the Lummus Asbestos PI Trust shall not be liable for the costs and expenses of more than one counsel for all indemnified Entities in any one jurisdiction. Without the prior written consent of the Entity seeking indemnification, the Lummus Asbestos PI Trust will not enter into any settlement of any such Claim which would lead to liability or create any financial or other obligation on the part of the Entity seeking indemnification for which the Entity seeking indemnification is not entitled to indemnification hereunder, or which provides for injunctive or other non-monetary relief applicable to the Entity seeking indemnification, or does not include an unconditional release of all Entities seeking indemnification. If a firm offer is made to settle such Claim without leading to liability or the creation of a financial or other obligation on the part of the Entity seeking indemnification for which the Entity seeking indemnification is not entitled to indemnification hereunder and the Lummus Asbestos PI Trust desires to accept and agree to such offer, the Lummus Asbestos PI Trust will give written notice to Entity seeking indemnification to that effect. If the Entity seeking indemnification fails to consent to such firm offer within ten days after its receipt of such notice, the Entity seeking indemnification may continue to contest or defend such Claim and, in such event, the maximum liability of the Lummus Asbestos PI Trust as to such Claim will not exceed the amount of such settlement offer. The Entity seeking indemnification will provide the Lummus Asbestos PI Trust with reasonable access during normal business hours to books, records and employees of the Entity seeking indemnification necessary in connection with the Lummus Asbestos PI Trust's defense of any such Claim that is the subject of a claim for indemnification by an Entity seeking indemnification hereunder. A failure to give timely notice or to include any specified information in any notice provided in this Section 3.3(a) will not affect the rights or obligations of any party hereunder, except and only to the extent that, as a result of such failure, any party which was entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise materially prejudiced as a result of such failure. If any Person waives the protection and benefits offered to it under the Lummus Asbestos PI Channeling Injunction, or fails to avail itself of such protection or benefits, the Lummus Asbestos PI Trust shall not be required to indemnify any Person against any Claim or Damages that would not have been incurred if such waiver or such failure had not occurred. If any person waives the protection and benefits offered to it under the Lummus Asbestos PI Channeling Injunction pursuant to Section 11.2 of the Plan, or fails to avail itself of such protection

and benefits, the Lummus Asbestos PI Trust shall not be required to indemnify any such Person against Claims or Damages that would not have been incurred if such waiver had not been granted or such failure had not occurred.

(b) From and after the Effective Date, the Reorganized Debtor shall protect, indemnify, and hold harmless, to the fullest extent permitted by applicable law, each of the Released Parties from and against any and all Claims or Damages whatsoever arising out of, resulting from or relating to, directly or indirectly any of the Released Claims.

(c) From and after the Effective Date, ABB Holdings shall protect, indemnify, and hold harmless each of the Lummus Asbestos PI Trust and Lummus from and against any and all Claims and Damages whatsoever arising out of, resulting from, or relating directly or indirectly to any liability or responsibility in respect of the Pension Plans (as defined in the Plan). The Reorganized Debtor's obligations under this Section 3.3(b) shall continue for only so long as the Reorganized Debtor remains a subsidiary of ABB Oil & Gas unless the Reorganized Debtor agrees in writing to extend such indemnification obligations past such time.

(d) For the avoidance of doubt, except as set forth in the Plan Documents and Section 3.3(a) herein, the Lummus Asbestos PI Trust shall have no obligation to protect, indemnify, hold harmless, or reimburse any Entity or person, including (i) any Entity in connection with Workers' Compensation Claims, (ii) any Entity in connection with any claims for indemnity or otherwise arising from any executory or non-executory Subject Lummus Insurance Settlement Agreement or Subject Lummus Insurance Policy, except to the extent that a claim arises out of the satisfaction of, or defense against, a Lummus Asbestos PI Trust Claim, or (iii) any Entity in connection with any claims or damages arising under or in respect of any other contract. With respect to Lummus Asbestos PI Trust Claims, anything in the Plan, any Plan Document, the Confirmation Order, the Channeling Injunction or otherwise to the contrary notwithstanding, the releases, exculpatory provisions, injunctions, and indemnifications provided to or afforded any Released Party shall operate and be construed to release, exculpate, benefit, or indemnify such Released Party (subject also to the other limitations set forth in the Plan and Plan Documents) only as to such Lummus Asbestos PI Trust Claims (whether now existing or hereafter arising) based upon the Debtor's direct or indirect liability or alleged liability. For the sake of clarity, Lummus Asbestos PI Trust Claims "based upon the Debtor's direct or indirect liability or alleged liability" include Lummus Asbestos PI Trust Claims (whether now existing or hereafter arising) against any Alstom Protected Party which is (i) a former Affiliate of the Debtor, or (ii) a direct or indirect successor to, or transferee of assets of, the Debtor or a former Affiliate of the Debtor (or against any Entity that, pursuant to the Plan or otherwise after the Effective Date, becomes a direct or indirect transferee of, or successor to, any such Alstom Protected Party or any of the assets of any such Alstom Protected Party (but only to the extent that any such Entity is or may be alleged to be directly or indirectly liable for Lummus Asbestos PI Trust Claims and such liability is asserted to exist as a result of its becoming such a transferee or successor)) in either case to the extent such Lummus Asbestos PI Trust Claims arise as a consequence of the acts, omissions, products, business or operations of an Entity when such Entity was an Affiliate of the Debtor.

3.4    *Injunction Default.*

In the event that the Lummus Asbestos PI Trust determines that an Injunction Default may have occurred, the Lummus Asbestos PI Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Court that an Injunction Default has occurred. Upon entry of an order by the Court finding that an Injunction Default has occurred, the provisions of Section 7.14.2 of the Plan shall apply, in addition to all other remedies at law, in equity, or under any of the Plan Documents.

## ARTICLE 4

## CONDITIONS TO CONSUMMATION OF THE SETTLEMENT

4.1    *Conditions to the Obligations of Each Party and the Effectiveness of the Releases and Indemnities Herein.* The obligation of each party hereto to take the actions contemplated to be taken by that party and the delivery or effectiveness of the releases or indemnities contemplated to be delivered or given by that party under this Agreement are subject to the occurrence of the Effective Date.

4.2    *Conditions to the Obligations of the Debtor.* The obligations of the Debtor with respect to the actions contemplated to be taken by it under this Agreement are subject to, in addition to the condition set forth in Section 4.1, the condition that all the representations and warranties of the Lummus Asbestos PI Trust in this Agreement shall be true and correct as of the Effective Date as though made as of the Effective Date.

4.3    *Conditions to the Obligations of ABB, ABB Holdings and ABB Oil & Gas.* The obligation of ABB, ABB Holdings, and ABB Oil & Gas with respect to the actions contemplated to be taken by them under this Agreement is subject to, in addition to the condition set forth in Section 4.1, the condition that all of the representations and warranties of the

Lummus Asbestos PI Trust in this Agreement shall be true and correct as of the Effective Date as though made as of the Effective Date.

4.4    *Conditions to the Obligations of the Lummus Asbestos PI Trust.* The obligations of the Lummus Asbestos PI Trust with respect to the actions contemplated to be taken by it under this Agreement are subject, in addition to the condition set forth in Section 4.1, the condition that all of the representations and warranties of the Debtor, ABB, ABB Holdings, and ABB Oil & Gas in this Agreement shall be true and correct as of the Effective Date as though made as of the Effective Date. In addition, ABB shall deliver to the Asbestos PI Trust on the Effective Date a written opinion of Swiss counsel, dated as of the Effective Date and in a form reasonably acceptable to the Lummus Asbestos PI Trust, stating that this Agreement and the ABB Guaranty with respect to the Swiss Entities party hereto and thereto have been duly authorized, executed, and delivered, and assuming such agreement is valid and binding under the laws of the State of New York, is enforceable by the Lummus Asbestos PI Trust against ABB under the laws of Switzerland.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

5.1    *Representations and Warranties of the Debtor, ABB, ABB Holdings, and ABB Oil & Gas.* As of the Effective Date, each of the Debtor, ABB, ABB Holdings, and ABB Oil & Gas represents and warrants to the other parties to this Agreement as follows:

(a) *Organization and Qualification.* It is a corporation duly organized, validly existing and, except for ABB (as to which the concept of good standing does not apply because it is a Swiss corporation), in good standing under the laws of its jurisdiction of incorporation, as set forth in the preamble to this Agreement.

(b) *ABB Holdings.* ABB Holdings is the successor in interest by merger to Asea Brown Boveri.

(c) *ABB Oil & Gas.* ABB Oil & Gas is the direct parent of Lummus and the sole holder of Capital Stock of Lummus.

(d) *Authority.* It has the requisite corporate power and authority to enter into this Agreement and, subject to the conditions set forth herein, to consummate the settlement contemplated hereby. The execution and delivery by it of this Agreement have been duly authorized by all necessary corporate action on its part.

(e) *Enforceability.* This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with the terms hereof, except as that enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally.

5.2    *Representations and Warranties of the Lummus Asbestos PI Trust.* The Lummus Asbestos PI Trust represents and warrants to the other parties to this Agreement as follows:

(a) *Authority.* It has all requisite power and authority to enter into this Agreement and, subject to the conditions set forth herein, to consummate the settlement contemplated hereby. The execution and delivery of this Agreement by it have been duly authorized by all necessary action on its part.

(b) *Enforceability.* This Agreement has been executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with the terms hereof, except as that enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

## ARTICLE 6

## COVENANTS

6.1    *Issuance of Voting Securities by Lummus.* Lummus shall not issue any additional shares of Capital Stock or securities exercisable, convertible or exchangeable into or for shares of Lummus Capital Stock unless upon such issuance at least 51% of such shares of Capital Stock or securities exercisable, convertible or exchangeable into or for shares of Lummus Capital Stock are pledged to the Lummus Asbestos PI Trust pursuant to and in accordance with the Pledge and Irrevocable Proxy and such shares are subject to the terms and provisions thereof.

6.2    *Books and Records.* None of the Debtor, the Reorganized Debtor, ABB Holdings or ABB Oil & Gas shall sell or transfer any of its Asbestos Books unless, prior to such sale or transfer, the purchaser or transferee of the Asbestos Books

agrees in writing to grant the Lummus Asbestos PI Trust and its Representatives the same rights they have with respect to such Asbestos Books pursuant to the Plan.

6.3    *Assignment of Asbestos Insurance Actions.* The Reorganized Debtor shall not assign any Asbestos Insurance Actions related to the Subject Lummus Insurance Policies without the prior written approval of the Lummus Asbestos PI Trust, which approval shall not be unreasonably withheld.

## ARTICLE 7

## GENERAL PROVISIONS

7.1    *Binding Effect; Assignment; Third Party Beneficiaries.* The Plan shall provide that this Agreement is binding on the parties hereto. This Agreement and the rights of the parties hereunder may not be assigned (by operation of law or otherwise) and will be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that no transfer or assignment shall release any party of its obligations hereunder. This Agreement is not intended, and shall not be construed, deemed, or interpreted, to confer on any Entity not a party hereto any rights or remedies hereunder, except as otherwise provided expressly herein.

7.2    *Entire Agreement; Amendment; Waivers.* This Agreement and the other Plan Documents shall constitute the entire agreement and understanding among the parties to this Agreement with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, among the parties hereto relating to the subject matter of this Agreement. This Agreement may not be amended or modified, and no provision hereof may be waived, except by an agreement in writing signed by the party against whom enforcement of any such amendment, modification, or waiver is sought. The waiver of any of the terms and conditions hereof shall not be construed or interpreted as, or deemed to be, a waiver of any other term or condition hereof.

7.3    *Termination of This Agreement.*

(a) This Agreement may be terminated at any time prior to the Effective Date solely by:

(i) the mutual written consent of the parties hereto; or

(ii) any party hereto if the Effective Date shall not have occurred by December 31, 2006.

(b) If this Agreement is terminated under Section 7.3(a), there shall be no liability or obligation under this Agreement on the part of any party hereto.

7.4    *No Admissions.* This Agreement does not constitute, and shall not be construed, interpreted or otherwise read to constitute any admission by any of the Debtor or the Released Parties with respect to any alleged asbestos-related liabilities attributable to the business or operations of Lummus or its respective predecessors.

7.5    *Notices.* All notices required or permitted under this Agreement must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by facsimile or courier service, when actually received by the party to whom notice is sent or (ii) except for notices to ABB, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 7.5):

(A) *If to the Debtor:*

ABB Lummus Global Inc.
310 Briarpark
Houston, TX 77042

Attn: V.P. Controller/ Chief Financial Officer
Facsimile: (713) 821-3595

with a copy (which will not constitute notice for purposes of this Agreement) to:

Kirkpatrick & Lockhart Nicholson Graham LLP
599 Lexington Avenue
New York, NY 10022-6030

Attn: Jeffrey Rich, Esq.
Facsimile: (212) 536-3901

(B) *If to ABB*:

ABB Ltd
Affolternstrasse 44
CH-8050 Zurich
Switzerland

Attn: General Counsel/Chief Financial Officer
Facsimile: (41) 43-317-79-92

with a copy (which shall not constitute notice for purposes of this Agreement) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675

Attn: Theodore L. Freedman, Esq.
Facsimile: (212) 446-4900

(C) *If to ABB Holdings*:

ABB Holdings Inc.
501 Merritt 7
P.O. Box 5308
Norwalk, CT 06856-5308

Attn: General Counsel/Chief Financial Officer
Facsimile: (203) 750-2447

with a copy (which shall not constitute notice for purposes of this Agreement) to:

Kirkland & Ellis LLP
Citicorp Center
153 E. 53rd Street
New York, NY 10022-4675

Attn: Theodore L. Freedman, Esq.
Facsimile: (212) 446-4900

(D) *If to the trustee of the Lummus Asbestos PI Trust*:

[to be added]

with a copy (which shall not constitute notice for purposes of this Agreement) to:

[to be added]

(F) *If to the Lummus FCR*:

Law Offices of Richard B. Schiro
Regency Plaza, Suite 1350
3710 Rawlins Street
Dallas, TX 75219

Attn: Richard B. Schiro, Esq.
Facsimile: (214) 521-3838

with a copy (which shall not constitute notice for purposes of this Agreement) to:

Porter & Hedges, L.L.P.
1000 Main Street
36th Floor
Houston, TX 77002

Attn: John F. Higgins, Esq.
Facsimile: (713) 226-6248

(G) If to the ACC (if appointed)

**[to be added]**

with a copy (which shall not constitute notice for purposes of this Agreement) to:

**[to be added]**

(H) *If to the Lummus Asbestos PI Trust Advisory Committee*:

**[to be added]**

with a copy (which shall not constitute notice for purposes of this Agreement) to:

**[to be added]**

7.6    *Governing Law; Jurisdiction.*

(a) This Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to claims under this Agreement other than claims against ABB, each party (other than ABB) hereby irrevocably (i) submits to the exclusive jurisdiction of the Court; *provided, that* to the extent that the Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then each party (other than ABB) hereby submits to the exclusive jurisdiction of the federal and state courts in New York, New York and (ii) agrees that any and all claims in respect of such action, suit, or proceeding may be heard and determined in any such court. With respect to claims under this Agreement against ABB, all such claims shall be resolved exclusively by the Commercial Court of Zurich (*Handelsgericht das Kantons Zürich*), except to such extent that ABB has waived in the ABB Guaranty or may in the future waive its right to the exclusive jurisdiction of the Swiss court and explicitly elect or consent to the jurisdiction of the Court; *provided, that* to the extent that the Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then to the extent that ABB explicitly elects or consents to the jurisdiction of the federal and state courts in New York, New York.

7.7    *Exercise of Rights and Remedies.* Except as this Agreement otherwise provides, no delay or omission in the exercise of any right, power or remedy accruing to any party hereto as a result of any breach or default hereunder by any other party hereto will impair any such right, power or remedy, nor will it be construed, deemed or interpreted as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor will any waiver of any single breach or default be construed, deemed or interpreted as a waiver of any other breach or default hereunder occurring before or after that waiver. No right, remedy, or election any term of this Agreement gives will be deemed exclusive, but each will be cumulative with all other rights, remedies, and elections available at law or in equity.

7.8    *Further Assurances.* From and after the Effective Date, each party hereto will use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable laws, and execute and deliver such documents and other papers as may be required to carry out the provisions of this Agreement and to consummate, perform, and make effective the settlement contemplated hereby. Without limiting the generality of the foregoing, on or after the Effective Date, (i) each of ABB and ABB Holdings will, and each will cause its Subsidiaries to, execute and deliver such additional documents as any of the Debtor or the Lummus Asbestos PI Trust may reasonably request, and (ii) each of the Debtor and the Lummus Asbestos PI Trust will execute and deliver such additional documents as ABB or ABB Holdings may reasonably request, in each case in order to fully implement and effectuate the terms and provisions of this Agreement.

7.9  *Reformation and Severability.* If any provision of this Agreement is invalid, illegal, or unenforceable, that provision will, to the extent possible, be modified in such manner as to be valid, legal, and enforceable but so as to most nearly retain the intent of the parties hereto as expressed herein, and if such a modification is not possible, that provision will be severed from this Agreement, and in either case the validity, legality, and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby, it being intended by each party hereto that all the rights and privileges of all parties hereto will be enforceable to the fullest extent permitted by applicable law.

7.10  *Counterparts.* This Agreement may be executed in multiple counterparts, each of which will be an original, but all of which together will constitute one and the same agreement.

\* \* \* \* \*

[signature page to follow]

IN WITNESS WHEREOF, the parties hereto have executed this ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) as of the date first above written:

**ABB LTD**                                          **ABB HOLDINGS INC.**

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

**ABB LUMMUS GLOBAL INC.**                **ABB OIL & GAS USA, INC.**

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

**THE LUMMUS ASBESTOS PI TRUST (by its Trustee)**    **THE LUMMUS FCR**

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

**Exhibit A to the ABB and Non-Debtor Affiliate**
**Settlement Agreement (Lummus)**

**Promissory Note**

**PROMISSORY NOTE**

**$33,000,000**                                                            **Dated:**

FOR VALUE RECEIVED, the undersigned, ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), hereby promises to pay to the **ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST**, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.) (the "*Bankruptcy Code*"), the principal amount of **THIRTY THREE MILLION DOLLARS ($33,000,000)** (which amount shall accrue interest as described in Section 1.5 herein) on the dates and in the manner and subject to the conditions set forth in this Promissory Note (this "*Note*"). All dollar amounts specified in this Note are denominated in Dollars. Certain capitalized terms used herein are defined in Section 3.16 of this Note, and capitalized terms used herein without definition shall have the meanings given to those terms in the Glossary.

This Note is being issued pursuant to the Plan and the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), as modified from time to time (the "*Settlement Agreement*") among ABB, ABB Holdings, Maker, [ABB Oil & Gas][1], the Lummus FCR, and the Lummus Asbestos PI Trust, and is the Lummus Note. This Note and the obligations represented hereby are effective as of the Effective Date.

1.  *Payments.*

    1.1.  *Payments.* The Maker shall pay to the Permitted Holder an aggregate amount of **THIRTY THREE MILLION DOLLARS ($33,000,000)**, in thirteen installments of principal on the dates (each such date, an "*Payment Date*") and in the amounts set forth on Exhibit A attached hereto.

    1.2.  *Method of Payment.* The Maker shall pay, or cause to be paid, all amounts due hereunder in Dollars, by wire transfer of immediately available funds, to the account set forth in Section 3.6 hereof, or such other account designated in writing for such payments by the Permitted Holder from time to time in accordance with Section 3.6 hereof.

    1.3.  *Mandatory Prepayments.*

        (a) On each Mandatory Prepayment Date, if any (and with respect to Net Proceeds, if any, received prior to the Effective Date, within ten (10) Business Days after the Effective Date):

            (i) in respect of an Asset Sale other than a Complete Asset Disposition, the Maker will make a payment to the Permitted Holder, on account of principal and interest hereunder, in an amount equal to the lesser of (i) such Net Proceeds, or (ii) the principal amount of this Note outstanding plus the amount of interest accrued and unpaid as of such Mandatory Prepayment Date; *provided, however,* that no amounts will be due and payable to the Permitted Holder in respect of, at the Maker's election from time to time, up to an aggregate of $25,000,000 of Net Proceeds of Asset Sales; and

            (ii) in respect of any Stock Disposition or Complete Asset Disposition the Maker will make a payment to the Permitted Holder in cash in an amount equal to the outstanding amount of principal of this Note and interest accrued and unpaid as of such Mandatory Prepayment Date;

        (each such payment set forth in this Section 1.3(a), a "*Mandatory Prepayment*"). Together with the payment of each Mandatory Prepayment, Lummus will deliver to the Permitted Holder pursuant to Section 3.6 hereof, a Notice of Transaction.

---

[1]    ABB Oil and Gas is scheduled to be merged into ABB Holdings Inc. during the third or fourth quarter of 2005, with ABB Holdings Inc. as the surviving entity. References to ABB Oil and Gas may have to be updated accordingly.
EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

        (b) For purposes of Section 1.3(a), (A) Net Proceeds (other than Cash Equivalents) will be deemed "received" on the Business Day when such Net Proceeds first are credited as immediately available funds in the bank account of the Entity of the ABB Group that is the first recipient thereof or any designee of such Entity, and (B) Cash Equivalents issued or required to be issued by a purchaser pursuant to or in connection with the terms of any Asset Sale or Stock Disposition shall be deemed to have been "received" on the date of closing of the relevant Asset Sale or Stock Disposition.

(c) If prior to delivering a Notice of Transaction in respect of an Asset Sale other than a Complete Asset Disposition, the Maker is not able to determine the actual amount of Net Proceeds due to insufficient information as to the amount of the Transaction Costs, the Maker shall estimate the amount of the Transaction Costs in good faith based on the information available to it at such time, and the corresponding Mandatory Prepayment shall be paid based on such good faith estimate. Reasonably promptly after becoming aware of reasonably sufficient information to determine the definitive amount of Transaction Cost, any shortfall in the corresponding Mandatory Prepayment shall be paid to the Permitted Holder.

(d) Mandatory Prepayments will be applied first to repayment of any accrued and unpaid interest, and then to repayment of outstanding principal to be applied in inverse order of maturity, in each case as of the applicable Mandatory Prepayment Date.

1.4.    *Optional Prepayments*. The Maker (and any Permitted Payor) may prepay, without premium or penalty, the unpaid principal amount of this Note from time to time (the date of such prepayment, an "*Optional Prepayment Date*"), in whole or in part (any such voluntary prepayment, an "*Optional Prepayment*") by paying to the Permitted Holder the principal amount (applied in inverse order of maturity) the Maker intends to prepay plus all interest accrued and unpaid as of the relevant Optional Prepayment Date.

1.5.    *Interest*. The outstanding principal amount of this Note will accrue interest at a rate equal to six percent (6%) *per annum*, and such interest shall be payable in arrears on the date of each Mandatory Prepayment Date as set forth in Section 1.3, on each Optional Prepayment Date as set forth in Section 1.4, on each Payment Date, and upon final maturity (whether at scheduled maturity, by acceleration or otherwise). Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of this Note and all unpaid interest will accrue interest at eight percent (8%) *per annum* (the "*Default Rate*"). During the continuance of an Event of Default, interest payable at the Default Rate shall be payable on demand. All interest shall be calculated on the basis of a 365-day year, or a 366-day year, as the case may be, for the number of days actually elapsed.

1.6.    *Payments by Permitted Payor*. The Maker's obligation to pay all or any portion of any amounts under this Note may be satisfied by direct payment of such amounts by a Permitted Payor. To the extent any amount due hereunder is paid timely by a Permitted Payor, the Maker's obligation to pay such amount shall be deemed satisfied, and no Event of Default shall occur hereunder to the extent of the amount so timely paid.

1.7.    *Reinstatement*. To the extent that the Maker or any Permitted Payor makes a payment or payments to the Permitted Holder pursuant to this Note or the Permitted Holder receives any amounts of collateral (if any), securing this Note on account of amounts due hereunder, which payments or proceeds, or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the amount of such payment and proceeds, the part of this Note which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

1.8.    *Cash Disposition*. Except with the prior written consent of the Permitted Holder, Lummus will not accept and will not permit any Subsidiary of Lummus to accept any consideration other than cash or Cash Equivalents in connection with any Asset Sale other than a Complete Asset Disposition.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

2.  *Events of Default: Remedies Upon Default*.

2.1.    *Event of Default*. For purposes of this Note, an "Event of Default" shall be deemed to have occurred if:

(i) Any amount owed by the Maker pursuant to the terms of Section 1.1, 1.3(a) or 1.5 of this Note is not paid on the due date therefor, which amount continues unpaid for ten (10) days after such due date;

(ii) an Injunction Default shall have been deemed to have occurred pursuant to Section 7.14.2 of the Plan solely with respect to a failure by the Maker to make any payments required to be made pursuant to Section 2.2 of the Settlement Agreement;

(iii) any material representation or warranty contained in this Note, the Settlement Agreement, any Guaranty or the Pledge and Irrevocable Proxy proves to have been incorrect in any material respect when made or deemed made

and the principal and accrued interest on this Note has not been paid within 20 days after receipt of written notice of such error from the Permitted Holder.

(iv) the occurrence and continuation beyond any applicable grace period of any event of default in the payment when due on final maturity of any indebtedness for borrowed money of the Maker, any Subsidiary of the Maker, or any Guarantor (other than indebtedness for borrowed money pursuant to this Note, any Guaranty or the Pledge and Irrevocable Proxy), resulting in the acceleration of any such indebtedness of the Maker, any Subsidiary of the Maker, or any Guarantor; *provided, however*, that the aggregate principal amount of any such indebtedness for borrowed money exceeds $50,000,000;

(v) a Guaranty (A) ceases for any reason, or is asserted by the Maker or the Guarantors to have ceased, to be in full force and effect and enforceable in each case in accordance with its terms, for any reason whatsoever, or (B) any Guarantor shall in writing contest or deny the validity or enforceability of its obligations under a Guaranty; *provided, however*, that no Event of Default shall occur pursuant to this Section 2.1(v) to the extent that (A) or (B) above occur as a result of a Guarantor merging with or into, selling all or substantially all of its assets to, reorganizing, or otherwise consolidating with another Entity as explicitly permitted, and in compliance with the terms of, the applicable Guaranty, or such Guaranty ceasing to be in full force and effect otherwise in accordance with its terms or with the prior written consent of the Permitted Holder;

(vi) the entry of a decree or order by a court having jurisdiction in the premises (i) for relief in respect of the Maker or any Guarantor in an involuntary case or proceeding under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency, reorganization or other similar law or (ii) adjudging the Maker or any Guarantor bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment or composition of the Maker or any Guarantor under the Bankruptcy Code or any applicable federal or state law, or appointing under any such law a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Maker or any Guarantor or of all or substantially all of its assets, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 90 consecutive days; or

(vii) the commencement by the Maker or any Guarantor of a voluntary case or proceeding under the Bankruptcy Code or any applicable bankruptcy, insolvency, reorganization or similar law or any other case or proceeding to be adjudicated bankrupt or insolvent, or the consent by the Maker or any Guarantor to the entry of a decree or order for relief in respect thereof in an involuntary case or proceeding under the Bankruptcy Code or any applicable bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by the Maker or any Guarantor of a petition or consent seeking reorganization or relief under any applicable federal or state law, or the consent by it under any such law to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of any of the Maker or any Guarantor or all or substantially all of its assets, or the making by it of

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

an assignment for the benefit of creditors under any such federal or state law, or the admission by it in writing of its inability to pay its debts generally as they become due or the taking of corporate action by the Maker or any Guarantor in furtherance of any such action; or

(viii) to the extent not otherwise provided for under clauses (i) through (vii) of this Section 2.1, the Maker, a Guarantor, **[ABB Oil and Gas]**[2], or the relevant ABB Group Entity violates or fails to perform or observe any covenant, term or condition of this Note, a Guaranty, the Pledge and Irrevocable Proxy or the Settlement Agreement, as applicable in each case, which remains unremedied for a period of forty (40) days after receipt of written notice thereof sent by Permitted Holder to the Maker and the Guarantors.

2.2.    *Remedies Upon Default.* If an Event of Default has occurred and is continuing:

(i) all payments provided for under Section 1.1 and 1.5 hereof shall become immediately due and payable on the twentieth (20th) day after written demand by the Permitted Holder of this Note has been given to the Maker, the Guarantors and the Pledgor; *provided, however*, that (A) with respect to Section 2.1(v), if a replacement guaranty by an Entity reasonably satisfactory to the Permitted Holder has been provided before the end of such twentieth day, no amounts shall become due and payable hereunder and no Event of Default shall be deemed to have occurred; and (B) upon the occurrence of an Event of Default specified under Section 2.1(vi) or Section 2.1(vii), such payments will automatically be due and payable.

(ii) the Permitted Holder may take any action, at law or in equity, as the Permitted Holder deems appropriate, necessary or desirable to collect amounts then due or thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Maker under this Note;

(iii) the Permitted Holder may set-off against the principal and interest owed pursuant to this Note any cash or other funds of the Maker held by the Permitted Holder; or

(iv) the Permitted Holder of this Note shall be entitled to recover promptly upon demand by the Permitted Holder all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its representatives in connection with the enforcement of this Note or the taking of any actions or the exercise of remedies (whether by law or in equity) to collect on this Note and any indebtedness evidenced hereby, or the taking of any actions or the exercise of remedies to collect on any obligations of a Maker hereunder; and

(v) the outstanding principal amount of this Note and all past due interest under this Note shall accrue interest at the Default Rate until all past due amounts are paid in full to the Permitted Holder.

2.3.    *Injunction Default.* If at any time the Permitted Holder asserts that the Maker has failed to make a payment pursuant to Section 1.3, 1.5 or 2.2 of this Note, which assertion is disputed by the Maker in good faith, then notwithstanding anything else in this Note, the payment of the disputed amount will not be due hereunder (and no Injunction Default will be deemed to have occurred as a result of the failure to make payment of such disputed amount) unless and until (i) the Permitted Holder and Maker agree that such disputed amount, or any portion thereof, is due, or (ii) the Permitted Holder's Claim with respect to such disputed amount is decided by a Final Order of a court acting pursuant to Section 3.12 of this Note against the Maker (the amount, if any, agreed upon by the Permitted Holder and the Maker or determined by such court or arbitrator to be due and payable to the Permitted Holder in respect of such dispute pursuant to a Final Order, as applicable, the "*Disputed Payment*") in which event (A) such Disputed Payment will be deemed due and payable for all purposes only ten (10) days after the relevant order became a Final Order of such court or arbitrator, or after resolution of such dispute by agreement of the Permitted Holder and the Maker, as applicable; and (B) interest at the Default Rate shall accrue on the Disputed Payment from the date such Disputed Payment was originally due pursuant to this Note without

---

²     To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

regard to any dispute (as agreed by the parties or as determined by the Final Order of a court) until such Disputed Payment together with interest at the Default Rate is paid in full. For the avoidance of doubt, no Injunction Default will be deemed to have occurred as a result of the failure to make a payment in respect of a disputed amount, unless and until the corresponding Disputed Payment remains unpaid on the date set forth in (A) above.

2.4.    *Limitation on Injunction Default.* An Event of Default pursuant to this Note will not cause or be the basis for an Injunction Default pursuant to the Plan if at the time such Event of Default has occurred the Lummus Asbestos PI Trust is not the Permitted Holder.

3.    *Miscellaneous.*

3.1.    *Representations and Warranties of the Maker.* The Maker represents and warrants, as of the Effective Date, that:

(a) The execution and delivery of this Note has been duly authorized by all necessary corporate action on the part of the Maker and this Note has been duly executed and delivered by the Maker.

(b) This Note is a legal, valid and binding obligation of the Maker, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Maker of this Note does not conflict with, result in a breach of any of the provisions of, or constitute an event of default under, the certificate of incorporation or the by-laws, of the Maker, or any material contract by which the Maker is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Maker.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over such Maker is required for the execution and delivery of this Note, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

3.2.    *Payments.*

(a) All payments to be made by the Maker hereunder shall be made in Dollars by wire transfer of immediately available funds to the Permitted Holder, in accordance with such wire transfer instructions that are provided pursuant to Section 3.6 by the Permitted Holder from time to time. Upon request by the Permitted Holder, the Maker shall provide, or cause to be provided, the Federal Reserve Bank wire reference numbers and other wire information related to any payments hereunder.

(b) All payments by the Maker hereunder shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes.

(c) Whenever any payment to be made under this Note shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(d) The obligations hereunder or in respect of any payments contemplated hereby shall, notwithstanding the rate of exchange actually applied in rendering such conversion, be discharged only in the amount of Dollars in fact received by the Permitted Holder.

3.3.    *Calculation of Foreign Currency Net Proceeds; Allocation of Proceeds.*

(a) If any cash proceeds are received, or Transaction Costs are incurred, in respect of any Asset Sale by any Entity of the ABB Group in any currency other than Dollars (the "foreign currency"), the value of such cash proceeds or Transaction Costs in Dollars shall be (i) if the relevant Entity of the ABB Group converts such foreign currency into Dollars in accordance with its normal banking and cash management procedures,

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

the actual amount of Dollars received by such Entity, or (ii) determined by applying the applicable "noon buying rate" in New York City, New York for cable transfers in foreign currencies as certified for customs purposes by the Federal Reserve Bank of New York on the first Business Day following receipt of the Net Proceeds in respect of the underlying Asset Sale.

(b) If proceeds are received by any Entity of the ABB Group (or any Entity designated by any Entity of the ABB Group) from a transaction in which that Entity concurrently undertakes an Asset Sale and a sale of other assets, the amount of the proceeds of such transaction to be allocated to such Asset Sale shall be (A) the value assigned to the Asset Sale in good faith by the parties to the corresponding transaction in the underlying transaction documents or, (B) if no such value has been assigned, such fair market value of the assets sold in such transaction, as is determined reasonably and in good faith by the Board of Directors or other similar governing body of the Entity of the ABB Group that is the selling party in such transaction.

3.4.    *Ranking.* The Permitted Holder shall be entitled to priority of payment with respect to the Subordinated Intercompany Indebtedness and the Exit Financing to the extent set forth in Section 3.2 of the Settlement Agreement.

3.5.    *Cancellation Upon Payment in Full.* Promptly upon payment in full of all amounts owed to the Permitted Holder hereunder, the Permitted Holder shall return this Note to the Maker marked "cancelled" and shall otherwise execute and deliver all such documents as reasonably requested by Maker to fully document the payment of all obligations hereunder.

3.6.    *Notices.* All notices required or permitted under this Note must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Services, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 3.6); provided that to be effective any notice to a Guarantor hereunder must also be given to ABB Ltd:

**If to Permitted Holder:**
ABB Lummus Global Inc. 524(g)    *With copies to, which shall not constitute notice:*
Asbestos PI Trust:

Attn: Facsimile:

Attn: _____

Facsimile:_____

**[Insert Permitted Holder's wire info]**

**If to the Maker:**
ABB Lummus Global Inc.          *For each notice to the Maker, with copies to, the*    ABB Ltd
3010 Briarpark Drive            *Guarantors and the Pledgor which shall not*       Affolternstrasse 44
Houston, TX 77042               *constitute notice:*                               CH-8050 Zürich
Attn: V.P. Controller/                                                            Switzerland
    Chief Financial Officer                                   Attn: General Counsel/
Facsimile: (713) 821-1395                                                             Chief Financial Officer
*(if sending overnight packages use*                                             Facsimile: (41) 43-317-79-92
*zip code 06851)*

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

If to the Guarantor ABB Holdings, Inc.          If to Guarantor **[ABB Oil and Gas, Inc.]**[3]
ABB Holdings Inc.,                              ABB Oil and Gas, Inc.
501 Merritt 7, 6th Floor                       501 Merritt 7, 6th Floor
Norwalk, CT 06856-5308                         Norwalk, CT 06856-5308
Attn: General Counsel/                         Attn: General Counsel/
    Chief Financial Officer       Chief Financial Officer
Facsimile: (203) 750-2307                      Facsimile: (203) 750-2307
*(if sending overnight packages use zip code*  *(if sending overnight packages use zip code*
*06851)*                                        *06851)*

If to the Guarantor ABB Ltd.
ABB Ltd
Affolternstrasse 44
CH-8050 Zürich
Switzerland
Attn: General Counsel/
    Chief Financial Officer
Facsimile: (41) 43-317-79-92

If to the Guarantor ABB Asea Brown Boveri
Ltd.
ABB Asea Brown Boveri Ltd.
Affolternstrasse 44
CH-8050 Zürich
Switzerland
Attn: Chief Financial Officer
Facsimile: (41) 43-317-79-92

If to Pledgor **[ABB Oil and Gas, Inc.]**[4]
501 Merritt 7, 6th Floor
Norwalk, CT 06856-5308
Attn: General Counsel/
    Chief Financial Officer
Facsimile: (203) 750-2307
*(if sending overnight packages use zip code*

*06851)*

Kirkpatrick & Lockhart
Nicholson Graham LLP
599 Lexington Avenue
New York, New York 10022-6030
Attn: Jeffrey Rich
Facsimile: (212) 536-3901

---

³   To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

⁴   To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

Kirkland & Ellis LLP
Citicorp Center
153 E. 53rd Street
New York, NY 10022-4675
Attn: Theodore L. Freedman
Facsimile: (212) 446-4900

3.7.   *Waiver of Presentment, etc.* The Maker hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note. The Maker hereby waives the pleading of any statute of limitations as a defense to any demand hereunder against such Maker.

3.8.   *Waivers.* No delay on the part of the Permitted Holder in exercising any right or remedy under this Note or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy.

3.9.   *Captions.* The captions of the sections and subsections of this Note have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Note.

3.10.   *Severability.* If any term of this Note shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of all other terms hereof shall in no way be affected thereby.

3.11.   *Binding Nature.* This Note shall be binding upon the Maker and its successors and permitted assigns and shall inure to the benefit of the Permitted Holder, and its successors and permitted assigns.

3.12.   *Governing Law; Jurisdiction.*

(i) This Note and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(ii) With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Note (such claims, suits, actions, proceedings, and other disputes, the *"Claims"*) the Maker and the Permitted Holder hereby irrevocably submit to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the *"Courts"*), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

(iii) Subject to the preceding paragraph, the Permitted Holder and the Maker hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

(iv) The Maker and the Permitted Holder agree that venue shall be proper in such courts and hereby waive any objection or defense which either may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens.* The Maker and the Permitted Holder hereby agree that all

process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

3.13.   *No Modification Except in Writing*. Neither this Note nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by both parties hereto, and then only to the extent set forth in such instrument.

3.14.   *Gender/Number*. As used in this Note, the masculine shall include the feminine and neuter and vice versa; the singular shall include the plural and the plural shall include the singular, as the context may require.

3.15.   *Transferability and Assignment*.

(a) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign nor transfer any of its rights or obligations under this Note without the prior written consent of the Maker (such consent not to be unreasonably withheld, conditioned or delayed); *provided, however*, that (A) the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, shall under no circumstance (excluding upon the occurrence and during the continuance of an Event of Default) be permitted to assign or transfer less than all of its rights and obligations under this Note, and any assignment must be made in compliance with federal, state and other securities laws, (B) following any assignment or transfer by the Lummus Asbestos PI Trust, no failure by the Maker or a Guarantor to perform any of its obligations under this Note shall cause or be the basis for an Injunction Default; and (C) the consent of the Maker shall not be required for any assignment or transfer consummated during the continuance of an Event of Default.

(b) The Maker may not assign or transfer its rights or obligations under this Note without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned or denied by the Permitted Holder in its sole and absolute discretion.

(c) Notwithstanding the preceding paragraph (b), however, neither such paragraph nor anything else in this Note shall restrict at any time the ability of the Maker to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which, immediately following such transaction, is directly or indirectly a Wholly Owned Subsidiary of ABB, provided, however, that, unless the Permitted Holder consents otherwise in writing (i) immediately after such transaction the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Maker have been transferred) shall be an Entity formed or organized under the laws of the United States or a state thereof; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Maker; (iii) no Event of Default and no event which, with the giving of notice or the passage of time, would constitute an Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute an event of default under, the certificate of incorporation or the by-laws of the Maker or such surviving or succeeding Entity is bound or any other material agreement or material contract by which the Maker or such surviving or succeeding Entity or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) consummation of such transaction shall not materially impair the Maker's ability to perform pursuant to this Note; (vi) at least 10 days prior to consummation of such transaction, such Maker shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vi) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, chief financial officer, treasurer or controller of such Entity, to the effect that such officer has reviewed this Note for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 3.15(c) and is being undertaken for a valid business purpose.

(d) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation, as applicable, the surviving or succeeding Entity shall (i) by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the

Maker hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Maker hereunder, with the same effect as if it had been originally named herein; provided however, that the Maker shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Note; and (ii) cause the owner of at least 51% of its Capital Stock to pledge such Capital Stock to the Permitted Holder on substantially the same terms as those contained in the Pledge and Irrevocable Proxy and will cause each of the Guarantors to acknowledge in writing in form and substance reasonably satisfactory to the Permitted Holder, that such transaction will not affect such Guarantor's obligations under the applicable Guaranty.

(e) The Maker shall be responsible for and shall pay promptly upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Maker pursuant to Section 3.15 (whether or not such transaction is in fact consummated).

(f) Maker shall maintain a register on which it records the name and address of the Permitted Holder.

(g) Any assignment in breach of this Section 3.15 shall be null and void, and shall not transfer any interest in this Note to any other Entity.

3.16.    *Definitions.* The following capitalized terms used herein shall have the meanings set forth below:

"*ABB*" means ABB Ltd, a corporation formed under the laws of Switzerland.

"*ABB Group*" means ABB and its Subsidiaries from time to time.

"*ABB Holdings*" means ABB Holdings Inc., a Delaware corporation.

"**[ABB Oil and Gas]**⁵" means ABB Oil and Gas USA Inc., a Delaware corporation.

"*Asset Sale*" means any sale or other disposition of any assets of Lummus or any of its Subsidiaries occurring after March 15, 2005, other than a sale or disposition of assets (i) in the Lummus Ordinary Course of Business or (ii) exclusively to Lummus or any Subsidiary of Lummus.

"*Assumed Debt*" means, in respect of an Asset Sale, the aggregate amount of any indebtedness for borrowed money plus the fair value of any liabilities (whether contingent or otherwise) in respect of letters of credit or credit support arrangements owed by any Entity of the ABB Group and assumed by a purchaser (or any Entity as designee of such purchaser) in connection with such Asset Sale.

"*Business Day*" means any day excluding Saturday, Sunday or a federal holiday in the United States or a holiday in the State of New York.

"*Capital Stock*" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock or similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of common stock or similar equity ownership interest.

"*Cash Equivalents*" means, in respect of an Asset Sale, any note or other instrument or agreement pursuant to which a buyer is obligated to make one or more deferred payments in cash of all or a portion of the purchase price relating to such Asset Sale.

"*Claim*" has the meaning set forth in Section 3.12(ii) hereof.

---

⁵    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

"*Complete Asset Disposition*" means an Asset Sale of all or substantially all of the then remaining assets of Lummus or its Subsidiaries.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Court*" has the meaning set forth in Section 3.12(ii) hereof.

"*Default Rate*" has the meaning set forth in Section 1.4 hereof.

"*Disputed Payment*" has the meaning set forth in Section 2.3 hereof.

"*Dollars*" means the lawful currency of the United States of America.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Event of Default*" has the meaning set forth in Section 2.1 hereof.

"*Exit Financing*" [to come][6]

---

[6]    "Exit Financing" will be defined as an amount to be equal to the amount of any financing (whether for borrowed money or credit support), provided by any Entity (including any Entity of the ABB Group) to Lummus and any Subsidiaries of Lummus, on or after the "Effective Date" of the Lummus plan of reorganization pursuant to one or more "exit" financing facilities and including any refinancing, amendment or modification thereof.

   Such financing facilities will be unsecured and in an aggregate amount determined by Lummus, which amount, if so determined by Lummus, may be at least equal to the sum of (A) the Pre-petition Short-Term Working Capital Financing; (B) any financing (whether for borrowed money or credit support) provided to Lummus and any Subsidiaries of Lummus on or after the Petition Date pursuant to a debtor-in-possession credit facility under §364 of the Bankruptcy Code; and (C) any additional financing requirements (whether for borrowed money or credit support) of Lummus and any Subsidiaries of the Lummus on and after the Effective Date of the Lummus plan of reorganization. Whether the Exit Financing is provided by an Entity of the ABB Group or by another Entity, the terms and conditions thereof shall include subordination provisions identical in all material respects with the terms set forth in Section 3.2 of the Settlement Agreement.

   For purposes of the Exit Financing, "Pre-petition Short-Term Working Capital Financing" means the indebtedness (whether for borrowed money or credit support) for principal, interest and other fees, costs and expenses outstanding as of the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus, for advances or loans made by any Entity of the ABB Group to Lummus and its Subsidiaries between the close of business of the thirty-first (31st) consecutive calendar day prior to the Petition Date (the "*Cutoff Date*") and the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus.

   For the sake of clarity, "Pre-petition Working Capital" shall include all contingent obligations of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support provided to Lummus or its Subsidiaries incurred between the Cutoff Date and the moment in time immediately prior to the filing for relief pursuant to Chapter 11 by Lummus, but shall not include obligations (contingent or otherwise) of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support obligations created or incurred prior to the Cutoff Date.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

"*Final Order*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc.

"*Guaranty*" means the guarantee of payment obligations of the Lummus Note of ABB, ABB Holdings and **[ABB Oil and Gas]'**.

"*Guarantors*" means ABB Holdings, **[ABB Oil and Gas]**[8] and ABB.

"*Indirect Stock Disposition*" means the consummation of a transaction, the result of which is that the Maker ceases to be, directly or indirectly, a Wholly-Owned Subsidiary of ABB.

"*Injunction Default*" has the meaning set forth in the Glossary.

"*Lummus Asbestos PI Trust*" has the meaning set forth in the preamble hereof.

"*Lummus FCR*" has the meaning set forth in the Glossary.

"*Lummus Ordinary Course of Business*" means the ordinary course of business of Lummus and its Subsidiaries, consistent in all material respects with the manner in which it was conducted prior to March 15, 2005; *provided*, that the licensing and sale of technology for the oil & gas, refining and petrochemical industries, in a manner consistent in all material respects with Lummus's practices prior to March 15, 2005, shall be deemed part of the Lummus Ordinary Course of Business at all times.

"*Maker*" has the meaning set forth in the preamble.

"*Mandatory Prepayment*" has the meaning set forth in Section 1.3 hereof.

"*Mandatory Prepayment Date*" means, the earlier of (x) the Business Day on which a Mandatory Prepayment is made, or (y) the tenth (10th) Business Date after each date on which Net Proceeds are received.

"*Net Proceeds*" means, as of any time of determination:

(A) the sum of

(i) the amount in Dollars of (x) cash proceeds received at such time, if any, plus (y) the sum of all deferred purchase price payments to be made in the future pursuant to Cash Equivalents (without discount or other deduction) which Cash Equivalents are received at such time in connection with an Asset Sale (and for the purposes of the Mandatory Prepayment Date definition, in respect of a Stock Disposition), *plus*

(ii) the aggregate amount of any Assumed Debt (including the aggregate amount of any Subordinated Intercompany Indebtedness or Exit Financing assumed by the purchaser in connection with such Asset Sale (and for the purposes of the Mandatory Prepayment Date definition, in respect of a Stock Disposition), if any), *less*

---

[7] To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

[8] To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

(B) all Transaction Costs incurred by any Entities of the ABB Group through such time in respect of such Asset Sale or Stock Disposition (except to the extent such Transaction Costs have been applied to reduce previous payments of Net Proceeds).

In this definition of Net Proceeds, the term "received" means received at the time of determination by any Entity of the ABB Group or any designee of any such Entity.

"*Notice of Transaction*" means, in respect of an Asset Sale or Stock Disposition, a written notice prepared by Lummus (i) stating that an Asset Sale or Stock Disposition has occurred, (ii) describing in reasonable detail the assets or stock sold pursuant to such transaction, (iii) setting forth the amount of gross cash proceeds and Cash Equivalents resulting therefrom, (iv) setting forth the items and amounts of Transaction Costs associated therewith and otherwise reconciling in all material respects the gross cash proceeds and the Net Proceeds received as a result of such transaction; (v) setting forth any amounts described in Section 1.3(a) taken into account in the calculation of the corresponding Mandatory Prepayment; and (vi) setting forth the amount of the corresponding Mandatory Prepayment.

"*Optional Prepayment Date*" has the meaning set forth in Section 1.4.

"*Payment Date*" has the meaning set forth in Section 1.1 hereof

"*Permitted Holder*" means, as of any date of determination, the Lummus Asbestos PI Trust, or any assignee thereof that has acquired all of the interests in the Note pursuant to Section 3.15 hereof, as applicable on such date.

"*Permitted Payor*" means any Entity (other than a Maker) acting on behalf of, or designated by, a Maker, provided that such Entity can make the relevant payment without such payment being subject to rescission, avoidance, return or recovery on account of applicable fraudulent transfer, preference or other similar laws, or for any other reason.

"*Plan*" has the meaning set forth in the Glossary.

"*Pledge and Irrevocable Proxy*" means the Pledge and Irrevocable Proxy dated as of the date hereof executed by **[ABB Oil & Gas]** for the benefit of the Permitted Holder in the form attached as Exhibit A to the Guaranty provided by **[ABB Oil and Gas]**[10].

"*Pledgor*" means the pledgor under the Pledge and Irrevocable Proxy.

"*Prime Rate*" means as of any date of determination, the "prime rate" for transactions in Dollars announced by The Wall Street Journal (National Edition).

"*Settlement Agreement*" has the meaning set forth in the preamble hereof.

"*Stock Disposition*" means a sale, transfer, assignment or other disposition (whether directly or by merger, consolidation, reorganization or otherwise) of any or all the Capital Stock of Maker by any Entity of the ABB Group (other than a sale, transfer, assignment or other disposition, by merger, consolidation, reorganization or otherwise pursuant, to which Lummus remains a direct or indirect Wholly Owned Subsidiary of ABB) or any Indirect Stock Disposition.

---

[9]    To be updated as required by the merger of ABB Oil and Gas into ABB Holdings, with ABB Holdings Inc. as the surviving entity.

[10]    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

"*Subordinated Intercompany Indebtedness*"[11] means the amounts owed by Lummus or any of its Subsidiaries, in respect of (i) indebtedness for borrowed money provided by ABB Treasury or any Entity of the ABB Group and in an aggregate principal amount of **[approximately $470,000,000]** which indebtedness and liabilities are identified in Exhibit B hereof, and (ii) any indebtedness and liabilities (whether fixed, matured, contingent or otherwise) existing or which may arise to any Entities of the ABB Group for or in respect of letters of credit or credit support arrangements outstanding as of the close of business of the thirty-first (31st) day immediately preceding the Petition Date provided by any such Entities, which letters of credit or credit support arrangements are identified on Exhibit C hereof, including any reimbursement or indemnity obligations or liabilities for amounts drawn or subject to being drawn after the close of business on the thirty first (31st) day immediately preceding the Petition Date hereafter under the letters of credit and other credit enhancements identified in Exhibit C.

"*Subsidiaries*" shall have the meaning set forth in the Glossary.

"*Transaction Costs*" means, in respect of an Asset Sale, the aggregate amount in Dollars of (1) the actual reasonable transaction fees, expenses and other reasonable out-of-pocket costs incurred by any Entity of the ABB Group directly relating to the relevant Asset Sale, including reasonable legal, accounting, investment banking and brokerage fees and sales commissions; and (2) direct and reasonable out-of-pocket costs and expenses incurred by any Entity of the ABB Group resulting from currency exchanges and any applicable exchange controls and other restrictions on cross-border transfers of funds relating to the relevant transaction (without duplication in respect of any such costs and expenses taken into account in the conversion of any proceeds pursuant to Section 3.3 or the determination of Net Proceeds).

"*Wholly-Owned Subsidiary*" means, with respect to any Entity as of any time of determination, any Subsidiary of such Entity 100% of the Capital Stock of which such Entity owns or controls at that time, directly or indirectly through another Subsidiary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Note unless the context shall otherwise require.

Unless otherwise indicated, the term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever the Note provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

[Signature page follows.]

---

[11] The maximum amount in this definition will equal the intercompany indebtedness for borrowed money and credit support owed by Lummus and its Subsidiaries as of the close of business in New York on the thirty-first (31st) consecutive calendar day prior to the Petition Date to ABB Treasury and other ABB Entities.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

IN WITNESS WHEREOF, the Maker has duly executed this Promissory Note as of the day and year first above written.

MAKER:

ABB LUMMUS GLOBAL INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Acknowledged and accepted as of                 :

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST,
a Delaware statutory trust

By: _____
Name: _____
Title: _____

Lummus Promissory Note Signature Page

### *Exhibit A to Promissory Note*

### Schedule of Payments

### [(assumes Dec 31, 2005 Effective Date)][12]

| Payment No. | Payment Date | Amount of Payment |
|---|---|---|
| 1. ................................. | [Effective Date] | $ 5.4 million |
| 2. ................................. | [12/31/2006] | $ 2.3 million |
| 3. ................................. | [12/31/2007] | $ 2.3 million |
| 4. ................................. | [12/31/2008] | $ 2.3 million |
| 5. ................................. | [12/31/2009] | $ 2.3 million |
| 6. ................................. | [12/31/2010] | $ 2.3 million |
| 7. ................................. | [12/31/2011] | $ 2.3 million |
| 8. ................................. | [12/31/2012] | $ 2.3 million |
| 9. ................................. | [12/31/2013] | $ 2.3 million |
| 10. ................................. | [12/31/2014] | $ 2.3 million |
| 11. ................................. | [12/31/2015] | $ 2.3 million |
| 12. ................................. | [12/31/2016] | $ 2.3 million |
| 13. ................................. | [12/31/2017] | $ 2.3 million |

---

[12] This form of Promissory Note and the Schedule of Payments above assumes that the Effective Date occurs on or before December 30, 2005. References in the Schedule of Payments to a year are to the year indicated in each case; *provided*, *however*, that if the Effective Date (a) does not occur on or before December 30, 2005 and occurs during the year 2006, then each reference to a year will be deemed to be a reference to the year immediately succeeding the year indicated in each case, and (b) does not occur on or before December 31, 2006 and occurs during the year 2007, then each reference to a year will be deemed to be a reference to the second year immediately succeeding the year indicated in each case. By way of example (a) if the Effective Date does not occur on or prior to December 30, 2005 but occurs during the year 2006, then a reference to "2006" will be deemed a reference to 2007, a reference to "2007" will be deemed a

reference to 2008, etc., and (b) if the Effective Date does not occur on or prior to December 31, 2006 but occurs during the year 2007, then a reference to "2006" will be deemed a reference to year 2008, a reference to year "2007" will be deemed a reference to 2009, etc.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

**Exhibit B to Promissory Note**

**Intercompany Loans**

**[TO BE PROVIDED]**
**Exhibit C to Promissory Note**

**Subordinated Intercompany Indebtedness**

**[TO BE PROVIDED]**

Exhibit B to the ABB and Non-Debtor Affiliate
Settlement Agreement

**ABB LTD Guaranty**

# ABB LTD GUARANTY

## $33,000,000 NOTE

This ABB LTD GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the          , 2005, by ABB LTD, a Swiss corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note (as defined below) and is effective as of the Effective Date.

## WITNESSETH

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  *Definitions.* As used in this Guaranty, the following terms shall have the following meanings:

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Permitted Payor*" means any Entity (other than a Maker) acting on behalf of, or designated by, a Maker, provided that such Entity can make the relevant payment without such payment being subject to rescission, avoidance, return or recovery on account of applicable fraudulent transfer, preference or other similar laws, or for any other reason.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global, Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and

Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as primary obligor hereunder in accordance with Article 111 of the Swiss Code of Obligations and not merely as surety and as a guarantee of payment and not merely as a guarantee of collection for the benefit of the Permitted Holder, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the "*Guaranteed Obligations*"); *provided, however,* that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such supporting documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the liability for the Guaranteed Note Obligations is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable law, in particular Article 285 et seq. of the Swiss Bankruptcy Code.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker, as debtor-in-possession, under Section 364 of the Bankruptcy Code, or the Guarantor;

(x) the disallowance, under Section 502 of the Bankruptcy Code or any applicable provisions of any comparable law, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however*, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Sections 15, and 16, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4. *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives, to the extent permitted by applicable law, acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof and to the extent permitted by applicable law, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5. *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6. *Representations and Warranties.* The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

(f) **[Guarantor has entered into a commission fee arrangement with the Maker pursuant to which it is entitled to receive from the Maker consideration for the entire term of this Guaranty for the provision of this Guaranty, the terms of which the Guarantor reasonably believes are no less favorable to Guarantor than would be obtained in a comparable arm's length transaction with a third party who is not an affiliate of Guarantor (the *"Commission Fee Agreement"*)].**

7. *Liability for Representations and Warranties.* Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8. *Guarantor Covenants.* The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants.* The Guarantor shall:

(i) *Maintenance of Existence and Qualifications.* Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

(ii) **[*Commission Fee Agreement.* Guarantor shall enforce any and all of its rights pursuant to the Commission Fee Agreement (if any).]**

(iii) *Information Covenants.* Furnish to the Permitted Holder

(A) *Statutory Annual Financial Statements.* As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be

consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as of the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate.* Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants.* The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing, sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 16 of this Guaranty.

9.  *Defaults and Remedies.*

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10. *Setoff.* At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

11. *Financial Information.* The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12. *Reinstatement.* Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13. *Subrogation.* The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

14.  *Amendments; Waivers.* (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(a) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

15.  *Effectiveness; Termination.* This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

16.  *Consolidation, Successors and Assigns.*

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however,* that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however,* that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute an Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 16 and is being undertaken for a valid business purpose.

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 16(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Guaranty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 16 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

17. *Governing Law*. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF SWITZERLAND.

18. *Jurisdiction*. With respect to all claims or disputes under this Guaranty, all such claims or disputes shall be resolved at the sole election of the Lummus Asbestos PI Trust (A) if by a court, exclusively by the Commercial Court of the Canton of Zurich, Switzerland, except to such extent that Guarantor may waive its right to the exclusive jurisdiction of such a Swiss court and elect or consent, in writing, to the jurisdiction of the Bankruptcy Court (as defined in the Note), provided that to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then to the extent that Guarantor elects or consents, in writing, to the jurisdiction of the federal and state courts in the state, county and city of New York, New York or (B) pursuant to binding arbitration under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules (with proceedings conducted in London).

For the avoidance of doubt, it is the parties intent that nothing in this Guaranty (including this Section 18) shall have the effect of submitting any Entity of the ABB Group other than the Guarantor and the Permitted Holder (including any other Entity of the ABB Group organized under the laws of a jurisdiction other than the laws of a state of the United States) to the laws of the State of New York the State of Delaware, the laws of the United States or the jurisdiction of the Courts or other court exercising United States federal or state jurisdiction.

19. *Advice of Counsel*. The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

20. *Notices*. All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 20);

| If to Guarantor: | *With copies* | Kirkland & Ellis LLP |
|---|---|---|
| ABB Ltd | *to, which* | Citigroup Center |
| Affolternstrasse 44 | *shall not* | 153 E. 53ʳᵈ Street |
| CH-8050 Zürich | *constitute* | New York, NY 10022-4675 |
| Switzerland | *notice:* | Attn: Theodore L. Freedman |
| | | Facsimile: (212) 446-4900 |

Attn: General Counsel
Facsimile: (41) 43-317-79-92

21. *Severability*. Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

22. *Entire Agreement*. This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

23. *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

24. *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

ABB LTD

By _____
Name:
Title:

Acknowledged and agreed to
as of the    day of    ,    .

ABB LUMMUS GLOBAL INC. 529 (g) ASBESTOS PI TRUST

By: _____
Name:
Title:

**Exhibit B to the ABB and Non-Debtor Affiliate Settlement Agreement (Continued)**

**ABB Oil and Gas USA Inc. Guaranty**

## [ABB OIL AND GAS USA INC.][1] GUARANTY

### $33,000,000 NOTE

This **[ABB OIL AND GAS USA INC.]**[2] GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the          , 2005, by **[ABB Oil and Gas USA Inc.]**[3], a Delaware corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan (as defined below) pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note and is effective as of the Effective Date.

### WITNESSETH

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. *Definitions.* As used in this Guaranty, the following terms shall have the following meanings:

"*ABB Ltd*" means ABB Ltd, a Swiss corporation.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents, adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

---

[1]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

[2]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

[3]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time.

"*Pledge and Irrevocable Proxy*" means the Pledge and Irrevocable Proxy executed by the Guarantor in favor of the Lummus Asbestos PI Trust of even date herewith in the form annexed as Exhibit A hereto.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) For value received and in consideration of the transactions set forth in the Note and in the Plan, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guaranty, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance, in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the "*Guaranteed Obligations*"); *provided, however*, that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such supporting documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the Guarantor and the Maker are jointly and severally liable for the Guaranteed Note Obligations, which liability is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable state law.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker or the Guarantor, as debtor-in-possession, under Section 364 of the Bankruptcy Code;

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(x) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however,* that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Section 17, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4.    *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all

Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5.  *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6.  *Representations and Warranties.* The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

7.  *Liability for Representations and Warranties.* Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8.  *Guarantor Covenants.* The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants.* The Guarantor shall:

(i) *Maintenance of Existence and Qualifications*. Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 17 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(ii) *Information Covenants*. Furnish to the Permitted Holder

(A) *Annual Financial Statements*. As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as of the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate*. Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants*. The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 17 of this Guaranty.

9.   *Defaults and Remedies*.

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10.   *Setoff*. At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

11.   *Financial Information*. The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other

guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12. *Reinstatement.* Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13. *Pledge.* Guarantor shall pledge 51% of the Capital Stock of the Maker to the Lummus Asbestos PI Trust pursuant to, and in accordance with, the terms of the Pledge and Irrevocable Proxy which Guarantor shall execute and deliver to the Lummus Asbestos PI Trust concurrently with the execution and delivery of this Guaranty.

14. *Subrogation.* The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

15. *Amendments; Waivers.* (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT ─ ABB OIL AND GAS USA INC.
GUARANTY

16. *Effectiveness; Termination.* This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

17. *Consolidation, Successors and Assigns.*

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however,* that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

171

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however*, that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute and Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 17 and is being undertaken for a valid business purpose.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 17(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Guaranty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 17 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

18.   *Governing Law.* THIS GUARANTY SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

19.   *Jurisdiction.* With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guaranty (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") against the Guarantor, the Guarantor hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

Subject to the preceding paragraph, the Guarantor and the Permitted Holder hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

The Guarantor and the Permitted Holder agree that venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*. The Guarantor and the Permitted Holder hereby agree that all process which may be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

20.  *Advice of Counsel.* The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

21.  *Notices.* All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 21); provided that to be effective any notice to Guarantor hereunder must also be given to ABB Ltd:

| If to Guarantor: | With copies to, which shall not | ABB Ltd |
|---|---|---|
| [ABB Oil and Gas USA Inc.][4] | constitute notice: | |
| 501 Merritt 7, 6th Floor | | ABB Ltd |
| P.O. Box 5308 | | Affolternstrasse 44 |
| Norwalk, CT 06856-5308 | | CH-8050 Zürich |
| Attn: General Counsel/Chief | | Switzerland |
| Financial Officer | | |
| Facsimile: (203) 750-2307 | | Attn: General Counsel |
| *(if sending overnight packages use zip* | | Facsimile: (41) 43-317-79-92 |
| *code 06851)* | | |
| | | Kirkland & Ellis LLP |
| | | Citigroup Center |
| | | 153 E. 53rd Street |
| | | New York, NY 10022-4675 |
| | | Attn: Theodore L. Freedman Facsimile: |
| | | (212) 446-4900 |

22.  *Severability.* Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

23.  *Entire Agreement.* This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

24.  *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

25. *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

---

[4]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

[ABB OIL AND GAS USA INC.][5]

By _____
Name:
Title:

Acknowledged and agreed to
as of the      day of      ,      .

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST

By: _____
Name:
Title:

---

[5]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

*EXHIBIT A TO ABB LTD GUARANTY*

*PLEDGE AND IRREVOCABLE PROXY[6]*

---

[6]    To be included only in the Guaranty to be provided by ABB Oil and Gas USA Inc.

68700-001\DOCS_DE:117237.1

**PLEDGE AND IRREVOCABLE PROXY**

THIS PLEDGE AND IRREVOCABLE PROXY (this "*Pledge Agreement*") is made as of            , 2005, by **[ABB Oil and Gas USA Inc.]**[1], a Delaware corporation ("*ABB Oil and Gas*" or the "*Pledgor*"), in favor of the ABB Global Lummus Inc. 524(g) Asbestos PI Trust, (the "*Lummus Asbestos PI Trust*").

W I T N E S S E T H :

WHEREAS, the Pledgor, ABB Ltd, a corporation organized and existing under the laws of Switzerland ("*ABB*"), ABB Holdings Inc., a Delaware corporation ("*ABB Holdings*"), a successor in interest by merger to Asea Brown Boveri Inc., ABB Lummus Global Inc., a Delaware corporation ("*Lummus*" or the "*Debtor*") and a wholly owned subsidiary of ABB Holdings, Richard B. Schiro as the Lummus Future Claimants' Representative, and the Lummus Asbestos PI Trust entered into the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "*Settlement Agreement*"); capitalized terms used but not defined herein shall have the meanings ascribed to them in the Promissory Note of even date herewith made by Lummus to the Lummus Asbestos PI Trust in the initial principal amount of $33,000,000 (the "*Lummus Note*");

WHEREAS, in connection with the Settlement Agreement, Lummus made the Lummus Note;

WHEREAS, the Pledgor has guaranteed Lummus's obligations under the Lummus Note pursuant to that certain **[ABB Oil and Gas]**[2] Guaranty (the "*ABB Oil and Gas Guaranty*") made by the Pledgor as of an even date herewith in favor of the Permitted Holder;

WHEREAS, as of the date hereof, the Pledgor owns 100% of the Capital Stock of the Debtor, and ABB owns, indirectly, 100% of the Capital Stock of the Pledgor;

WHEREAS, it is a condition precedent to the effectiveness of the Settlement Agreement that the Pledgor execute and deliver this Pledge Agreement to the Lummus Asbestos PI Trust; and

WHEREAS, it is the intention of the parties hereto that the Pledged Securities (as defined herein) be and become collateral to secure the payment and performance of the Obligations (as defined herein);.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.    *Pledge; Grant of Security Interest*. As security for the due and punctual payment and performance of the Obligations (as defined below), the Pledgor hereby delivers and pledges to the Permitted Holder, certificates representing            shares of the common stock, par value $            per share, of Lummus and any and all accretions, accessions and rights relating thereto, at the time pledged with the Permitted Holder hereunder (collectively, the "*Pledged Securities*"), and the Pledgor hereby pledges, assigns, transfers and grants to the Permitted Holder a security interest in and Lien on all of the Pledged Securities. The certificates representing the Pledged Securities (whether now existing or hereafter received as a result of stock dividends, stock splits, workouts, reorganizations, restructurings or otherwise) are accompanied by stock powers with respect thereto duly executed in blank by the Pledgor as the registered owner of its Pledged Securities. The Pledgor will not cause or permit certificated securities comprising any of the Pledged Securities to be converted to uncertificated securities. The term "Pledged Securities" as used in this Pledge Agreement shall include, in addition to the aforesaid securities, any other securities issued by Lummus or collateral which may from time to time be delivered hereunder as security for the Obligations, together with all the proceeds of any of the foregoing. The term "*Lien*" as used in this Pledge Agreement shall mean any encumbrance, mortgage, pledge, hypothecation, charge, assessment, preference or other security interest of any kind securing any obligation of any person

Section 2.    *Obligations*. The Pledged Securities from time to time held hereunder shall secure the following obligations (collectively, the "*Obligations*"):

(a) The prompt and complete payment when due (whether by acceleration or otherwise) of all monies due (including interest and charges thereon) to the Permitted Holder under and pursuant to the Lummus Note and the **[ABB Oil and Gas]**[3] Guaranty, each as the same may be from time to time amended, modified, supplemented, extended, renewed, deferred, refinanced, replaced, refunded or restated, in whole or in part, in accordance with the terms and conditions thereof, by operation of law or otherwise; and

(b) Any and all other liabilities and obligations of every name and nature whatsoever of the Pledgor under the Lummus Note and the **[ABB Oil and Gas]**[4] Guaranty, whether such liabilities and obligations be direct or indirect, absolute or contingent, secured or unsecured, now existing or hereafter arising or acquired, due or to become due, whether for principal,

interest (including interest which, but for the filing of a petition in bankruptcy with respect to the Pledgor, would have accrued on any Obligation, whether or not a claim is allowed against the Pledgor for such interest in the related bankruptcy proceeding), fees, expenses, or otherwise.

Section 3.    *Representations and Warranties*. The Pledgor hereby represents and warrants to the Permitted Holder that, as of the Effective Date:

(a) The Pledgor is the legal, beneficial and record owner and has good title to all of the Pledged Securities free and clear of all Liens of every nature whatsoever except to or in favor of the Permitted Holder hereunder, or except as made pursuant to the Contribution Agreement dated as of the date hereof among Pledgor, Debtor, ABB, ABB Holdings and the Combustion Engineering 524(g) Asbestos PI Trust (the "*Contribution Agreement*");

(b) All of the shares of the Pledged Securities have been duly and validly issued and are fully paid and non-assessable;

(c) The Pledged Securities constitute 51% of the issued and outstanding shares of all classes of Capital Stock of Lummus, and there are no presently outstanding options, warrants or other rights to purchase or acquire the Pledged Securities or any other shares of the Capital Stock of Lummus; and

(d) The Pledgor has full power and authority to enter into this Pledge Agreement and to pledge its Pledged Securities as herein contemplated.

---

3    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

4    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT A TO THE ABB OIL AND GAS USA INC.
GUARANTY — PLEDGE AND
IRREVOCABLE PROXY

Section 4.    *Issue or Sale of Pledged Securities*. The Pledgor hereby covenants and agrees that it will not:

(a) Except (i) pursuant to a Stock Disposition that results in payment in accordance with Section 1.3(a)(ii) of the Lummus Note of the outstanding principal amount of the Lummus Note plus the amount of interest accrued and unpaid as of the date of the Stock Disposition (a "*Permitted Sale*"), or (ii) as permitted pursuant to Section 17 hereof, directly or indirectly sell, assign, pledge or otherwise encumber or dispose of its Pledged Securities; or

(b) permit the issuer of any of its Pledged Securities, directly or indirectly, to issue or sell any additional shares of Capital Stock or any options, warrants or rights to acquire such shares to the extent that such issuance or sale causes the Permitted Holder to have a first priority Lien on less than 51% of the issued and outstanding shares of all classes of Capital Stock of Lummus; or

(c) create, incur, assume or permit to exist, and will defend the Pledged Securities against, and will take such other actions as are necessary to remove, any Lien or claim on or to the Pledged Securities, other than the Liens created hereby or created pursuant to the Contribution Agreement, and will defend the right, title and interest of Permitted Holder in and to any of the Pledged Securities against the claims and demands of any and all Entities.

Section 5.    *Voting Rights of Pledgor*. Provided that the Pledge Remedy Date (as defined below) has not occurred and any Event of Default is not continuing after such date, the Pledgor shall be entitled to exercise exclusively and in its sole discretion, voting power with respect to its Pledged Securities. After the Pledge Remedy Date and during the continuance of an Event of Default, the Permitted Holder shall have the rights specified in Section 7.

Section 6.    *Distributions and Dividends*.

(a) Upon the dissolution, winding up, liquidation or reorganization of the Debtor, whether in bankruptcy, insolvency or receivership proceedings, or upon an assignment for the benefit of creditors or otherwise, any sum to be paid or any property to be distributed upon or with respect to any of such Pledged Securities shall be paid over to the Permitted Holder to be held by the Permitted Holder as collateral security for the Obligations; *provided* that any cash distribution shall be applied to the payment of Obligations first to any that are interest and then to principal payments in inverse order of maturity.

(b) In the event that any stock dividend shall be declared on any of the Pledged Securities, or any shares of stock or fractions thereof shall be issued pursuant to any stock split involving any of the Pledged Securities, or any property shall be distributed upon or with respect to any of the Pledged Securities, the shares or other property so distributed shall be pledged

and delivered (with any necessary endorsements) to the Permitted Holder to be held as additional collateral security for the Obligations to the extent necessary to ensure that following such pledge and delivery, Pledgor will have pledged pursuant to this Pledge Agreement 51% of the issued and outstanding shares of voting Capital Stock of Lummus. All such shares shall constitute Pledged Securities and are subject to all of the provisions of this Pledge Agreement.

(c) In the event that any cash dividend shall be declared on any of the Pledged Securities, or any distribution of capital shall be made on any of the Pledged Securities, (i) if the Pledge Remedy Date (as defined below) has occurred and an Event of Default is continuing, Pledgor shall cause such dividend to be promptly remitted to the Permitted Holder and such dividend shall be applied toward the satisfaction of the Obligations and any amounts remaining after the satisfaction of the Obligations in full (other than Unmatured Contingent Obligations (as defined below)) shall be promptly remitted to the Pledgor, or (ii) if the Pledge Remedy Date has not occurred and no Event of Default is continuing, such dividend may be retained by the Pledgor.

Section 7.    *Default; Remedies.*

(a) After the date when amounts due under the Lummus Note have become immediately due and payable in accordance with Section 2.2(i) of the Lummus Note (the "*Pledge Remedy Date*"), if an Event of Default is continuing the Permitted Holder shall have full power and authority: (i) to sell or otherwise dispose of the Pledged Securities or any part thereof; (ii) to vote the Pledged Securities with respect to any and all matters and to exercise all rights to payments, conversion, exchange, subscription or otherwise with respect to the Pledged Securities; and (iii) to exercise any and all rights and remedies of a secured party under the Uniform Commercial Code as enacted in the State of New York (the "*UCC*").

(b) To the extent permitted by any applicable law, any sale or other disposition by the Permitted Holder may be by public or private proceedings and may be made by one or more contracts, as a unit or in parcels, at such time and place, by such method, in such manner and on such terms as the Permitted Holder may determine. Except as required by law or pursuant to the terms of the Lummus Note or this Pledge Agreement, such sale or other disposition may be made without advertisement or notice of any kind or to any person. Where reasonable notification of the time or place of such sale or other disposition is required by law or pursuant to the Lummus Note or this Pledge Agreement, such requirement shall have been met if such notice is telegraphed, sent by facsimile, cabled or mailed, postage prepaid, at least fifteen (15) days before the time of such sale or other disposition to each person entitled thereto at such person's address as specified in Section 14 below. To the extent permitted by any applicable law, upon any such sale or sales the Pledged Securities so purchased shall be held by the purchaser absolutely free from any claims or rights of whatsoever kind or nature, including any equity of redemption or any similar rights, all such equity of redemption and any similar rights being hereby expressly waived and released by the Pledgor thereof to the extent permitted by applicable law. In the event any consent, approval or authorization of any governmental agency shall be necessary to effectuate any such sale or sales, the Pledgor shall execute, and hereby agree to cause the issuer of the Pledged Securities to execute, as necessary, all applications or other instruments as may be required; *provided* that the foregoing shall not in any way obligate the Pledgor to register the Pledged Securities under the Securities Act of 1933, as amended. After deducting all reasonable costs and expenses of collection, custody, sale or other disposition or delivery (including legal costs and reasonable attorney's fees) and all other charges due against the Pledged Securities (including any charges of the type described in Section 9 below), the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations (other than any Obligations under this Pledge Agreement, the Lummus Note, the **[ABB Oil and Gas]**[a] Guaranty or the Settlement Agreement that by their terms survive termination of the relevant agreement, but are not, as of the date of determination, due and payable and for which no outstanding claim has been made ("*Unmatured Contingent Obligations*") first to any that are interest and then to principal payments in inverse order of maturity. After applying all or a portion of the proceeds of any such sale or other disposition to the payment of the Obligations (other than Unmatured Contingent Obligations), the remaining residue of the proceeds of any such sale or other disposition shall be promptly remitted to the Pledgor. The Pledgor shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale or other disposition or delivery and all other charges due against the Pledged Securities, as hereinbefore enumerated.

(c) The Pledgor recognizes that the Permitted Holder may be unable to effect a public sale of all or a part of the Pledged Securities by reason of certain prohibitions contained in the Securities Act of 1933, as amended, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Pledged Securities for their own account for investment and not with a view to the distribution or resale thereof. The Pledgor agrees that private sales so made may be at a price and on other terms less favorable to the seller than if such Pledged Securities were sold at public sales, and that the Permitted Holder does not have an obligation to delay the sale of any such Pledged Securities for the period of time necessary to permit such Pledged Securities to be registered for public sale under the Securities Act of 1933,

5    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

as amended. The Pledgor agrees that sales made under the foregoing circumstances shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of any sale made on terms less favorable to the seller resulting from the private nature of the sale.

Section 8.    *Transfer of Pledged Securities and Notation on Books and Records*. Pledgor hereby irrevocably appoints the Permitted Holder after the Pledge Remedy Date if an Event of Default is continuing, as agent to arrange for any and all transfers of its Pledged Securities as the Permitted Holder may from time to time deem advisable and to assist the Permitted Holder in obtaining the benefit of its security interest therein, including, but not limited to, the transfer (subject to the receipt of any required approvals of any Governmental Authority) of the Pledged Securities into the name of the Permitted Holder or its nominee at any time and/or the provision of instructions to the issuers of uncertificated securities or financial intermediaries to initiate actions to enforce any of the Permitted Holder's rights to such Pledged Securities, the foregoing appointment being deemed a power coupled with an interest and irrevocable. The Pledgor shall cause Lummus to mark its share register to indicate the pledge of the Pledged Securities by the Pledgor pursuant to this Pledge Agreement.

Section 9.    *Payment of Taxes, Charges, Etc.* After the Pledge Remedy Date if an Event of Default is continuing, Permitted Holder, at its option, may discharge any taxes or Liens upon the Pledged Securities or otherwise protect the value thereof. All such expenditures incurred by the Permitted Holder shall become Obligations and shall be payable by the Pledgor to the Permitted Holder upon demand and shall bear interest at the rate applicable to the Lummus Note.

Section 10.    *Duties with Respect to Collateral*. The Permitted Holder has no duty to the Pledgor with respect to the Pledged Securities other than the duty to use reasonable care in the safe custody of any Pledged Securities in its possession and such other duties explicitly applicable to secured parties in the Uniform Commercial Code as enacted in the State of New York. Except during the continuance of an Event of Default after the Pledge Remedy Date, the Permitted Holder shall not transfer, sell or create any Liens or otherwise dispose of, the Pledged Securities or any of the certificates representing the Pledged Securities or any related stock powers.

Section 11.    *Waivers*. The Pledgor hereby waives demand, payment, notice of dishonor or protest and all other notices of any kind in connection with the Obligations except notices required by law or by this or any other agreement between or among the Pledgor and the Permitted Holder. The Permitted Holder may release, supersede, exchange or modify any other collateral security (if any) which it may from time to time hold and may release, surrender or modify the liability of any third party without giving notice hereunder to the Pledgor. Such modifications, charges, renewals, releases or other actions shall in no way affect the Pledgor's obligations hereunder. The Permitted Holder may modify Lummus' rights under the Lummus Note in accordance with and to the extent permitted under the Lummus Note without affecting Pledgor's rights and obligations hereunder.

Section 12.    *Expenses*. The Pledgor agrees to pay, indemnify and hold harmless the Permitted Holder from and against (a) during the continuance of an Event of Default, all costs and expenses (including taxes, if any) out of or incurred in connection with any transfer of the Pledged Securities into or out of the name of the Permitted Holder or Permitted Holder's nominees or any other person and (b) all costs and expenses of the Permitted Holder arising out of or incurred in connection with the exercise by the Permitted Holder of its rights hereunder. Any such amount not paid on demand shall bear interest at the default rate applicable to obligations under the Lummus Note and shall be an Obligation hereunder.

Section 13.    *Modification*. This Pledge Agreement may not be modified or amended without the prior written consent of each of the parties hereto.

Section 14.    *Notices*. Except as otherwise expressly provided herein, all notices and other communications made or required to be given pursuant to this Pledge Agreement shall be made in accordance with the provisions of Section 3.6 of the Lummus Note.

Section 15.    *Rights*. No course of dealing between the Pledgor and the Permitted Holder nor any delay in exercising, on the part of the Permitted Holder of any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any rights, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law, including, without limitation, the rights and remedies of a secured party under the UCC.

Section 16.    *Waiver of Set Off and Subrogation*. The Pledgor hereby waives and releases, to the fullest extent permitted by law:

68700-001\DOCS_DE:117237.1                                              178

(a) any defense, set off or counterclaim which the Pledgor may otherwise assert against the Permitted Holder; and

(b) any right of subrogation it may have against the Permitted Holder or the Pledged Securities by reason of any of the actions taken by the Permitted Holder hereunder.

Section 17. *Binding Effect, Etc.*

(a) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign or transfer any of its rights or obligations under this Pledge Agreement without the prior written consent of the Pledgor (such consent not to be unreasonably withheld, conditioned or delayed); *provided, however*, that (A) the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, shall under no circumstance (except upon the occurrence and during the continuance of an Event of Default) be permitted to assign or transfer less than all of its rights and obligations under this Pledge Agreement, and any assignment must be made in compliance with federal, state and other applicable securities laws, (B) the assignment or transfer of this Pledge Agreement must be concurrent with the assignment or transfer of the Lummus Note to the same assignee or transferee, (C) the consent of the Pledgor shall not be required for any assignment or transfer consummated after the Pledge Remedy Date if an Event of Default is continuing, unless the effects of such event have been expressly waived in writing, and (D) the Permitted Holder will provide the Pledgor with written notice of any intended assignment or transfer, including the name and notice details of the intended assignee or transferee, and such assignee or transferee agrees in writing to become bound by all of the obligations of the Permitted Holder hereunder.

(b) The Pledgor may not assign or transfer its rights or obligations under this Pledge Agreement without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned or denied by the Permitted Holder in its sole and absolute discretion.

(c) The parties agree that notwithstanding anything else in this Pledge Agreement, nothing shall restrict at any time the ability of the Pledgor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Wholly Owned Subsidiary of ABB as provided in and subject to the restrictions of Section 17 of the **[ABB Oil and Gas]**[6] Guaranty.

(d) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation, as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Pledgor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the Pledgor hereunder, with the same effect as if it had been originally named herein; provided; however, that the Pledgor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Pledge Agreement.

---

[6]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

(e) The Pledgor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with such transaction proposed by the Pledgor in Section 17(c) (whether or not such transaction is in fact consummated).

Section 18. *Severability.* The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision hereof.

Section 19. *Further Assurances.*

(a) The Pledgor at its sole cost and expense will execute, acknowledge and deliver all such instruments and take all such action as the Permitted Holder from time to time may reasonably request in order to further effectuate the purposes of this Pledge Agreement and to carry out the terms hereof, including without limitation, the execution of stock transfer orders, stock powers, the providing of notification in connection with any book entry security or general intangibles and the providing of instructions to issuers of uncertificated securities or financial intermediaries, and will do all such other acts as the Permitted Holder may reasonably request with respect to the perfection and protection of the security interest granted herein and the security interest effected hereby.

(b) In the event that the Pledgor receives or acquires any additional or substitute shares of voting Capital Stock of Lummus, Pledgor shall promptly pledge and deposit with the Permitted Holder certificates representing a number of such shares of voting Capital Stock as additional security for the Obligations such that, following such pledge, Pledgor will have

pledged pursuant to this Pledge Agreement 51% of the issued and outstanding shares of voting Capital Stock of Lummus. All such shares shall constitute Pledged Securities and are subject to all provisions of this Pledge Agreement.

Section 20.  *Provisions to Survive.* All representations, warranties, covenants and agreements contained in this Pledge Agreement shall survive the execution and delivery of the Settlement Agreement, the Lummus Note and the ABB Guaranty.

Section 21.  *Captions.* Captions and headings in this Pledge Agreement are for convenience only and in no way define, limit or describe the scope or intent of the provisions hereof.

Section 22.  *Termination.* Upon payment in full of the Obligations in accordance with their terms (other than Unmatured Contingent Obligations);

(a) This Pledge Agreement and the Liens created hereunder shall automatically terminate, the Pledged Securities shall be absolutely free from any claims or rights of whatever kind of nature and any such claims or rights of the Permitted Holder or the Lummus Asbestos PI Trust, and any related stock powers, shall automatically terminate and the Permitted Holder shall promptly return to the Pledgor, at the expense of the Pledgor, certificates evidencing the Pledged Securities, any related stock powers, and any such collateral in the possession or control of the Permitted Holder as has not theretofore been disposed of pursuant to the provisions hereof, together with any moneys and other property at the time held by the Permitted Holder hereunder, and shall deliver to the Pledgor documents in recordable form sufficient to discharge and evidence the discharge of the Liens granted hereunder. Notwithstanding anything to the contrary herein or under the Lummus Note, the Settlement Agreement or the **[ABB Oil and Gas]**[7] Guaranty, the Permitted Holder is hereby irrevocably authorized by Lummus Asbestos PI Trust to take any legal action requested by the Pledgor having the effect of releasing the Pledged Securities upon such payment in full of the Obligations in accordance with their terms (other than Unmatured Contingent Obligations not then due and payable).

(b) Notwithstanding the obligations to return the Pledged Securities set forth in (a) above, in the event of a Permitted Sale, the Permitted Holder hereby covenants to deliver to the Pledgor the original certificates

---

[7]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

representing the Pledged Securities and the respective stock powers (or, in the case described in Section 22(c) below, a lost certificate affidavit for the Pledged Securities) at or prior to the time and place of the Closing (as defined below), each as specified on the Sale Notice (as defined below). The Pledgor must provide the Permitted Holder with written notice (the "*Sale Notice*") of any impending Permitted Sale at least ten (10) days prior to the date of the expected closing of such sale (the "*Closing*") specifying the time and place of the Closing. The Sale Notice will be delivered in accordance with the notice provisions in Section 21 of the **[ABB Oil and Gas]**[8] Guaranty. The certificates representing the Pledged Securities provided by the Permitted Holder shall be absolutely free from any claims, Liens or rights of whatsoever kind or nature created by or on behalf of the Permitted Holder or the Lummus Asbestos PI Trust and any such claim or rights shall automatically terminate upon the Closing of such Permitted Sale.

(c) In the event that any certificate representing the Pledged Securities shall have been lost, stolen or destroyed, the Permitted Holder will provide (and in the event of a Permitted Sale, will provide at the Closing) a lost certificate affidavit of that fact, and will provide such assurances as the Pledgor may reasonably direct as indemnity against any claim that may be made against the Pledgor with respect to the certificate alleged to have been lost, stolen or destroyed.

(d) The Permitted Holder agrees to reimburse and indemnify and hold harmless the Pledgor and its officers, directors, managers, members, equity owners, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Pledgor or any of its officers, directors, managers, members, equity owners, employees, attorneys or agents in any way relating to or arising out of the failure of the Permitted Holder to comply with this Section 22. This Section 22 shall survive the termination of this Pledge Agreement.

Section 23.  *Conflict.* In the event that there is a conflict between any provision of this Pledge Agreement and the Settlement Agreement, then the provisions of the Settlement Agreement shall control.

Section 24.  *Irrevocable Proxy.*

(a) Subject to terms and provisions of this Pledge Agreement, including, without limitation, Sections 5, 7 and 22 hereof, the Pledgor, being the sole holder and owner of the Pledgor's Pledged Securities, hereby authorizes Permitted Holder, after the Pledge Remedy Date and during the continuance of an Event of Default, to vote for such Pledgor, as the Pledgor's

proxy, at any and all meetings of the shareholders of the issuer(s) of the Pledgor's Pledged Securities such Pledged Securities as Permitted Holder sees fit, in its sole and unfettered discretion, and, as the Pledgor's proxy, to consent or dissent to any action taken without a meeting, and further makes, constitutes and irrevocably appoints the Permitted Holder to act as the true and lawful proxy and attorney-in-fact in the name and on behalf of the Pledgor, with full power to appoint a substitute or substitutes, to vote and execute and deliver written voting consents with respect to the Pledgor's Pledged Securities, to the same extent and with the same effect as the Pledgor could do under any applicable laws or regulations governing the rights and powers of shareholders of the applicable issuer(s) of the Pledgor's Pledged Securities (the irrevocable proxy granted hereunder, the "*Irrevocable Proxy*").

(b) SUBJECT TO TERMINATION OF THIS PLEDGE AGREEMENT IN ACCORDANCE WITH ITS TERMS, THIS PROXY AND POWER OF ATTORNEY ARE IRREVOCABLE AND COUPLED WITH AN INTEREST. This Irrevocable Proxy is being given to Permitted Holder in connection with the pledge to Permitted Holder of the Pledged Securities pursuant to this Pledge Agreement. All power and authority conferred under this Irrevocable Proxy shall not be terminated by any act of the undersigned or by operation of law, by death or incapacity of the undersigned, by lack of appropriate power or authority, or by the occurrence of any other event or events, except as expressly provided in this Pledge Agreement. If, after the execution of this

---

<sup>‡</sup>    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

Irrevocable Proxy, any such event or events shall occur, Permitted Holder is nevertheless authorized and directed to vote the shares in accordance with the terms of this Irrevocable Proxy as if such death, incapacity, lack of appropriate power or authority or other event or events had not occurred and regardless of notice thereof. This Irrevocable Proxy shall be binding upon, and enforceable against, all beneficiaries, heirs at law, legatees, distributees, successors, assigns, transferees and legal representatives of the Pledgor.

(c) This Irrevocable Proxy shall automatically terminate upon payment in full of the Obligations (other than Unmatured Contingent Obligations not then due and payable).

Section 25.    *Governing Law; Jurisdiction.*

(a) This Pledge Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Pledge Agreement (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") each of the parties to this Pledge Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question then, at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware and each of the parties to this Pledge Agreement agrees that any and all Claims may be brought, heard and determined in such courts.

(c) Each of the parties to this Pledge Agreement agrees that (i) venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 3.6 of the Lummus Note and shall be deemed in every respect effective service of process upon such party when so given.

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge Agreement as of the date first above written.

*PLEDGOR:*                                              **[ABB OIL AND GAS USA, INC.]<sup>9</sup>**

By: _____

      **Name:**
      **Title:**

*PERMITTED HOLDER:*                    ABB GLOBAL LUMMUS INC. 524(G) ASBESTOS PI TRUST

                                       By: _____
                                            **Name:**
                                            **Title:**

---

[9]     To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings
        as the surviving entity.

**Exhibit B**

**To the ABB and Non-Debtor Affiliate**
**Settlement Agreement ABB Holdings Inc. Guaranty**

### ABB HOLDINGS INC. GUARANTY

#### $33,000,000 NOTE

This ABB HOLDINGS INC. GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the                , 2005, by ABB Holdings Inc., a Delaware corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan (as defined below) pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note and is effective as of the Effective Date.

### W I T N E S S E T H

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  *Definitions.* As used in this Guaranty, the following terms shall have the following meanings:

"*ABB Ltd*" means ABB Ltd, a Swiss corporation.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents, adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB HOLDINGS INC.
GUARANTY

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) For value received and in consideration of the transactions set forth in the Note and in the Plan, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guaranty, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance, in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the "*Guaranteed Obligations*"); *provided, however*, that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such supporting documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the Guarantor and the Maker are jointly and severally liable for the Guaranteed Note Obligations, which liability is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable state law.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker or the Guarantor, as debtor-in-possession, under Section 364 of the Bankruptcy Code;

(x) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however,* that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Section 16, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4.    *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5.    *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6.    *Representations and Warranties.* The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

7.    *Liability for Representations and Warranties.* Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8.    *Guarantor Covenants.* The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants.* The Guarantor shall:

(i) *Maintenance of Existence and Qualifications.* Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

(ii) *Information Covenants.* Furnish to the Permitted Holder

(A) *Annual Financial Statements.* As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as of the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate.* Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants*. The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 16 of this Guaranty.

9.   *Defaults and Remedies*.

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10.   *Setoff*. At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

11.   *Financial Information*. The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12.   *Reinstatement*. Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13.   *Subrogation*. The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

14.   *Amendments; Waivers*. (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and

conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

15. *Effectiveness; Termination*. This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

16. *Consolidation, Successors and Assigns.*

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however,* that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however,* that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute and Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 16 and is being undertaken for a valid business purpose.

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 16(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discouraged from, and shall remain liable for, any and all obligations and liabilities under this Guarnaty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 16 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

17. *Governing Law.* THIS GUARANTY SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

18. *Jurisdiction.* With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guaranty (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") against the Guarantor, the Guarantor hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

Subject to the preceding paragraph, the Guarantor and the Permitted Holder hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

The Guarantor and the Permitted Holder agree that venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*. The Guarantor and the Permitted Holder hereby agree that all process which may be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

19. *Advice of Counsel.* The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

20. *Notices.* All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 20); provided that to be effective any notice to Guarantor hereunder must also be given to ABB Ltd:

| If to Guarantor: | With copies to, which shall not | ABB Ltd |
|---|---|---|
| ABB Holdings Inc. | constitute notice: | |
| 501 Merritt 7, 6th Floor | | ABB Ltd |
| P.O. Box 5308 | | Affolternstrasse 44 |
| Norwalk, CT 06856-5308 | | CH-8050 Zürich Switzerland |
| Attn: General Counsel/Chief | | |
| Financial Officer | | Attn: General Counsel |
| Facsimile: (203) 750-2307 | | Facsimile: (41) 43-317-79-92 |
| *(if sending overnight* | | |
| *packages use zip code* | | |
| *06851)* | | |
| | | Kirkland & Ellis LLP |
| | | Citigroup Center |
| | | 153 E. 53rd Street |
| | | New York, NY 10022-4675 |
| | | Attn: Theodore L. Freedman |
| | | Facsimile: (212) 446-4900 |

21. *Severability.* Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such

law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

22. *Entire Agreement.* This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

23. *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

24. *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

ABB HOLDINGS INC.

By _____
Name:
Title:

Acknowledged and agreed to
as of the    day of    ,    .

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST

By: _____
Name:
Title:

**PLAN EXHIBIT B**

**NON-DEBTOR AFFILIATES**

**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| ALGERIA | ABB Electrical Service Company Spa, Hydra |
| ALGERIA | SpA ABB Lummus Global Algeria, Hydra |
| ALGERIA | SARPI — Société Algérienne pour la réalisation de projets industriels, Alger |
| ANGOLA | ABB Electrica SGPS, Lda., Luanda |
| ARGENTINA | ABB S.A., Buenos Aires |
| ARGENTINA | ABB Tubío S.A., San Luis |
| ARGENTINA | ABB Vetco Gray Argentina S.A., Pcia. De Buenos Aires |
| ARGENTINA | Asea Brown Boveri S.A., Buenos Aires Modulec S.A., San Luis |
| ARUBA (NL) | ABB Import & Export Services Ltd., Oranjestad/Aruba (NA) |
| AUSTRALIA | ABB Australia Pty Limited, Sydney |
| AUSTRALIA | ABB Elsag Bailey Pty Ltd., Regents Park |
| AUSTRALIA | ABB EPT Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Euro Pacific Technologies Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Fischer & Porter Pty Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Investments Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Networks Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Offshore Systems, Australia (non legal entity) |
| AUSTRALIA | ABB T&D Administrative Services Pty Ltd., Moorebank, NSW |
| AUSTRALIA | ABB Treasury Centre Australia, Sydney (non legal entity) |
| AUSTRALIA | ABB Vetco Gray Australia Pty Ltd., Melbourne, VIC |
| AUSTRALIA | Allco Constructions (Pty) Ltd, Tomago, NSW |
| AUSTRALIA | Allco Steel Erectors Pty Limited, Tomago, NSW |
| AUSTRALIA | Allco Pty Limited, Tomago, NSW |
| AUSTRALIA | Allco Newsteel Pty Limited, Clayton, VIC |
| AUSTRALIA | Allco Steel Corporation Pty Limited, Tomago, NSW |
| AUSTRALIA | Ascom Equipment Pty. Ltd., Melbourne, VIC |
| AUSTRALIA | Ascom Holdings Pty. Ltd., Melbourne, VIC |
| AUSTRALIA | Allco Steel Queensland Pty Limited, Wacol, QLD |
| AUSTRALIA | Babcock Australia Pty Limited, Sydney, NSW |
| AUSTRALIA | ABB Service Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB EPT Management Pty Limited, Sydney NSW |
| AUSTRALIA | ABB Group Investment Management Pty. Ltd., Sydney |
| AUSTRALIA | ABB Group Holdings Pty. Ltd., Sydney |
| AUSTRALIA | ABB Industry Pty Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Administrative Services Pty. Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Group Investment LLP, Sydney |
| AUSTRALIA | Mitchell Engineering Pty Limited, Wacol, QLD |

10,603,556                    PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| AUSTRALIA | ABB Mineral Slurry Transportation Pty Ltd, Sydney, NSW |
| AUSTRALIA | ABB Net SA Pty Limited, Sydney NSW |
| AUSTRALIA | ABB Redbank Investments Pty Ltd., Sydney |
| AUSTRALIA | Redbank Construction Pty Limited, Warkworth NSW |
| AUSTRALIA | Redbank Project Pty Limited, Warkworth NSW |
| AUSTRALIA | ABB Financial Services Australia Pty Limited, Sydney |
| AUSTRALIA | Trasor Pty. Ltd., Sydney, NSW |
| AUSTRALIA | ABB Transmission & Distribution Pty Limited, Moorebank NSW |

| | |
|---|---|
| AUSTRALIA | Westralian Transformers Pty Ltd., Osborne Park, WA |
| AUSTRALIA | Worley ABB Joint Venture, Melbourne |
| AUSTRALIA | Worley ABB Procurement Pty Ltd., Sydney |
| AUSTRIA | ABB AG, Vienna |
| AUSTRIA | ABB Information und Management Service G.m.b.H., Vienna |
| AUSTRIA | ABB Montage GmbH, Innsbruck |
| AUSTRIA | ABB Kent Europe Ltd., Luton/Vienna |
| AUSTRIA | Kraft & Warme Gebaudesysteme GmbH, Vienna |
| BAHRAIN | ABB Technologies W.L.L., Bahrain |
| BAHRAIN | ABB Automatic E.C., Bahrain |
| BELGIUM | Asea Brown Boveri S.A., Brussels |
| BELGIUM | Asea Brown Boveri Electro NV/SA, Zaventem |
| BELGIUM | Asea Brown Boveri Europe Ltd., Brussels |
| BELGIUM | S.A. Helvimo N.V., Brussels |
| BELGIUM | ABB Service n.v., Brussels |
| BELGIUM | Asea Brown Boveri Jumet S.A., Jumet |
| BELGIUM | ABB Energy Service NV, Zaventem |
| BELGIUM | ABB Energy Service NV, Machelen |
| BELGIUM | ABB Industrial IT n.v., Brussels |
| BELGIUM | Asea Brown Boveri De Meester S.A., Brussels |
| BELGIUM | Entrelec NV, Bruxelles |
| BELGIUM | Etablissements E. Duliere s.a., Brussels |
| BELGIUM | Maintenance TV, Zaventem |
| BELGIUM | Sirius Belgium Reassurances S.A., Liege |
| BERMUDA (GB) | Scandinavian Reinsurance Company Ltd., Bermuda |
| BOLIVIA | Asea Brown Boveri Ltda., La Paz |
| BOTSWANA | ABB (Pty) Ltd., Gaborone |
| BOTSWANA | ABB Energy Systems (Pty) Ltd., Gaborone |
| BRAZIL | ABB Ltda., Osasco |
| BRAZIL | Consorcio Lummus Andromeda, Osasco |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| BRAZIL | ABB Foundries, Brazil (non legal entity) |
| BRAZIL | ABB Power Lines, Brazil (non legal entity) |
| BRAZIL | ABB Lummus Global Ltda., Osasco |
| BRAZIL | ABB Participacoes Ltda., Osasco |
| BRAZIL | Termobahia Ltda., Osasco |
| BRAZIL | ABB Building Systems, Brazil (non legal entity) |
| BRAZIL | ABB Empreendimentos LTDA, Sao Paulo |
| BRAZIL | ABB Medicao de Energia Ltda., Brazil |
| BRAZIL | ABB Offshore Systems, Brazil (non legal entity) |
| BRAZIL | ABB Offshore Systems, Brazil (non legal entity) |
| BRAZIL | ABB Oil, Gas & Petrochemicals, Osasco (non legal entity) |
| BRAZIL | ABB Participacoes Ltda., Sao Paulo |
| BRAZIL | ABB Structured Finance Brazil, Osasco (non legal entity) |
| BRAZIL | ABB Treasury Center (Brazil), Osasco (non legal entity) |
| BRAZIL | Cellier do Brasil Industria e Comercio LTDA, Sao Paulo |
| BRAZIL | Entrelec Produtos Eletricos, Sao Paulo |
| BRAZIL | Termobahia II Ltda., Bahia |
| BULGARIA | ABB Bulgaria EOOD, Sofia |
| BULGARIA | ABB Avangard AD, Sevlievo |

| BULGARIA | ABB Control EOOD, Petrich |
| CAMEROON | Asea Brown Boveri S.A., Douala |
| CANADA | ABB Inc., St. Laurent, Quebec |
| CANADA | Bailey-Sea (NFLD) Ltd., ST. John's |
| CANADA | ABB Bomem Inc., Quebec |
| CANADA | Combustion Engineering Technology Investment Corp., St.Laurent, Quebec |
| CANADA | Citeq Inc., Varennes, Quebec |
| CANADA | ABB International Projects Inc., St.Laurent, QC |
| CANADA | ABB Offshore Systems Canada Inc., Nisku |
| CANADA | ABB PTTR Guelph, CA (non legal entity) |
| CANADA | ABB PTTR Quebec, CA (non legal entity) |
| CANADA | ABB PTTR Varennes, CA (non legal entity) |
| CANADA | ABB Vetco Gray Canada Inc., Edmonton, Alberta |
| CANADA | Bomem International Inc., Quebec |
| CANADA | Entrelec Inc., Brossard |
| CANADA | Smartcore Systems Inc., Alberta |
| CHILE | Asea Brown Boveri S.A., Santiago |
| CHINA | ABB (China) Ltd., Beijing |

10,603,556            PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| CHINA | ABB Engineering (Shanghai) Ltd., Shanghai |
| CHINA | ABB Automation Ltd., Hong Kong |
| CHINA | ABB Automation System (Beijing) Limited, Beijing |
| CHINA | ABB Bailey Beijing Controls Co. Ltd., Beijing |
| CHINA | ABB China Ltd., Hong Kong |
| CHINA | ABB Environmental Engineering Ltd., Hong Kong |
| CHINA | ABB Power System Communication & Automation Co. Ltd., Guangzhou |
| CHINA | ABB Yuejin Motors (Shanghai) Co. Ltd., Shanghai |
| CHINA | ABB Chongqing Transformer Company Ltd., Chongqing City |
| CHINA | ABB Distribution Transformer (Hefei) Limited, Anhui |
| CHINA | ABB Xiamen Switchgear Co. Ltd., Xiamen |
| CHINA | ABB (China) Engineering Co. Ltd. Xiamen |
| CHINA | ABB Huadian High Voltage Switchgear (Xiamen) Company Ltd., Xiamen |
| CHINA | ABB Holding Ltd., Hong Kong |
| CHINA | Hua Lu (Sino-Lummus) Engineering Co. Ltd., Beijing |
| CHINA | ABB Beijing Drive Systems Co. Ltd., Beijing |
| CHINA | ABB LV Installation Materials Co. Ltd., Beijing |
| CHINA | ABB Xinhui Low Voltage Switchgear Co. Ltd., Xinhui (Guangdong) |
| CHINA | ABB Xiamen Low Voltage Equipment Co. Ltd., Xiamen |
| CHINA | Long-Po Electrical Co. Ltd., Huaibei Au Hui |
| CHINA | ABB Lummus Global China Co. Ltd., Shanghai |
| CHINA | ABB Shanghai Motors Co. Ltd., Shanghai |
| CHINA | ABB Service Ltd., Hong Kong |
| CHINA | ABB Transmission and Distribution Ltd., Hong Kong |
| CHINA | ABB Shanghai Transformer Co. Ltd., Shanghai |
| CHINA | ABB High Voltage Switchgear Co. Ltd., Beijing |
| CHINA | ABB Hefei Transformer Co. Ltd., Hefei |
| CHINA | ABB Jiangjin Turbo Systems Company Limited, Chongqing |
| CHINA | ABB Xi'an Power Capacitor Company Limited, Xi'an |
| CHINA | ABB Transmission & Distribuition Automation Equipment (Xiamen) Co. Ltd., Fujian |
| CHINA | ABB Xiamen Electrical Controlgear Co. Ltd., Fujian Province |

| CHINA | ABB Zhongshan Transformer Company Ltd., Zhongshan City |
|-------|-------------------------------------------------------|
| CHINA | Guangdong ABB Power Plant Services Co. Ltd., Guangzhou |
| CHINA | Shenzhen Sino-American Meishi ABB |
| CHINA | Investment Company Ltd., Guangdong |
| CHINA | Vetco Gray Petroleum Equipment (Shanghai) Co. Ltd., Shanghai |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                    **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|--------------|--------------------|
| COLOMBIA | Asea Brown Boveri Ltda., Bogotá |
| COLOMBIA | ABB Inversiones Ltda., Bogotá |
| COLOMBIA | Termobarranquilla SA, Santafé de Bogotà |
| COTE D'IVOIRE/IVORY COAST | ABB Technology SA, Abidjan |
| COTE D'IVOIRE/IVORY COAST | Azito O & M S.A., Abidjan |
| COTE D'IVOIRE/IVORY COAST | Azito Energie S.A., Abidjan |
| CROATIA | ABB Ltd., Zagreb |
| CYPRUS | ABB Lummus Global Cyprus LTD., Nicosia |
| CZECH REPUBLIC | Entrelec Sro, Brno |
| CZECH REPUBLIC | ABB Elsynn, Prague (non legal entity) |
| CZECH REPUBLIC | Entrelec Ceska Sro, Brno |
| CZECH REPUBLIC | ABB s.r.o., Prague |
| CZECH REPUBLIC | ABB Lummus Global s.r.o., Brno |
| CZECH REPUBLIC | ABB Building Systems, Czeck Republic (non legal entity) |
| DENMARK | ABB A/S, Skovlunde |
| DENMARK | ABB Venture A/S, Odense |
| DENMARK | Veloduct-Renka A/S, Skovlunde |
| DENMARK | STAL Kulde A/S, Odense |
| DENMARK | ABB Satt A/S, Herlev |
| DENMARK | ABB Credit, Odense (non legal entity) |
| DENMARK | ABB Electric, Fredericia (non legal entity) |
| DENMARK | ABB Energi & Industri, Skovlunde (non legal entity) |
| DENMARK | ABB Komponent, Tastrup (non legal entity) |
| DENMARK | ABB Offshore Danmark A/S, Kolding |
| DENMARK | EB Global Engineering Denmark A/S, Copenhagen |
| DENMARK | Flakt Serviceteknik A/S, Odense |
| DENMARK | Zantingh Energi Systemr A/S, Hadsten |
| ECUADOR | Asea Brown Boveri S.A., Quito |
| EGYPT | Asea Brown Boveri S.A.E., Cairo |
| EGYPT | ABB Arab Contractors for Construction, Heliopolis |
| EGYPT | ABB Arab S.A.E., Cairo |
| EGYPT | ABB Automation S.A.E., Heliopolis |
| EGYPT | ABB Automoation, Industries and Petrochemical — AIPC — S.A.E., Heliopolis |
| EGYPT | ABB Group Process Center S.A.E., Cairo |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                    **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|--------------|--------------------|
| EGYPT | ABB High Voltage Co. S.A.E., Heliopolis/Cairo |
| EGYPT | ABB Metals & Plastics Manufact. Co. SAE, 10th of Ramadan City |
| EGYPT | ABB Petroleum Technology, Cairo |

| | |
|---|---|
| EGYPT | ABB SUSA Egypt LLC, Maadi |
| EGYPT | ABB Turbochargers S.A.E., Suez |
| EGYPT | ABB Transformers S.A.E., El-Nozha El-Gedida |
| EGYPT | Egyptian Maintenance Company, Cairo |
| EL SALVADOR | ABB S.A. de CV, San Salvador |
| ESTONIA | ABB AS, Tallinn |
| ESTONIA | ABB Kunda Service AS, Kunda |
| ETHIOPIA | ABB Manufacturing & Contracting Pvt. Ltd. Co., Addis Ababa |
| ETHIOPIA | ABB-Midroc Industrial Services Pvt. Ltd. Co., Addis Ababa |
| ETHIOPIA | Asea Brown Boveri Ltd., Addis Ababa |
| FINLAND | ABB Oy, Helsinki |
| FINLAND | ABB Credit Oy, Helsinki |
| FINLAND | ABB Current Oy, Helsinki |
| FINLAND | ABB Strömberg DO 25 Oy, Helsinki |
| FINLAND | ABB Strömberg DO 24 Oy, Helsinki |
| FINLAND | ABB Strömberg D08 Oy, Helsinki |
| FINLAND | ABB Strömberg DO 9 Oy, Helsinki |
| FINLAND | ABB Domestic Sales, Helsinki (non legal entity) |
| FINLAND | ABB Strömberg DO 23 Oy, Helsinki |
| FINLAND | OY Ensto Busch-Jaeger AB, Porvoo |
| FINLAND | ABB Energy Partner Oy, Helsinki |
| FINLAND | Fortek Oy, Kemi |
| FINLAND | Kiinteistö Oy Bölenraitti 10, Helsinki |
| FINLAND | Oy Merinova AB, Vaasa |
| FINLAND | Real Current Oy, Helsinki |
| FINLAND | ABB Sähkörinne Kiinteistö Oy, Helsinki |
| FINLAND | Oy Wedeco AB, Vaasa |
| FINLAND | ABB East Ventures Oy, Helsinki |
| FINLAND | ABB Product Services (non legal entity) |
| FINLAND | ABB Service, Helsinki (non legal entity) |
| FINLAND | ABB Shipins Oy, Turku |
| FINLAND | ABB Stromberg DO 26 Oy, Helsinki |
| FINLAND | ABB Stromberg DO 27 Oy, Helsinki |
| FINLAND | ABB TNP International Oy, Vaasa |

10,603,556              PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| FINLAND | Arandur Oy, Vantaa |
| FINLAND | Kanavakangas, Helsinki |
| FINLAND | Kiinteisto Oy Toijalan Hameentie 23, Helsinki |
| FINLAND | Kiinteisto Oy Voyrinkatu 15, Vaasa |
| FINLAND | Kymertek Oy Ltd., Hamina |
| FINLAND | Oy Expilac Ab, Helsinki |
| FINLAND | Ramse Consulting Oy, Helsinki |
| FINLAND | Sahkolahteenmaki-Kiinteistot Oy, Helsinki |
| FINLAND | Voimavasu Oy, Jyvaskyla |
| FRANCE | ABB S.A., Rueil-Malmaison |
| FRANCE | ABB Automation, Massy (non legal entity) |
| FRANCE | ABB Business Services, Rueil-Malmaison |
| FRANCE | Cogelub, Persan |
| FRANCE | ABB Entrelec Division commerciale France, Chassieu (non legal entity) |
| FRANCE | L'Ebenoid, Villeurbanne |

| | |
|---|---|
| FRANCE | Helita, Persan |
| FRANCE | Entrelec Développement SAS, Persan |
| FRANCE | ABB Entrelec SAS, Villeurbanne |
| FRANCE | Soulé Protection Surtensions, Villeurbanne |
| FRANCE | ABB Lummus Global SarL., Rueil-Malmaison |
| FRANCE | ABB MC, St Ouen l'Aumone |
| FRANCE | ABB Process Industrie, Aix les Bains |
| FRANCE | Striebel & John France S.A.R.L., Wesserling |
| FRANCE | ABB Systèmes Basse Tension, Geispolsheim-Gare (non legal entity) |
| FRANCE | ABB 2I SAS, Aix en Provences |
| FRANCE | ABB Alternative Energies SAS, Laon |
| FRANCE | ABB Automation SAS, Massy |
| FRANCE | ABB Building Systems, Massy |
| FRANCE | ABB Business Services, Paris |
| FRANCE | ABB Cellier SA, Aix les Bains |
| FRANCE | ABB Control SAS, Chassieu (non legal entity) |
| FRANCE | ABB Diffusion S.N.C., Chassieu (non legal entity) |
| FRANCE | ABB Entrelec SA, Villeurbanne |
| FRANCE | ABB Full Maintenance SAS, Persan |
| FRANCE | ABB ITI, Nanterre Cedex |
| FRANCE | ABB Lummus Global SarL., Paris La Defense |
| FRANCE | ABB Manufacturing and Consumer Industries, Beauchamp |
| FRANCE | ABB Participations SAS, Paris La Defense |

10,603,556                    PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| FRANCE | ABB Process Analytics Sarl |
| FRANCE | Fluidsysteme, Bois Colombes |
| FRANCE | ABB S.A., Paris La Defense |
| FRANCE | ABB Spie Tableaux, Geispolsheim-Gare |
| FRANCE | ABB Vetco Gray France S.A.R.L., Pau Cogelub, Persan |
| FRANCE | Entrelec Developpment, Lyon |
| FRANCE | Entrelec Group, Lyon |
| FRANCE | Helita, Paris |
| | Soule Finance Developpement, Bagneres de Bigorre |
| FRANCE | Soule Material Electrique, Bagneres de Bigorre |
| FRANCE | Soule Protection Surtensions, Bezons |
| FRANCE | Striebel & John France S.A.R.L., Wesserling |
| GERMANY | ABB Automatisierungsanlagen Cottbus GmbH, Cottbus |
| GERMANY | ABB Airport Technologies GmbH, Mannheim |
| GERMANY | ABB AG, Mannheim |
| GERMANY | ABB Automation Products, Eschborn (non legal entity) |
| GERMANY | Aenea Flugfeldsysteme GmbH, Bannewitz |
| GERMANY | ABB Automation Products GmbH, Eschborn |
| GERMANY | ABB Asset Finance GmbH, Mannheim |
| GERMANY | ABB Stotz-Kontakt/Striebel & John Vertriebs-GmbH, Sasbach |
| GERMANY | ABB Schaltanlagentechnik GmbH, Ladenburg |
| GERMANY | ABB Automation GmbH, Mannheim |
| GERMANY | ABB Automation Beteiligungs GmbH, Mannheim |
| GERMANY | ABB Reaktor GmbH, Mannheim |
| GERMANY | Busch-Jaeger Elektro GmbH, Mannheim/Lüdenscheid |
| GERMANY | ABB Bauprojektmanagement GmbH, Mannheim |

| | |
|---|---|
| GERMANY | ABB Beteiligungs — und Verwaltungsges. mbH, Mannheim |
| GERMANY | ABB Calor Emag Hochspannung, Hanau (non legal entity) |
| GERMANY | ABB Calor Emag Mittelspannung, Ratingen (non legal entity) |
| GERMANY | Commedia Marketing und Vertriebsgesellschaft mbH, Potsdam |
| GERMANY | Corporate Research Center, Germany (non legal entity) |
| GERMANY | ABB Foundries, Mannheim (non legal entity) |
| GERMANY | ABB Engineering and Consulting GmbH, Wiesbaden |
| GERMANY | Elektroinstallation Annaberg GmbH, Annaberg-Buchholz |
| GERMANY | Elemag Elektrizitätsgesellschaft mbH, Frankfurt |
| GERMANY | ABB Grundbesitz GmbH, Mannheim |
| GERMANY | ABB Grundbesitz Berlin GmbH & Co. Objekte Berlin OHG, Berlin |
| GERMANY | ABB Gebäudetechnik AG, Mannheim |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| GERMANY | Hartmann & Braun Grundstücksverwaltungs GmbH, Göttingen |
| GERMANY | Hartmann & Braun GmbH & Co. KG, Eschborn |
| GERMANY | JLEC Power Ventures GmbH, Mannheim |
| GERMANY | PanMedium Betriebsgesellschaft mbH, Potsdam |
| GERMANY | Komposit-Risikoberatungs — und Versicherungsvermittlungs-GmbH, Heidelberg |
| GERMANY | ABB Logistics Center Europe GmbH, Menden |
| GERMANY | Litra Grundstücks-Verwaltungsgesellschaft mbH und Co. KG, Grünwald |
| GERMANY | Asea Brown Boveri AG & Co. Leasing KG, Mannheim |
| GERMANY | ABB Lummus Global GmbH, Wiesbaden |
| GERMANY | ABB New Ventures GmbH, Essen |
| GERMANY | ABB Patent GmbH, Mannheim |
| GERMANY | A & T Projektentwicklungsges. & Co., Berlin |
| GERMANY | Protec Mess-Regel und Datentechnik GmbH, Neckargemuend |
| GERMANY | PROEAST Projektgesellschaft Osteuropa mbH, Cottbus |
| GERMANY | Pucaro Elektro-Isolierstoffe GmbH, Roigheim |
| GERMANY | ABB Service GmbH, Bobingen |
| GERMANY | Skyva International GmbH, Ladenburg |
| GERMANY | Stadion Magdeburg GmbH und Co KG, Magdeburg |
| GERMANY | Stadion Magdeburg Verwaltungsgesellschaft mbH, Magdeburg |
| GERMANY | Solum Grundstücksvermietungsges. mbH Objekt Dresden KG, Duesseldorf |
| GERMANY | ABB Stotz-Kontakt GmbH, Mannheim |
| GERMANY | Striebel & John GmbH & Co. KG, Sasbach-Obersasbach |
| GERMANY | Striebel Vermögensverwaltungs-GmbH, Sasbach-Obersasbach |
| GERMANY | ABB Training Center GmbH, Mannheim |
| GERMANY | ABB Treasury Center Germany, Frankfurt (non legal entity) |
| GERMANY | ABB Technologie GmbH, Mannheim |
| GERMANY | ABB Transformatoren, Bad Honnef (non legal entity) |
| GERMANY | ABB Unterstützungseinrichtung GmbH, Mannheim |
| GERMANY | ABB Utilities GmbH, Mannheim |
| GERMANY | ABB Utility Systems, Mannheim (non legal entity) |
| GERMANY | ABB Wirtschaftsbetriebe GmbH, Mannheim |
| GERMANY | WKF Wärmekontor Fürstenwalde GmbH, Ratingen |
| GERMANY | Yueyang Power Holding Company GmbH, München |
| GERMANY | ABB Automatisierungsanlagen Cottbus GmbH, Cottbus |
| GERMANY | ABB Beteiligungen GmbH, Mannheim |
| GERMANY | ABB Brown Boveri Montagegesellschaft mbH, Mannheim |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES

**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| GERMANY | ABB Calor Emag Hochspannung GmbH, Hanau |
| GERMANY | ABB Calor Emag Mittelspannung GmbH, RatingenABB Energiekabel GmbH, Mannheim |
| GERMANY | ABB Equity Ventures GmbH, Mannheim |
| GERMANY | ABB Financial Services Germany, Frankfurt (non legal entity) |
| GERMANY | ABB Finanzierungs — und Verwaltungs GmbH, Mannheim |
| GERMANY | ABB Flakt GmbH, Butzbach |
| GERMANY | ABB Group Services Center GmbH, Mannheim |
| GERMANY | ABB Grundbesitz Berlin GmbH & Co. Objekte Berlin OHG, Berlin |
| GERMANY | ABB Grundbesitz-Verwaltung-GmbH, Mannheim |
| GERMANY | ABB Isolrohr GmbH, Fulda |
| GERMANY | ABB Manufacturing & Consumer Industries GmbH, Friedberg |
| GERMANY | ABB Process Industries GmbH, Eschborn |
| GERMANY | ABB Robotersysteme GmbH, Mannheim |
| GERMANY | ABB Training Center Berlin GmbH, Berlin |
| GERMANY | ABB Training Center Rhein-Neckar GmbH, Mannheim |
| GERMANY | ABB Transformatoren GmbH, BAd Honnef |
| GERMANY | ABB Treasury Services GmbH, Frankfurt |
| GERMANY | Aquamundo GmbH, Mannheim |
| GERMANY | Corporate Research Center, Heidelberg (non legal entity) |
| GERMANY | ECO2X Development GmbH, Frankfurt |
| GERMANY | EDR Energiedienstleistungsges. Ratingen mbH, Frieburg |
| GERMANY | Entrelec Fanal GmbH & CO KG, Wuppertal |
| GERMANY | Entrelec Fanal Verwaltung GmbH, Hornberg |
| GERMANY | Entrelec Schiele Fanal GmbH, Koln |
| GERMANY | Entrelec Schiele Industriewerke GmbH & CO KG, Hornberg |
| GERMANY | Entrelec SIW GmbH, Hornberg |
| GERMANY | HKT Hensel-Kunststofftechnik GmbH & Co. |
| GERMANY | KG, Lennestadt-Altenhunden |
| GERMANY | HKV Hensel Kunststofftechnik |
| GERMANY | Verwaltungs-GmbH, Lennestadt |
| GERMANY | Ixys Semiconductor GmbH, Lampertheim |
| GERMANY | JLEC Holdings GmbH, Mannheim |
| GERMANY | Key2Automation GmbH, Mannheim |
| GERMANY | KOMED Entwicklungs — und Betriebsgesellschaft mbH, Berlin |
| GERMANY | Sirius Ruckversicherungsservice GmbH, Hamburg |
| GERMANY | Objekt Dresden KG, Duesseldorf |
| GERMANY | Telem GmbH, Witten |

10,603,556                    PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES

**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| GERMANY | Unterstutzungseinrichtung der ABB Kabel und Draht GmbH, Mannheim |
| GERMANY | W. Becker GmbH, Sasbach |
| GHANA | Asea Brown Boveri Ltd., Accra |
| GREECE | Asea Brown Boveri S.A., Metamorphossis Attica |
| GREECE | AIAS S.p.A., Athens |
| GREECE | SAE Hellas A.E., Società Anonima Tecnica Elettrificazione, Athens |
| GREECE | ABB Trade S.A., Metamorphossis Attica |

| GREECE | Wind Park of Rhodes SA, Rhodes |
| GREECE | WRE Hellas SA, Athens |
| GUATEMALA | ABB Turbocharger Servicios, S.A., Amatitlan |
| HONG KONG | ABB (Hong Kong) Ltd., Hong Kong |
| HONG KONG | ABB Asia Pacific Ltd., Hong Kong |
| HONG KONG | ABB Asia Pacific Services Ltd., Hong Kong |
| HONG KONG | ABB Equity Ventures (Asia Pacific) Ltd., Hong Kong |
| HONG KONG | Industrial and Building Systems (H.K.) Limited, Hong Kong |
| HONG KONG | ABB Building Systems, Hong Kong (non legal entity) |
| HONG KONG | ABB Services (Asia Pacific) Ltd., Hong Kong |
| HONG KONG | ABB Supply Services Ltd., Hong Kong |
| HONG KONG | ABB Vetco Gray (Hong Kong) Limited, Hong Kong |
| HUNGARY | ABB Engineering Trading and Service Ltd., Budapest |
| HUNGARY | ABB Pacont Kft., Budapest |
| HUNGARY | ABB Szerviz Kft., Budapest |
| INDIA | ABB Limited, Bangalore |
| INDIA | ST-CMS Electric Company Private Ltd., Chennai |
| INDIA | ABB Corporate Research Limited, Bangalore |
| INDIA | Daewoo Power India Ltd., New Delhi |
| INDIA | ABB Holdings (South Asia) Ltd., Bangalore |
| INDIA | Integra Hindustan Control Ltd., Vadodra |
| INDIA | Universal ABB Power Cables Ltd., Birla Vikas |
| INDIA | ABB Automation, Bangalore (non legal entity) |
| INDIA | ABB Group Processes Division, Vadodara (non legal entity) |
| INDIA | ABB Industrial & Building Systems, Calcutta (non legal entity) |
| INDIA | ABB Industrial IT Development Center Limited, Bangalore |
| INDIA | ABB Power Transmission & Distribution, Vadodara (non legal entity) |
| INDIA | ABB Process Industries Division, Bangalore (non legal entity) |
| INDIA | Asea Brown Boveri Ltd., Bombay |
| INDIA | National Switchgears Ltd., Lucknow |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
| --- | --- |
| INDONESIA | PT ABB Bailey, Jakarta |
| INDONESIA | PT ABB Batam, Batam |
| INDONESIA | PT ABB Installation Materials, Jakarta |
| INDONESIA | PT ABB Sakti Industri, Jakarta |
| INDONESIA | PT ABB Jasa Indonesia, Jakarta |
| INDONESIA | PT ABB Transmission and Distribution, Jakarta |
| INDONESIA | PT Dharma Sadhana, Jakarta |
| INDONESIA | PT Vetco Gray Indonesia, Jakarta |
| IRAN, ISLAMIC REPUBLIC OF | ABB (P.J.S.C.), Teheran |
| IRAN, ISLAMIC REPUBLIC OF | Sherkat Sahami Khass Electro-Danub, Teheran |
| IRAN, ISLAMIC REPUBLIC OF | ABB Petroleum Equipment Industries Company (PJSC), Tehran |
| IRELAND | ABB Ltd, Dublin |
| IRELAND | ABB Holdings Ireland Ltd., Dublin |
| IRELAND | Kilmainham Cables & Plastics Ltd., Dublin |
| IRELAND | ABB Transformers Ltd., Waterford |
| IRELAND | ABB Industrial Systems Ltd., Dundalk |
| IRELAND | Rialto Cables & Plastics Ltd., Dublin |
| IRELAND | Wessel Energy Cables Ltd., Dublin |
| IRELAND | Wessel Cable Ltd., Longford |

| | |
|---|---|
| IRELAND | Wessel Ireland Ltd., Dublin |
| IRELAND | Wessel Industries Holdings Ltd., Dublin |
| IRELAND | Wessel Industries Ltd., Dublin |
| IRELAND | Wessel Promotion Ltd., Dublin |
| IRELAND | Wessel Plastics Ltd., Dublin |
| IRELAND | Wessel (R&D) Ltd., Dublin |
| ISRAEL | ABB Technologies Ltd., Tirat Carmel |
| ITALY | ABB S.p.A., Milan |
| ITALY | ABB Power Technologies S.p.A., Milano |
| ITALY | ABB PS&S — "A" Division, Milano (non-legal entity) |
| ITALY | ABB SACE S.p.A., Sesto S. Giovanni (MI) |
| ITALY | Apisoi Service S.p.A., Falconara Marittima |
| ITALY | ABB Environment Service Srl., Milan |
| ITALY | ABB Corporate Administration & Properties S.p.A., Milan |
| ITALY | Consorzio Snamprogetti — ABB LG Chemicals, Milan |
| ITALY | ABB Power Lines, Sesto San Giovanni (non legal entity) |
| ITALY | ABB Estense Service S.p.A., Ferrara |
| ITALY | ABB Installazioni S.p.A., Milan |

10,603,556                    PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                                **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| ITALY | ABB Instrumentation S.p.A., Milan |
| ITALY | ABB Corporate Service s.r.l., Milan |
| ITALY | ABB Lummus Global Italia S.r.l., Milan |
| ITALY | ABB Trasmissione & Distribuzione S.p.A., Milan |
| ITALY | PR.ENER.CA Ceresio S.r.l., Milan |
| ITALY | Publicogen S.p.a., Empoli |
| ITALY | SACEM-Sarda Costruzioni e Montaggi Industriali S.p.A., Milan |
| ITALY | ABB SAE S.p.A., Milan |
| ITALY | ABB Sace, Bergamo (non legal entity) |
| ITALY | ABB Process Solutions & Services SPA, Milan |
| ITALY | Telecogen s.r.l., Bussolengo |
| ITALY | ABB Energy Automation S.p.A., Milan |
| ITALY | Toscogen S.p.a., Pisa |
| ITALY | ABB Group Service Center srl., Milano |
| ITALY | Telesafe Energy S.r.l., Massa |
| ITALY | ABB Finanziaria srl, Milan |
| ITALY | ABB Industria S.p.A. Milan |
| ITALY | ABB Lummus Global Italia S.r.l., Assago |
| ITALY | ABB Offshore Systems, Italy (non legal entity) |
| ITALY | ABB Reno De Medici s.r.l. Milan |
| ITALY | ABB Sace S.p.A., Milan |
| ITALY | ABB Servomotors S.r.l., Milan |
| ITALY | ABB Solutions — "A" Division, Milano (non-legal entity) |
| ITALY | ABB Solutions S.p.A., Milano |
| ITALY | ABB Synergia srl, Milano |
| ITALY | ABB Vetco Gray Italia S.R.L., Milan |
| ITALY | Api Energia S.p.A., Rome |
| ITALY | Assocogen Vicenza S.r.l., Vicenza |
| ITALY | Belleli Offshore International, Taranto |
| ITALY | Entrelec Sri, San Giuliano Milanese |
| ITALY | Escogen S.r.l., Verona |

| | |
|---|---|
| ITALY | Pantarei S.r.l., Gallicano |
| ITALY | Sae Energy Srl., Taranto |
| ITALY | Savim S.r.l., Sesto San Giovanni |
| ITALY | Soico Sud S.p.A., Taranto |
| JAPAN | Entrelec KK, Tokyo |
| JORDAN | ABB Near East Trading Ltd., Amman |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| KAZAKHSTAN | ABB Ltd., Almaty |
| KAZAKHSTAN | JV LLP ENERGOINVESTPROJEKT Scientific-production enterprise, Almaty |
| KAZAKHSTAN | CJSC ENERGIA Kazakh Scientific Research Institute of Energy Systems, Almaty |
| KAZAKHSTAN | ABB Offshore Systems, Kazakstan |
| KENYA | Asea Brown Boveri Ltd., Nairobi |
| KOREA, REPUBLIC OF | ABB Ltd., Seoul |
| KUWAIT | ABB Engg. Technologies Co. (KSCC), Safat |
| LATVIA | ABB SIA, Riga |
| LEBANON | ABB Electrical Co. S.A.L., Beirut |
| LITHUANIA | ABB UAB, Vilnius |
| LITHUANIA | ABB Technika UAB, Vilna |
| LUXEMBOURG | Asea Brown Boveri (Luxembourg) S.A., Luxembourg |
| LUXEMBOURG | Elux S.A., Luxembourg |
| LUXEMBOURG | ABB Energy Leasing S.a.r.l., Luxembourg |
| MALAYSIA | ABB Holdings Sdn. Bhd., Subang Jaya |
| MALAYSIA | ABB Contracting Sdn. Bhd., Subang Jaya |
| MALAYSIA | Elsag Bailey Sdn Bhd., Malaysia |
| MALAYSIA | ABB Industrial Contracting Sdn. BHd., Subang Jaya |
| MALAYSIA | ABB Industrial and Building Syst. Sdn. Bhd., Subang Jaya |
| MALAYSIA | Komposit Asia Pacific Limited, Labuan |
| MALAYSIA | ABB Malaysia Sdn Bhd, Subang Jaya |
| MALAYSIA | ABB Manufacturing Sdn. Bhd., Subang Jaya |
| MALAYSIA | Malaysia Transformer Manufacturing Sdn. Bhd., Kuala Lumpur |
| MALAYSIA | Quality Wiring Accessories SDN BHD, Kuala Lumpur |
| MALAYSIA | ABB Sapura Sdn.Bhd., Kuala Lumpur |
| MALAYSIA | ABB Transmission and Distribution Sdn. Bhd., Subang Jaya |
| MALAYSIA | ABB Insurance Brokers (L) Bhd., Labuan |
| MALAYSIA | Nisea Sdn.Bhd., Kuala Lumpur |
| MALAYSIA | Vetco Gray Delcom Sdn. Bhd., Kuala Lumpur |
| MALI | Asea Brown Boveri Mali, Bamako |
| MALTA | ABB Lummus Malta Limited, Floriana |
| MALTA | Snamprogetti Lummus Gas Ltd., Sliema |
| MAURITIUS | Asea Brown Boveri Ltd., Port Louis |
| MAURITIUS | ABB International Holdings Ltd., Port Louis |
| MAURITIUS | ABB Lummus Crest Mauritius, Port Louis |
| MEXICO | Asea Brown Boveri S.A. de C.V., Tlalnepantla |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| MEXICO | Elina 407 S.A. DE C.V., Mexico |

| | |
|---|---|
| MEXICO | Elina Sureste S.A. De C.V., Mexico |
| MEXICO | Entrelec SA de CV, Nuevo Leon |
| MEXICO | L.T.S. Peninsular S.A. de C.V., Tlalnepantla |
| MEXICO | Monterrey Power, S.A. de C.V., Mexico |
| MEXICO | SBE Mexico S.A. de C.V., Mexico City |
| MEXICO | ABB Mexico S.A. de C.V., Tlalnepantla |
| MEXICO | Se's oriental centro S.A., Tlalnepantla |
| MEXICO | ABB Tratamientos de Superficies S.A. de C.V., Tlalnepantla |
| MEXICO | ABB Formet S.A. de C.V., Tlalnepantla |
| MEXICO | ABB Mexico S.A. de C.V., Tlalnepantla |
| MEXICO | ABB Tratamientos de Superficies S.A. de C.V., Tlalnepantla |
| MEXICO | ABB Treasury Center, Mexico (non legal entity) |
| MEXICO | ABB Vetco Gray Mexico S.A. de C.V., Santa Clara Coatitla |
| MOROCCO | Asea Brown Boveri S.A., Casablanca |
| MOROCCO | Jorf Lasfar Energy Company, Casablanca |
| MOZAMBIQUE | ABB Tecnel Limitada, Maputo |
| NAMIBIA | Asea Brown Boveri (Pty) Ltd., Windhoek |
| NAMIBIA | ABB Namibia Transmission Lines (Pty.) Ltd., Windhoek |
| NETHERLANDS | ABB BV, Rotterdam |
| NETHERLANDS | ABB Holdings BV, Amsterdam |
| NETHERLANDS | ABB Capital, B.V., Amsterdam |
| NETHERLANDS | Lummus JSC Russia B.V. The Hague |
| NETHERLANDS | Cinergy Holding Company B.V., Amstelveen |
| NETHERLANDS | Elsag Bailey Hartmann & Braun Nederland BV, Delft |
| NETHERLANDS | ABB Energie Service BV, Rotterdam |
| NETHERLANDS | ABB Equity BV, Amsterdam |
| NETHERLANDS | ABB Equity Ventures B.V., Amsterdam |
| NETHERLANDS | ABB Finance B.V., Amsterdam |
| NETHERLANDS | ABB Financial Services B.V., Amsterdam |
| NETHERLANDS | ABB Power Investment (India) B.V., Amsterdam |
| NETHERLANDS | ABB Lummus Global B.V., The Hague |
| NETHERLANDS | ABB Lummus Global Technology B.V., The Hague |
| NETHERLANDS | ABB Lummus Heat Transfer B.V., The Hague |
| NETHERLANDS | ABB Lummus Project Participations B.V., The Hague |
| NETHERLANDS | Lummus Contracting B.V., The Hague |
| NETHERLANDS | Luwoco Lummus World-wide Contracting (Nethlands) B.V., The Hague |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

## ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| NETHERLANDS | Maynard BV, Breda |
| NETHERLANDS | Novolen Technology Holdings, C.V., The Hague |
| NETHERLANDS | ABB Oil & Gas Europe B.V., The Hague |
| NETHERLANDS | ABB Power Generation Investments B.V., Amstelveen |
| NETHERLANDS | ABB New Ventures B.V., Amstelveen |
| NETHERLANDS | ABB Energy Ventures Projects B.V., Amsterdam |
| NETHERLANDS | ABB Payment Services B.V., Amstelveen |
| NETHERLANDS | ABB SattLine BV, Etten-Leur |
| NETHERLANDS | ABB Structured Finance Investment BV, Amstelveen |
| NETHERLANDS | ABB Zantingh Energiesystemen BV, Aalsmeer |
| NETHERLANDS | ABB Entrelec BV, Hengelo |
| NETHERLANDS | ABB Flakt Service BV, Amersfoort |
| NETHERLANDS | ABB Lummus Project Participations B.V., The Hague |

| | |
|---|---|
| NETHERLANDS | ABB New Ventures B.V., Amstelveen |
| NETHERLANDS | Capio Finance B.V. |
| NETHERLANDS | Lummus Worldwide Contracting B.V. (LUWOCO), The Hague |
| NETHERLANDS | Settlement Center, Amsterdam (non legal entity) |
| NETHERLANDS | The Yueyang Power Holding Company B.V., Amstelveen |
| NETHERLANDS | Vetco Overseas N.V., Curacao |
| NETHERLANDS | Water Group Holland B.V., Rotterdam |
| NETHERLANDS ANTILLES (NL) | ABB Special Investment N.W., Willemstad |
| NEW ZEALAND | ABB Limited, Auckland |
| NEW ZEALAND | ABB Maintenance Services Limited, Auckland |
| NEW ZEALAND | Astec Corporation Ltd., Auckland |
| NIGERIA | ABB NG Ltd., Ikeja/Lagos |
| NIGERIA | ABB Electrical Systems Ltd., Lagos |
| NIGERIA | ABB Oil & Gas Nigeria Ltd., Lagos |
| NIGERIA | Soimi Nigeria Ltd., Lagos |
| NIGERIA | ABB Lummus Global (Nigeria) Ltd., Lagos |
| NIGERIA | ABB Offshore Systems, Nigeria (non legal entity) |
| NIGERIA | ABB Powerlines Limited., Lagos |
| NIGERIA | Vetco Gray Nigeria Limited, Port Harcourt |
| NIGERIA | |
| NORWAY | ABB AS, Billingstad |
| NORWAY | ABB Holding AS, Billingstad |
| NORWAY | ABB AT Division, Skien (non legal entity) |
| NORWAY | ABB ATMA Robotics, Bryne (non legal entity) |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| NORWAY | ABB Kommunikasjon AS, Billingstad |
| NORWAY | Bergerveien 12 ANS, Oslo |
| NORWAY | ABB Structured Finance AS, Billingstad |
| NORWAY | ABB Building Systems AS, Billingstad |
| NORWAY | Elektrisk Bureau AS, Billingstad |
| NORWAY | Engrossenteret Eiendom AS, Billingstad |
| NORWAY | Favusgården Harstad AS, Harstad |
| NORWAY | ABB MC Division, Oslo (non legal entity) |
| NORWAY | Nordisk Eiendomsforvaltning AS, Billingstad |
| NORWAY | ABB Process Industries Division, Oslo (non legal entity) |
| NORWAY | ABB PT Division, Skien (non legal entity) |
| NORWAY | A/S Senterutvikling, Lillestrom |
| NORWAY | ABB ATPA Turbo, Olso (non legal entity) |
| NORWAY | ABB Telexp AS, Bergen |
| NORWAY | ABB Anchor Contracting AS, Billingstad |
| NORWAY | ABB Asea Skandia AS, Oslo |
| NORWAY | ABB Building Systems, Norway (non legal entity) |
| NORWAY | ABB Corporate Research, Billingstad (non legal entity) |
| NORWAY | ABB Eiendomsdrift, Billingstad (non legal entity) |
| NORWAY | ABB Financial Reporting Unit, Billingstad (non legal entity) |
| NORWAY | ABB Financial Services AS, Olso |
| NORWAY | ABB Gas Technology AS, Bergen |
| NORWAY | ABB GP Division, Oslo (non legal entity) |
| NORWAY | ABB Industri og Offshore AS, Billingstad |
| NORWAY | ABB Kommunikasjon AS, Asker |

| NORWAY | ABB Kraft As, Drammen |
| NORWAY | ABB Offshore Systems Eliminations Unit, Sanones (non legal entity) |
| NORWAY | ABB Offshore Systems, Billingstad (non legal entity) |
| NORWAY | ABB OFS, Norway (non legal entity) |
| NORWAY | ABB OFS, Norway (non legal entity) |
| NORWAY | ABB UT Division, Oslo (non legal entity) |
| NORWAY | ABB Vetco Gray AS, Stavanger |
| NORWAY | Bailey Norge As, Billingstad |
| NORWAY | Centrum Elektriske AS, Porsgrunn |
| NORWAY | Ekofisk Alliansen DA, Stavanger |
| NORWAY | Hammerfest Strom AS, Norway |
| NORWAY | Hidro Hispana Norway AS, Billingstad |
| NORWAY | Holmen Ans I, Harstad |

10,603,556         PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| NORWAY | Intervent AS, Haugesund |
| NORWAY | J.P. Kenny AS, Forus |
| NORWAY | Norsk Subsea Cable AS, Drammen |
| NORWAY | Proel AS, Billingstad |
| NORWAY | Project Services and Developments AS, Billingstad |
| NORWAY | Stadt Automasjon AS, Billingstad |
| OMAN | ABB LLC, Al Hamriya |
| OMAN | Capital Aviation Services, Ruwi |
| OMAN | Oman Polypropylene LLC, Ruwi |
| PAKISTAN | ABB (Pvt) Ltd., Lahore |
| PAKISTAN | ABB Descon Manufacturing (PVT) Ltd., Lahore |
| PANAMA | ABB S.A., Panama |
| PANAMA | Tradeinvest Centroamericana S.A., Panama |
| PAPAUA, NEW GUINEA | General Construction (New Guinea) Ltd., Port Moresby |
| PAPAUA, NEW GUINEA | ABB James Watt (PNG) Limited, Regents Park, NSW |
| PAPAUA, NEW GUINEA | ABB Industry (PNG) Pty LTd., Regents Park, NSW |
| PAPAUA, NEW GUINEA | EPT (PNG) Pty Limited, Port Moresby |
| PERU | Asea Brown Boveri S.A., Lima |
| PHILIPPINES | Asea Brown Boveri Inc., Paranaque, Metro Manila |
| PHILIPPINES | Asmaco Inc., Paranaque, Metro Manila |
| POLAND | ABB Sp. zo.o., Warsaw |
| POLAND | Entrelec Polzka Sp. zo.o., Leborska |
| POLAND | ABB Instal Sp. zo.o., Wroclaw |
| POLAND | ABB Zamech Gazpetro Sp. zo.o., Elblag |
| POLAND | ABB Zamech Marine Sp. zo.o., Elblag |
| POLAND | ABB Centrum IT Sp. Zo.o., Wroclaw |
| POLAND | ABB Elpar Sp. Zo.o., Lódz |
| POLAND | ABB Elta, Lódz (non legal entity) |
| POLAND | ABB Group Services Centre Sp. zo.o., Warsaw |
| POLAND | ABB InfoSupport Sp. zo.o., Elblaq |
| POLAND | ABB SWAR, Warsaw (non legal entity) |
| PORTUGAL | ABB S.G.P.S, S.A., Amadora |
| PORTUGAL | BBC Brown Boveri, Lda., Porto |
| PORTUGAL | ABB Stotz Kontakt Eléctrica, Unipessoal, Lda., Porto |
| PORTUGAL | SGIE 2000 — Consultores em Organizaçao Industrial S.A., Lisboa |
| PORTUGAL | Discontinued Operations, Amadora (non-legal entity) |

| PORTUGAL | ABB (Asea Brown Boveri) S.A., Amadora |
| PORTUGAL | SMM — Sociedade de Montagens Metalomecanicas S.A., Amadora |

10,603,556            PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| PORTUGAL | SMM-UM-Sociedade de Montagens Metalomecanicas SA, Amadora |
| PORTUGAL | ABB Offshore Systems, Portugal (non legal entity) |
| PORTUGAL | ABB Stotz Kontakt Eléctrica, Lda., Porto |
| PORTUGAL | Fernando A. Lemos Ltda., Laran |
| QATAR | ABB Qutar LLC., Doha |
| ROMANIA | ABB SRL, Bucharest |
| ROMANIA | Bucuresti Nord-Est Energy SRL, Bucharest |
| ROMANIA | Elektro-Invest Romania SRL, Bucharest |
| ROMANIA | ABB Transformatoare SRL, Bucharest |
| RUSSIA | Asea Brown Boveri Ltd., Moscow |
| RUSSIA | ABB El Bushing Ltd., Moscow |
| RUSSIA | ABB Communications and Information Systems Ltd., Moscow |
| RUSSIA | ABB Electroengineering Ltd., Moscow |
| RUSSIA | ABB Energosvyaz LLC, Moscow |
| RUSSIA | ABB Industrial and Building Systems Ltd., Moscow |
| RUSSIA | JSC Vnipineft, Moscow |
| RUSSIA | ABB Moskabel Ltd., Moscow |
| RUSSIA | 000 ABB Lummus Global, Moscow |
| RUSSIA | ABB PS Ltd., Moscow |
| RUSSIA | ABB Automation LLC, Moscow |
| RUSSIA | ABB Service Ltd., Moscow |
| RUSSIA | ABB Ural Controlsystem, Moscow |
| RUSSIA | ABB UETM Ltd., Ekaterinburg |
| RUSSIA | ZAO Bailey Avtomatizatsija, Moscow |
| RUSSIA | ABB Lummus Global, Moscow |
| RUSSIA | ABB Elektroizolit Bushing Ltd., Moscow |
| RUSSIA | ABB Elmek Ltd., Moscow |
| RUSSIA | ABB Marine Automation Systems, St. Petersburg |
| RUSSIA | ABB Moselectro Ltd., Moscow |
| SAUDI ARABIA | ABB Contracting Company Ltd., Riyadh |
| SAUDI ARABIA | ABB Electrical Industries Ltd., Riyadh |
| SAUDI ARABIA | ABB Automation Co. Ltd., Riyadh |
| SAUDI ARABIA | Electrical Materials Center, Riyadh |
| SAUDI ARABIA | Lummus Alireza Ltd. Co., Saudi Arabia |
| SAUDI ARABIA | Saudi SAE Technical Construction Co. Ltd., Riyadh |
| SAUDI ARABIA | Saudi Consulting and Design Office, Damman |
| SAUDI ARABIA | ABB Service Co. Ltd., Al Khobar |
| SAUDI ARABIA | Soimi Saudi Ltd., Al Khobar |

10,603,556            PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| SENEGAL | ABB Technologies S.A., Dakar |
| SERBIA+MONTENEGRO | ABB d.o.o., Belgrade |
| SINGAPORE | ABB Agencies Pte. Ltd., Singapore |

| SINGAPORE | ABB Bailey Pte. Ltd., Singapore |
|---|---|
| SINGAPORE | Entrelec Asia, Singapore |
| SINGAPORE | ABB Environmental Pte. Ltd., Singapore |
| SINGAPORE | Gadelius Singapore Pte. Ltd., Singapore |
| SINGAPORE | ABB Holdings Pte. Ltd., Singapore |
| SINGAPORE | ABB Installation Materials (East Asia) Pte. Ltd., Singapore |
| SINGAPORE | ABB Industry Pte. Ltd., Singapore |
| SINGAPORE | ABB Instrumentation (East Asia) Pte. Ltd., Singapore |
| SINGAPORE | ABB Lummus Global Pte. Ltd., Singapore |
| SINGAPORE | ABB Power Pte. Ltd., Singapore |
| SINGAPORE | ABB Support Pte. Ltd., Singapore |
| SINGAPORE | ABB Transformers Pte. Ltd., Singapore |
| SINGAPORE | ABB Treasury Center (Asia Pacific) Pte. Ltd., Singapore |
| SINGAPORE | ABB Offshore Systems Pte. Ltd., Singapore |
| SLOVAKIA | ABB Vetco Gray Pte. Ltd., Singapore |
| SLOVAKIA | ABB Elektro s.r.o., Bratislava |
| SLOVAKIA | ABB Komponenty s.r.o., Kosice |
| SLOVENIA | ABB D.o.o., Ljubljana |
| SLOVENIA | ABB Energijski sistemi d.o.o., Ljubljana |
| SOUTH AFRICA | ABB Holdings (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | ABB Process and Automation, Sunninghill |
| SOUTH AFRICA | Desta Power Matla Holdings (Pty) Ltd., Pretoria |
| SOUTH AFRICA | Desta Power Matla (Pty) Ltd., Pretoria |
| SOUTH AFRICA | ABB Service (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | ABB Installation Materials Ltd., Pretoria |
| SOUTH AFRICA | ABB High Voltage Products (Pty) Ltd, Midrand |
| SOUTH AFRICA | Nelspruit Airport Operating Company (Pty) Ltd., Nelspruit |
| SOUTH AFRICA | Primkop Airport Management (Pty) Ltd., Nelspruit |
| SOUTH AFRICA | ABB Powertech Transformers (Pty) Ltd., Pretoria |
| SOUTH AFRICA | ABB Kutlwanong (Pty) Ltd., Bloemfontein |
| SOUTH AFRICA | ABB Southern Africa Region, Sunninghill (non legal entity) |
| SOUTH AFRICA | ABB South Africa (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | ABB Industry (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | ABB Karebo Manufacturers (Pty), Midrand |

10,603,556         PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SOUTH AFRICA | ABB Low Voltage Equipment, Bloemfontein |
| SOUTH AFRICA | ABB Powertech (Bophuthatswana) (Pty) Ltd., Pretoria |
| SOUTH AFRICA | ABB Properties (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | ABB Sub-Sahara Africa (Pty) Ltd., Sunninghill |
| SOUTH AFRICA | Powerlines (Pty) Ltd., Johannesburg |
| SOUTH AFRICA | Powerplan Systems Analysis (Pty) Ltd., Pretoria |
| SOUTH AFRICA | TCR Mining Services (Pty) Ltd., Pretoria |
| SOUTH AFRICA | Yelland Engineering (Pty) Ltd., Pretoria |
| SOUTH AFRICA | Yelland Power Managmeent (Pty) Ltd., Pretoria |
| SOUTH AFRICA | Yelland Technology Holdings (Pty) Ltd., Pretoria |
| SPAIN | Asea Brown Boveri S.A., Madrid |
| SPAIN | ABB Automation Products, Barcelona (non legal entity) |
| SPAIN | ABB Automation Products S.A., Barcelona |
| SPAIN | Low Voltage Unit, Barcelona (non legal entity) |
| SPAIN | ABB Sistemas Industriales S.A., San Quirze del Vallés |

| | |
|---|---|
| SPAIN | ABB Stotz Kontakt, S.A., Getafe |
| SPAIN | ABB Power Technology S.A., Zaragoza |
| SPAIN | ABB Energia, Madrid |
| SPAIN | ABB Manufacturing & Consumer Industries, Barcelona (non legal entity) |
| SPAIN | ABB Transmission & Distribution Systems, Madrid |
| SRI LANKA | Lanka Transformers Ltd., Moratuwa |
| SWEDEN | ABB Participation AB, Västerås |
| SWEDEN | ABB AB, Västerås |
| SWEDEN | AT — Control Platform Products, Västerås (non legal entity) |
| SWEDEN | PT — Assist, Ludvika (non legal entity) |
| SWEDEN | PT — Interrupters, Grängesberg (non legal entity) |
| SWEDEN | AT — CEWE, Nyköping (non legal entity) |
| SWEDEN | PT — Components, Ludvika (non legal entity) |
| SWEDEN | ABB Construction AB, Västerås |
| SWEDEN | AT — Control, Västerås (non legal entity) |
| SWEDEN | Romania Invest AB, Västerås |
| SWEDEN | AB Cythere 61, Västerås |
| SWEDEN | AB Cythere 63, Västerås |
| SWEDEN | Key2automation AB, Västerås |
| SWEDEN | Svenska Kunskapshusen AB, Stockholm |
| SWEDEN | AB Cythere Röd, Västerås |
| SWEDEN | Stri AB, Ludvika |

10,603,556        PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SWEDEN | ABB Foundries, Västerås (non legal entity) |
| SWEDEN | AT — ABB Kabeldon, Alingsås (non legal entity) |
| SWEDEN | AB Electro-Invest, Västerås |
| SWEDEN | ABB Industriunderhåll AB, Degerfors |
| SWEDEN | ABB Fastighet AB, Västerås |
| SWEDEN | PT — Figeholm, Figeholm (non legal entity) |
| SWEDEN | ABB Technology FLB AB, Stockholm |
| SWEDEN | SwedeWater AB, Västerås |
| SWEDEN | ABB Virkestorkar AB, Skellefteå |
| SWEDEN | AB C 7 Förvaltning AB, Västerås |
| SWEDEN | Fortek AB, Norrsundet |
| SWEDEN | ASEA AB, Västerås |
| SWEDEN | HSG Development AB, Stockholm |
| SWEDEN | PT — High Voltage Cables, Karlskrona (non legal entity) |
| SWEDEN | ABB Industriservice AB, Uppsala |
| SWEDEN | Industriqompetens Västra Mälardalen, Skultuna |
| SWEDEN | LCP Life Cycle Profit AB, Västerås |
| SWEDEN | AT — LV Systems, Västerås (non legal entity) |
| SWEDEN | AT — Marine Ventilation, Mölindal (non legal entity) |
| SWEDEN | AT — Central Stock Nordic, Västerås (non-legal entity) |
| SWEDEN | AT — Motors & Machines, Västerås (non legal entity) |
| SWEDEN | PT — Medium Voltage Products, Ludvika (non legal entity) |
| SWEDEN | ABB Network Partner AB, Västerås |
| SWEDEN | ABB Norden Holding AB, Stockholm |
| SWEDEN | AT — Nordkomponent, Västerås (non legal entity) |
| SWEDEN | ABB Automation Technologies AB, Västerås |
| SWEDEN | PT — Plast, Piteå (non legal entity) |

| | |
|---|---|
| SWEDEN | ABB Power Technologies AB, Ludvika |
| SWEDEN | Gladsheim Aviation Finance AB, Stockholm |
| SWEDEN | Tre Kronor Investment AB, Västerås |
| SWEDEN | AT — Robotics, Västerås (non legal entity) |
| SWEDEN | ABB Country Treasurer Cash Pool, Stockholm (non legal entity) |
| SWEDEN | AT — Service, Västerås (non legal entity) |
| SWEDEN | PT — High Voltage Products, Ludvika (non legal entity) |
| SWEDEN | PT — Swedewater, Landskrona (non legal entity) |
| SWEDEN | PT — Power Transformers, Ludvika (non legal entity) |
| SWEDEN | ABB Financial Services AB, Sollentuna |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SWEDEN | Teknikbyn Västerås Technology Park, Västerås |
| SWEDEN | UT — Utility Automation Systems, Västerås (non legal entity) |
| SWEDEN | PT — Power Systems Substations, Västerås (non legal entity) |
| SWEDEN | ABB CEWE AB, Västerås |
| SWEDEN | Förenade Elektriska AB, Västerås |
| SWEDEN | AB Electro-Invest, Västerås |
| SWEDEN | AB Svensk Exportkredit, Stockholm |
| SWEDEN | ABB, AB, Västerås |
| SWEDEN | ABB Asea Skandia AB, Västerås |
| SWEDEN | ABB Automation Instrumentation AB, Västerås |
| SWEDEN | ABB Automoation Technology Products AB, Västerås |
| SWEDEN | ABB Body in White AB, Västerås |
| SWEDEN | ABB Building Systems AB, Västerås |
| SWEDEN | ABB CSC Finance AB, Stockholm |
| SWEDEN | ABB Electrotec AB, Västerås |
| SWEDEN | ABB Energy Information Systems AB, Stockholm |
| SWEDEN | ABB Facilities Management, Västerås (non legal entity) |
| SWEDEN | ABB Figeholms Bruk AB, Västerås |
| SWEDEN | ABB Financial Consulting, Stockholm (non legal entity) |
| SWEDEN | ABB Financial Energy AB, Stockholm |
| SWEDEN | ABB Financial Holding, Stockholm (non legal entity) |
| SWEDEN | ABB Fl?kt Virkestorkning AB, Skellefteå |
| SWEDEN | ABB Fullservice AB, ?rnsk?ldsvik |
| SWEDEN | ABB Group Services Center AB, Västerås |
| SWEDEN | ABB I-R Waterjet AB, Ronneby |
| SWEDEN | ABB Industris AB, Västerås |
| SWEDEN | ABB Industriunderhåll AB, Degerfors |
| SWEDEN | ABB Inelta AB, Västerås |
| SWEDEN | ABB Insurance Holding Sweden AB, Stockholm |
| SWEDEN | ABB Kabeldon, Alingsås (non legal entity) |
| SWEDEN | ABB Kumotech AB, Sundsvall |
| SWEDEN | ABB Livsmedelsunderhåll AB, Eskilstuna |
| SWEDEN | ABB Manufacturing & Consumer Industries |
| SWEDEN | AB, Västerås |
| SWEDEN | ABB Motors Central Stock Nordic AB, Västerås |
| SWEDEN | ABB New Finance AB, Stockholm |
| SWEDEN | ABB New Ventures AB, Västerås |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES

## NON-DEBTOR AFFILIATES

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SWEDEN | ABB Olofstrom Automation Group AB, Västerås |
| SWEDEN | ABB Robotics AB, Västerås |
| SWEDEN | ABB Service AB, Västerås |
| SWEDEN | ABB Service Pappersunderhåll AB, Västerås |
| SWEDEN | ABB Structured Finance Investment AB, Stockholm |
| SWEDEN | ABB Support AB, Västerås |
| SWEDEN | ABB TD Finance AB, Stockholm |
| SWEDEN | ABB Teknikservice AB, Fagersta |
| SWEDEN | ABB Transformers Partille AB, Partille |
| SWEDEN | ABB Utilities AB, Västerås |
| SWEDEN | ABB Welding Systems AB, Västerås |
| SWEDEN | Allmanna Svenska Elektriska AB, Västerås |
| SWEDEN | AT — Arc Welding & Application Equipment, Laxå (non legal entity) |
| SWEDEN | AT — Metering, Kista (non legal entity) |
| SWEDEN | AT — Motors & Machines, Västerås (non legal entity) |
| SWEDEN | AT — Nordkomponent, Bollnås (non legal entity) |
| SWEDEN | CEPA Industri AB, Grängesberg |
| SWEDEN | CEPA Presstenknik AB, Grängesberg |
| SWEDEN | Cleanroom — Building Systems, Stockholm (non legal entity) |
| SWEDEN | Embedded Artists AB, Västerås |
| SWEDEN | Fastighets AB B?lgen, Västerås |
| SWEDEN | Fastighets AB Isolatorn, Västerås |
| SWEDEN | Fastighets AB Jonslund, Västerås |
| SWEDEN | Fastighets AB Lothar, Västerås |
| SWEDEN | Fastighets AB Nalmaberg, Västerås |
| SWEDEN | Fastighets AB Regionen, Västerås |
| SWEDEN | Fastighets AB Romberga, Västerås |
| SWEDEN | Fastighets AB Sinus, Västerås |
| SWEDEN | Fastighets AB Solskåvan, Västerås |
| SWEDEN | Fastighets AB Örjan, Västerås |
| SWEDEN | GMKI Elkonsult, Stockholm (non legal entity) |
| SWEDEN | Karl Hanssons Elektriska AB, Västerås |
| SWEDEN | Kunskapshusen, Stockholm |
| SWEDEN | Life Cycle Profit AB, Västerås |
| SWEDEN | MC — Communications, Västerås (non legal entity) |
| SWEDEN | Mobility4Sweden AB, Stockholm |
| SWEDEN | Nyk?pings Ljus & Kraft AB, Västerås |

10,603,556        PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SWEDEN | PI — Marine & Turbocharing, Askim (non legal entity) |
| SWEDEN | PT — Assist, Ludvika (non legal entity) |
| SWEDEN | PT — Capacitors, Ludvika (non legal entity) |
| SWEDEN | PT — Distribution Transformers, Mj?lby (non legal entity) |
| SWEDEN | PT — High Voltage Cables, Karlskrona (non legal entity) |
| SWEDEN | PT — Medium Voltage Products, Arboga (non legal entity) |
| SWEDEN | PT — Transformers, Ludvika (non legal entity) |
| SWEDEN | Sirius International F?rs?krings AB (publ), Stockholm |

| | |
|---|---|
| SWEDEN | Stiftelsen Electronikcentrum, Kista |
| SWEDEN | Stratos Ventilation AB, Västerås |
| SWEDEN | Str?mberg Svenska AB, Västerås |
| SWEDEN | Swedish Hydropower University AB, Västerås |
| SWEDEN | Tre Kronor Kapital AB, Stockholm |
| SWEDEN | Turbec AB, Malm? |
| SWEDEN | UT — Power Systems, Ludvika (non legal entity) |
| SWEDEN | UT — Utilities, Automation, Västerås (non legal entity) |
| SWITZERLAND | ABB Ltd, Zurich |
| SWITZERLAND | ABB Asea Brown Boveri Ltd., Zurich |
| SWITZERLAND | ABB Insurance Brokers AG, Baden |
| SWITZERLAND | ABB Automation Technologies Management Ltd., Zurich |
| SWITZERLAND | BBC Brown Boveri AG, Zurich |
| SWITZERLAND | ABB CMC Low Voltage Products, Schaffhausen (non legal entity) |
| SWITZERLAND | ABB Corporate Research, Baden-Dättwil (non legal entity) |
| SWITZERLAND | ABB Credit, Baden (non legal entity) |
| SWITZERLAND | ABB Dicoesa, Belfaux |
| SWITZERLAND | ABB Energy Engineering AG, Zurich |
| SWITZERLAND | ABB MEA Participation Ltd., Zurich |
| SWITZERLAND | ABB Energy Services International Ltd., Zurich |
| SWITZERLAND | ABB Information Systems Ltd., Zurich |
| SWITZERLAND | ABB Handels — und Verwaltungs AG, Zurich |
| SWITZERLAND | ABB Hochspannungstechnik, Zurich (non legal entity) |
| SWITZERLAND | ABB Intra AG, Zurich |
| SWITZERLAND | ABB Immobilien AG, Baden |
| SWITZERLAND | ABB Industrie, Baden (non legal entity) |
| SWITZERLAND | ABB Business Services, Baden (non legal entity) |
| SWITZERLAND | ABB International Services AG, Zurich |
| SWITZERLAND | Micafil AG, Zurich (non legal entity) |
| SWITZERLAND | ABB Modular Scalable Solutions, Baden (non legal entity) |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| SWITZERLAND | ABB Schweiz AG, Baden |
| SWITZERLAND | ABB Low Voltage Power, Lenzburg (non legal entity) |
| SWITZERLAND | ABB Normelec, Zurich (non legal entity) |
| SWITZERLAND | ABB International Marketing Ltd., Zurich |
| SWITZERLAND | ABB Power Technology Systems, Baden (non legal entity) |
| SWITZERLAND | ABB Power Technologies Management Ltd., Zurich |
| SWITZERLAND | ABB Research Ltd., Zurich |
| SWITZERLAND | ABB Sécheron S.A., Satigny |
| SWITZERLAND | ABB Semiconductors, Baden (non legal entity) |
| SWITZERLAND | Skyva Schweiz, Baden (non legal entity) |
| SWITZERLAND | ABB Technology Ltd., Zurich |
| SWITZERLAND | ABB Turbo-Systems Holding Ltd., Baden |
| SWITZERLAND | ABB Turbo-Systems AG, Baden |
| SWITZERLAND | ABB Unifer, Birr (non legal entity) |
| SWITZERLAND | ABB Turbo-Systems Holding Ltd., Baden |
| SWITZERLAND | "Patelhold" Patentverwertungs — und Elektro-Holding AG, Zurich |
| SWITZERLAND | ABB AP Trading & Engineering (Holding Taiwan), Zurich (non legal entity) |
| SWITZERLAND | ABB AP Trading & Engineering AG, Zurich |
| SWITZERLAND | ABB Asea Brown Boveri Ltd., Zurich |

| | |
|---|---|
| SWITZERLAND | ABB Asia Participations AG, Zurich |
| SWITZERLAND | ABB Automation Technology Products Management Ltd., Zurich |
| SWITZERLAND | ABB Automation Technology, Zurich (non legal entity) |
| SWITZERLAND | ABB CMC Carl Maier, Schaffhausen (non legal entity) |
| SWITZERLAND | ABB Corporate Management Services AG, Zurich |
| SWITZERLAND | ABB Credit, Baden |
| SWITZERLAND | ABB Elettro Impianti S.A., Lugano |
| SWITZERLAND | ABB Energie Services Schweiz, Zurich |
| SWITZERLAND | ABB Equity Ventures, Zurich (non legal entity) |
| SWITZERLAND | ABB Export Bank, Zurich |
| SWITZERLAND | ABB Financial Services Investments Ltd., Zurich |
| SWITZERLAND | ABB Financial Services Ltd., Zurich |
| SWITZERLAND | ABB Flexible Automation, Zurich (non legal entity) |
| SWITZERLAND | ABB Future, Zurich (non legal entity) |
| SWITZERLAND | ABB Geb?udetechnik Schweiz, Volketswil (non legal entity) |
| SWITZERLAND | ABB Group Processes Ltd., Zurich |
| SWITZERLAND | ABB Holding AG, Zurich |
| SWITZERLAND | ABB Installationen AG, Volketswil |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| SWITZERLAND | ABB KeyCom AG, Zurich |
| SWITZERLAND | ABB Low Voltage Power, Baden (non legal entity) |
| SWITZERLAND | ABB Manufacturing and Consumer Industries Management Ltd., Zurich |
| SWITZERLAND | ABB New Ventures Ltd., Zurich |
| SWITZERLAND | ABB Oil, Gas and Petrochemicals Management Ltd., Zurich |
| SWITZERLAND | ABB Participation, Baden (non legal entity) |
| SWITZERLAND | ABB Power Automation, Turgi (non legal entity) |
| SWITZERLAND | ABB Power Technology Products |
| SWITZERLAND | Mangement Ltd., Zurich |
| SWITZERLAND | ABB Process Industries Management Ltd., Zurich |
| SWITZERLAND | ABB Projects and Services Ltd., Zurich |
| SWITZERLAND | ABB Schweiz Holding AG, Baden |
| SWITZERLAND | ABB Structured Finance, Zurich (non legal entity) |
| SWITZERLAND | ABB Unifer, Baden (non legal entity) |
| SWITZERLAND | ABB Utilities Management Ltd., Zurich |
| SWITZERLAND | AIRRANGE AG, Zurich |
| SWITZERLAND | Arnold AG, Bern |
| SWITZERLAND | Asea Brown Boveri (Middle East & Africa ) Ltd., Baden |
| SWITZERLAND | Broger AG, M?llheim |
| SWITZERLAND | Entrelec International Dicoesa, Belfaux |
| SWITZERLAND | Entrelec Swiss, Belfaux |
| SWITZERLAND | Grossenbacher Installationen AG, St. Gallen |
| SWITZERLAND | JAG Jakob Installationen AG, Biel |
| SWITZERLAND | Kriegel & Co., Inh. Th. Muller AG, Muttenz |
| SWITZERLAND | Kriegel & Schaffner AG, Basel |
| SWITZERLAND | Rabbit-Air Ltd., Kloten |
| SWITZERLAND | Skyva Switzerland AG, Haegendorf |
| SWITZERLAND | Swiss Settlement Center, Baden (non legal entity) |
| TAIWAN | ABB Ltd., Taipei |
| TANZANIA, UNITED REPUBLIC | Asea Brown Boveri Ltd., Dar Es Salaam |
| TANZANIA, UNITED REPUBLIC | ABB Pemacco Ltd., Dar es Salaam |

| Country Name | Company Legal Name |
|---|---|
| TANZANIA, UNITED REPUBLIC | ABB Tanelec Ltd., Arusha |
| TANZANIA, UNITED REPUBLIC | ABB Berkeley Electrical Ltd., Dar es Salaam |
| THAILAND | ABB LIMITED, Bangkok |

10,603,556                PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                          **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| THAILAND | Asea Brown Boveri Holding Ltd., Bangkok |
| THAILAND | ABB Bailey Limited, Bangkok |
| THAILAND | ABB Foundries, Bangkok (non legal entity) |
| THAILAND | Kent Meters (Thailand) Ltd., Bangkok |
| THAILAND | ABB Bailey Limited, Ladyao Jatuchak |
| THAILAND | ABB Capacitors Ltd., Samutprakarn |
| THAILAND | ABB Distribution Ltd., Samutprakarn |
| THAILAND | ABB Engineering & Construction Ltd., Samutprakarn |
| THAILAND | ABB Environmental Ltd., Samutprakarn |
| THAILAND | ABB Industry Ltd., Samutprakarn |
| THAILAND | ABB LIMITED, Samutprakarn |
| THAILAND | ABB Offshore Systems, Thailand (non legal entity) |
| THAILAND | ABB Power Ltd., Samutprakarn |
| THAILAND | ABB Stal Refrigeration Ltd., Samutprakarn |
| THAILAND | Aros-Thai Agencies Ltd., Samutprakarn |
| THAILAND | Asea Brown Boveri Holding Ltd., Samutprakarn |
| THAILAND | Asea Brown Boveri Ltd., Samutprakarn |
| THAILAND | SAE (Thailand) Ltd., Samutprakarn |
| THAILAND | Thailand Enterprises Ltd., Samutprakarn |
| THAILAND | Thephalai Company Ltd., Samutprakarn |
| TUNISIA | L'Ebenoid Production, Tunisie |
| TUNISIA | ABB Maghreb Services S.A., Tunis |
| TURKEY | ABB Holding A.S., Istanbul |
| TURKEY | ABB Barmek Elektrik Sanayi Ve Ticaret, Ankara |
| TURKEY | ABB Elektrik Sanayi A.S., Istanbul |
| UGANDA | ABB Ltd., Kampala |
| UKRAINE | ABB Ltd., Kiev |
| UKRAINE | ABB ELEKTRO Closed Joint Stock Company, Kiev |
| UKRAINE | ABB Ukrelektroapparat Transformer Ltd., Khmelnitzkij |
| UKRAINE | ABB Monolit, Kharkov-664 |
| UKRAINE | Eco-Engineering, Kiev |
| UKRAINE | |
| UNITED ARAB EMIRATES | ABB Energy Automation S.p.A., Abu Dhabi |
| UNITED ARAB EMIRATES | ABB Transmission & Distribution Ltd., Abu Dhabi |
| UNITED ARAB EMIRATES | ABB Industries (L.L.C), Dubai |
| UNITED ARAB EMIRATES | ABB Investments and Services FZE, Dubai |
| UNITED KINGDOM | ABB Ltd., Warrington |
| UNITED KINGDOM | Architron Steward Ltd., Warrington |

10,603,556                PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                          **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| UNITED KINGDOM | ABB Magda Ltd., Warrington |
| UNITED KINGDOM | Bailey Automation PLC, Warrington |

| UNITED KINGDOM | ABB UK LV Product Sales, Coventry (non legal entity) |
| UNITED KINGDOM | ABB Control Ltd., Exhall, Coventry |
| UNITED KINGDOM | ABB Credit Ltd., London |
| UNITED KINGDOM | ABB Eutech Limited, Warrington |
| UNITED KINGDOM | ABB UK LV Switchgear, Sunderland (non legal entity) |
| UNITED KINGDOM | Elsag Bailey Ltd., Warrington |
| UNITED KINGDOM | ABB Equity Development Company Ltd., London |
| UNITED KINGDOM | ABB UK LV Product Manufacturing, Coventry (non legal entity) |
| UNITED KINGDOM | Entrelec UK Ltd., Coventry |
| UNITED KINGDOM | ABB Equity Ventures (UK) Ltd., London |
| UNITED KINGDOM | ABB Equity Limited, Guernsey |
| UNITED KINGDOM | ABB ESAP Limited, Guernsey |
| UNITED KINGDOM | ABB UK Engineering Services & Solutions, Warrington (non legal entity) |
| UNITED KINGDOM | ABB Equity Ventures (Jersey) Ltd., Jersey |
| UNITED KINGDOM | ABB Flexible Automation Ltd., Warrington |
| UNITED KINGDOM | ABB Energy Information Systems Ltd., Warrington |
| UNITED KINGDOM | Gratte Barrett & Wright Ltd., London |
| UNITED KINGDOM | Fischer and Porter Ltd., Warrington |
| UNITED KINGDOM | ABB Treasury & Energy Services (UK) PLC, Warrington |
| UNITED KINGDOM | ABB Lummus Global Ltd., Surrey |
| UNITED KINGDOM | ABB Holdings Ltd., Warrington |
| UNITED KINGDOM | ABB International Finance Limited, Guernsey |
| UNITED KINGDOM | ABB Insurance Limited, Guernsey |
| UNITED KINGDOM | ABB UK Automation Products & Processes, Warrington (non legal entity) |
| UNITED KINGDOM | ABB IOP Services Ltd., Surrey |
| UNITED KINGDOM | ABB Investments Ltd., Warrington |
| UNITED KINGDOM | ABB UK Process Instrumentation, Warrington (non legal entity) |
| UNITED KINGDOM | Kent Introl Ltd., Warrington |
| UNITED KINGDOM | ABB Lummus Crest Ltd., Surrey |
| UNITED KINGDOM | Lighting for Staffordshire Holdings Ltd., Staffordshire |
| UNITED KINGDOM | Entrelec MTE, Coventry |
| UNITED KINGDOM | Lighting for Staffordshire Ltd., Staffordshire |
| UNITED KINGDOM | ABB Lutech Resources Ltd., Surrey |
| UNITED KINGDOM | ABB Motors Limited, Warrington |

10,603,556                PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                                **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| UNITED KINGDOM | ABB Metering Systems Ltd., Warrington |
| UNITED KINGDOM | ABB Process Analytics Ltd., Warrington |
| UNITED KINGDOM | Power Asset Development Company Ltd., Croydon |
| UNITED KINGDOM | ABB Support Ltd., Warrington |
| UNITED KINGDOM | ABB UK Power Division, Stone (non legal entity) |
| UNITED KINGDOM | ABB Real Estate, Warrington |
| UNITED KINGDOM | Constructors Sadelmi International Ltd., Jersey (Channel Islands) |
| UNITED KINGDOM | ABB Service Limited, Warrington |
| UNITED KINGDOM | ABB Instrumentation Ltd., Warrington |
| UNITED KINGDOM | Seeboard Powerlink Ltd., Waterloo |
| UNITED KINGDOM | ABB Automation Ltd., Warrington |
| UNITED KINGDOM | ABB Power T&D Ltd., Stone |
| UNITED KINGDOM | ABB Low Voltage Systems Ltd., Sunderland |
| UNITED KINGDOM | ABB Transinvest Limited, Guernsey |
| UNITED KINGDOM | ABB Ventilation & Refrigeration Ltd, Warrington |

| UNITED KINGDOM | Westwood Major Ltd., Warrington |
| UNITED KINGDOM | ABB Building Technologies Ltd, Warrington |
| UNITED KINGDOM | William Steward (Holdings) Ltd., Warrington |
| UNITED KINGDOM | William Steward International Ltd., Warrington |
| UNITED KINGDOM | William Steward London Ltd., Warrington |
| UNITED KINGDOM | William Steward (Northern) Ltd., Warrington |
| UNITED KINGDOM | ABB Combined Heat and Power Ltd., Warrington |
| UNITED KINGDOM | ABB Automation Ltd., Stevenage |
| UNITED KINGDOM | ABB Building Technologies, Solihull |
| UNITED KINGDOM | ABB Consultancy Services Ltd., Hants |
| UNITED KINGDOM | ABB Energy Information Systems Ltd., Farnham, Surrey |
| UNITED KINGDOM | ABB Energy Services Ltd., Cheltenham |
| UNITED KINGDOM | ABB Equity Ventures (Jersey) Ltd., Jersey |
| UNITED KINGDOM | ABB ESOP Limited, Guernsey |
| UNITED KINGDOM | ABB Eurofin Limited, Guernsey |
| UNITED KINGDOM | ABB Flexible Automation Ltd., Milton Keynes |
| UNITED KINGDOM | ABB Holdings Company Limited, St. Helier/Jersey |
| UNITED KINGDOM | ABB Holdings Ltd., London |
| UNITED KINGDOM | ABB Instrumentation Control Valvbes, St. Neots (non legal entity) |
| UNITED KINGDOM | ABB Instrumentation Ltd., St. Neots |
| UNITED KINGDOM | ABB Investments Ltd., London |
| UNITED KINGDOM | ABB Ltd., London |
| UNITED KINGDOM | ABB Lummus Crest Ltd., Redhill |

10,603,556             PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
|---|---|
| UNITED KINGDOM | ABB Lummus Global Ltd., Redhill |
| UNITED KINGDOM | ABB Lutech Resources Ltd., Redhill |
| UNITED KINGDOM | ABB Magda Ltd., Crawley |
| UNITED KINGDOM | ABB Metering Systems Ltd., Stone |
| UNITED KINGDOM | ABB Motors Limited, London |
| UNITED KINGDOM | ABB Offshore Systems Ltd., Bristol |
| UNITED KINGDOM | ABB Power T&D Ltd, Stone |
| UNITED KINGDOM | ABB Process Analytics Ltd., St. Neots |
| UNITED KINGDOM | ABB Real Estate, London |
| UNITED KINGDOM | ABB Support Ltd., Derby |
| UNITED KINGDOM | ABB Trading (UK) Ltd., London |
| UNITED KINGDOM | ABB Transinvest Limited, St. Helier, Jersey |
| UNITED KINGDOM | ABB Treasury & Energy Servides (UK) PLC, London |
| UNITED KINGDOM | ABB Ventilation & Refrigeration Ltd, Birmingham |
| UNITED KINGDOM | ABB Vetco Gray U.K. Ltd., Aberdeen |
| UNITED KINGDOM | ABB Zantingh Ltd., Cheltenham |
| UNITED KINGDOM | Architron Steward Ltd., London |
| UNITED KINGDOM | Durham Control Systems Ltd., London |
| UNITED KINGDOM | Durham Switchgear International Ltd., London |
| UNITED KINGDOM | Durham Switchgear Ltd., London |
| UNITED KINGDOM | Durham Switchgear Middle East Ltd., London |
| UNITED KINGDOM | Elsag Bailey Ltd., Telford |
| UNITED KINGDOM | Entrelec MTE, Essex |
| UNITED KINGDOM | Entrelec UK Ltd., West Sussex |
| UNITED KINGDOM | European Field Development Technology Ltd., Sutton |
| UNITED KINGDOM | GN Novinvest Ltd., St. Helier |

| UNITED KINGDOM | Kent Introl Ltd., Brighouse |
| UNITED KINGDOM | Koomey Companies International Ltd., Aberdeen |
| UNITED KINGDOM | Syntheseas Ltd., London |
| UNITED KINGDOM | West Africa Completion Services Ltd., London |
| UNITED KINGDOM | William Steward (Holdings) Ltd., London |
| UNITED KINGDOM | William Steward (Northern) Ltd., London |
| UNITED KINGDOM | William Steward International Ltd., London |
| UNITED KINGDOM | Willaim Steward London Ltd., London |
| UNITED KINGDOM | William Steward Overseas Ltd., London |
| UNITED STATES | Sarida Offshore Company |
| UNITED STATES | Susa/A.Arenson/Baran Group, North Brunswick NJ |
| UNITED STATES | Asea Brown Boveri, Norwalk (non legal entity) |

10,603,556            PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
| --- | --- |
| UNITED STATES | ABB Barranquilla Inc., Princeton, NJ |
| UNITED STATES | Basic Incorporated, Rocky Hill, CT |
| UNITED STATES | ABB Instrumentation, Warminster (non legal entity) |
| UNITED STATES | ABB Capital (USA) LLC, Delaware |
| UNITED STATES | Catalytic Distillation Technologies, Bloomfield |
| UNITED STATES | CDTech International Corporation, Houston |
| UNITED STATES | Combustion Engineering Inc., Norwalk, CT |
| UNITED STATES | Chevron-Lummus Global, LLC, Bloomfield |
| UNITED STATES | ABB Control, Wichita Falls (non legal entity) |
| UNITED STATES | ABB Corporate Research Center, Raleigh (non legal entity) |
| UNITED STATES | Connecticut Valley Claims, CT |
| UNITED STATES | ABB Dry Type Transformers, Bland (non legal entity) |
| UNITED STATES | ABB Foundries, Wickliffe (non legal entity) |
| UNITED STATES | ABB Jeff City PTTR, Jefferson City (non legal entity) |
| UNITED STATES | DLI Engineering Corp., Bainbridge Island |
| UNITED STATES | ABB Susa/Dillingham, North Brunswick |
| UNITED STATES | ABB Liquid Filled Small Power Transformers, South Boston (non legal entity) |
| UNITED STATES | ABB Equity Ventures Inc., Princeton, NJ |
| UNITED STATES | ABB Flexible Automation, New Berlin, WI (non legal entity) |
| UNITED STATES | ABB Holdings Inc., Norwalk |
| UNITED STATES | ABB Investments LLC, Norwalk, CT |
| UNITED STATES | ABB Automation, Columbus (non legal entity) |
| UNITED STATES | Brown & Root/ABB SUSA, North Brunswick |
| UNITED STATES | KOMPOSIT AMERICAS Risk Management, Consultancy & Insurance Brokerage Serv. California |
| UNITED STATES | ABB LGI Constructors Inc., Houston, TX |
| UNITED STATES | ABB Lummus Global Americas Division, Houston, TX (non-legal entity) |
| UNITED STATES | Lummus Catalyst Company, Bloomfield, NJ |
| UNITED STATES | ABB Finance Inc., Norwalk, CT |
| UNITED STATES | ABB Lummus Global Construction Company, Houston |
| UNITED STATES | ABB LGI/Grootint Joint Venture, Houston |
| UNITED STATES | ABB Lummus Global International Corp., Texas |
| UNITED STATES | ABB Lummus Global Overseas Corporation, Bloomfield, NJ |
| UNITED STATES | Joint Venture ABB Lummus Snamprogetti USA, Houston |
| UNITED STATES | ABB LG technology division, Bloomfield (non legal entity) |
| UNITED STATES | ABB Lummus Global Eliminations Unit, Bloomfield (non legal entity) |
| UNITED STATES | ABB Lummus Global Inc., Bloomfield, NJ |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                    **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| UNITED STATES | ABB Muncie PTTR, Alamo (non legal entity) |
| UNITED STATES | ABB Automation, New Berlin (non legal entity) |
| UNITED STATES | ABB Oil & Gas USA Inc., Houston, TX |
| UNITED STATES | ABB Inc., Raleigh NC |
| UNITED STATES | ABB Process Analytics, Lewisburg, WV (non legal entity) |
| UNITED STATES | ABB Performance Services LLC, Norwalk |
| UNITED STATES | ABB Paint Finishing Inc., Auburn Hills, MI |
| UNITED STATES | ABB High Voltage, Mt.Pleasant PA (non legal entity) |
| UNITED STATES | ABB Medium Voltage, Lake Mary FL (non legal entity) |
| UNITED STATES | ABB Power Systems, Raleigh NC (non legal entity) |
| UNITED STATES | ABB Prospects Inc., Norwalk |
| UNITED STATES | ABB Utility Automation, Wickliffe OH (non legal entity) |
| UNITED STATES | ABB Susa Inc., North Brunswick, NJ |
| UNITED STATES | Dillingham/ABB Susa, North Brunswick |
| UNITED STATES | ABB Business Services, Cary, NC (non legal entity) |
| UNITED STATES | Camelot IS-2 International, Inc. D/B/A Skyva International, Wickliffe |
| UNITED STATES | ABB Semiconductors Inc., Pittsburgh PA |
| UNITED STATES | ABB Susa International Inc., North Brunswick, NJ |
| UNITED STATES | Lockwood/ABB Susa, North Brunswick |
| UNITED STATES | ABB Alamo PTTR, Alamo, TN (non legal entity) |
| UNITED STATES | ABB Treasury Center USA Inc., Norwalk, CT |
| UNITED STATES | ABB Totalflow, Bartlesville (non legal entity) |
| UNITED STATES | Lummus Thyssen Rheinstahl Technik GmbH, Bloomfield |
| UNITED STATES | ABB St.Louis PTTR, St.Louis MO (non legal entity) |
| UNITED STATES | ABB Turbocharger, North Brunswick, NJ (non legal entity) |
| UNITED STATES | ABB Automation Metering and Systems, Raleigh (non legal entity) |
| UNITED STATES | ABB Body in White Inc., Auburn Hills, MI |
| UNITED STATES | ABB Business Services, Raleigh, NC (non legal entity) |
| UNITED STATES | ABB Control Valves Inc., South Plainfield NJ |
| UNITED STATES | ABB DTC Inc., Bloomfield, NJ |
| UNITED STATES | ABB Finance Inc., Stamford, CT |
| UNITED STATES | ABB Financial Services Inc., Stamford, CT |
| UNITED STATES | ABB Inc., Raleigh NC |
| UNITED STATES | ABB Industrial Products, Norwalk (non legal entity) |
| UNITED STATES | ABB Infrastructure Management Services Inc., Littleton, CO |
| UNITED STATES | ABB Offshore Systems, Inc., Houston |
| UNITED STATES | ABB OFS, America (non legal entity) |
| UNITED STATES | ABB OFS, America (non legal entity) |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
                    **NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| UNITED STATES | ABB Semiconductors Inc., Norwarlk, CT |
| UNITED STATES | ABB Structured Finance (USA) Inc., Stamford |
| UNITED STATES | ABB Substation Automation and Protection, Allentown (non legal entity) |
| UNITED STATES | ABB Susa/A.Arenson/Baran Group, North Brunswick NJ |
| UNITED STATES | ABB Susa/Brown & Root, North Brunswick |
| UNITED STATES | ABB Susa/Cegaz, North Brunswick |

| | |
|---|---|
| UNITED STATES | ABB Susa/KDL, North Brunswick |
| UNITED STATES | ABB Vetco Gray Eliminations Unit, Houston (non legal entity) |
| UNITED STATES | ABB Vetco Gray Inc., Houston, TX |
| UNITED STATES | ABB Vetco Gray Western Hemisphere (non legal entity) |
| UNITED STATES | Asea Brown Boveri Inc., Norwalk, CT |
| UNITED STATES | Asea Harvest Partners I, New York |
| UNITED STATES | Asea Harvest Partners II, New York |
| UNITED STATES | Bailey Fischer & Porter, Warminster (non legal entity) |
| UNITED STATES | Elsag Bailey Automation, Wickliffe (non legal entity) |
| UNITED STATES | Entrelec Inc., Texas |
| UNITED STATES | GPE Sales, LLC, Princeton NJ |
| UNITED STATES | Grande Prarie Energy, LLC, Princeton, NJ |
| UNITED STATES | Howard-Harbert-Sadelmi, Birmingham |
| UNITED STATES | Indeck North American Power Fund L.P., Wheeling |
| UNITED STATES | Indeck North American Power Partners L.P., Wheeling |
| UNITED STATES | Integrated Communications Systems Inc., Smyrna |
| UNITED STATES | Ixys Corporation, Santa Clara |
| UNITED STATES | Koomey Companies International Inc., Houston |
| UNITED STATES | Lummus Catalyst Company, Bloomfield, NJ |
| UNITED STATES | Offshore Production Systems, Inc., Houston, TX |
| UNITED STATES | Satellite Services International Inc, Houston |
| UNITED STATES | Shared Savings Contract, Inc., Saint Louis |
| UNITED STATES | Sirius America Insurance Company, New York, NY |
| UNITED STATES | SSAC, Baldwinsville — NY |
| UNITED STATES | Tiger Brands, Inc., Cleveland, OH |
| UNITED STATES | Ultryx Corporation, Ohio |
| URUGUAY | ABB CL Logistic S.A., Montevideo |
| URUGUAY | SBE Uruguay S.A., Montevideo |
| URUGUAY | ABBSF Trading S.A., Montevideo |
| UZBEKISTAN | ABB CHTZ Closed Joint Stock Company, Chirchik |
| UZBEKISTAN | ABB Tamir Ltd., Nurabad |
| VENEZUELA | Asea Brown Boveri S.A., Caracas |

10,603,556                           PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| VENEZUELA | Heat Transfer Systems de Venezuela, Caracas |
| VENEZUELA | ABB Servicios Vetco Gray de Venezuela C.A., Las Morochas |
| VENEZUELA | ABB Vetco Gray de Venezuela, C.A., Maracaibo |
| VENEZUELA | Transformadores de Distribucion Trade, S.A., Caracas |
| VIET NAM | ABB Vietnam Rep. Office, Vietnam (non legal entity) |
| VIET NAM | ABB Ltd., Hanoi |
| ZAMBIA | ABB Ltd., Lusaka |
| ZIMBABWE | ABB Service (Private) Ltd., Harare |
| ZIMBABWE | ABB (Private) Ltd., Harare |
| ZIMBABWE | ABB Steward (PVT) Ltd., Harare |

10,603,556                           PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES

**PLAN EXHIBIT C**

**ALSTOM AND ALSTOM NV AFFILIATES**

## ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
| --- | --- |
| Algeria | ALSTOM Algérie "Société par Actions" |
| Argentina | ALSTOM Argentina S.A. |
| Argentina | RAPIVIA S.A. |
| Australia | ALSTOM Australia Holdings Limited |
| Australia | ALSTOM Australia Limited |
| Australia | ALSTOM Australia Superannuation Plan Pty Limited |
| Australia | ALSTOM Melbourne Transport Limited |
| Australia | ALSTOM Painting Systems Pty Limited |
| Australia | ALSTOM Power Limited |
| Australia | ALSTOM Power Project Management Pty Limited |
| Australia | ALSTOM Power Site Services Pty Limited |
| Australia | BABCOCK ENGINEERING AUSTRALIA PTY LIMITED |
| Australia | MAINCO MELBOURNE PTY LIMITED |
| Australia | RAIL FLEET SERVICES LIMITED |
| Australia | SIGMA ENERGY SOLUTIONS PTY LTD |
| Austria | ALSTOM Power Austria GmbH |
| Austria | ALSTOM Power Flowsystems GmbH |
| Bahamas | ALSTOM POWER ESPANA-BAHAMAS LTD |
| Belgium | ALSTOM Acec Energie SA |
| Belgium | ALSTOM Belgium SA |
| Belgium | ALSTOM Finances et Services SA |
| Belgium | ALSTOM Power Management Services S.A. |
| Belgium | ALSTOM T&D Belgium |
| Belgium | BGT BELGIUM N.V. |
| Belgium | GEC ALSTHOM SALES NETWORK S.A. |
| Belgium | SERVICES TECHNIQUES BALTEAU |
| Brazil | AIR PREHEATER EQUIPAMENTOS LTDA |
| Brazil | ALSTOM Brasil Ltda |
| Brazil | ALSTOM Elec Equipamentos Eletricos Ltda |
| Brazil | ALSTOM Industria S/A |
| Brazil | CEBRAF SERVICOS S.A. |
| Brazil | ETE — EQUIPAMENTOS DE TRACAO ELETRICA LTDA |
| Bulgaria | ALSTOM Power Bulgaria SP Ltd |
| Canada | ALSTOM Canada Inc. |
| Canada | GENERAL RAILWAY SIGNAL OF CANADA LTD |
| Canada | TELECITE INC. |
| Chile | ALSTOM Chile S.A. |
| Chile | ALSTOM Power Tocopilla Limitada |
| China | ABB POWER GENERATION LIMITED |
| China | ALSTOM (China) Investment Co., Ltd |
| China | ALSTOM Beizhong Power (Beijing) Co., Ltd |
| China | ALSTOM Hong Kong Ltd |
| China | ALSTOM Qingdao Railway Equipment Co Ltd |
| China | ALSTOM Technical Services (Shanghai) Co., Ltd |
| China | ALSTOM Wuhan Automation Co Limited — AWAC |
| China | BEIJING ALSTOM Engineering Consultancy Services Co., Ltd |
| China | CASCO SIGNAL LTD |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
| --- | --- |
| China | SHANGHAI ALSTOM Transport Company Limited |
| China | SHANGHAI ALSTOM Transport Electrical Equipment Company Ltd |
| China | TIANJIN ALSTOM Hydro Co., Ltd |

| | |
|---|---|
| Colombia | ALSTOM Power Colombia S.A. |
| Congo (ex-Zaire) | GEC ALSTHOM ACEC CONGO |
| Croatia | ALSTOM Croatia Ltd |
| Czech Republic | ALSTOM a.s. |
| Czech Republic | ALSTOM Czech s.r.o., ALSTOM Group |
| Czech Republic | ALSTOM Power CZ, s.r.o. |
| Czech Republic | ALSTOM Power, s.r.o., ALSTOM Group |
| Denmark | ALSTOM Danmark A/S |
| Denmark | ALSTOM Power Denmark A/S |
| Denmark | ALSTOM Power FlowSystems A/S |
| Denmark | ROSENFELT CHRISTENSEN & WEST ENERGI A/S |
| Egypt | ALSTOM International Egypt S.A.E. |
| Egypt | ALSTOM Power Egypt for Power Generation & Electrical Works SAE |
| Egypt | ALSTOM Water Systems |
| Estonia | ALSTOM Estonia AS |
| Finland | ALSTOM Finland Oy |
| Finland | ALSTOM Power FlowSystems Oy |
| France | A.M.R. |
| France | ALSTOM BGR |
| France | ALSTOM DDF |
| France | ALSTOM Fluides et Mécanique |
| France | ALSTOM Holdings |
| France | ALSTOM I.T.C. ou ALSTOM Infrastructure Technology Center |
| France | ALSTOM International |
| France | ALSTOM Kléber Eleven |
| France | ALSTOM Kleber Nancy (Société en liquidation) |
| France | ALSTOM Kléber Nine |
| France | ALSTOM Kleber Nineteen |
| France | ALSTOM Kleber Sixteen |
| France | ALSTOM Kléber Thirteen |
| France | ALSTOM Kleber Twenty |
| France | ALSTOM Leroux Naval |
| France | ALSTOM Magnets and Superconductors SA |
| France | ALSTOM Management SA |
| France | ALSTOM Moteurs SA |
| France | ALSTOM Power Boilers |
| France | ALSTOM Power Centrales |
| France | ALSTOM Power Conversion |
| France | ALSTOM Power Conversion Holding |
| France | ALSTOM Power Environment |
| France | ALSTOM Power Environmental Consult Sarl |
| France | ALSTOM Power Flowsystems SA |
| France | ALSTOM Power Heat Exchange |
| France | ALSTOM Power Holdings SA |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| France | ALSTOM Power Hydraulique |
| France | ALSTOM Power Hydro |
| France | ALSTOM Power Industrie |
| France | ALSTOM Power Management |
| France | ALSTOM Power SA |
| France | ALSTOM Power Service |
| France | ALSTOM Power Turbomachines |
| France | ALSTOM Resources Management SA |
| France | ALSTOM Transport Holding |

| | |
|---|---|
| France | ALSTOM Transport SA |
| France | BELFORT INVESTISSEMENT |
| France | CENTRE D'ESSAIS FERROVIAIRE EN REGION NORD PAS DE CALAIS SA |
| France | CHANTIERS DE L'ATLANTIQUE |
| France | COMPAGNIE DE MONTAGES ELECTRIQUES A L'EXPORTATION — COMELEX |
| France | ENERMECA |
| France | ETOILE KLEBER |
| France | FRAMECA — FRANCE METRO CARACAS |
| France | HYMEC — SOCIETE D'EQUIPEMENT HYDROMECANIQUE |
| France | HYMEC ENERGY |
| France | INNORAIL |
| France | INTERINFRA (COMPAGNIE INTERNATIONALE POUR LE DEVELOPPEMENT D'INFRASTRUCTURES) |
| France | KLEBER CARNOT |
| France | LORELEC |
| France | PRINCIPIA MARINE SA |
| France | RESTAURINTER |
| France | SDEM SA (en liquidation) |
| France | SOCIETE CIVILE IMMOBILIERE KLEBER-BELFORT — SCIKB |
| France | SOGEEF (Société de gestion et d'exploitation ferroviaire) |
| France | TECHNOS ET COMPAGNIE |
| Germany | ALSTOM Ballard GmbH |
| Germany | ALSTOM Energie GmbH |
| Germany | ALSTOM Energie Service GmbH |
| Germany | ALSTOM GmbH |
| Germany | ALSTOM Information Technology Centre GmbH |
| Germany | ALSTOM LHB GmbH |
| Germany | ALSTOM Lokomotiven Service GmbH |
| Germany | ALSTOM Power AG |
| Germany | ALSTOM Power Boiler GmbH |
| Germany | ALSTOM Power Boiler Service GmbH |
| Germany | ALSTOM Power Conversion GmbH |
| Germany | ALSTOM Power Energy Recovery GmbH |
| Germany | ALSTOM Power Environmental Consult GmbH |
| Germany | ALSTOM Power FlowSystems GmbH |
| Germany | ALSTOM Power Generation AG |
| Germany | ALSTOM Power Service GmbH |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| Germany | ALSTOM Power Support GmbH |
| Germany | ALSTOM T&D GmbH |
| Germany | INTER-ELECTRO-GESELLSCHAFT MBH |
| Germany | MIRAS VERWALTUNGS GMBH & CO VERMIETUNGS-OHG |
| Germany | VGT VORBEREITUNGSGESELLSCHAFT TRANSPORTTECHNIK GMBH |
| Greece | ALSTOM Infrastructure Hellas Joint Stock Technical & Commercial Company |
| Greece | ALSTOM Transport Hellas S.A. |
| Greece | INTERINFRA HELLA ETAIREIA PERIORISMENIS EFTHINIS |
| Greece | JOINT VENTURE SUBURBAN RAILWAY "JV J&P-AVAX SA, ATE GNOMON SA, ETETH SA, ALSTOM TRANSPORT SA |
| Hungary | ALSTOM Power Hungaria Rt. |
| Hungary | ALSTOM Signaling Kft |
| Hungary | BGT HUNGARIA KFT |
| India | ALSTOM Energy Limited |
| India | ALSTOM India Ltd |
| India | ALSTOM Industrial Products Ltd |

| India | ALSTOM Limited |
| India | ALSTOM Power Boilers Services Limited |
| India | ALSTOM Projects India Ltd |
| India | ALSTOM Steam Turbine Limited |
| India | BEACON NEYRPIC LTD |
| India | NTPC ALSTOM POWER SERVICES PRIVATE LTD |
| Indonesia | PT ALSTHOMINDO |
| Indonesia | PT ALSTOM Power Energy Systems Indonesia |
| Iran | ALSTOM Khadamat S.A. |
| Ireland | ALSTOM Ireland Ltd |
| Israel | CITADIS ISRAEL |
| Israel | CITYPASS LIMITED |
| Italy | ALSTOM Ferroviaria S.p.A. |
| Italy | ALSTOM Power FlowSystems s.r.l. |
| Italy | ALSTOM Power Italia S.p.A. |
| Italy | ALSTOM S.p.A. |
| Italy | ALSTOM Transport Systems S.P.A. |
| Italy | CEGELEC ITALIA (IN LIQUIDAZIONE) |
| Italy | S.A.T. SYSTEMA AUTOMATICO DI TRASPORTO S.R.L. |
| Italy | SIM S.P.A. — SOCIETA ITALIANA MONTAGGI S.P.A. |
| Italy | T.P.B. TRASPORTI PUBBLICI DELLA BRIANZA S.p.A. (in bankruptcy) |
| Japan | ALSTOM K.K. |
| Japan | ALSTOM Power Energy Recovery Co, Ltd |
| Japan | JAPAN GAS TURBINE K.K. |
| Japan | KAJIWARA IRON WORKS CO., LTD |
| Japan | NIHON KENGYO K.K. |
| Japan | NIHON SANGYO K.K. |
| Latvia | ALSTOM Latvia Ltd |
| Lithuania | ALSTOM Lietuva Ltd |
| Malaysia | ALSTOM Export Sdn Bhd |
| Malaysia | ALSTOM Power Asia Pacific Sdn Bhd |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| Marshall Islands | AURO SHIPPING SA |
| Mauritius | ALSTOM Infrastructure Holding Ltd |
| Mauritius | ALSTOM Mauritius Ltd |
| Mexico | ALSTOM Mexico, S.A. de C.V. |
| Mexico | ALSTOM Power Azufres S.A. de C.V. |
| Mexico | ALSTOM Power Chicoasen, S.A. de C.V. |
| Mexico | ALSTOM Power Instalaciones S.A. de C.V. |
| Mexico | ALSTOM Power Mexico S.A. de C.V. |
| Mexico | ALSTOM Power Monterrey III S.A. de C.V. |
| Mexico | ALSTOM Power Proyectos S.A. de C.V. |
| Mexico | ALSTOM Servicios, S.A. de C.V. |
| Mexico | ALSTOM Transporte, SA de CV |
| Mexico | BALMEC SA DE CV |
| Mexico | CERREY SA DE CV |
| Mexico | DELAS REPSA |
| Mexico | PESCA INDUSTRIAL CORPORATIVA SA DE CV — PICOSA (en faillite) |
| Mexico | ROSARITO POWER S.A. DE C.V. |
| Morocco | ALSTOM Maroc S.A. |
| Morocco | ALSTOM Power Hydraulique SAS |
| Morocco | HYDROMONTAGE (MAROC) SA (en cours de dissolution) |
| Nepal | NEPAL HYDRO & ELECTRIC PVT.LTD |
| Netherlands | ALSTOM Infrastructure Holding NV |

| | |
|---|---|
| Netherlands | ALSTOM NV |
| Netherlands | ALSTOM Power Flowsystems BV |
| Netherlands | ALSTOM Power International Operations BV |
| Netherlands | ALSTOM POWER INVESTMENT PROJECTS B.V. |
| Netherlands | ALSTOM Power Nederland B.V. |
| Netherlands | ALSTOM POWER TAMUIN HOLDINGS B.V. |
| Netherlands | ALSTOM Transport BV |
| Netherlands | BALTEAU BV |
| Netherlands | GEC ALSTHOM NV |
| New Zealand | ALSTOM New Zealand Holdings Limited |
| New Zealand | ALSTOM New Zealand Limited |
| New Zealand | ALSTOM Power New Zealand Limited |
| New Zealand | ALSTOM Transport New Zealand Limited |
| Nigeria | ALSTOM Nigeria Limited |
| Nigeria | GEC ALSTHOM T&D NIGERIA ELECTRICAL PLANT LTD |
| Nigeria | GEC ALSTHOM T&D NIGERIA POWER ENGINEERING LTD |
| Norway | ALSTOM Norway AS |
| Pakistan | ALSTOM Pakistan Private Limited |
| Panama | ALSTOM Panama, S.A. |
| Peru | AGUAYTIA SUMINISTROS Y EQUIPAMIENTOS S.A. |
| Peru | ALSTOM Power Peru S.A. |
| Peru | MALACAS ENERGIA SUMINISTROS Y EQUIPAMIENTOS S.A. |
| Philippines | ABRECO REALTY CORPORATION |
| Philippines | ALSTOM Philippines, Inc. |
| Poland | ALSTOM Konstal Spolka Akcyjna |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| Poland | ALSTOM Polska Sp. z.o.o. |
| Poland | ALSTOM Power FlowSystems Sp. z o.o. in Elblag |
| Poland | ALSTOM Power Sp. Zo.o. in Warsawa |
| Portugal | ALSTOM Portugal II Distribuçao de Energia Ltda |
| Portugal | ALSTOM Portugal, S.A. |
| Puerto Rico | ALSTOM Caribe, Inc. |
| Romania | ALSTOM General Turbo SA |
| Romania | ALSTOM Power Romania srl |
| Romania | ALSTOM Power Uzinsider S.A. (in liquidation) |
| Romania | ALSTOM Transport SA |
| Russian Federation | ALSTOM Limited |
| Russian Federation | ALSTOM Power Stavan |
| Russian Federation | ALSTOM Power TurboZam Ltd |
| Russian Federation | Joint Venture ALSTOM Power Uniturbo Limited |
| Saudi Arabia | ALSTOM Saudi Arabia Limited |
| Saudi Arabia | POWER EQUIPMENT & MATERIALS CO LTD |
| Saudi Arabia | THE ELECTRICAL MATERIALS & EQUIPMENT CO LTD |
| Singapore | ALSTOM Power Singapore Pte Ltd |
| Singapore | ALSTOM Transport (S) Pte Ltd |
| Singapore | RUSTON FAR EAST (PTE) LTD |
| Slovakia | ALSTOM Power Slovakia, s.r.o. |
| South Africa | ALSTOM S&E Africa (Pty) |
| South Korea | ALSTOM Korea Ltd |
| South Korea | EUKORAIL CO., LTD |
| Spain | ALSTOM Espana IB, S.L. |
| Spain | ALSTOM Power, S.A. |
| Spain | ALSTOM Transporte, S.A. |
| Spain | APLICACIONES TECNICAS INDUSTRIALES, S.A. |

| | |
|---|---|
| Spain | COMPANIA DE INVERSIONES DE VILLAVERDE |
| Spain | COMPANIA DE INVERSIONES SANT ANDREU (IN LIQUIDATION) |
| Spain | COMPANIA DE INVERSIONES SANT VICENT (IN LIQUIDATION) |
| Spain | LA MAQUINISTA TERRESTRE Y MARITIMA S.A.—MTM |
| Spain | OPERADORA DEL TRAMVIA METROPOLITA, S.A. |
| Spain | SAB IBERICA, S.A. |
| Spain | SDEM INABENSA (IN LIQUIDATION) |
| Spain | TRAMVIA METROPOLITA DEL BESOS SA |
| Spain | TRAMVIA METROPOLITA, S.A. |
| Sweden | ALSTOM Power Carbon Aktiebolag |
| Sweden | ALSTOM Power FlowSystems AB |
| Sweden | ALSTOM Power Generation Aktiebolag |
| Sweden | ALSTOM Power Sweden Aktiebolag |
| Sweden | ALSTOM Sweden AB |
| Sweden | ALSTOM Transport AB |
| Sweden | FASTIGHETS AKTIEBOLAGET FORGASAREN |
| Sweden | FASTIGHETS AKTIEBOLAGET LOSARAM |
| Sweden | RENEA SERVICE AB |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| Switzerland | ALSTOM (Schweiz) Services AG ou ALSTOM (Switzerland) Services Ltd ou ALSTOM (Suisse) Services SA |
| Switzerland | ALSTOM (Switzerland) Ltd (ou) ALSTOM (Schweiz) AG (ou) ALSTOM (Suisse) SA |
| Switzerland | ALSTOM Power Consulting AG (ou) ALSTOM Power Consulting Ltd |
| Switzerland | ALSTOM Power Management Resources AG (ou) ALSTOM Power Management Resources Ltd |
| Switzerland | ALSTOM Power O&M AG (ALSTOM Power O&M Ltd) |
| Switzerland | ALSTOM Prom AG (ALSTOM Prom Ltd) |
| Switzerland | ALSTOM Schienenfahrzeuge AG |
| Switzerland | ALSTOM Technologie AG (ou) ALSTOM Technology Ltd (ou) ALSTOM Technologie SA |
| Switzerland | ENERCON ENGINEERING UND MONTAGE AG |
| Switzerland | FLUCOMALT AG |
| Switzerland | FLUCORREX AG |
| Switzerland | SPRECHER ENERGIE AG (ou) SPRECHER ENERGIE SA (ou) SPRECHER ENERGIE LTD |
| Taiwan | ALSTOM Projects Taiwan Ltd |
| Taiwan | ALSTOM Taiwan Ltd |
| Thailand | ALSTOM Contracting Ltd |
| Thailand | ALSTOM Holdings (Thailand) Co. Ltd |
| Thailand | ALSTOM Power (Thailand) Ltd |
| Thailand | ALSTOM Transport Infrastructure Limited |
| Thailand | ALSTOM Transportation Services Ltd |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM ULASIM SISTEMLERI TESIS TICARET VE SANAYI LIMITED SIRKETI |
| U.S.A. | AACP LLC |
| U.S.A. | ALSKAW LLC |
| U.S.A. | ALSTOM Inc. |
| U.S.A. | ALSTOM Leasing Company |
| U.S.A. | ALSTOM MAINTENANCE INC. |
| U.S.A. | ALSTOM Power Conversion Inc. |
| U.S.A. | ALSTOM Power Inc. |
| U.S.A. | ALSTOM Power International, Inc. |
| U.S.A. | ALSTOM Power Receivables Corporation |
| U.S.A. | ALSTOM Signaling Inc. |
| U.S.A. | ALSTOM Transportation Inc. |

| U.S.A. | ALSTOM USA Inc. |
| U.S.A. | APCH, Inc |
| U.S.A. | APCOMPOWER INC |
| U.S.A. | BBCP Corporation |
| U.S.A. | BTGS LP |
| U.S.A. | DDCP Corporation |
| U.S.A. | EECP LLC |
| U.S.A. | FFCP LLC |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
| --- | --- |
| U.S.A. | MARINE SERVICE PARTNERS INC. |
| U.S.A. | NORTH EAST CORRIDOR MAINTENANCE SERVICES CO, LLC |
| U.S.A. | PRENCO SERVICES, INC. |
| U.S.A. | SGTB LLC |
| U.S.A. | SIGMA ENERGY SOLUTIONS, INC |
| U.S.A. | TELECITE ELECTRONIC SYSTEMS INC. |
| U.S.A. | THE ENGLISH ELECTRIC CORPORATION |
| United Arab Emirates | ALSTOM Power Service (Arabia) FZE |
| United Kingdom | ABB ALSTOM POWER STEAM PLANTS PIC LIMITED |
| United Kingdom | ALSTOM Automation International Ltd |
| United Kingdom | ALSTOM Combined Cycles International Ltd |
| United Kingdom | ALSTOM Combined Cycles Ltd |
| United Kingdom | ALSTOM Combustion Services Limited |
| United Kingdom | ALSTOM Contracting Ltd |
| United Kingdom | ALSTOM Controls Ltd |
| United Kingdom | ALSTOM Electrical Machines Ltd |
| United Kingdom | ALSTOM Energy Limited |
| United Kingdom | ALSTOM Energy Services Limited |
| United Kingdom | ALSTOM Energy Systems SHG Limited |
| United Kingdom | ALSTOM Hydro Limited |
| United Kingdom | ALSTOM Hydro Projects Limited |
| United Kingdom | ALSTOM International Ltd |
| United Kingdom | ALSTOM Large Machine Projects Limited |
| United Kingdom | ALSTOM Ltd |
| United Kingdom | ALSTOM Nominees Ltd |
| United Kingdom | ALSTOM NORTHERN LINE SERVICE PROVISION |
| United Kingdom | ALSTOM Pension Trust Ltd |
| United Kingdom | ALSTOM Power Construction Ltd |
| United Kingdom | ALSTOM Power Conversion Ltd |
| United Kingdom | ALSTOM Power Generation Limited |
| United Kingdom | ALSTOM Power Industrial Turbines India Limited |
| United Kingdom | ALSTOM Power Investment Projects II Limited |
| United Kingdom | ALSTOM Power Ltd |
| United Kingdom | ALSTOM Power Plants India Ltd |
| United Kingdom | ALSTOM Power Plants Ltd |
| United Kingdom | ALSTOM Power Plants Services Limited |
| United Kingdom | ALSTOM Power Tamuin II Holdings Limited |
| United Kingdom | ALSTOM Power UK Holdings |
| United Kingdom | ALSTOM Power UK Ltd |
| United Kingdom | ALSTOM Rail Ltd |
| United Kingdom | ALSTOM Real Estate 2 Ltd |
| United Kingdom | ALSTOM Real Estate 4 Ltd |
| United Kingdom | ALSTOM Signalling Ltd |
| United Kingdom | ALSTOM T&D Distribution Switchgear Limited |
| United Kingdom | ALSTOM T&D Ltd |

| | |
|---|---|
| United Kingdom | ALSTOM T&D Power Electronic Systems Ltd |
| United Kingdom | ALSTOM T&D Systems Ltd |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Country | Name |
|---|---|
| United Kingdom | ALSTOM Traction International Ltd |
| United Kingdom | ALSTOM Traction Limited |
| United Kingdom | ALSTOM Transport |
| United Kingdom | ALSTOM Transport Hong Kong Ltd |
| United Kingdom | ALSTOM Transport Service Ltd |
| United Kingdom | ALSTOM Transportation Projects International Ltd |
| United Kingdom | ALSTOM Transportation Projects Limited |
| United Kingdom | ALSTOM Trust Ltd |
| United Kingdom | ALSTOM Turbine Generators China Ltd |
| United Kingdom | ALSTOM Turbine Generators India Ltd |
| United Kingdom | ALSTOM UK |
| United Kingdom | ALSTOM UK Holdings Ltd |
| United Kingdom | ALSTOM Wessex Traincare (Holdings) Ltd |
| United Kingdom | ALSTOM Wessex Traincare Limited |
| United Kingdom | APC Overseas Limited |
| United Kingdom | BRE-METRO LIMITED |
| United Kingdom | CEGELEC PENSION TRUST LTD |
| United Kingdom | GEC GENERAL SIGNAL LIMITED |
| United Kingdom | GLASGOW RAIL MAINTENANCE LTD |
| United Kingdom | GREATER MANCHESTER METRO LTD |
| United Kingdom | METRO-CAMMELL LTD |
| United Kingdom | RAILCARE LTD |
| United Kingdom | TICKFORD RAIL LTD |
| United Kingdom | WEST COAST SERVICE PROVISION LIMITED |
| United Kingdom | WEST COAST TRAINCARE (HOLDINGS) LIMITED |
| United Kingdom | WESTCOAST TRAINCARE LIMITED |
| United Kingdom | WOLVERTON RAIL MAINTENANCE LT |
| Uruguay | BYRCO CORP SA |
| Venezuela | ALSTOM Venezuela S.A. |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Algeria | ALSTOM Algérie "Société par Actions" |
| Argentina | ALSTOM Argentina S.A. |
| Argentina | ALSTOM Argentina S.A. |
| Argentina | RAPIVIA S.A. |
| Argentina | RAPIVIA S.A. |
| Argentina | RAPIVIA S.A. |
| Australia | ALSTOM Australia Holdings Limited |
| Australia | ALSTOM Australia Limited |
| Australia | ALSTOM Australia Superannuation Plan Pty Limited |
| Australia | ALSTOM Melbourne Transport Limited |
| Australia | ALSTOM Painting Systems Pty Limited |
| Australia | ALSTOM Power Limited |
| Australia | ALSTOM Power Project Management Pty Limited |
| Australia | ALSTOM Power Site Services Pty Limited |
| Australia | BABCOCK ENGINEERING AUSTRALIA PTY LIMITED |
| Australia | MAINCO MELBOURNE PTY LIMITED |
| Australia | RAIL FLEET SERVICES LIMITED |
| Australia | SIGMA ENERGY SOLUTIONS PTY LTD |
| Austria | ALSTOM Power Austria GmbH |
| Austria | ALSTOM Power Flowsystems GmbH |
| Bahamas | ALSTOM POWER ESPANA-BAHAMAS LTD |
| Belgium | ALSTOM Acec Energie SA |
| Belgium | ALSTOM Acec Energie SA |
| Belgium | ALSTOM Belgium SA |
| Belgium | ALSTOM Finances et Services SA |
| Belgium | ALSTOM Power Management Services S.A. |
| Belgium | ALSTOM T&D Belgium |
| Belgium | BGT BELGIUM N.V. |
| Belgium | GEC ALSTHOM SALES NETWORK S.A. |
| Belgium | SERVICES TECHNIQUES BALTEAU |
| Belgium | SERVICES TECHNIQUES BALTEAU |
| Brazil | AIR PREHEATER EQUIPAMENTOS LTDA |
| Brazil | ALSTOM Brasil Ltda |
| Brazil | ALSTOM Brasil Ltda |
| Brazil | ALSTOM Elec Equipamentos Eletricos Ltda |
| Brazil | ALSTOM Industria S/A |
| Brazil | ALSTOM Industria S/A |
| Brazil | ALSTOM Industria S/A |
| Brazil | CEBRAF SERVICOS S.A. |
| Brazil | ETE — EQUIPAMENTOS DE TRACAO ELETRICA LTDA |
| Brazil | ETE — EQUIPAMENTOS DE TRACAO ELETRICA LTDA |
| Bulgaria | ALSTOM Power Bulgaria SP Ltd |
| Canada | ALSTOM Canada Inc. |
| Canada | GENERAL RAILWAY SIGNAL OF CANADA LTD |
| Canada | TELECITE INC. |
| Chile | ALSTOM Chile S.A. |
| Chile | ALSTOM Power Tocopilla Limitada |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Chile | ALSTOM Power Tocopilla Limitada |
| China | ABB POWER GENERATION LIMITED |
| China | ALSTOM (China) Investment Co., Ltd |

| | |
|---|---|
| China | ALSTOM Beizhong Power (Beijing) Co., Ltd |
| China | ALSTOM Hong Kong Ltd |
| China | ALSTOM Qingdao Railway Equipment Co Ltd |
| China | ALSTOM Technical Services (Shanghai) Co., Ltd |
| China | ALSTOM Wuhan Automation Co Limited — AWAC |
| China | BEIJING ALSTOM Engineering Consultancy Services Co., Ltd |
| China | CASCO SIGNAL LTD |
| China | SHANGHAI ALSTOM Transport Company Limited |
| China | SHANGHAI ALSTOM Transport Company Limited |
| China | SHANGHAI ALSTOM Transport Electrical Equipment Company Ltd |
| China | SHANGHAI ALSTOM Transport Electrical Equipment Company Ltd |
| China | TIANJIN ALSTOM Hydro Co., Ltd |
| Colombia | ALSTOM Power Colombia S.A. |
| Colombia | ALSTOM Power Colombia S.A. |
| Congo (ex-Zaire) | GEC ALSTHOM ACEC CONGO |
| Croatia | ALSTOM Croatia Ltd |
| Czech Republic | ALSTOM a.s. |
| Czech Republic | ALSTOM Czech s.r.o., ALSTOM Group |
| Czech Republic | ALSTOM Power CZ, s.r.o. |
| Czech Republic | ALSTOM Power, s.r.o., ALSTOM Group |
| Denmark | ALSTOM Danmark A/S |
| Denmark | ALSTOM Power Denmark A/S |
| Denmark | ALSTOM Power FlowSystems A/S |
| Denmark | ROSENFELT CHRISTENSEN & WEST ENERGI A/S |
| Egypt | ALSTOM International Egypt S.A.E. |
| Egypt | ALSTOM International Egypt S.A.E. |
| Egypt | ALSTOM Power Egypt for Power Generation & Electrical Works SAE |
| Egypt | ALSTOM Water Systems |
| Egypt | ALSTOM Water Systems |
| Estonia | ALSTOM Estonia AS |
| Finland | ALSTOM Finland Oy |
| Finland | ALSTOM Power FlowSystems Oy |
| France | A.M.R. |
| France | ALSTOM BGR |
| France | ALSTOM DDF |
| France | ALSTOM DDF |
| France | ALSTOM Fluides et Mécanique |
| France | ALSTOM Holdings |
| France | ALSTOM I.T.C. ou ALSTOM Infrastructure Technology Center |
| France | ALSTOM International |
| France | ALSTOM Kléber Eleven |
| France | ALSTOM Kleber Nancy (Société en liquidation) |
| France | ALSTOM Kléber Nine |
| France | ALSTOM Kleber Nineteen |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| France | ALSTOM Kleber Sixteen |
| France | ALSTOM Kléber Thirteen |
| France | ALSTOM Kleber Twenty |
| France | ALSTOM Leroux Naval |
| France | ALSTOM Magnets and Superconductors SA |
| France | ALSTOM Management SA |
| France | ALSTOM Moteurs SA |
| France | ALSTOM Power Boilers |
| France | ALSTOM Power Centrales |

| | |
|---|---|
| France | ALSTOM Power Centrales |
| France | ALSTOM Power Centrales |
| France | ALSTOM Power Conversion |
| France | ALSTOM Power Conversion Holding |
| France | ALSTOM Power Environment |
| France | ALSTOM Power Environmental Consult Sarl |
| France | ALSTOM Power Flowsystems SA |
| France | ALSTOM Power Heat Exchange |
| France | ALSTOM Power Holdings SA |
| France | ALSTOM Power Hydraulique |
| France | ALSTOM Power Hydraulique |
| France | ALSTOM Power Hydro |
| France | ALSTOM Power Industrie |
| France | ALSTOM Power Management |
| France | ALSTOM Power SA |
| France | ALSTOM Power Service |
| France | ALSTOM Power Turbomachines |
| France | ALSTOM Resources Management SA |
| France | ALSTOM Transport Holding |
| France | ALSTOM Transport SA |
| France | BELFORT INVESTISSEMENT |
| France | BELFORT INVESTISSEMENT |
| France | CENTRE D'ESSAIS FERROVIAIRE EN REGION NORD PAS DE CALAIS SA |
| France | CHANTIERS DE L'ATLANTIQUE |
| France | COMPAGNIE DE MONTAGES ELECTRIQUES A L'EXPORTATION — COMELEX |
| France | ENERMECA |
| France | ETOILE KLEBER |
| France | FRAMECA — FRANCE METRO CARACAS |
| France | FRAMECA — FRANCE METRO CARACAS |
| France | HYMEC — SOCIETE D'EQUIPEMENT HYDROMECANIQUE |
| France | HYMEC ENERGY |
| France | INNORAIL |
| France | INTERINFRA (COMPAGNIE INTERNATIONALE POUR LE DEVELOPPEMENT D'INFRASTRUCTURES) |
| France | KLEBER CARNOT |
| France | LORELEC |
| France | PRINCIPIA MARINE SA |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| France | RESTAURINTER |
| France | SDEM SA (en liquidation) |
| France | SOCIETE CIVILE IMMOBILIERE KLEBER-BELFORT — SCIKB |
| France | SOGEEF (Société de gestion et d'exploitation ferroviaire) |
| France | TECHNOS ET COMPAGNIE |
| Germany | ALSTOM Ballard GmbH |
| Germany | ALSTOM Energie GmbH |
| Germany | ALSTOM Energie Service GmbH |
| Germany | ALSTOM GmbH |
| Germany | ALSTOM Information Technology Centre GmbH |
| Germany | ALSTOM LHB GmbH |
| Germany | ALSTOM Lokomotiven Service GmbH |
| Germany | ALSTOM Power AG |
| Germany | ALSTOM Power Boiler GmbH |
| Germany | ALSTOM Power Boiler Service GmbH |
| Germany | ALSTOM Power Conversion GmbH |

| | |
|---|---|
| Germany | ALSTOM Power Energy Recovery GmbH |
| Germany | ALSTOM Power Environmental Consult GmbH |
| Germany | ALSTOM Power FlowSystems GmbH |
| Germany | ALSTOM Power Generation AG |
| Germany | ALSTOM Power Service GmbH |
| Germany | ALSTOM Power Support GmbH |
| Germany | ALSTOM T&D GmbH |
| Germany | INTER-ELECTRO-GESELLSCHAFT MBH |
| Germany | MIRAS VERWALTUNGS GMBH & CO VERMIETUNGS-OHG |
| Germany | VGT VORBEREITUNGSGESELLSCHAFT TRANSPORTTECHNIK GMBH |
| Greece | ALSTOM Infrastructure Hellas Joint Stock Technical & Commercial Company |
| Greece | ALSTOM Transport Hellas S.A. |
| Greece | INTERINFRA HELLA ETAIREIA PERIORISMENIS EFTHINIS |
| Greece | JOINT VENTURE SUBURBAN RAILWAY "JV J&P-AVAX SA, ATE GNOMON SA, ETETH SA, ALSTOM TRANSPORT SA |
| Hungary | ALSTOM Power Hungaria Rt. |
| Hungary | ALSTOM Signaling Kft |
| Hungary | BGT HUNGARIA KFT |
| India | ALSTOM Energy Limited |
| India | ALSTOM Energy Limited |
| India | ALSTOM India Ltd |
| India | ALSTOM Industrial Products Ltd |
| India | ALSTOM Limited |
| India | ALSTOM Power Boilers Services Limited |
| India | ALSTOM Projects India Ltd |
| India | ALSTOM Projects India Ltd |
| India | ALSTOM Projects India Ltd |
| India | ALSTOM Steam Turbine Limited |
| India | ALSTOM Steam Turbine Limited |
| India | BEACON NEYRPIC LTD |
| India | NTPC ALSTOM POWER SERVICES PRIVATE LTD |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Indonesia | PT ALSTHOMINDO |
| Indonesia | PT ALSTOM Power Energy Systems Indonesia |
| Iran | ALSTOM Khadamat S.A. |
| Ireland | ALSTOM Ireland Ltd |
| Israel | CITADIS ISRAEL |
| Israel | CITYPASS LIMITED |
| Italy | ALSTOM Ferroviaria S.p.A. |
| Italy | ALSTOM Power FlowSystems s.r.l. |
| Italy | ALSTOM Power Italia S.p.A. |
| Italy | ALSTOM S.p.A. |
| Italy | ALSTOM Transport Systems S.P.A. |
| Italy | CEGELEC ITALIA (IN LIQUIDAZIONE) |
| Italy | S.A.T. SYSTEMA AUTOMATICO DI TRASPORTO S.R.L. |
| Italy | SIM S.P.A. — SOCIETA ITALIANA MONTAGGI S.P.A. |
| Italy | T.P.B. TRASPORTI PUBBLICI DELLA BRIANZA S.p.A. (in bankruptcy) |
| Japan | ALSTOM K.K. |
| Japan | ALSTOM Power Energy Recovery Co, Ltd |
| Japan | JAPAN GAS TURBINE K.K. |
| Japan | KAJIWARA IRON WORKS CO., LTD |
| Japan | NIHON KENGYO K.K. |
| Japan | NIHON SANGYO K.K. |
| Latvia | ALSTOM Latvia Ltd |

| | |
|---|---|
| Lithuania | ALSTOM Lietuva Ltd |
| Malaysia | ALSTOM Export Sdn Bhd |
| Malaysia | ALSTOM Power Asia Pacific Sdn Bhd |
| Marshall Islands | AURO SHIPPING SA |
| Mauritius | ALSTOM Infrastructure Holding Ltd |
| Mauritius | ALSTOM Mauritius Ltd |
| Mexico | ALSTOM Mexico, S.A. de C.V. |
| Mexico | ALSTOM Power Azufres S.A. de C.V. |
| Mexico | ALSTOM Power Chicoasen, S.A. de C.V. |
| Mexico | ALSTOM Power Instalaciones S.A. de C.V. |
| Mexico | ALSTOM Power Mexico S.A. de C.V. |
| Mexico | ALSTOM Power Monterrey III S.A. de C.V. |
| Mexico | ALSTOM Power Proyectos S.A. de C.V. |
| Mexico | ALSTOM Servicios, S.A. de C.V. |
| Mexico | ALSTOM Transporte, SA de CV |
| Mexico | BALMEC SA DE CV |
| Mexico | CERREY SA DE CV |
| Mexico | DELAS REPSA |
| Mexico | PESCA INDUSTRIAL CORPORATIVA SA DE CV — PICOSA (en faillite) |
| Mexico | ROSARITO POWER S.A. DE C.V. |
| Morocco | ALSTOM Maroc S.A. |
| Morocco | ALSTOM Power Hydraulique SAS |
| Morocco | ALSTOM Power Hydraulique SAS |
| Morocco | HYDROMONTAGE (MAROC) SA (en cours de dissolution) |
| Nepal | NEPAL HYDRO & ELECTRIC PVT.LTD |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Netherlands | ALSTOM Infrastructure Holding NV |
| Netherlands | ALSTOM NV |
| Netherlands | ALSTOM Power Flowsystems BV |
| Netherlands | ALSTOM Power International Operations BV |
| Netherlands | ALSTOM POWER INVESTMENT PROJECTS B.V. |
| Netherlands | ALSTOM Power Nederland B.V. |
| Netherlands | ALSTOM POWER TAMUIN HOLDINGS B.V. |
| Netherlands | ALSTOM Transport BV |
| Netherlands | BALTEAU BV |
| Netherlands | GEC ALSTHOM NV |
| New Zealand | ALSTOM New Zealand Holdings Limited |
| New Zealand | ALSTOM New Zealand Limited |
| New Zealand | ALSTOM Power New Zealand Limited |
| New Zealand | ALSTOM Transport New Zealand Limited |
| Nigeria | ALSTOM Nigeria Limited |
| Nigeria | GEC ALSTHOM T&D NIGERIA ELECTRICAL PLANT LTD |
| Nigeria | GEC ALSTHOM T&D NIGERIA POWER ENGINEERING LTD |
| Norway | ALSTOM Norway AS |
| Pakistan | ALSTOM Pakistan Private Limited |
| Panama | ALSTOM Panama, S.A. |
| Peru | AGUAYTIA SUMINISTROS Y EQUIPAMIENTOS S.A. |
| Peru | ALSTOM Power Peru S.A. |
| Peru | MALACAS ENERGIA SUMINISTROS Y EQUIPAMIENTOS S.A. |
| Philippines | ABRECO REALTY CORPORATION |
| Philippines | ALSTOM Philippines, Inc. |
| Poland | ALSTOM Konstal Spolka Akcyjna |
| Poland | ALSTOM Polska Sp. z.o.o. |
| Poland | ALSTOM Power FlowSystems Sp. z o.o. in Elblag |

| | |
|---|---|
| Poland | ALSTOM Power Sp. Zo.o. in Warsawa |
| Portugal | ALSTOM Portugal II Distribuçao de Energia Ltda |
| Portugal | ALSTOM Portugal, S.A. |
| Puerto Rico | ALSTOM Caribe, Inc. |
| Romania | ALSTOM General Turbo SA |
| Romania | ALSTOM General Turbo SA |
| Romania | ALSTOM Power Romania srl |
| Romania | ALSTOM Power Uzinsider S.A. (in liquidation) |
| Romania | ALSTOM Power Uzinsider S.A. (in liquidation) |
| Romania | ALSTOM Transport SA |
| Russian Federation | ALSTOM Limited |
| Russian Federation | ALSTOM Power Stavan |
| Russian Federation | ALSTOM Power TurboZam Ltd |
| Russian Federation | Joint Venture ALSTOM Power Uniturbo Limited |
| Saudi Arabia | ALSTOM Saudi Arabia Limited |
| Saudi Arabia | POWER EQUIPMENT & MATERIALS CO LTD |
| Saudi Arabia | THE ELECTRICAL MATERIALS & EQUIPMENT CO LTD |
| Singapore | ALSTOM Power Singapore Pte Ltd |
| Singapore | ALSTOM Transport (S) Pte Ltd |

10,603,566              PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Singapore | RUSTON FAR EAST (PTE) LTD |
| Slovakia | ALSTOM Power Slovakia, s.r.o. |
| South Africa | ALSTOM S&E Africa (Pty) |
| South Korea | ALSTOM Korea Ltd |
| South Korea | EUKORAIL CO., LTD |
| Spain | ALSTOM Espana IB, S.L. |
| Spain | ALSTOM Espana IB, S.L. |
| Spain | ALSTOM Power, S.A. |
| Spain | ALSTOM Transporte, S.A. |
| Spain | APLICACIONES TECNICAS INDUSTRIALES, S.A. |
| Spain | COMPANIA DE INVERSIONES DE VILLAVERDE |
| Spain | COMPANIA DE INVERSIONES SANT ANDREU (IN LIQUIDATION) |
| Spain | COMPANIA DE INVERSIONES SANT VICENT (IN LIQUIDATION) |
| Spain | LA MAQUINISTA TERRESTRE Y MARITIMA S.A. — MTM |
| Spain | OPERADORA DEL TRAMVIA METROPOLITA, S.A. |
| Spain | SAB IBERICA, S.A. |
| Spain | SDEM INABENSA (IN LIQUIDATION) |
| Spain | TRAMVIA METROPOLITA DEL BESOS SA |
| Spain | TRAMVIA METROPOLITA DEL BESOS SA |
| Spain | TRAMVIA METROPOLITA, S.A. |
| Spain | TRAMVIA METROPOLITA, S.A. |
| Sweden | ALSTOM Power Carbon Aktiebolag |
| Sweden | ALSTOM Power FlowSystems AB |
| Sweden | ALSTOM Power Generation Aktiebolag |
| Sweden | ALSTOM Power Sweden Aktiebolag |
| Sweden | ALSTOM Sweden AB |
| Sweden | ALSTOM Transport AB |
| Sweden | FASTIGHETS AKTIEBOLAGET FORGASAREN |
| Sweden | FASTIGHETS AKTIEBOLAGET LOSARAM |
| Sweden | RENEA SERVICE AB |
| Switzerland | ALSTOM (Schweiz) Services AG ou ALSTOM (Switzerland) Services Ltd ou ALSTOM (Suisse) Services SA |
| Switzerland | ALSTOM (Switzerland) Ltd (ou) ALSTOM (Schweiz) AG (ou) ALSTOM (Suisse) SA |
| Switzerland | ALSTOM Power Consulting AG (ou) ALSTOM Power Consulting Ltd |

| | |
|---|---|
| Switzerland | ALSTOM Power Management Resources AG (ou) ALSTOM Power Management Resources Ltd |
| Switzerland | ALSTOM Power O&M AG (ALSTOM Power O&M Ltd) |
| Switzerland | ALSTOM Prom AG (ALSTOM Prom Ltd) |
| Switzerland | ALSTOM Schienenfahrzeuge AG |
| Switzerland | ALSTOM Technologie AG (ou) ALSTOM Technology Ltd (ou) ALSTOM Technologie SA |
| Switzerland | ENERCON ENGINEERING UND MONTAGE AG |
| Switzerland | FLUCOMALT AG |
| Switzerland | FLUCORREX AG |
| Switzerland | SPRECHER ENERGIE AG (ou) SPRECHER ENERGIE SA (ou) SPRECHER ENERGIE LTD |

10,603,566        PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

### ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| Taiwan | ALSTOM Projects Taiwan Ltd |
| Taiwan | ALSTOM Taiwan Ltd |
| Thailand | ALSTOM Contracting Ltd |
| Thailand | ALSTOM Contracting Ltd |
| Thailand | ALSTOM Holdings (Thailand) Co. Ltd |
| Thailand | ALSTOM Power (Thailand) Ltd |
| Thailand | ALSTOM Power (Thailand) Ltd |
| Thailand | ALSTOM Transport Infrastructure Limited |
| Thailand | ALSTOM Transport Infrastructure Limited |
| Thailand | ALSTOM Transportation Services Ltd |
| Thailand | ALSTOM Transportation Services Ltd |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Proje Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM Power Ve Ulasim Anonim Sirketi |
| Turkey | ALSTOM ULASIM SISTEMLERI TESIS TICARET VE SANAYI LIMITED SIRKETI |
| U.S.A. | AACP LLC |
| U.S.A. | ALSKAW LLC |
| U.S.A. | ALSTOM Inc. |
| U.S.A. | ALSTOM Inc. |
| U.S.A. | ALSTOM Leasing Company |
| U.S.A. | ALSTOM MAINTENANCE INC. |
| U.S.A. | ALSTOM Power Conversion Inc. |
| U.S.A. | ALSTOM Power Inc. |
| U.S.A. | ALSTOM Power International, Inc. |
| U.S.A. | ALSTOM Power Receivables Corporation |
| U.S.A. | ALSTOM Signaling Inc. |
| U.S.A. | ALSTOM Transportation Inc. |
| U.S.A. | ALSTOM USA Inc. |
| U.S.A. | APCH, Inc |
| U.S.A. | APCOMPOWER INC |
| U.S.A. | MARINE SERVICE PARTNERS INC. |
| U.S.A. | NORTH EAST CORRIDOR MAINTENANCE SERVICES CO, LLC |
| U.S.A. | PRENCO SERVICES, INC. |
| U.S.A. | TELECITE ELECTRONIC SYSTEMS INC. |
| U.S.A. | THE ENGLISH ELECTRIC CORPORATION |
| United Arab Emirates | ALSTOM Power Service (Arabia) FZE |

| United Kingdom | ABB ALSTOM POWER STEAM PLANTS PIC LIMITED |
| United Kingdom | ALSTOM Automation International Ltd |
| United Kingdom | ALSTOM Combined Cycles International Ltd |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
|---|---|
| United Kingdom | ALSTOM Combined Cycles Ltd |
| United Kingdom | ALSTOM Combustion Services Limited |
| United Kingdom | ALSTOM Contracting Ltd |
| United Kingdom | ALSTOM Controls Ltd |
| United Kingdom | ALSTOM Electrical Machines Ltd |
| United Kingdom | ALSTOM Energy Limited |
| United Kingdom | ALSTOM Energy Services Limited |
| United Kingdom | ALSTOM Energy Systems SHG Limited |
| United Kingdom | ALSTOM Hydro Limited |
| United Kingdom | ALSTOM Hydro Projects Limited |
| United Kingdom | ALSTOM International Ltd |
| United Kingdom | ALSTOM Large Machine Projects Limited |
| United Kingdom | ALSTOM Ltd |
| United Kingdom | ALSTOM Nominees Ltd |
| United Kingdom | ALSTOM NORTHERN LINE SERVICE PROVISION |
| United Kingdom | ALSTOM Pension Trust Ltd |
| United Kingdom | ALSTOM Power Construction Ltd |
| United Kingdom | ALSTOM Power Conversion Ltd |
| United Kingdom | ALSTOM Power Generation Limited |
| United Kingdom | ALSTOM Power Industrial Turbines India Limited |
| United Kingdom | ALSTOM Power Investment Projects II Limited |
| United Kingdom | ALSTOM Power Ltd |
| United Kingdom | ALSTOM Power Plants India Ltd |
| United Kingdom | ALSTOM Power Plants Ltd |
| United Kingdom | ALSTOM Power Plants Services Limited |
| United Kingdom | ALSTOM Power Tamuin II Holdings Limited |
| United Kingdom | ALSTOM Power UK Holdings |
| United Kingdom | ALSTOM Power UK Ltd |
| United Kingdom | ALSTOM Rail Ltd |
| United Kingdom | ALSTOM Real Estate 2 Ltd |
| United Kingdom | ALSTOM Real Estate 4 Ltd |
| United Kingdom | ALSTOM Signalling Ltd |
| United Kingdom | ALSTOM T&D Distribution Switchgear Limited |
| United Kingdom | ALSTOM T&D Ltd |
| United Kingdom | ALSTOM T&D Power Electronic Systems Ltd |
| United Kingdom | ALSTOM T&D Systems Ltd |
| United Kingdom | ALSTOM Traction International Ltd |
| United Kingdom | ALSTOM Traction Limited |
| United Kingdom | ALSTOM Transport |
| United Kingdom | ALSTOM Transport Hong Kong Ltd |
| United Kingdom | ALSTOM Transport Service Ltd |
| United Kingdom | ALSTOM Transportation Projects International Ltd |
| United Kingdom | ALSTOM Transportation Projects Limited |
| United Kingdom | ALSTOM Trust Ltd |
| United Kingdom | ALSTOM Turbine Generators China Ltd |
| United Kingdom | ALSTOM Turbine Generators India Ltd |
| United Kingdom | ALSTOM UK |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
| --- | --- |
| United Kingdom | ALSTOM UK Holdings Ltd |
| United Kingdom | ALSTOM Wessex Traincare (Holdings) Ltd |
| United Kingdom | ALSTOM Wessex Traincare Limited |
| United Kingdom | APC Overseas Limited |
| United Kingdom | BRE-METRO LIMITED |
| United Kingdom | CEGELEC PENSION TRUST LTD |
| United Kingdom | GEC GENERAL SIGNAL LIMITED |
| United Kingdom | GLASGOW RAIL MAINTENANCE LTD |
| United Kingdom | GREATER MANCHESTER METRO LTD |
| United Kingdom | METRO-CAMMELL LTD |
| United Kingdom | RAILCARE LTD |
| United Kingdom | TICKFORD RAIL LTD |
| United Kingdom | WEST COAST SERVICE PROVISION LIMITED |
| United Kingdom | WEST COAST TRAINCARE (HOLDINGS) LIMITED |
| United Kingdom | WESTCOAST TRAINCARE LIMITED |
| United Kingdom | WOLVERTON RAIL MAINTENANCE LT |
| Uruguay | BYRCO CORP SA |
| Venezuela | ALSTOM Venezuela S.A. |
| | ACP Corp. |
| | ALSTOM Schneider SA |
| | ALSTOM Offshore Limited |
| | ALSTHOM MALJET INSURANCE SERVICES LIMITED |
| | ALSTOM Gears Ltd |
| | ALSTOM Newbold Ltd |
| | ALSTOM Real Estate 1 Ltd |
| | ALSTOM Real Estate 3 Ltd |
| | GEC ALSTHOM ENERGY SYSTEMS LTD |
| | MODERN WHEEL DRIVE LIMITED |
| | RAPID TRANSIT LIMITED |
| | ALSTOM Participacoes Limitada |
| | ALSTOM International GmbH |
| | ALSTOM Nederland BV |
| | ALSTOM Italia SRL |
| | ALSTOM Power Limited |
| | ALSTOM Power Austria AG |
| | ABB ALSTOM POWER ESPANA-BAHAMAS LTD |
| | ALSTOM Power Canada Inc. |
| | ALSTOM Power, s.r.o. |
| | ALSTOM Power Turbinen GmbH |
| | ALSTOM Power Boilers S.p.A. |
| | ABB ALSTOM POWER INVESTMENT PROJECTS B.V. |
| | ABB ALSTOM POWER TAMUIN HOLDINGS B.V. |
| | ALSTOM Power Norway AS |
| | COMBUSTION ENGINEERING CARIBE, INC. |
| | ALPHA REWOP AB |
| | ALSTOM Power Environmental Systems Aktiebolag |
| | FASTTIGHETS AKTIEBOLAGET SKOVELN |

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
| --- | --- |
| | FASTTIGHETS AKTIEBOLAGET TRAKTORN |
| | STAL FLOTECH AKTIEBOLAK |

STAL SVENSKA TURBINF ABRIKSAKTIEBOLAGET
STALS BOSTADSAKTIEBOLAG
ALSTOM Power Service (Arabia) AG
ABB MAINTENANCE INC.
ABB COMBUSTION ENGINEERING LIMITED
ABB OPERATIONS & MAINTENANCE SERVICES LIMITED
ALSTOM Energy Systems Ltd
ALSTOM Integrated Maintenance Services Limited
ALSTOM Power Industrial Turbines Services Limited
ALSTOM Power Projects Ltd.
ALSTOM Power UK Holdings Limited
ALSTOM T.G.S. 1998 Ltd
NAPIER TURBOCHARGERS LTD
RUSTON GAS TURBINES LIMITED
ALSTOM Power Venezuela S.A.
ALSTOM Automation & Control Limited
ALSTOM Austria AG
ALSTOM Energietechnik GmbH
ALSTOM Sachsenwerk GmbH
ALSTOM Schorch Transformatoren GmbH
ALSTOM Vakuumschalttechnik GmbH
SCHORCH ALTERSVERSORGUNG GMBH
ALSTOM Hungaria Kft.
ALSTOM CGS S.p.A.
ALSTOM FIR S.p.a.
ALSTOM T&D S.p.A.
KLEBER VENEZIA SRL
ALSTOM Malaysia Sdn. Bhd.
ALSTOM T&D AS
ALSTOM T&D Pte Ltd
ALSTOM T&D, spol. s.r.o.
ALSTOM Power Conversion, S.A.
ALSTOM T&D, S.A.
ALSTOM Kraftteknik AB
ALSTOM T&D AB
ALSTOM ESCA Corporation
ALSTOM T&D Inc.
ALSTOM T&D HBDC India Ltd
ALSTOM T&D Instrument Transformers Ltd
ALSTOM T&D Long & Crawford Limited
ALSTOM Low Voltage Equipment Limited
ALSTOM T&D Power Electronics International Ltd
ALSTOM T&D Protection & Control Ltd
ALSTOM T&D SPR International Limited
ALSTOM T&D Transformers Limited

10,603,566          PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
| --- | --- |
| | ALSTOM T&D Trnsmission Switchgear Ltd |
| | ALSTOM T&D Vacuum Equipment |
| | ALSTOM T&D Vacuum Porjects Limited |
| | CEGELEC OVERSEAS LIMITED |
| | LONG & CRAWFORD LIMITED |
| | VACUUM INTERRUPTERS LTD |
| | ALSTOM T&D Venezuela, SA |
| | ALSTOM Signaling A/S |

ALSTOM Signalling Research S.p.A.
ALSTOM Transport SpA
ALSTOM Transport Information Solutions Limited
ALSTOM Transport Ltd
MULTIRAIL LIMITED
PEOPLE MOVERS LIMITED
RAILPART LIMITED
SGE RAILWAY SIGNALS LIMITED
TUBERAIL LTD
WT TRUSTEE LIMITED
JUNIPER CONTRACT HIRE LTD
ALSTOM T&D Etudes Techniques
ALSTOM T&D, S.A. DE C.V.
ALSTOM T&D SA
ALSTOM Belgium SA
ALSTOM TRANSPORT Architecture Solutions
ALSTOM Transport Limited
ALSTOM New Zealand Superannuation Limited
ALSTOM T&D Protection & Controle SA
ALSTOM Power Insurance Ltd.
ALSTOM Hellas AE, Electrical Industry & Transport AE
ATELIERS DE MONTOIR
GEC ALSTHOM SALES NETWORK SA/NV
ALSTHOM EXPORT SERVICOS TECNICOS LIMITADA
SOCIETE CIVILE IMMOBILIERE KLEBER SAINT-QUEN
ALSTOM T&D Equipment Basse Tension SA
ALSTOM Parafoudres SA
ALSTOM T&D Transformateurs de Mesure SA
MABELEC
PT ALSTOM Distribution
ALSTOM Bergeron
ALSTOM Power Chaudieres Industrielles
ALSTOM Elec S/A
ALSTOM Power Holding Ltda
KAT-TEC GESELLSCHAFT FUR KATAL YSATORENTECHNIK GMBH
ABB ALSTOM POWER S.H.G. CO., LTD
ALSTOM Kleber Twelve
PT ALSTOM Transmission
ALSTOM T&D Limited

10,603,566                    PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

## ALSTOM AND ALSTOM NV AFFILIATES

| Nationality | Name |
| --- | --- |
| | ALSTOM Elektrik Endustrisi A.S. |
| | CEM ELEKTRIK SANAYI VE TICARET |
| | SOCIETE BELFORTAINE DE MAISONS ECONOMIQUES — SBME |
| | ALSTOM Power Sp. Zo.o. in Elblag |
| | LABORATOIRE OSKMAN SERAPHIN |
| | ALSTOM T&D S.A. |
| | DATA SERVICE CENTER LTD |
| | SOFONA-SOCIETE ANONYME D'ETUDES POUR L'EXPLOITATION DES FORCES NATURELLES — SAFONA |
| | TURBOSERVICIOS MEXICANOS S.A. de C.V. |
| | ALSTOM Egypt S.A.E. |
| | ALSTOM Systems Limited |
| | ALSTOM Sverdlovsky Electromechanical Plant |
| | COGELEX ALSTHOM |

ALSTOM Power Boilers Limited
ALSTOM Signaling S.A.
Joint Venture ALSTOM Power Nevsky Ltd
ALSTOM T&D Suzhou High Voltage Switchgear Co., Ltd
ALSTOM T&D Lightning Arresters Private Limited
LA MAISON FAMILIALE CHARENTAISE DE PRODUCTION D'HLM
ALSTOM Ejecto Water Systems
ALSTOM T&D Shanghai Power Automation Co., Ltd
SUZHOU ALSTOM T&D Switchgear Limited
SOGEEF
ALSTOM (Tianjin) Energy Systems., Limited
ALSTOM Shangai Transformer Co., Ltd
ALTM S.A. — TECNOLOGIA E SERVICOS DE MANUTENCAO
ALSTOM DBD Instrument Transformer Co., Ltd
ALSTOM Power India Limited
ALSTOM Desoil Services
BEXTRAY SA
OPTIMAL LIMITED
GASTURBINKRAFT I HELSINGBORG HANDELSBOLAG
SPE ALSTOM, SA de CV

10,603,566            PLAN — EXHIBIT C — ALSTOM AFFILIATES AS OF JULY 6, 2005

**PLAN EXHIBIT D**

**LUMMUS ASBESTOS PI TRUST AGREEMENT**

## ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST AGREEMENT

This ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST AGREEMENT (this "Lummus Asbestos PI Trust Agreement"), effective as of the Effective Date, is among ABB Lummus Global Inc., a Delaware corporation and the debtor and debtor-in-possession in case number 05-            in the United States Bankruptcy Court for the District of Delaware, as settlor (the "Debtor" or the "Settlor"), the Lummus Future Claimants' Representative, the Trust Advisory Committee and the Trustee identified on the signature page hereof and appointed pursuant to the Prepackaged Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code of ABB Lummus Global Inc., as the same may be amended, modified or supplemented from time to time (the "Plan"). All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Glossary of Terms for the Plan Documents Pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. (the "Glossary"), and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Glossary, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

### RECITALS

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 Case, the Debtor was named as a defendant in personal injury actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; and

WHEREAS, the Debtor has reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court, known as *In re ABB Lummus Global Inc.*, Case No. 05-            ; and

WHEREAS, the Plan, filed by the Debtor and supported, *inter alia*, by the Lummus Future Claimants' Representative and the CCC has been confirmed by the Court; and

WHEREAS, the Plan Documents provide, among other things, for the creation of the Lummus Asbestos PI Trust; and

WHEREAS, pursuant to the Plan, the Lummus Asbestos PI Trust is to use its assets and income to pay Lummus Asbestos PI Trust Claims as and to the extent provided for herein and in the Lummus TDP; and

WHEREAS, pursuant to the Plan, the Lummus Asbestos PI Trust is intended to qualify as a "qualified settlement fund" (a "QSF") within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time (the "IRC"); and

WHEREAS, it is the intent of the Settlor, the Trustees, the Lummus Future Claimants' Representative and the TAC that the Lummus Asbestos PI Trust be administered, maintained, and operated at all times as a qualified settlement fund through mechanisms that provide reasonable assurance that the Lummus Asbestos PI Trust will value, and be in a financial position to pay, all Lummus Asbestos PI Trust Claims that involve similar claims in substantially the same manner in strict compliance with the terms of the Plan, this Lummus Asbestos PI Trust Agreement and the Lummus TDP; and

WHEREAS, the Plan provides, among other things, for the complete treatment of all liabilities and obligations of the Debtor (among others) with respect to Lummus Asbestos PI Trust Claims; and

WHEREAS, the Court has determined that the Lummus Asbestos PI Trust and the Plan satisfy all the prerequisites for the injunctions provided for in the Plan, and such injunctions have been entered by the Court.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1 **Definitions**. As used herein, the following capitalized terms shall have the respective meanings set forth below:

"ABB" has the meaning set forth in the Glossary.

"ABB Holdings" has the meaning set forth in the Glossary.

"ABB Oil & Gas" has the meaning set forth in the Glossary.

"ACC" has the meaning set forth in the Glossary.

"Additional Indemnitees" has the meaning set forth in the Glossary.

"Affiliate" has the meaning set forth in the Glossary.

"Asbestos Protected Party" has the meaning set forth in the Glossary.

"Bankruptcy Code" has the meaning set forth in the Glossary.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" has the meaning set forth in the Glossary.

"CCC" shall have the meaning set forth in the Glossary.

"Debtor" has the meaning set forth in the preamble.

"Eligible Depositories" has the meaning set forth in Section 4.2(h) herein.

"Entity" has the meaning set forth in the Glossary.

"Glossary" has the meaning set forth in the preamble.

"IRC" has the meaning set forth in the preamble.

"Lien" has the meaning set forth in the Glossary.

"Lummus Asbestos PI Trust" has the meaning set forth in the Glossary.

"Lummus Asbestos PI Trust Agreement" has the meaning set forth in the preamble.

"Lummus Asbestos PI Trust Assets" has the meaning set forth in the Glossary.

"Lummus Asbestos PI Trust Claims" has the meaning set forth in the Glossary.

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

"Lummus Asbestos PI Trust Expenses" has the meaning set forth in the Glossary.

"Lummus Future Claimants' Representative" or "Lummus FCR" has the meaning set forth in the Glossary.

"Lummus TDP" means the ABB Lummus Global Inc. 524(g) Asbestos PI Trust Distribution Procedures attached hereto as Exhibit A, as the same may be modified, amended or supplemented from time to time.

"Moody's" has the meaning set forth in the Glossary.

"Non-Debtor Affiliate" has the meaning set forth in the Glossary.

"Petition Date" has the meaning set forth in the Glossary.

"Plan" has the meaning set forth in the preamble.

"Plan Documents" has the meaning set forth in the Glossary.

"QSF" has the meaning set forth in the preamble.

"Reorganized Debtor" has the meaning set forth in the Glossary.

"Representatives" has the meaning set forth in the Glossary.

"S&P" has the meaning set forth in Section 4.2(b) herein.

"Settlor" has the meaning set forth in the preamble.

"Subsidiary" has the meaning set forth in the Glossary.

"TAC" has the meaning set forth in the Glossary.

"TDP Determined Claims" means Lummus Asbestos PI Trust Claims which qualify for distributions from the Lummus Asbestos PI Trust under the Lummus TDP.

"Termination Date" has the meaning set forth in Section 8.2(a) herein.

"Trust By-laws" means the ABB Lummus Global Inc. 524(g) Asbestos PI Trust By-laws to be adopted pursuant to Section 3.1(c)(viii) hereof, as the same may be modified, amended or supplemented from time to time.

## ARTICLE II
## AGREEMENT OF TRUST

2.1 **Creation and Name.** The Settlor hereby creates a trust known as the "ABB Lummus Global Inc. 524(g) Asbestos PI Trust" as a Delaware statutory trust, which is the Lummus Asbestos PI Trust to be created on the Effective Date pursuant to the Plan. The Trustees of the Lummus Asbestos PI Trust may transact the business and affairs of the Lummus Asbestos PI Trust in the name "Lummus Asbestos PI Trust" or "ABB Lummus Global Inc. 524(g) Asbestos PI Trust". Contemporaneously with the execution of this Lummus Asbestos PI Trust Agreement, the Settlor will file a Certificate of Trust for the creation of a statutory trust with the Secretary of State of Delaware.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

2.2 **Purpose.** The purpose of the Lummus Asbestos PI Trust is to assume all Lummus Asbestos PI Trust Claims (whether now existing or arising at any time hereafter) and to use the Lummus Asbestos PI Trust Assets to pay holders of such Lummus Asbestos PI Trust Claims in accordance with this Lummus Asbestos PI Trust Agreement and the Lummus TDP, and in such a way that all holders of Lummus Asbestos PI Trust Claims that involve similar claims are treated in substantially the same manner and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code. All Lummus Asbestos PI Trust Claims shall be processed, and liquidated and paid, if and to the extent entitled to payment, pursuant to this Lummus Asbestos PI Trust Agreement and the Lummus TDP.

2.3 **Transfer of Assets.** Pursuant to the Plan, the Debtor, ABB, ABB Holdings and ABB Oil & Gas will transfer, issue or assign, as appropriate, and deliver to the Lummus Asbestos PI Trust the ABB Consideration, at the time and in the manner contemplated by the Plan Documents, in each case free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. The Settlor and any other party transferring any ABB Consideration to the Lummus Asbestos PI Trust shall execute and deliver, or cause to be executed and delivered, such documents as the Trustees may reasonably request from time to time to reflect the transfer, issuance, assignment and delivery, as applicable, of the ABB Consideration to the Lummus Asbestos PI Trust.

2.4 **Acceptance of Assets and Assumption of Liabilities.**

(a) In furtherance of the purposes of the Lummus Asbestos PI Trust, the Trustees, on behalf of the Lummus Asbestos PI Trust, hereby expressly accept the transfer, issuance, assignment and delivery, as applicable, to the Lummus Asbestos PI Trust of the ABB Consideration at the time and in the manner contemplated by the Plan Documents, in accordance with the terms of this Lummus Asbestos PI Trust Agreement.

(b) In furtherance of the purposes of the Lummus Asbestos PI Trust, the Trustees, on behalf of the Lummus Asbestos PI Trust, hereby expressly assume all Lummus Asbestos PI Trust Claims (whether now existing or arising at any time hereafter). The Lummus Asbestos PI Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Lummus Asbestos PI Trust Claims that the Debtor or any Asbestos Protected Party or any successors of the Debtor or any Asbestos Protected Party has or would have had under applicable law or under any agreement related thereto.

(c) Nothing in this Lummus Asbestos PI Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the injunctions issued in connection with the Plan or the Lummus Asbestos PI Trust's assumption of the Lummus Asbestos PI Trust Claims as provided therein.

## ARTICLE III
## POWERS AND TRUST ADMINISTRATION

3.1 **Powers.**

(a) Each Trustee is and shall act as a fiduciary to the Lummus Asbestos PI Trust in accordance with the provisions of this Lummus Asbestos PI Trust Agreement, the Plan, and Delaware law. The Trustees shall, at all times, administer the Lummus Asbestos PI Trust and the Lummus Asbestos PI Trust Assets in accordance with Section 2.2 of this Lummus Asbestos PI Trust Agreement. Subject to the limitations set forth in this Lummus Asbestos PI Trust Agreement and the Lummus TDP, the Trustees shall have the power to take any and all actions that, in the reasonable judgment of the Trustees, are necessary or proper to fulfill the purposes of the Lummus Asbestos PI Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any statutory trust power now or hereafter permitted under the laws of the State of Delaware.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

(b) Except as otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c) Without limiting the generality of Section 3.1(a) above, and except as limited below, the Trustees shall have the power to:

(i) Receive, hold, and manage the ABB Consideration and the Lummus Asbestos PI Trust Assets;

(ii) invest the monies and other assets held from time to time by the Lummus Asbestos PI Trust;

(iii) sell, transfer, or exchange any or all of the Lummus Asbestos PI Trust Assets at such prices and upon such terms as they may consider proper, consistent with the other terms of this Lummus Asbestos PI Trust Agreement;

(iv) enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Lummus Asbestos PI Trust to operate;

(v) pay liabilities and expenses of the Lummus Asbestos PI Trust, including, but not limited to Lummus Asbestos PI Trust Expenses;

(vi) establish such funds, reserves and accounts within the Lummus Asbestos PI Trust estate as deemed by the Trustees to be useful in carrying out the purposes of the Lummus Asbestos PI Trust;

(vii) sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding or legal action;

(viii) adopt the Trust By-laws and from time to time amend the Trust By-laws in accordance with the terms thereof;

(ix) supervise and administer the Lummus Asbestos PI Trust in accordance with the Lummus TDP and the terms hereof;

(x) administer, amend, supplement, or modify the Lummus TDP in accordance with the terms hereof and thereof;

(xi) appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants or alternative dispute resolution panelists, and agents as the business of the Lummus Asbestos PI Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the Lummus Asbestos PI Trust;

(xii) pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors, and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustees for services rendered prior to the execution hereof;

(xiii) compensate the Trustees, the Lummus Future Claimants' Representative, the TAC and their respective Representatives and reimburse all out of pocket costs and expenses incurred by such Entities in connection with the performance of their duties hereunder, including without limitation costs and expenses incurred prior to the execution hereof.

(xiv) execute, deliver and perform such instruments as the Trustees consider proper in administering the Lummus Asbestos PI Trust;

(xv) enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the Lummus Asbestos PI Trust, provided such arrangements do not conflict with any other provision of this Lummus Asbestos PI Trust Agreement or the Lummus TDP;

(xvi) in accordance with Section 3.4, indemnify the Entities to be indemnified under Section 3.4 to the fullest extent that a corporation or trust organized under the law of the State of Delaware is from time to

### PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

time entitled to indemnify and/or insure its Representatives and purchase insurance for the Lummus Asbestos PI Trust and those Entities for whom the Lummus Asbestos PI Trust has an indemnification obligation hereunder;

(xvii) delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Lummus Asbestos PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Sections 5.4, 6.8 and 7.9;

(xviii) consult with the Reorganized Debtor, ABB, the Non-Debtor Affiliates or their successors at such times and with respect to such issues relating to the conduct of the Lummus Asbestos PI Trust as the Trustees consider desirable;

(xix) make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Lummus Asbestos PI Trust [or the name of the Reorganized Debtor or any successor in interest], any claim, right, action or cause of action included in the Lummus Asbestos PI Trust Assets;

(xx) merge or contract with other claims resolution facilities that are not specifically created by this Lummus Asbestos PI Trust Agreement or the Lummus TDP; provided that such merger or contract shall not (a) subject the Reorganized Debtor or any successor in interest to any risk of having any Lummus Asbestos PI Trust Claims asserted against it or them, (b) result in the imposition of any federal, state or local tax or assessment on the Reorganized Debtor, or (c) otherwise jeopardize the validity or enforceability of the injunctions issued pursuant to the Plan;

(xxi) object to Lummus Asbestos PI Trust Claims as provided in the Plan and the Lummus TDP;

(xxii) seek to modify the Plan as provided in Article 4 of the Plan;

(xxiii) procure insurance policies and establish claims handling agreements and other arrangements as provided in Section 8.2(a)(ii) of this Lummus Asbestos PI Trust Agreement;

(xxiv) obtain a tax identification number for the Lummus Asbestos PI Trust, communicate with the Internal Revenue Service and state and local taxing authorities on behalf of the Lummus Asbestos PI Trust, make payment of taxes on behalf of the Lummus Asbestos PI Trust, and file all applicable tax returns for the Lummus Asbestos PI Trust; and

(xxv) execute, deliver and perform the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus) and the other Plan Documents to which the Lummus Asbestos PI Trust is a party.

(d) The Trustees shall not have the power to guarantee any debt of other Entities.

(e) In addition to the consent requirements of Section 3.2(f), the Trustees shall give the Lummus Future Claimants' Representative and the TAC prompt notice of any act performed or taken pursuant to Section 3.1(c)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xviii), (xix), (xx), (xxi), (xxii) and (xxiii).

### 3.2 General Administration.

(a) To the extent not inconsistent with the terms of this Lummus Asbestos PI Trust Agreement, the Trust By-laws shall govern the affairs of the Lummus Asbestos PI Trust and each Trustee shall act in accordance with the Trust By-laws. In the event of an inconsistency between the Trust By-laws and this Lummus Asbestos PI Trust Agreement, this Lummus Asbestos PI Trust Agreement shall govern.

(b) Tax Returns and Reports.

(i) The Trustees shall cause to be obtained, at the cost and expense of the Lummus Asbestos PI Trust, a Federal Employer Identification Number for the Lummus Asbestos PI Trust and shall cause such income tax

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

and other returns and statements as are required by the applicable provisions of the IRC and the Treasury Regulations and such other state or local laws and regulations as may be applicable to be timely filed on behalf of the Lummus Asbestos PI Trust on the basis of a December 31 year end. The Trustees shall take all steps necessary to ensure that any tax obligations imposed upon the Lummus Asbestos PI Trust are paid and shall otherwise comply with Section 1.468B-2 of the Treasury Regulations and all other reporting obligations of the Lummus Asbestos PI Trust. The Trustees shall comply with all applicable withholding obligations as required under the applicable provisions of the IRC and such other state and local laws as may be applicable, and the regulations promulgated thereunder.

(ii) The Trustees shall cause the Trust to qualify and maintain, qualification as a "qualified settlement fund" within the meaning of section 1.468B-1(c) of the Treasury Regulations promulgated under section 468B of the IRC.

(iii) Within seventy-five (75) days (or earlier if required by law) after the end of each calendar year, the Lummus Asbestos PI Trust shall cause to be prepared and mailed such information as required by law to enable payees to complete and file each of their respective federal, state and local income and other tax returns. The Trustees also shall provide a copy of any filed tax returns of the Lummus Asbestos PI Trust to the Lummus Future Claimants' Representative and the TAC when such return is filed.

(c) (i) For so long as the Chapter 11 Case remains open, the Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the Lummus Asbestos PI Trust (including, without limitation, a balance sheet of the Lummus Asbestos PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial position of the Lummus Asbestos PI Trust as of such year end and the results of its operations as of the year then ended in conformity with accounting principles generally accepted in the United States. The Trustees shall provide a copy of such report to the Lummus Future Claimants' Representative, the TAC and the Reorganized Debtor or its successor when such reports are filed with the Bankruptcy Court.

(ii) After the Chapter 11 Case is closed, the Trustees shall cause to be prepared, as soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, and, once prepared, shall make copies available with reasonable promptness to any Entity upon written request, an annual report containing financial statements of the Lummus Asbestos PI Trust (including, without limitation, a balance sheet of the Lummus Asbestos PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial position of the Lummus Asbestos PI Trust as of such year end and the results of its operations for the year then ended in conformity with accounting principles generally accepted in the United States. The Trustees shall provide, with reasonable promptness, a copy of such report to the Lummus Future Claimants' Representative, the TAC and the Reorganized Debtor or its successor when such report is available.

(iii) For so long as the Chapter 11 Case remains open, simultaneously with delivery of each set of financial statements referred to in Section 3.2(c)(i), the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Lummus Asbestos PI Trust Claims (and the amount paid in respect of each such Lummus Asbestos PI Trust Claim) disposed of during the period covered by the financial statements. The Trustees shall provide a copy of such report to the Lummus Future Claimants' Representative and the TAC when such report is filed.

(iv) After the Chapter 11 Case is closed, simultaneously with delivery of each set of financial statements referred to in Section 3.2(c)(ii), the Trustees shall cause to be prepared, and, after prepared, shall

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

make copies available with reasonable promptness to any Entity upon written request, a report containing a summary regarding the number and type of Lummus Asbestos PI Trust Claims (and the amount paid in respect of each such Lummus Asbestos PI Trust Claim) disposed of during the period covered by the financial statements. The Trustees

shall provide, with reasonable promptness, a copy of such report to the Lummus Future Claimants' Representative and the TAC when such report is available.

(v) All materials required to be filed with the Bankruptcy Court by this Section 3.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Bankruptcy Court.

(d) The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projection covering such fiscal year and the succeeding four fiscal years. The Trustees shall provide a copy of the budget and cash flow projection to the Lummus Future Claimants' Representative and the TAC.

(e) The Trustees shall consult with the Lummus Future Claimants' Representative and the TAC on the implementation and administration of the Lummus Asbestos PI Trust and the Lummus TDP. The Trustees may consult with the Lummus Future Claimants' Representative and the TAC with respect to any other matter affecting the Lummus Asbestos PI Trust and the Lummus TDP. The Trustees shall meet with the Lummus Future Claimants' Representative and the TAC not fewer than four (4) times each calendar year during the first two (2) years following the Effective Date and then two (2) times each calendar year thereafter, which shall be at a regular or special meeting of the Trustees as mutually agreed to by the Trustees, the Lummus Future Claimants' Representative and the TAC, to discuss matters regarding the administration of the Lummus Asbestos PI Trust, the review, determination, liquidation, and payment of Lummus Asbestos PI Trust Claims, and the condition of the Lummus Asbestos PI Trust Assets.

(f) In addition to the other provisions contained in this Lummus Asbestos PI Trust Agreement or in the Lummus TDP requiring the consent of the Lummus Future Claimants' Representative and the TAC, the Trustees shall be required to obtain the consent of the Lummus Future Claimants' Representative and the consent of the TAC to:

(i) amend any provision of this Lummus Asbestos PI Trust Agreement;

(ii) terminate the Lummus Asbestos PI Trust pursuant to Section 8.2 hereof;

(iii) change the number of Trustees to serve hereunder and appoint successor Trustee(s); provided, however that in no event shall the number of Trustees authorized to serve hereunder exceed five (5);

**(iv) [settle the liability of any insurer under any Subject Lummus Insurance Policy or to settle any Lummus Asbestos Insurance Rights;]**

(v) change the compensation of the Trustees (other than with respect to cost-of-living increases);

(vi) amend or modify the Lummus TDP; or

(vii) take any action pursuant to Section 3.1(c)(iii), 3.1(c)(viii), 3.1(c)(xx), 3.1(c)(xxi) or 3.1(c)(xxiii).

(g) The Trustees, upon notice from the Lummus Future Claimants' Representative or the TAC requesting consideration of one or more issues, shall at their next regular meeting or, if appropriate, at a specially called meeting, place on their agenda and consider such issues.

3.3 **Claims Administration**. On the Effective Date, the Trustees shall promptly implement the Lummus TDP. The Lummus TDP provides or will provide, as applicable, mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

values of present Lummus Asbestos PI Trust Claims and future demands, and other comparable mechanisms, that provide reasonable assurance that the Lummus Asbestos PI Trust will value and be in a financial position to pay Lummus Asbestos PI Trust Claims that involve similar claims in substantially the same manner.

3.4 **Indemnification of Trustees and Additional Indemnitees.**

(a) The Lummus Asbestos PI Trust shall indemnify and defend the Trustees, the Lummus Asbestos PI Trust's officers, and employees to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Additionally, any of the Additional Indemnitees who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of such Additional Indemnitees with respect to (i) the

Chapter 11 Case, CE Plan, and any act or omission undertaken in furtherance thereof by them prior to the commencement thereof, (ii) the liquidation of any Lummus Asbestos PI Trust Claims, (iii) the administration of the Lummus Asbestos PI Trust and the implementation of Lummus TDP, or (iv) any and all activities in connection with this Lummus Asbestos PI Trust Agreement shall be indemnified and defended by the Lummus Asbestos PI Trust to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its officers, directors, Trustees, and employees, against reasonable expenses, costs and fees (including reasonable attorneys' fees and costs), judgments, awards, amounts paid in settlement, and liabilities of all kinds incurred by each Additional Indemnitee in connection with or resulting from such action, suit, or proceeding, if he or she acted in good faith and in a manner such Additional Indemnitee reasonably believed to be in, or not opposed to, the best interests of the holders or future holders of Lummus Asbestos PI Trust Claims whom the applicable Additional Indemnitee represents. Notwithstanding the foregoing, and subject to Section 3.4(b) below, neither the Trustees nor any officer or employee of the Lummus Asbestos PI Trust, nor the Lummus Future Claimants' Representative nor any member of the TAC shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which they are ultimately liable under Sections 5.4, 6.8 or 7.9, as applicable.

(b) Reasonable expenses, costs and fees (including reasonable attorneys' fees and costs) incurred by or on behalf of a Trustee or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which he or she is indemnified by the Lummus Asbestos PI Trust pursuant to Section 3.4(a), shall be paid by the Lummus Asbestos PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by Final Order that such Trustee or any Additional Indemnitee is not entitled to be indemnified by the Lummus Asbestos PI Trust.

(c) The Trustees shall have the power, generally or in specific cases, to cause the Lummus Asbestos PI Trust to indemnify the agents, advisors, or consultants of the Lummus Asbestos PI Trust to the same extent as provided in this Section 3.4 with respect to the Trustees.

(d) Any indemnification under Section 3.4(c) of this Lummus Asbestos PI Trust Agreement shall be made by the Lummus Asbestos PI Trust upon a determination by the Trustees that indemnification of such Entity is proper in the circumstances.

(e) The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of the Lummus Asbestos PI Trust and pay any individual who is or was a Trustee, officer, employee, agent or representative of the Lummus Asbestos PI Trust or an Additional Indemnitee against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, Lummus Future Claimants' Representative, member of the TAC, officer, employee, agent or other representative.

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

3.5 **Encumbrance.** The Trustees and the Additional Indemnitees shall have an Encumbrance upon the Lummus Asbestos PI Trust Assets which shall be prior to any other Encumbrance thereon, and the Lummus Asbestos PI Trust hereby grants a security interest in the Lummus Asbestos PI Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Lummus Asbestos PI Trust Assets are deposited or maintained to each of the Trustees and the Additional Indemnitees, in each case to secure the payment of any amounts payable to them pursuant to Section 3.4, 5.5, 6.5 or 7.6, as applicable. The Lummus Asbestos PI Trust shall take such actions as may be necessary or reasonably requested by any of the Trustees, the Lummus Future Claimants' Representative, the TAC or any of the other Additional Indemnitees to evidence such Encumbrance (including, without limitation, filing appropriate financing statements).

### ARTICLE IV
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

4.1 **Accounts.** The Trustees may, from time to time, establish and maintain such accounts and reserves within the Lummus Asbestos PI Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of Lummus Asbestos PI Trust Expenses payable hereunder and TDP Determined Claims in accordance with the Lummus TDP, and may, with respect to any such account or reserve, restrict the use of monies therein.

4.2 **Investments.** Investment of monies held in the Lummus Asbestos PI Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a) The Lummus Asbestos PI Trust shall not acquire any equity or debt securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed or insured as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate fair market

value as determined in good faith by the Trustees of all securities and instruments issued by such Entity held by the Lummus Asbestos PI Trust would exceed 2% of the aggregate value of the Lummus Asbestos PI Trust estate. The Lummus Asbestos PI Trust shall not hold any equity or debt securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed or insured as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate fair market value as determined in good faith by the Trustees of all securities and instruments issued by such Entity and held by the Lummus Asbestos PI Trust would exceed 5% of the aggregate value of the Lummus Asbestos PI Trust estate. The Lummus Asbestos PI Trust shall not acquire any securities or other instruments issued by any Person (other than debt securities or other instruments issued or fully guaranteed as to the principal and interest by the United States of America) unless, at the time of acquisition, the securities or other instruments so acquired represent not more than 5% of all outstanding securities or instruments of the same class and series.

(b) No more than __ % of the Lummus Asbestos PI Trust Assets may at any time be invested in equity securities. The Lummus Asbestos PI Trust shall not acquire, directly or indirectly, equity securities of any Entity if, immediately following such acquisition, the Lummus Asbestos PI Trust would hold more than 1% of the equity securities of such Entity. The Lummus Asbestos PI Trust shall not hold, directly or indirectly, more than 2% of the equity securities of any Entity. The Lummus Asbestos PI Trust shall not acquire, directly or indirectly, equity securities of any Entity (i) unless such securities are listed or traded on the New York Stock Exchange, the American Stock Exchange or The NASDAQ National Market of The NASDAQ Stock Market, Inc. or (ii) if such Entity is not organized under the laws of the United States of America or a political subdivision thereof unless such securities are issued in ADR form, ADS form or registry form denominated in Dollars.

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

(c) Unless otherwise permitted by clauses (d), (e), (f) or (g), the Lummus Asbestos PI Trust shall not acquire or hold, for longer than 90 days, any debt securities, participation certificates or similar instruments of any Entity that are not commercial paper unless (i) such securities, certificates or similar instruments have been issued or fully guaranteed or insured as to principal and interest by the United States of America or any agency or instrumentality thereof or (ii) such securities, certificates or similar instruments are rated A or higher by Moody's or S&P or, in the case of short-term notes, P-2 or higher by Moody's or SP-1 or higher by S&P.

(d) The Lummus Asbestos PI Trust shall not acquire, or hold for longer than 90 days, any commercial paper unless (i) such commercial paper is rated "Prime-2" or higher by Moody's or "A-2" or higher by S&P's and (ii) the senior long-term debt of the commercial paper issuer is rated "A" or higher by Moody's or S&P.

(e) The Lummus Asbestos PI Trust shall not acquire or hold any banker's acceptance, certificate of deposit, Eurodollar or other time deposit, unless that instrument has a maturity of not more than three (3) years from the date of acquisition and is issued by a domestic commercial bank (or an Affiliate thereof) having capital and surplus in excess of $500 million and either such issue of banker's acceptances, certificates of deposit or deposits or such issuer has a rating of A or higher by either Moody's or S&P.

(f) The Lummus Asbestos PI Trust shall not acquire debt securities which are direct or indirect obligations of any state, county, city or other qualifying tax exempt Entity unless such debt securities have a rating of MIG 2 or higher from Moody's or SP-1 or higher from S&P (if such securities are short-term debt securities) or A or higher from either Moody's or S&P (if such securities are long-term securities).

(g) The Lummus Asbestos PI Trust may acquire or cause Lummus Asbestos PI Trust Assets to be held in money market mutual funds registered under the Investment Company Act of 1940, as amended, that have the highest rating obtained from either Moody's or S&P, the portfolio of which consists generally of assets in which the monies of the Lummus Asbestos PI Trust may be invested pursuant to subsections (a), (b), (c), (d), (e) and (f) of this Section 4.2.

(h) The Lummus Asbestos PI Trust may enter into repurchase agreements collateralized by debt securities and other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof equal to at least 102% of such repurchase obligations with primary United States governmental securities dealers or with commercial banks meeting the qualifications of Eligible Depositories. The term "Eligible Depositories" shall mean commercial bank(s) designated from time to time by the Trustee for the Estate Assets, each of which (1) has deposits insured by the Federal Deposit Insurance Corporation, (2) is organized under the laws of the United States or any state thereof, (3) has a minimum long-term rating of "A-3" or the then equivalent by Moody's and a long-term rating of "A-" (or the then equivalent) by S&P and (4) has total risk-based capital in excess of $5 billion and meets the minimum risk-based ratios established under the Federal Deposit Insurance Corporation Improvement Act of 1991.

(i) The Lummus Asbestos PI Trust shall not engage in short sales, puts, calls, straddles, hedges, options, futures, other derivatives or commodities contracts and shall not acquire securities on margin (or otherwise use credit or borrowed funds to acquire securities).

(j) In determining investments to be held by the Lummus Asbestos PI Trust, due regard shall be given by the Trustees to safety of principal and to production of reasonable amounts of current income. The Trustees shall not have an obligation to invest Lummus Asbestos PI Trust Assets for capital appreciation, in view of the purposes for which the Lummus Asbestos PI Trust was created, but are not prohibited from so doing.

Notwithstanding the foregoing, the Lummus Asbestos PI Trust may acquire and hold (A) equity or debt securities or instruments of the type(s) described in clauses (a), (b), (c) or (d) of this Section 4.2 which are issued by the

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

Debtor, Reorganized Debtor, ABB, ABB Holdings, ABB Oil & Gas or any of their Subsidiaries, Affiliates, or successors, and (B) any other property or asset contributed in kind as a part of the ABB Contribution, in each case without regard to any of the limitations set forth in such clauses (a), (b), (c) or (d).

4.3 **Source of Payments.** All Lummus Asbestos PI Trust Expenses and all liabilities with respect to the Lummus Asbestos PI Trust Claims shall be payable by the Lummus Asbestos PI Trust solely from the Lummus Asbestos PI Trust Assets and other assets held by the Lummus Asbestos PI Trust from time to time. Except as otherwise provided in Section 7.15.2 of the Plan, neither the Debtor, Reorganized Debtor, their respective Affiliates or subsidiaries, any successor in interest or the present or former stockholders, directors, officers, employees or agents of the Debtor, Reorganized Debtor, or their subsidiaries, nor the Trustees, the Lummus Future Claimants' Representative, the TAC or any of their officers, agents, advisors, or employees shall be liable for the payment of any Lummus Asbestos PI Trust Claims, Lummus Asbestos PI Trust Expense or any other liability of the Lummus Asbestos PI Trust.

4.4 **Indemnification.** The Lummus Asbestos PI Trust shall indemnify the Debtor and the Released Parties in accordance with the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus).

## ARTICLE V
## TRUSTEES

5.1 **Number.** The initial number of Trustees shall be one (1); provided, however, that the number of Trustees may be increased or decreased in accordance with Section 3.2(f)(iii) hereof. The initial Trustee shall be nominated by the Lummus Future Claimants' Representative, the CCC and the ACC, if appointed, subject to the approval of the Bankruptcy Court pursuant to Section 7.2.2 of the Plan.

5.2 **Term of Service.**

(a) The initial Trustee shall serve from the Effective Date and each successor Trustee or Trustees named to fill a vacancy shall serve from the date of appointment until the earlier of (i) his or her death, (ii) the end of the calendar in which he or she reaches age 70, (iii) his or her resignation pursuant to Section 5.2(b), (iv) his or her removal pursuant to Section 5.2(c), or (v) the termination of the Lummus Asbestos PI Trust pursuant to Section 8.2.

(b) Any Trustee may resign at any time by written notice to each of the TAC and the Lummus Future Claimants' Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) Any Trustee may be removed in the event that such Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with Section 3.2, a consistent pattern of neglect and failure to perform or participate in performing the duties of a trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall be made by the mutual decision of the TAC and the Lummus Future Claimants' Representative, and shall take effect at such time as the TAC and the Lummus Future Claimants' Representative jointly shall determine.

5.3 **Appointment of Successor Trustee(s).**

(a) In the event of a vacancy in the position of a Trustee, the vacancy shall be filled by the joint consent of the TAC and the Lummus Future Claimants' Representative. If such vacancy has not been filled within ninety (90) days, the Bankruptcy Court shall fill the vacancy on application of any of such person.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

(b) Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

5.4 **Liability of Trustees, Officers and Employees**. No Trustee, officer, or employee of the Lummus Asbestos PI Trust shall be liable to the Lummus Asbestos PI Trust, to any Entity holding a Lummus Asbestos PI Trust Claim, or to any other Entity except for such individual's (i) own breach of trust committed in bad faith or (ii) willful misappropriation. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the Lummus Asbestos PI Trust. No Trustee, officer, or employee of the Lummus Asbestos PI Trust shall be liable for any act or omission of any other officer, employee, agent or consultant of the Lummus Asbestos PI Trust, unless such Trustee, officer, employee or consultant of the Lummus Asbestos PI Trust, respectively, acted with bad faith in the selection or retention of such other officer, employee, agent, or consultant of the Lummus Asbestos PI Trust.

5.5 **Compensation and Expenses of Trustees**.

(a) Each Trustee shall receive compensation from the Lummus Asbestos PI Trust for his or her services as a Trustee in the amount of $       per annum plus a per diem allowance for meetings or other Lummus Asbestos PI Trust business attended in the amount of $       ; provided, however, that if a meeting was less than a full day's duration, the Trustees shall receive only a proportional payment of the per diem amount. The per annum compensation payable to each Trustee hereunder shall be reviewed every three (3) years and appropriately adjusted with the consent of each of the Lummus Future Claimants' Representative and the TAC.

(b) The Lummus Asbestos PI Trust will promptly reimburse each Trustee for all reasonable out-of-pocket costs and expenses incurred by each Trustee in connection with the performance of his or her duties hereunder.

(c) The Lummus Asbestos PI Trust will include a description of the amounts paid under this Section 5.5 in the report to be filed pursuant to Section 3.2(c)(i) of this Lummus Asbestos PI Trust Agreement.

5.6 **Trustees' Employment of Experts**. The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, and other Entities deemed by the Trustee to be qualified as experts on the matters submitted to them with the consent of each of the Lummus Future Claimants' Representative and the TAC, and the opinion of any such Entities on any matters submitted to them by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of any such Entity, in the absence of gross negligence.

5.7 **Trustees' Independence**. No Trustee shall, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized Debtor, ABB, any Non-Debtor Affiliates, or any of their successors. No Trustee shall act as an attorney for any Entity who holds a Lummus Asbestos PI Trust Claim.

5.8 **Bond**. The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### ARTICLE VI
### THE FUTURE CLAIMANTS' REPRESENTATIVE

6.1 **Duties**. The Lummus Future Claimants' Representative shall serve in a fiduciary capacity for the purpose of protecting the rights of persons that might subsequently assert Demands. Where provided in this

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

Lummus Asbestos PI Trust Agreement or the Lummus TDP, certain actions of the Trustees are subject to the consent of the Lummus Future Claimants' Representative.

6.2 **Term of Office**.

(a) The Lummus Future Claimants' Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b), (iii) his or her removal pursuant to Section 6.2(c) or (iv) the termination of the Lummus Asbestos PI Trust pursuant to Section 8.2.

(b) The Lummus Future Claimants' Representative may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) The Lummus Future Claimants' Representative may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include, without limitation, a consistent pattern of neglect and failure to perform or to participate in performing the duties of the Lummus Future Claimants' Representative hereunder and under the Lummus TDP, such as repeated non-attendance at scheduled meetings. Such removal shall be made by decision of the Trustees and the TAC, and shall take effect at such time as the Trustees and the TAC jointly shall determine.

6.3 **Appointment of Successor.** A vacancy caused by resignation shall be filled with an individual nominated by the resigning Lummus Future Claimants' Representative. A vacancy for any other reason, or in the absence of a nomination by the former Lummus Future Claimants' Representative, shall be filled with an individual selected by the Trustees with the consent of the TAC.

6.4 **Lummus Future Claimants' Representative's Employment of Professionals.** The Lummus Future Claimants' Representative may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the Lummus Future Claimants' Representative to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the Lummus Future Claimants' Representative in good faith and in accordance with the advice of any such Entity, and in the absence of gross negligence. The Lummus Future Claimants' Representative and his or her experts shall at all times have complete access to the Lummus Asbestos PI Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Lummus Asbestos PI Trust as well as to all information generated by them or otherwise available to the Lummus Asbestos PI Trust or the Trustees.

6.5 **Compensation and Expenses of the Lummus Future Claimants' Representative.**

(a) The Lummus Future Claimants' Representative shall receive compensation from the Lummus Asbestos PI Trust for his or her services as the Lummus Future Claimants' Representative as detailed on Schedule 1 attached hereto, such compensation being subject to an annual review and adjustment by the Trustees.

(b) The Lummus Asbestos PI Trust will promptly reimburse, or pay directly if so instructed, the Lummus Future Claimants' Representative for all reasonable out-of-pocket costs and expenses, including reasonable fees and costs associated with the employment of professionals pursuant to Section 6.4 and the procurement and maintenance of insurance incurred by the Lummus Future Claimants' Representative in connection with the performance of his or her duties hereunder. All such reimbursements or direct payments shall be deemed Lummus Asbestos PI Trust Expenses.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

6.6 **Procedure for Obtaining Consent of the Lummus Future Claimants' Representative.**

(a) In the event the consent of the Lummus Future Claimants' Representative is required pursuant to the terms of this Lummus Asbestos PI Trust Agreement, the Trustees shall promptly provide the Lummus Future Claimants' Representative and his or her counsel with notice and with all information regarding the matter in question.

(b) The Lummus Future Claimants' Representative must consider in good faith and in a timely fashion any request by the Trustees and may not withhold his or her consent unreasonably. If the Lummus Future Claimants' Representative does not notify the Trustees of his or her objection to such request within 45 days or such other time as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the Lummus Future Claimants' Representative's consent shall be deemed to have been affirmatively granted.

6.7 **Lack of Consent of the Lummus Future Claimants' Representative.**

(a) In the event the Trustees are unable to obtain the consent of the Lummus Future Claimants' Representative to any action or decision for which consent is required after following the procedure set forth in Section 6.6 of this Lummus Asbestos PI Trust Agreement, or if the Trustees and the Lummus Future Claimants' Representative are unable to reach agreement on any matter on which such consent is required, the matter shall be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the Lummus Future Claimants' Representative.

(b) If the disagreement is not resolved by alternative dispute resolution or if the Trustees and the Lummus Future Claimants' Representative do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the Lummus Future Claimants' Representative's consent.

6.8 **Liability of Lummus Future Claimants' Representative, Officers and Employees**. The Lummus Future Claimants' Representative shall not be liable to the Lummus Asbestos PI Trust, to any Entity holding a Lummus Asbestos PI Trust Claim, or to any other Entity except for such individual's (i) own breach of trust committed in bad faith or (ii) willful misappropriation. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, attorneys, or consultants of the Lummus Future Claimants' Representative. Neither the Lummus Future Claimants' Representative nor any officer or employee of the Lummus Future Claimants' Representative shall be liable for any act or omission of any other officer, employee, agent, or consultant of the Lummus Asbestos PI Trust, unless the Lummus Future Claimants' Representative, or officer or employee of the Lummus Future Claimants' Representative, acted with bad faith in the selection or retention of such other officer, employee, agent, or consultant of the Lummus Asbestos PI Trust.

6.9 **Copies to the Lummus Future Claimants' Representative**. The Trustees shall provide the Lummus Future Claimants' Representative with copies of all notices and other written information provided to the TAC pursuant to this Lummus Asbestos PI Trust Agreement.

## ARTICLE VII
## TRUST ADVISORY COMMITTEE

7.1 **Formulation and Number**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall be composed of **[three (3)]** members. The initial TAC members shall be nominated by the Debtor, the

## *PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

CCC, the ACC, if appointed, and the Lummus Future Claimants' Representative, acting jointly, subject to approval by the Bankruptcy Court pursuant to Section 7.2.3 of the Plan and named on the signature page hereof. The TAC shall have a chairperson who shall act as the TAC's liaison with the Lummus Asbestos PI Trust and the Lummus Future Claimants' Representative, coordinate and schedule meetings of the TAC, and handle all administrative matters that come before the TAC.

7.2 **Duties**. The TAC and its members shall serve in a fiduciary capacity representing all holders of present Lummus Asbestos PI Trust Claims. Where provided in this Lummus Asbestos PI Trust Agreement or the Lummus TDP, certain actions by the Trustees are subject to the consent of the TAC.

7.3 **Term of Office.**

(a) Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b), (iii) his or her removal pursuant to Section 7.3(c) or (iv) the termination of the Lummus Asbestos PI Trust pursuant to Section 8.2.

(b) Any member of the TAC may resign at any time by written notice to each of the remaining TAC members. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) Any member of the TAC may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include, without limitation, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder and under the Lummus TDP, such as repeated non-attendance at scheduled meetings. Such removal shall be made by the majority vote of the Trustees, the Lummus Future Claimants' Representative and the other members of the TAC, and shall take effect at such time as the Trustees, the Lummus Future Claimants' Representative and the other members of the TAC jointly determine.

7.4 **Appointment of Successors**. A vacancy in the TAC caused by resignation, death, or removal shall be filled with an individual, not a firm, approved by the majority vote of the Lummus Future Claimants' Representative and all remaining members of the TAC.

7.5 **The TAC's Employment of Professionals.** The TAC may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the TAC to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the TAC hereunder in good faith and in accordance with the written opinion of any such Entity, and in the absence of gross negligence. The TAC and its experts shall at all times have complete access to the Lummus Asbestos PI Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Lummus Asbestos PI Trust as well as all information generated by them or otherwise available to the Lummus Asbestos PI Trust or the Trustees.

7.6 **Compensation for Attendance at Meetings and Expenses of the TAC.** The members of the TAC shall be compensated for attendance at meetings as detailed on Schedule 2 attached hereto. The Lummus Asbestos PI Trust will promptly reimburse, or pay directly if so instructed, the TAC and each TAC member for all reasonable out-of-pocket costs and expenses, including reasonable fees and costs associated with employment of professionals pursuant to Section 7.5 and the procurement and maintenance of insurance incurred by the TAC in connection with the performance of its members' duties hereunder. Such reimbursement or direct payment shall be deemed a Lummus Asbestos PI Trust Expense.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

7.7 **Procedure for Obtaining Consent of the TAC.**

(a) In the event the consent of the TAC is required pursuant to the terms of this Lummus Asbestos PI Trust Agreement, the Trustees shall promptly provide the TAC and its counsel with notice and with all information regarding the matter in question.

(b) The TAC must consider in good faith and in a timely fashion any request by the Trustees and may not withhold its consent unreasonably. If the TAC does not notify the Trustees of its objection to such request within 45 days or such other time as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the TAC's consent shall be deemed to have been affirmatively granted.

(c) Except where otherwise provided for in this Lummus Asbestos PI Trust Agreement, the TAC shall act in all cases by majority vote.

7.8 **Lack of Consent of the TAC.**

(a) In the event the Trustees are unable to obtain the consent of the TAC on any action or decision for which consent of the TAC is required, after following the procedure set forth in Section 7.7 of this Lummus Asbestos PI Trust Agreement, or if the Trustees and the TAC are unable to reach agreement on any matter on which the TAC's consent is required, then the matter may be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the TAC.

(b) If the disagreement is not resolved by alternative dispute resolution, or if the Trustees and the TAC do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the TAC's consent.

7.9 **Liability of the TAC, Officers and Employees.** No member of the TAC shall be liable to the Lummus Asbestos PI Trust, to any Entity holding a Lummus Asbestos PI Trust Claim, or to any other Entity except for such individual's (i) own breach of trust committed in bad faith or (ii) willful misappropriation. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the TAC. No member of the TAC, nor any officer or employee of the TAC, shall be liable for any act or omission of any other officer, employee, agent or consultant of the TAC unless the TAC, or officer or employee of the TAC, acted with bad faith in the selection or retention of such other officer, employee, agent, or consultant of the Lummus Asbestos PI Trust.

7.10 **Copies to the TAC.** The Trustees shall provide the TAC with copies of all notices and other written information provided to the Lummus Future Claimants' Representative pursuant to this Lummus Asbestos PI Trust Agreement.

### ARTICLE VIII
### GENERAL PROVISIONS

8.1 **Irrevocability.** The Lummus Asbestos PI Trust is irrevocable.

8.2 **Termination.**

(a) The Lummus Asbestos PI Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i) subject to Section 3.2(f), the Trustees in their discretion decide to terminate the Lummus Asbestos PI Trust because (A) they deem it unlikely that new Lummus Asbestos PI Trust Claims will be filed against

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

the Lummus Asbestos PI Trust, and (B) Lummus Asbestos PI Trust Claims duly filed with the Lummus Asbestos PI Trust have been processed and paid to the extent provided in this Lummus Asbestos PI Trust Agreement and the Lummus TDP (and to the extent possible based upon the funds available to the Lummus Asbestos PI Trust from the Lummus Asbestos PI Trust Assets and the other assets then held by the Lummus Asbestos PI Trust), or have been determined not to qualify for payment under the terms of this Lummus Asbestos PI Trust Agreement and the Lummus TDP (and all such determinations are no longer subject to further review), and twelve (12) consecutive months have elapsed during which no new Lummus Asbestos PI Trust Claims have been filed with the Lummus Asbestos PI Trust; or

(ii) if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Lummus Asbestos PI Trust in a manner consistent with this Lummus Asbestos PI Trust Agreement and the Lummus TDP, the date on which the Bankruptcy Court or other court of competent jurisdiction enters an order approving such insurance and other arrangements and such order becomes a Final Order.

(b) On the Termination Date after payment of all the Lummus Asbestos PI Trust's liabilities, after all Demands have been provided for, and after liquidation of all properties and other non-cash Lummus Asbestos PI Trust Assets or other assets then held by the Lummus Asbestos PI Trust, all monies remaining in the Lummus Asbestos PI Trust estate shall be donated to one or more organization(s) exempt from federal income tax under section 501(c)(3) of the IRC, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtor within the meaning of Section 468B(d)(3) of the IRC. Notwithstanding any other provision of the Plan Documents, this Section 8.2(b) cannot be modified or amended.

8.3 **Amendments.** The Trustees, after consultation with the Lummus Future Claimants' Representative and the TAC, and subject to the consent of each of the Lummus Future Claimants' Representative and the TAC to the extent provided elsewhere in this Lummus Asbestos PI Trust Agreement, may modify or amend this Lummus Asbestos PI Trust Agreement or any document annexed to it, including, without limitation, the Trust By-laws or the Lummus TDP (provided the provisions of the Lummus TDP, if any, regarding any such modification or amendment are also followed). Any modification or amendment made pursuant to this Section 8.3 must be done in writing. Notwithstanding anything contained in this Lummus Asbestos PI Trust Agreement to the contrary, neither this Lummus Asbestos PI Trust Agreement, the Trust By-laws, the Lummus TDP nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the applicability of Section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the injunctions set out in the Plan, the Lummus Asbestos PI Trust's QSF status under section 468B of the IRC or the rights of the Debtor or the Reorganized Debtor under the Plan Documents.

8.4 **Meetings.** The Trustees, the Lummus Future Claimants' Representative, or a TAC member shall be deemed to have attended a meeting in the event such person spends a substantial portion of the day conferring, by phone or in person, on Lummus Asbestos PI Trust matters with the Lummus Future Claimants' Representative, the Trustees or a TAC member, as applicable. The Trustees shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of this Lummus Asbestos PI Trust Agreement.

8.5 **Severability.** Should any provision in this Lummus Asbestos PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Lummus Asbestos PI Trust Agreement.

## PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT

8.6 **Notices.** Notices to Entities asserting Asbestos Trust PI Claims shall be given at the address of such Entity, or, where applicable, such Entity's representative, in each case as provided on such person's claim form submitted to the Lummus Asbestos PI Trust with respect to his or her or its Asbestos Trust PI Claim or as otherwise provided to the Lummus

Asbestos PI Trust. Any notices or other report required or permitted by this Lummus Asbestos PI Trust Agreement must be in (i) writing and is deemed given when (a) delivered personally to the recipient, (b) sent by facsimile before 5:00 p.m. prevailing eastern time on a Business Day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) five (5) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Entities at the addresses set forth below, or at such other address as such Entity may designate from time to time in writing in accordance with this Section 8.6.

To the Lummus Asbestos PI Trust through the Trustees:

> _____
> _____
> _____
> Attention:_____
> Fax: _____

To the TAC:

> _____
> _____
> _____
> Attention:_____
> Fax: _____

To the Lummus Future Claimants' Representative:

> Law Offices of Richard B. Schiro
> Regency Plaza, Suite 1350
> 3710 Rawlins Street
> Dallas, TX 75219
> Attention: Richard B. Schiro, Esq.
> Fax: (214) 521-3838

With a copy to:

> Porter & Hedges, L.L.P.
> 1000 Main Street
> 36th Floor
> Houston, TX 77002
> Attention: John F. Higgins, Esq.
> Fax: (713) 226-6248

To Debtor, Settlor or Reorganized Debtor:

> ABB Lummus Global Inc.
> 310 Briarpark
> Houston, TX 77042
> Attention: Margaret Duplantier, Esq.
> Fax: (713) 821-3595

### *PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

With a copy to:

> Kirkpatrick & Lockhart Nicholson Graham LLP
> 599 Lexington Avenue
> New York, NY 10022-6030
> Attention: Jeffrey N. Rich, Esq.
> Fax: (212) 536-3901

All such notices and communications, if delivered personally or via overnight courier or if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return electronic transmission.

8.7 **Successors and Assigns.** The provisions of this Lummus Asbestos PI Trust Agreement shall be binding upon and inure to the benefit of the Debtor, Reorganized Debtor, the Lummus Asbestos PI Trust and the Trustees and their respective successors and assigns, except that neither the Debtor nor the Lummus Asbestos PI Trust nor the Trustees may assign or otherwise transfer any of its, or his or her rights or obligations under this Lummus Asbestos PI Trust Agreement, except, in the case of the Lummus Asbestos PI Trust and the Trustees, as contemplated by Sections 3.1 and 8.2.

8.8 **Limitation on Claim Interests for Securities Laws Purposes.** Lummus Asbestos PI Trust Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution and except that the foregoing shall not apply to any holder of a Lummus Derivative Asbestos Personal Injury Claim that is subrogated to a Lummus Asbestos PI Trust Claim as a result of its satisfaction of such Lummus Asbestos PI Trust Claim; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

8.9 **Entire Agreement; No Waiver.** The entire agreement of the parties relating to the subject matter of this Lummus Asbestos PI Trust Agreement is contained herein and in the documents referred to herein, and this Lummus Asbestos PI Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity, except as otherwise provided in the injunctions issued pursuant to the Plan.

8.10 **Headings.** The headings used in this Lummus Asbestos PI Trust Agreement are inserted for convenience only and neither constitute a portion of this Lummus Asbestos PI Trust Agreement, nor in any manner affect the construction of the provisions of this Lummus Asbestos PI Trust Agreement.

8.11 **Governing Law.** This Lummus Asbestos PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to Delaware conflict of laws principles.

8.12 **Dispute Resolution.** Any disputes that arise under this Lummus Asbestos PI Trust Agreement or under the Lummus TDP or the Trust By-Laws shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided herein, or in the Lummus TDP or in the Trust By-Laws. Notwithstanding anything else herein contained, to the extent any provision of this Lummus Asbestos PI Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control.

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

8.13 **Enforcement and Administration.** The provisions of this Lummus Asbestos PI Trust Agreement and the annexes hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees.

8.14 **Effectiveness.** This Lummus Asbestos PI Trust Agreement shall not become effective until such time as it has been approved by the Bankruptcy Court and executed and delivered by all the parties hereto, and the Effective Date of the Plan has occurred.

8.15 **Counterpart Signatures.** This Lummus Asbestos PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

8.16 **References and Interpretation.** When a reference is made in this Lummus Asbestos PI Trust Agreement to a Section, such reference will be to a Section of this Lummus Asbestos PI Trust Agreement unless otherwise indicated. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.

8.17 **Notices Under Plan Documents.** The Trustees shall deliver to the TAC and the Lummus Future Claimants' Representative a copy of all written notices that the Lummus Asbestos PI Trust or the Trustees give or receive under any of the Plan Documents (other than the Lummus TDP) promptly after receipt of the same. Notices to the TAC or the Lummus Future Claimants' Representative under the Lummus TDP shall be governed by the provisions of the Lummus TDP.

\* \* \* \* \*

[signature page to follow]

*PLAN — EXHIBIT D — LUMMUS ASBESTOS PI TRUST AGREEMENT*

IN WITNESS WHEREOF, the parties have executed this ABB Lummus Global Inc. 524(g) Asbestos PI Trust Agreement this day of        , 2005.

**SETTLOR:**

ABB LUMMUS GLOBAL INC.

By: _____

Name: _____

Title: _____

**TRUSTEE:**

_____

Name: _____

**LUMMUS FUTURE CLAIMANTS'**
**REPRESENTATIVE**

_____

Name:  Richard B. Schiro

**TRUST ADVISORY COMMITTEE**

_____

Name: _____

_____

Name: _____

_____

Name: _____

**PLAN EXHIBIT E**

**LUMMUS 524(G) ASBESTOS PI TRUST
DISTRIBUTION PROCEDURES**

ABB LUMMUS GLOBAL INC. 524(g)

LUMMUS ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

The ABB Lummus Global Inc. 524(g) Asbestos PI Trust Distribution Procedures ("Lummus TDP") provide for satisfying all asbestos-related personal injury and death claims caused by conduct of and/or exposure to products for which ABB Lummus Global Inc., a Delaware corporation ("Lummus"), has legal responsibility, as provided in and required by the Prepackaged Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code of ABB Lummus Global Inc. ("Plan") and the ABB Lummus Global Inc. 524(g) Asbestos PI Trust Agreement ("Lummus Asbestos PI Trust Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Glossary of Terms for the Plan Documents Pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. (the "Glossary") or in the Lummus Asbestos PI Trust Agreement.

The Plan and the Lummus Asbestos PI Trust Agreement establish the Lummus Asbestos PI Trust. The Trustee of the Lummus Asbestos PI Trust shall implement and administer this Lummus TDP in accordance with the Lummus Asbestos PI Trust Agreement.

SECTION I

Introduction

**1.1 Purpose.** This Lummus TDP has been adopted pursuant to the Lummus Asbestos PI Trust Agreement. It is designed to provide fair and equitable treatment for all Lummus Asbestos PI Trust Claims that may presently exist or may arise in the future in substantially the same manner.

**1.2 Interpretation.** Nothing in the Lummus TDP shall be deemed to create a substantive right for any claimant.

**1.3 Definitions.** The following capitalized terms used herein shall have the meanings set forth below:

"Average Value" means the average value for Disease Levels as set forth in Section 5.2(b)(3).

"Category A Claims" means TDP Determined Lummus Asbestos PI Trust Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) and those settled as Disease Level I allocated to Category A as set forth below.

"Category B Claims" means TDP Determined Lummus Asbestos PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) and those settled as Disease Level I allocated to Category B as set forth below.

"Claimant's Jurisdiction" means (a) the jurisdiction in which the claim was filed (if at all) against Lummus in the tort system prior to the Petition Date or (b) if the claim was not filed against Lummus in the tort system prior to the Petition Date, at the claimant's election, (i) the jurisdiction in which the claimant resides at the time of diagnosis, (ii) the jurisdiction in which the claimant resides when the claim is filed with the Lummus Asbestos PI Trust, or (iii) any jurisdiction in which the claimant experienced Lummus Exposure. Notwithstanding the foregoing, 1) if a claim is asserted by a personal representative or authorized agent and 2) the Claimant's Jurisdiction would be Alabama under the provisions of the preceding sentence such that the claim asserted would arise under the Alabama Wrongful Death Statute; then the Claimant's Jurisdiction will be the Commonwealth of Pennsylvania for purposes of evaluating the Claim.

## PLAN EXHIBIT E — LUMMUS TDP

"Claims Materials" means suitable and efficient claims materials prepared by the Lummus Asbestos PI Trust as described in Section VI.

"Claims Payment Ratio" means the claims payment ratio set forth in Section 2.5.

"Direct Claimant" has the meaning set forth in Section 5.5.

"Disease Levels" means the eight asbestos-related disease levels defined in Section 5.2(a)(3).

"Effective Date" has the meaning set forth in the Glossary.

"Expedited Review" means a review pursuant to the Expedited Review Process.

"Expedited Review Process" means the process to liquidate Lummus Asbestos PI Trust Claims set forth in Section 5.2(a).

"Exigent Hardship Claim" means a claim that meets the criteria set forth in Section 5.3(b).

"Extraordinary Claim" has the meaning set forth in Section 5.3(a).

"FIFO" means first-in-first-out.

"FIFO Payment Queue" has the meaning set forth in Section 5.1(c).

"FIFO Processing Queue" has the meaning set forth in Section 5.1(a)(1).

"Final Order" has the meaning set forth in the Glossary.

"Glossary" has the meaning set forth in the preamble.

"Indirect Claimant" has the meaning set forth in Section 5.5.

"Individual Review Process" means the individual review process described in Section 5.2(b).

"Initial Claims Filing Date" means on or before the date six months after the Lummus Asbestos PI Trust first distributes or otherwise makes available to claimants the proof of claim form and other claim materials required for filing Lummus Asbestos PI Trust Claims with the Lummus Asbestos PI Trust.

"Lummus" has the meaning set forth in the preamble.

"Lummus Asbestos PI Trust" has the meaning set forth in the Glossary.

"Lummus Asbestos PI Trust Agreement" has the meaning set forth in the preamble.

"Lummus Asbestos PI Trust Claims" has the meaning set forth in the Glossary.

"Lummus Derivative Asbestos Personal Injury Claims" has the meaning set forth in the Glossary.

"Lummus Design and Construction Claims" means Lummus Asbestos PI Trust Claims filed or asserted against Lummus alleging exposure arising from asbestos during the construction of refineries, chemical plants

## PLAN EXHIBIT E — LUMMUS TDP

and other industrial facilities. Most such claims allege that Lummus and/or certain of its Affiliates were involved in either the actual construction of the facilities or the design of the processing plants that allegedly contain asbestos-containing materials. To the extent that any Lummus Asbestos PI Trust Claim filed or otherwise asserted against Lummus does not specifically allege exposure arising from such circumstances, such claim shall be presumed to be a Lummus Feedwater Heater Claim unless designated as a Lummus Design and Construction Claim in the applicable proof of claim form (subject to challenge by the Trustee) or specific evidence to the contrary is provided.

"Lummus Exposure" means exposure to asbestos or asbestos-containing products that occurred on or before December 31, 1982 for which Lummus has legal responsibility as determined by the Lummus Asbestos PI Trust.

"Lummus FCR" has the meaning set forth in the Glossary.

"Lummus Feedwater Heater Claims" means Lummus Asbestos PI Trust Claims filed or asserted against Lummus alleging asbestos exposure arising from feedwater heaters manufactured by Lummus and subsequently installed at third-party facilities. To the extent that any Lummus Asbestos PI Trust Claim filed or otherwise asserted against Lummus does not specifically allege exposure arising from feedwater heaters manufactured by Lummus, such claim shall be presumed to be a Lummus Feedwater Heater Claim unless designated as a Lummus Design and Construction Claim in the applicable proof of claim form (subject to challenge by the Trustee) or specific evidence to the contrary is provided.

"Lummus TDP" has the meaning set forth in the preamble.

"Maximum Annual Payment" has the meaning set forth in Section 2.4.

"Maximum Extraordinary Value" has the meaning set forth in Section 5.3(a).

"Maximum Value" means the maximum value for Disease Levels as set forth in Section 5.2(b)(3).

"Medical/Exposure Criteria" means the medical/exposure criteria for each Disease Level set forth in Section 5.2(a)(3).

"Multiple Exposure Claims" has the meaning set forth in Section 2.1.

"Payment Percentage" has the meaning set forth in Section 4.1.

"Plan" has the meaning set forth in the preamble.

"Reduced Payment Option" has the meaning set forth in Section 2.5.

"Scheduled Value" means the scheduled value for each of the seven Disease Levels eligible for Expedited Review as set forth in Section 5.2(a)(3).

"Significant Occupational Exposure" has the meaning set forth in Section 5.6(b)(2).

"TAC" has the meaning set forth in the Glossary.

"TDP Determined Lummus Asbestos PI Trust Claim" means a Lummus Asbestos PI Trust Claim which qualifies for distributions from the Lummus Asbestos PI Trust under the Lummus TDP.

## PLAN EXHIBIT E — LUMMUS TDP

"Trustee" has the meaning set forth in the Glossary.

### SECTION II

### Overview

**2.1 Lummus Asbestos PI Trust Goals.** The goal of the Lummus Asbestos PI Trust is to treat all holders of Lummus Asbestos PI Trust Claims equitably. The Lummus TDP furthers that goal by setting forth procedures for processing Lummus Asbestos PI Trust Claims and paying TDP Determined Lummus Asbestos PI Trust Claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all holders of TDP Determined Lummus Asbestos PI Trust Claims over time as equivalent a share as possible of the value of such claims based on historical values for substantially similar claims in the tort system. The Lummus TDP classifies Lummus Asbestos PI Trust Claims as either Lummus Feedwater Heater Claims or Lummus Design and Construction Claims. To this end, for each category of claim, the Lummus TDP establishes a schedule of eight asbestos-related Disease Levels, as defined in Section 5.2(a)(3) of the Lummus TDP, all of which have Medical/Exposure Criteria set forth in SubSection 5.2(a)(3), seven of which have Scheduled Values, as set forth in Sections 5.2(a)(3), and five of which have both anticipated Average Values and Maximum Values, set forth in Section 5.2(b)(3), as well as Maximum Extraordinary Values, set forth in Section 5.3(a). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values, Maximum Values and Maximum Extraordinary Values have all been determined with the intention of achieving a fair allocation of the Lummus Asbestos PI Trust's funds among claimants suffering from different disease processes in light of the most current and accurate medical information available at the time and considering the settlement history of Lummus as well as the rights claimants would have in the tort system absent Lummus' bankruptcy.

A claimant with Lummus Exposure and (a) a claim against Lummus and one or more entities for which Lummus has legal responsibility or (b) a claim against more than one entity for which Lummus has legal responsibility (the "Multiple Exposure Claims"), may assert separate Lummus Asbestos PI Trust Claims against the Lummus Asbestos PI Trust; provided, however, that all such Multiple Exposure Claims must be filed by the claimant at the same time. Under no circumstances, however, shall any claimant receive more than the value of one TDP Determined Lummus Asbestos PI Trust Claim as such value is determined under this Lummus TDP, subject to the applicable Payment Percentage and Maximum Annual Payment, and Claims Payment Ratio limitations, if any, set forth below.

**2.2 Claims Liquidation Procedures.** Lummus Asbestos PI Trust Claims shall be processed and determined based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a). The Lummus Asbestos PI Trust shall liquidate efficiently and expeditiously under the Expedited Review Process described in Section 5.2(a) all Lummus Asbestos PI Trust Claims that meet the presumptive Medical/Exposure Criteria of Disease Levels I – V, VII or VIII. Lummus Asbestos PI Trust Claims in Disease Levels II – V, VII or VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Individual Review Process described in Section 5.2(b). In such a case, notwithstanding that the Lummus Asbestos PI Trust Claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Lummus Asbestos PI Trust can offer the claimant an amount up to the Scheduled Value of the relevant Disease Level if the Lummus Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Lummus Asbestos PI Trust Claims in Disease Levels IV – VIII tend to raise more complex valuation issues than the Lummus Asbestos PI Trust Claims in Disease Levels I – III. Accordingly, (a) claimants holding Lummus Asbestos PI Trust Claims involving Disease Level VI (Lung Cancer 2) may be liquidated only pursuant to the Individual Review Process and (b) claimants holding Lummus Asbestos PI Trust Claims involving Disease

## PLAN EXHIBIT E — LUMMUS TDP

Levels IV, V, VII or VIII may in addition or alternatively seek to establish a liquidated value for such claim that is greater than the Scheduled Value of the relevant Disease Level by electing the Individual Review Process. However, the liquidated value of a more serious Lummus Asbestos PI Trust Claim involving Disease Level IV, V, VII or VIII that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value. A claim which is Individually Reviewed shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3), unless such Lummus Asbestos PI Trust Claim qualifies as an Extraordinary Claim, in which case its liquidated value shall not exceed the Maximum Extraordinary Value specified in Section 5.3(a).

Based upon Lummus' claims settlement history, applicable tort law and current projections of Lummus Asbestos PI Trust Claims and TDP Determined Lummus Asbestos PI Trust Claims, the Scheduled Values and Maximum Values set forth in Section 5.2(b)(3) have been established for each of the five more serious Disease Levels that are eligible for Individual Review, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process will result in the Average Values also set forth in that provision.

Certain unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of a Lummus Asbestos PI Trust Claim shall be subject to binding or non-binding arbitration, at the election of the claimant, as provided in Section 5.9. Arbitrable disputes with the Lummus Asbestos PI Trust that cannot be resolved by non-binding arbitration may be resolved in the tort system as provided in Sections 5.10 and 7.6. However, if and when a claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Annual Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7.

**2.3 Application of the Payment Percentage.** After the liquidated value of a TDP Determined Asbestos PI Claim (other than a claim involving Disease Level I – Cash Discount Payment) is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, as applicable, the claimant will ultimately receive a pro-rata share of such liquidated value based on the Payment Percentage described in Section 4.1. The Payment Percentage may be adjusted upwards or downwards from time to time by the Lummus Asbestos PI Trust, with the consent of the TAC and the Lummus FCR, to reflect then-current estimates of the Lummus Asbestos PI Trust's assets and its liabilities, as well as the then-estimated value of then-pending and future claims. However, any adjustment to the initial Payment Percentage shall be made only pursuant to Section 4.2. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the Lummus TDP will not receive additional payments. Because there is uncertainty in the prediction of both the number and severity of future TDP Determined Lummus Asbestos PI Trust Claims, and the amount of the Lummus Asbestos PI Trust's assets, no guarantee can be made as to what Payment Percentage of a TDP Determined Lummus Asbestos PI Trust Claim's liquidated value will be paid to the holder of any such claim.

**2.4 Lummus Asbestos PI Trust's Determination of the Maximum Annual Payment.** The Lummus Asbestos PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future claimants as similarly as possible. The Lummus Asbestos PI Trust will be empowered to pay up to a certain limited amount during each fiscal year, which amount shall be determined annually by the Trustee with the consent of the TAC and the Lummus FCR (the "Maximum Annual Payment"), and shall be calculated after reserves or other provision for Trust Expenses due in the related fiscal year have been established such that the application of the assets of the Lummus Asbestos PI Trust over its life shall correspond with the needs created by the anticipated flow of TDP Determined Lummus Asbestos PI Trust Claims, taking into account the Payment Percentage provisions set forth in Sections 2.3 and 4.2. The Lummus Asbestos PI Trust's aggregate distributions to all claimants for a particular

## PLAN EXHIBIT E — LUMMUS TDP

fiscal year shall not exceed the Maximum Annual Payment determined for that year. The Maximum Annual Payment shall be initially set at $5,000,000 for the first fiscal year in which claims are paid.

In distributing the Maximum Annual Payment, the Lummus Asbestos PI Trust shall allocate such Maximum Annual Payment between Categories A and B in accordance with the Claims Payment Ratio. Thereafter the amounts allocated to Categories A and B shall be used to satisfy all TDP Determined Lummus Asbestos PI Trust Claims, (subject to a reduction of

the Claims, if applicable, by the Payment Percentage and the Claims Payment Ratio set forth in Section 2.5). In the event there are insufficient funds in any year to pay the total amount of TDP Determined Lummus Asbestos PI Trust Claims in Categories A or B the available funds allocated to a Category of claims shall be paid to the maximum extent possible to claimants in the particular Category based on their place in the FIFO Payment Queue. Disease Level I claims allocated to either Category shall be paid prior to payment of any other claims contained in said Category. Claims in each Category for which there are insufficient funds shall be carried over to the next year and shall remain at the head of the FIFO Payment Queue for their Category.

**2.5 Claims Payment Ratio.** Based upon Lummus' claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 80% for Lummus Asbestos PI Trust Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) as well as allocated Disease Level I claims ("Category A Claims"), and at 20% for Lummus Asbestos PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) as well as allocated Disease Level I claims ("Category B Claims"). Any Lummus Asbestos PI Trust Claims for Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall be allocated to either Categories A or B based on the highest Disease Level established by the medical evidence submitted for that claim. In each year, after the determination of the Maximum Annual Payment, by application of the Claims Payment Ratio (which percentage shall be modified to correspond with each change, if any, in the Claims Payment Ratio after the Effective Date), 80% of the Maximum Annual Payment will be allocated to, and available to pay liquidated Category A Claims and 20% (which percentage shall be modified to correspond with each change, if any, in the Claims Payment Ratio after the Effective Date) will be allocated to, and available to pay, liquidated Category B Claims.

In the event there are insufficient funds in any year to pay the TDP Determined Claims in Category A and/or Category B, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in the particular Category based on their place in the FIFO Payment Queue described in Section 5.1(c). Claims for which there are insufficient funds will be carried to the next year where they will remain at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories because there is an insufficient amount of liquidated claims to exhaust the amount of the Maximum Annual Payment allocated to that Category by application of the Claims Payment Ratio, then the excess funds for either or both Categories will be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 80%/20% Claims Payment Ratio and its rollover provision shall apply to all Lummus Asbestos PI Trust Claims and shall not be amended until the fifth anniversary of the Effective Date. Thereafter, both the Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. The accumulation, rollover and subsequent delay in the payment of claims resulting from the application of the Claims Payment Ratio, shall not, in and of itself, constitute such circumstances. Likewise, an increase in the number of Category B Claims beyond those predicted or expected shall not be considered as a factor in deciding whether to reduce the percentage allocated to Category A Claims and provide a corresponding increase in the percentage allocated to Category B Claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee should consider the reasons for which the Claims Payment Ratio and its rollover provisions were

**PLAN EXHIBIT E — LUMMUS TDP**

adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants. In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the Lummus FCR pursuant to the consent process set forth in Sections 6.6 and 7.7 of the Lummus Asbestos PI Trust Agreement.

However, the Trustee, with the consent of the TAC and Lummus FCR, may, at any time, offer the option of a reduced payment percentage to claimants in either Category in return for prompt payment (the "Reduced Payment Option").

**2.6 Indemnity and Contribution Claims.** As set forth in Section 5.5, Lummus Derivative Asbestos Personal Injury Claims, if any, will be subject to the same evaluation, categorization and payment provisions of the Lummus TDP as all other Lummus Asbestos PI Trust Claims.

*i*

## SECTION III

### Lummus TDP Administration

**3.1 Trust Advisory Committee and Lummus FCR.** Pursuant to the Plan and the Lummus Asbestos PI Trust Agreement, the Lummus TDP will be administered by the Trustee in consultation with the TAC (which represents the interests of holders of present Lummus Asbestos PI Trust Claims), and the Lummus FCR (who represents the interests of holders of Lummus Asbestos PI Trust Claims that may be asserted in the future). The Trustee shall obtain the consent of the TAC and the Lummus FCR on any amendments to the Lummus TDP pursuant to Section 8.1, and on such other matters as are otherwise required herein or in the Lummus Asbestos PI Trust Agreement. The Trustee shall also consult with the TAC and the Lummus FCR on such matters as are provided below and in Section 3.1(e) of the Lummus Asbestos PI Trust Agreement. The initial members of the TAC and the initial Lummus FCR are identified on the signature pages to the Lummus Asbestos PI Trust Agreement.

**3.2 Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required hereunder, the Trustee will provide written notice to the TAC and the Lummus FCR of the specific amendment or other action that is proposed. The Trustee will not implement such amendment nor take such action unless and until the parties have engaged in the consent process described in Sections 6.6 and 7.7 of the Lummus Asbestos PI Trust Agreement, respectively.

## SECTION IV

### Payment Percentage; Periodic Estimates; De Minimis Distributions

**4.1 Uncertainty of Lummus' Personal Injury Asbestos Liabilities.** As discussed above, there is inherent uncertainty regarding Lummus' total asbestos-related tort liabilities, as well as the total value of the assets available to pay such claims. Consequently, there is inherent uncertainty regarding the amounts that holders of TDP Determined Lummus Asbestos PI Trust Claims will receive. To seek to ensure substantially equivalent treatment of all present and future claims, the Trustee must determine from time to time the percentage of full liquidated value that holders of TDP Determined Lummus Asbestos PI Trust Claims will receive (the "Payment Percentage").

## PLAN EXHIBIT E — LUMMUS TDP

**4.2 Computation of Payment Percentage.** The initial Payment Percentage shall be one hundred percent (100%) of the full liquidated value of a TDP Determined Lummus Asbestos PI Trust Claim calculated on the assumption that the Average Values set forth in Section 5.2(b)(3) will be achieved with respect to existing present claims and projected future claims involving Disease Levels IV – VIII and the Scheduled Values for Disease Levels I – III.

The Payment Percentage shall be subject to change pursuant to the terms of the Lummus TDP and the Lummus Asbestos PI Trust Agreement if the Trustee, with the consent of the TAC and the Lummus FCR, determine that an adjustment is required to assure that the Lummus Asbestos PI Trust will be in a financial position to pay all present and future Lummus Asbestos PI Trust Claims in substantially the same manner. In making any such adjustment, the Trustee, the TAC and the Lummus FCR shall take into account the most current and accurate information and analysis available at the time. No less frequently than once every three years, commencing with the first day of January occurring more than three years after the Plan is consummated, the Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information. After such reconsideration, the Trustee may change the Payment Percentage if necessary with the consent of the TAC and the Lummus FCR. The Trustee, TAC and FCR shall also reconsider the then-applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Lummus FCR.

The Trustee, TAC and FCR must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future TDP Determined Lummus Asbestos PI Trust Claims, the value and liquidity of the assets then available to the Lummus Asbestos PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of liquidated value to all holders of TDP Determined Lummus Asbestos PI Trust Claims. In this regard, payment percentages applicable to claims allocated to Categories A and B may be different. When making these determinations, the Trustee, TAC and FCR shall exercise common sense and flexibly evaluate all relevant factors.

**4.3 Applicability of the Payment Percentage.** No holder of a TDP Determined Lummus Asbestos PI Trust Claim other than a TDP Determined Lummus Asbestos PI Trust Claim involving Disease Level I (Cash Discount Payment) shall

receive a payment that exceeds the Payment Percentage of the relevant liquidated value of such TDP Determined Lummus Asbestos PI Trust Claim, except as otherwise provided in Section 5.1(c) for TDP Determined Lummus Asbestos PI Trust Claims involving deceased or incompetent claimants for which court approval of the Lummus Asbestos PI Trust's offer is required. TDP Determined Lummus Asbestos PI Trust Claims involving Disease Level I (Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.2(a)(3).

Except as provided in the remainder of this paragraph, the Payment Percentage applied to a TDP Determined Lummus Asbestos PI Trust Claim will be the one in effect at the time the Lummus Asbestos PI Trust's offer was made. If at the time of such offer a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the Lummus FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but is not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount, subject to the limitation provided if Section 4.4. Conversely, if the proposed Payment Percentage was the higher amount and is subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount, subject to the limitation in Section 4.4.

## PLAN EXHIBIT E — LUMMUS TDP

### 4.4 De Minimis Distributions.

Notwithstanding any other provision of the Lummus TDP, the Lummus Asbestos PI Trust Agreement or the Plan, the Trustee shall not be required to make distributions to any holder of a TDP Determined Lummus Asbestos PI Trust Claim in an amount less than $100.00, other than pursuant to the Reduced Payment Option. Cash allocated to a TDP Determined Lummus Asbestos PI Trust Claim but withheld from distribution pursuant to this Section 4.4 shall be held by the Trustee for the account of and future distribution to the holder of such TDP Determined Lummus Asbestos PI Trust Claim in the event the holder of such TDP Determined Lummus Asbestos PI Trust Claim becomes entitled to a distribution which, together with all distributions withheld pursuant to this Section 4.4, exceeds $100.00.

### 4.5 Offsets.

If a TDP Determined Lummus Asbestos PI Trust Claim is secured by an appeal bond or is entitled to the benefit of any other security provided by or on behalf of Lummus, the Lummus Asbestos PI Trust shall offset against the liquidated amount of such TDP Determined Lummus Asbestos PI Trust Claim an amount equal to the amount such holder is entitled to receive from, under or in respect of such appeal bond or other security, and the amount the holder of such TDP Determined Lummus Asbestos PI Trust Claim shall receive under the Lummus TDP shall equal the liquidated amount of such claim, first reduced by such offset, and then multiplied by the applicable Payment Percentage.

### SECTION V

### Resolution of TDP Determined Lummus Asbestos PI Trust Claims.

#### 5.1 Ordering, Processing and Payment of Claims.

##### 5.1(a) Ordering of TDP Determined Lummus Asbestos PI Trust Claims.

5.1(a)(1) **Establishment of the FIFO Processing Queue.** The Lummus Asbestos PI Trust will order TDP Determined Lummus Asbestos PI Trust Claims for processing and determination purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue"). For all TDP Determined Lummus Asbestos PI Trust Claims filed on or before the Initial Claims Filing Date, a claimant's position in the FIFO Processing Queue shall be determined as of the first to occur of (i) the date prior to the Petition Date that the specific Lummus Asbestos PI Trust Claim was either filed against Lummus in the tort system or was actually submitted to Lummus pursuant to an administrative settlement agreement; (ii) the date before the Initial Claims Filing Date that a Lummus Asbestos PI Trust Claim was filed against another defendant in the tort system if at the time such claim was subject to a tolling agreement with Lummus; (iii) the date after the Petition Date on or before the Initial Claims Filing Date that the Lummus Asbestos PI Trust Claim was filed against another defendant in the tort system; or (iv) the date after the Effective Date but on or before the Initial Claims Filing Date that the Lummus Asbestos PI Trust Claim was filed with the Lummus Asbestos PI Trust.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim was filed with the Lummus Asbestos PI Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue vis-à-vis the other claim filed on the same date shall be determined by the date of the diagnosis of the asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in

the FIFO Processing Queue vis-à-vis the other claim filed on the same date shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**PLAN EXHIBIT E — LUMMUS TDP**

**5.1(a)(2) Effect of Statutes of Limitations and Repose.** To be eligible for a place in the FIFO Processing Queue, a Lummus Asbestos PI Trust Claim must meet either (i) for claims first filed in the tort system against Lummus prior to the Petition Date, the applicable federal and state statutes of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against Lummus in the tort system prior to the Petition Date, the applicable statutes of limitation and repose that was in effect at the time of the filing with the Lummus Asbestos PI Trust. However, the running of the relevant statutes of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against Lummus prior to the Petition Date, whether in the tort system or by submission of the claim to Lummus pursuant to an administrative settlement agreement; (B) the filing of the claim against another defendant in the tort system prior to the Petition Date if the claim was tolled against Lummus at the time by an agreement or otherwise; (C) the filing of a claim after the Petition Date but prior to the Initial Claims Filing Date against another defendant in the tort system; (D) the filing of a proof of claim in the Chapter 11 Case prior to the Effective Date; or (E) the filing of a proof of claim with the requisite supporting documentation with the Lummus Asbestos PI Trust within three years following the Effective Date.

If a Lummus Asbestos PI Trust Claim meets any of the tolling provisions described in (A), (B), (C) or (D) of the preceding sentence, it will be treated as timely filed regardless of the date that it is actually filed with the Lummus Asbestos PI Trust. Also, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statutes of limitation or repose, must be filed with the Lummus Asbestos PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.

**5.1(b) Processing of Lummus Asbestos PI Trust Claims.** As a general practice, the Lummus Asbestos PI Trust will review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

**5.1(c) Payment of TDP Determined Lummus Asbestos PI Trust Claims.** Lummus Asbestos PI Trust Claims involving Disease Level I, Category A Claims and Category B Claims that have been liquidated by the Expedited Review Process as provided in Section 5.2(a), by the Individual Review Process as provided in Section 5.2(b), by arbitration as provided in Section 5.9, or in the tort system as provided in Sections 5.10 and 7.6, shall be paid in FIFO order based on the date their liquidation became final (the "FIFO Payment Queue"). All such payments are subject to the Maximum Annual Payment and the Claims Payment Ratio. In addition, all TDP Determined Lummus Asbestos PI Trust Claims (except Disease Level I Claims) shall also be subject to the Payment Percentage. The Trustee, with the consent of the TAC and the Lummus FCR, may offer a Reduced Payment Option to holders of either Category A Claims or Category B Claims in return for more prompt payment (the "Reduced Payment Option").

Where the claimant is deceased or incompetent, and the settlement and payment of his or her TDP Determined Lummus Asbestos PI Trust Claim must be approved by a court of competent jurisdiction prior to acceptance of an offer made by the Lummus Asbestos PI Trust on the claim by the claimant's representative, such offer shall remain open so long as proceedings before that court remain pending, provided that the Lummus Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court for approval. If the offer is ultimately approved by the court and accepted by the claimant's representative, the Lummus Asbestos PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, each such claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of such claimant's asbestos- related disease, with earlier diagnosis dates given priority over later diagnosis dates. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the

**PLAN EXHIBIT E — LUMMUS TDP**

FIFO Payment Queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2 Resolution of Unliquidated Lummus Asbestos PI Trust Claims.** Within six months after the establishment of the Lummus Asbestos PI Trust, the Trustee, with the consent of the TAC and the Lummus FCR, shall adopt procedures for reviewing and liquidating all unliquidated Lummus Asbestos PI Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require claimants seeking resolution of unliquidated Lummus Asbestos PI Trust Claims to file a proof of claim form, together with the required supporting documentation, in accordance with the provisions

of Sections 6.1 and 6.2. The Lummus Asbestos PI Trust shall make reasonable efforts to provide an initial response to the claimant within six months of receiving the proof of claim form.

All claims filed with the Lummus Asbestos PI Trust shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, with all lower Disease Levels for which the claim then qualifies or may qualify in the future subsumed into the higher Disease Level for both processing and payment purposes. Upon filing of a proof of claim form established pursuant to Section 6.1, and all other Claims Materials required to be filed in accordance with the instructions delivered by the Lummus Asbestos PI Trust pursuant to Section VI, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a), and shall be liquidated either under the Expedited Review Process described in Section 5.2(a) or, in certain circumstances, the Individual Review Process described in Section 5.2(b).

### 5.2(a) Expedited Review Process.

**5.2(a)(1) In General.** The Lummus Asbestos PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating Lummus Asbestos PI Trust Claims (except those involving Lung Cancer 2—Disease Level VI) which can easily be verified by the Lummus Asbestos PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing their claims than the Individual Review Process described in Section 5.2(b). Expedited Review is also intended to provide a fixed and certain liquidated amount to qualifying claimants.

Claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be assigned the Scheduled Value for such Disease Level set forth in Section 5.2(a)(3). All claims liquidated by Expedited Review shall be subject to the Maximum Annual Payment and the Claims Payment Ratio. All claims liquidated by Expedited Review, other than Disease Level I—Other Asbestos Disease, shall be subject to the Payment Percentage. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Lummus Asbestos PI Trust's Individual Review Process set forth in Section 5.2(b).

**5.2(a)(2) Claims Processing under Expedited Review.** All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the Lummus Asbestos PI Trust's proof of claim form described in Section 6.1. As a proof of claim form is reached in the FIFO Processing Queue, the Lummus Asbestos PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a Disease Level is determined, the Lummus Asbestos PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage. If the claimant accepts the Scheduled Value, the claim shall be placed in the FIFO Payment Queue, following which the Trust shall disburse payment subject to the limitations of the Maximum Annual Payment, the Payment Percentage and **the** Claims Payment Ratio, if any.

## PLAN EXHIBIT E — LUMMUS TDP

In the event a personal representative or authorized agent submits a claim to the Lummus Asbestos PI Trust arising under the Alabama Wrongful Death Statute and the Claimant's Jurisdiction, as otherwise defined herein, would be the State of Alabama, then for purposes of evaluating such claim, the Lummus Asbestos PI Trust shall treat the Claimant's Jurisdiction as being the Commonwealth of Pennsylvania, and such claimant's damages shall be evaluated by the Lummus Asbestos PI Trust pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles or the provisions of 5.2(b)(2) defining Claimant's Jurisdiction.

**5.2(a)(3) Disease Levels, Scheduled Values and Medical/Exposure Criteria.** The eight disease levels covered by the Lummus TDP set forth below (each, a "Disease Level") together with the medical/exposure criteria for each such Disease Level (as applicable, the "Medical/Exposure Criteria"), are set forth below:

| Disease Level | Medical/Exposure Criteria |
| --- | --- |
| Mesothelioma (Level VIII) | (1) Diagnosis[1] of mesothelioma; and (2) Lummus Exposure.[2] |

Lung Cancer 1 (Level VII)

(1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[3], (2) six months Lummus Exposure (3) Significant Occupational Exposure[4], and (4) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the lung cancer in question.

Lung Cancer 2 (Level VI)

(1) Diagnosis of a primary lung cancer, (2) Lummus Exposure, and (3) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VII) claims. All claims in this Disease Level will be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $1,000.00 for Lummus Feedwater Heater Claims and $5,000.00 for Lummus Design and Construction

---

[1]    The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of the TDP are set forth in Section 5.6.

[2]    The term "Lummus Exposure" is defined in Section 5.6(b)(3).

[3]    Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, V, and VII, means a report submitted by a qualified physician stating that the claimant has or had an X-ray reading of 1/0 or higher on the ILO scale, or bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification (or, solely for claims filed against CE or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, a chest x-ray reading that indicates bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease).

[4]    The term "Significant Occupational Exposure" is defined in Section 5.6(b)(2) .

## PLAN EXHIBIT E — LUMMUS TDP

| Disease Level | Medical/Exposure Criteria |
| --- | --- |
|  | Claims, with such awards capped at $4,000.00 for Lummus Feedwater Heater Claims and $30,000.00 for Lummus Design and Construction Claims unless the claim qualifies for Extraordinary Claim treatment. |
|  | Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a Smoker.[5] In any event, no presumption of validity will be available for any claims in this category. |
| Other Cancer (Level V) | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months cumulative Lummus Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos[6] , plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Lummus |

Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the pulmonary deficit in question.

[5] here is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust. In such a case, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer (Level VII) shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

[6] Proof of asbestosis may be based on the pathological grading system for asbestos described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982) and Pulmonary Function testing.

## PLAN EXHIBIT E — LUMMUS TDP

| Disease Level | Medical/Exposure Criteria |
|---|---|
| Asbestosis/Pleural Disease (Level III) | Diagnosis of asbestosis with ILO of 1/0 or greater or asbestosis determined by pathology, or Bilateral Asbestos Related Non-malignant Disease of B2 or greater, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Lummus Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the pulmonary deficit in question. |
| Asbestosis/Pleural Disease (Level II) | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Lummus Exposure, and (3) five years cumulative occupational exposure to asbestos |
| Other Asbestos Disease (Level I -Cash Discount Payment) | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy (except mesothelioma), and (2) Lummus Exposure. |

These Disease Levels and Medical/Exposure Criteria shall apply to all Lummus Asbestos PI Trust Claims filed with the Lummus Asbestos PI Trust on or before the Initial Claims Filing Date provided in Section 5.1. The Scheduled Values for each of seven Disease Levels eligible for Expedited Review (as applicable, the "Scheduled Value") determined by the applicable conduct of Debtor which formulates the liability, are set forth in 5.2(b)(3). Thereafter, with the consent of the TAC and the Lummus FCR, the Trustee may add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then-current Disease Levels.

### 5.2(b) Individual Review Process

#### 5.2(b)(1) In General.

5.2(b)(1)(A) Disease Levels II – III. The Lummus Asbestos PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a Lummus Asbestos PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels II – III. In such a case, the Lummus Asbestos PI Trust shall either deny the claim, or, if the Lummus Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Lummus Asbestos PI Trust may offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.3(a), in which case the Lummus Asbestos PI Trust may offer the claimant more than the Scheduled Value for that Disease Level but such offer of liquidated value shall not exceed the Maximum Extraordinary Value for such claim.

**5.2(b)(1)(B) Disease Levels IV – VIII.** Claimants holding Lummus Asbestos PI Trust Claims in the more serious Disease Levels IV, V, VII or VIII shall be eligible to seek, and claimants holding Lummus Asbestos PI Trust Claims in Disease Level VI shall be required to undergo, Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence. The Individual Review Process is intended

## PLAN EXHIBIT E — LUMMUS TDP

to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Lummus Asbestos PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. The liquidated value for a claim involving Disease Levels IV – VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3), unless the claim meets the requirements of an Extraordinary Claim as defined in Section 5.3(a), in which case the Lummus Asbestos PI Trust may offer the claimant more than the Scheduled Value for that disease level but such offer shall not exceed the Maximum Extraordinary Value for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process will necessarily be paid the liquidated value of their Lummus Asbestos PI Trust Claims later than would have been the case had the claimant elected the Expedited Review Process.

**5.2(b)(2) Valuation Factors to be Considered in Individual Review.** The Lummus Asbestos PI Trust shall liquidate the value of each Individual Review claim based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The Lummus Asbestos PI Trust will thus take into consideration the factors that affect the severity of damages and values within the tort system including, but not limited to (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including Lummus Exposure (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts and the claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims.

**5.2(b)(3) Scheduled, Average and Maximum Values.** For claims involving Severe Asbestosis (Disease Level IV) or malignancies (Disease Levels V – VIII) the "Scheduled Value", "Average Value" and "Maximum Value" for each such claim are, respectively, as set forth below:

### Lummus Design and Construction Claims

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $25,000 | $60,000 | $400,000 |
| Lung Cancer 1 (Level VII) | $7,500 | $12,500 | $75,000 |
| Lung Cancer 2 (Level VI) | Subject to Individual Review | $5,000 | $30,000 |
| Other Cancer (Level V) | $2,500 | $5,000 | $15,000 |
| Severe Asbestosis (Level IV) | $7,500 | $12,500 | $75,000 |
| Asbestosis (Level III) | $3,000 | $ Scheduled Value | $ Scheduled Value |
| Asbestosis/ Pleural Disease (Level II) | $2,000 | $ Scheduled Value | $ Scheduled Value |
| Other Asbestos Disease (Cash Discount Payment) (Level I) | $200 | none | none |

## PLAN EXHIBIT E — LUMMUS TDP

### Lummus Feedwater Heater Claims

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $1,000 | $6,000 | $25,000 |
| Lung Cancer 1 (Level VII) | $1,000 | $2,000 | $8,000 |
| Lung Cancer 2 (Level VI) | Subject to Individual Review | $1,000 | $4,000 |
| Other Cancer (Level V) | $550 | $700 | $1,000 |
| Severe Asbestosis (Level IV) | $1,000 | $2,000 | $8,000 |
| Asbestosis (Level III) | $400 | $ Scheduled Value | $ Scheduled Value |

| | | | |
|---|---|---|---|
| Asbestosis/ Pleural Disease (Level II) | $200 | $ Scheduled Value | $ Scheduled Value |
| Other Asbestos Disease (Cash Discount Payment) (Level I) | $100 | none | none |

The applicable Average Values and Maximum Values shall apply to all Lummus Asbestos PI Trust Claims filed with the Lummus Asbestos PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1. Thereafter, the Lummus Asbestos PI Trust, with the consent of the TAC and the Lummus FCR pursuant to Sections 6.6 and 7.7 of the Lummus Asbestos PI Trust Agreement, may change these valuation amounts for good cause and consistent with the amendment provisions contained in Section 8.1.

### 5.3 Categorizing Claims as Extraordinary and/or Exigent Hardship

**5.3(a) Extraordinary Claims.** "Extraordinary Claim" means a TDP Determined Lummus Asbestos PI Trust Claim that otherwise satisfies the Medical Criteria for any of Disease Levels IV – VIII, that is held by a claimant whose exposure to asbestos was at least 75% the result of Lummus Exposure as defined in Section 5.6(b)(3), and for which there is little likelihood of the claimant receiving a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to an amount equal to five (5) times the Maximum Value set forth in Section 5.2(b)(3) for claims qualifying for Disease Levels IV -V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI (in each case, the "Maximum Extraordinary Value"), multiplied by the applicable Payment Percentage. An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue for purposes of payment based on its date of liquidation, subject to the Maximum Annual Payment and the Claims Payment Ratio.

**5.3(b) Exigent Hardship Claims.** Notwithstanding any other provision herein, at any time the Lummus Asbestos PI Trust may liquidate and pay certain Lummus Asbestos PI Trust Claims that qualify as Exigent Hardship Claims (as defined below), and such claims may be considered separately no matter what the order of processing otherwise would have been under the Lummus TDP. An Exigent Hardship Claim, following its liquidation, shall be placed at the head of the FIFO Payment Queue for purposes of payment, subject to the Maximum Annual Payment and the Claims Payment Ratio described above. A Lummus Asbestos PI Trust Claim qualifies for payment as an "Exigent Hardship Claim" if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V – VIII), and the Lummus Asbestos PI Trust, in its sole discretion, determines that (a) the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (b) there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.4 Certain Derivative Claimants.** If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek Individual Review of his or her claim pursuant to Section 5.2(b). In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under the Lummus TDP that would

### PLAN EXHIBIT E — LUMMUS TDP

have been applicable had that person filed a direct claim against the Lummus Asbestos PI Trust. In addition, the derivative claimant must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.2(b)(3), that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person experienced Lummus Exposure as defined in Section 5.6(b)(3), and that such Lummus Exposure was a cause of the claimed disease. The proof of claim form to be provided by the Lummus Asbestos PI Trust shall include an additional section for Lummus Derivative Asbestos Personal Injury Claims. All liquidation and payment rights and limitations under the Lummus TDP shall be applicable to such claims.

**5.5 Lummus Derivative Asbestos Personal Injury Claims For Contribution/Indemnification.** Lummus Derivative Asbestos Personal Injury Claims that are asserted against the Lummus Asbestos PI Trust shall be treated as presumptively valid and paid by the Lummus Asbestos PI Trust, subject to the Maximum Annual Payment, Claims Payment Ratio and applicable Payment Percentage, if (a) such claim satisfied the requirements of the Bar Date established by the Bankruptcy Court for Lummus Derivative Asbestos Personal Injury Claims, if any, and is not otherwise disallowed under Section 502(e) of the Bankruptcy Code, or subordinated by Section 509(c) of the Bankruptcy Code, and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligations of the Trust to the individual to whom the PI Trust would otherwise have had a liability or obligation under the Lummus TDP (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever released the Trust from all claims by the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Lummus Asbestos PI Trust superior to the rights of the related Direct Claimant against the Lummus Asbestos PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Lummus Derivative Asbestos Personal Injury Claim may be liquidated

and paid in an amount that exceeds what the Indirect Claimant actually paid to the related Direct Claimant in respect of such Direct Claimant's claim against the Lummus Asbestos PI Trust.

To establish a presumptively valid Lummus Derivative Asbestos Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim against the Lummus Asbestos PI Trust must also have been liquidated by the Indirect Claimant by settlement (and it must be established that such settled claim is valid under applicable state law) or a Final Order, and has been paid by the Indirect Claimant. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Lummus Asbestos PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Lummus Asbestos PI Trust a release in form and substance reasonably satisfactory to the Trustee. The Trustee may develop and approve a separate proof of claim form for such claims.

Provided an Indirect Claimant supplies a release in a substance and form acceptable to the Trustee, but cannot meet the presumptive requirements set forth above, the Indirect Claimant may request that the Lummus Asbestos PI Trust review the indirect Asbestos Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Lummus Asbestos PI Trust had to the Direct Claim as of the Effective Date of the Lummus TDP. If the Indirect Claimant can show that it has paid all or a portion of a liability or obligation that the Lummus Asbestos PI Trust had on the Direct Claim, then the Indirect Claimant shall have a claim in the amount so paid, which shall be satisfied subject to the then applicable Payment Percentage, Maximum Annual Payment and claims Payment Ratio. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, to the extent the Lummus Asbestos PI Trust has paid an Indirect Claim, the full liquidated amount of such Indirect Claim shall be treated as an offset to or reduction of the full liquidated amount of any Lummus Asbestos PI Trust Claim that might be subsequently asserted by the Direct Claimant against the Lummus Asbestos PI Trust.

## PLAN EXHIBIT E — LUMMUS TDP

Any dispute between the Lummus Asbestos PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the arbitration procedures as described herein and adopted by the Lummus Asbestos PI Trust. If such dispute is not resolved by said arbitration procedures, the Indirect Claimant may litigate the dispute in the tort system as set forth in Sections 5.10 and 7.6. The Trustee may develop and approve a separate proof of claim form for such Lummus Derivative Asbestos Personal Injury Claims.

Lummus Derivative Asbestos Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Court shall be processed in accordance with procedures to be developed and implemented by the Trustee, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Lummus Asbestos PI Trust would have afforded the holders of the underlying valid Lummus Asbestos PI Trust Claims.

### 5.6 Evidentiary Requirements

#### 5.6(a) Medical Evidence.

**5.6(a)(1) In General.** All diagnoses of Disease shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. All diagnoses shall also be based upon a physical examination of the claimant by the physician providing the diagnosis, and all diagnoses of a non-malignant disease shall be based on an X-ray reading by a certified B-reader or a CT scan and on full pulmonary function tests. A finding by a physician that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be considered by the Lummus Asbestos PI Trust as a diagnosis.

**5.6(a)(1)(A). Disease Levels I – IV.** Except for claims filed against Lummus or another asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I – IV) shall be based (i) in the case of a claimant who was living at the time the claim is filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; (B) an X-ray reading by a certified B-reader or a CT scan, and (C) pulmonary function testing[7] if the claim involves Asbestosis/Pleural Disease (Level III) or Severe Asbestosis (Level IV),[8] and (ii) in the case of a claimant who was deceased at the time the claim is filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease if available, (B) pathological evidence and (C) a X-ray reading by a certified B reader if available.

**5.6(a)(1)(B). Disease Levels V – VIII.** Except for claims filed against Lummus or another asbestos defendant in the tort system prior to the Petition Date, diagnoses of an asbestos-related malignancy (Disease Levels V – VIII)

shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease unless deceased, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.

---

[7]    "Pulmonary Function Testing" shall mean spirometry testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.

[8]    All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy. However, the PI Trust may rebut such presumptions.

## PLAN EXHIBIT E — LUMMUS TDP

Section 5.6(a)(1)(C). Treatment of Certain Pre-Petition Claims. The exceptions provided in Sections 5.6(a)(1)(A) and (B) for claims filed against Lummus or another asbestos defendant in the tort system prior to the Petition Date shall not apply if (i) the holder of such a claim has available the medical evidence in question, (ii) the holder has filed such medical evidence with another asbestos-related personal injury settlement trust that requires the holder to provide such medical evidence and such medical evidence is made available by such other trust to the Lummus Asbestos PI Trust, or (iii) the Lummus Asbestos PI Trust determines that the claimant could reasonably obtain and submit the medical evidence required.

5.6(a)(2) Credibility of Medical Evidence. Before making any payment to a claimant, the Lummus Asbestos PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Lummus Asbestos PI Trust may require the submission of x-rays, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable.

In addition, claimants who otherwise meet the requirements of the Lummus TDP for payment of a TDP Determined Lummus Asbestos PI Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Lummus Asbestos PI Trust in any Individual Review proceeding conducted pursuant to 5.2(b) or any Extraordinary Claim proceeding conducted pursuant to 5.3(a).

### 5.6(b) Exposure Evidence

5.6(b)(1) In General. As set forth above in Section 5.2(a)(3), to qualify for any Disease Level, the claimant must demonstrate some Lummus Exposure (which, in the case of Lummus Derivative Asbestos Personal Injury Claimants, shall be Lummus Exposure in respect of the Direct Claimant). Claims based on conspiracy theories that involve no Lummus Exposure are not compensable under the Lummus TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.2(a)(3), the claimant must show (i) for all Disease Levels, Lummus Exposure as defined in Section 5.6(b)(3); (ii) for Asbestos/Pleural Disease Level II, six months Lummus Exposure, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months Lummus Exposure, plus Significant Occupational Exposure to asbestos as defined in Section 5.6(b)(2). If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her Lummus Exposure pursuant to Section 5.2(b).

5.6(b)(2) Significant Occupational Exposure. "Significant Occupational Exposure" means employment for a cumulative period of at least five years in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to raw asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

5.6(b)(3) Lummus Exposure. The claimant must demonstrate meaningful and credible exposure to asbestos or asbestos-containing products that occurred on or before December 31, 1982 for which Lummus has legal responsibility. The Lummus Asbestos PI Trust shall consider the meaningful and credible evidence presented by the claimant, including an affidavit of the claimant, an affidavit of a co-worker or the affidavit of a

**PLAN EXHIBIT E — LUMMUS TDP**

family member in the case of a deceased claimant (providing the Lummus Asbestos PI Trust finds such evidence reasonably reliable), invoices, employment, construction or similar records, or other credible evidence. The Lummus Asbestos PI Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary. The specific exposure information required by the Lummus Asbestos PI Trust to process a claim under either Expedited Review or Individual Review shall be set forth on the proof of claim form established by the Lummus Asbestos PI Trust pursuant to Section 6.1 for use by claimants in making a claim against the Lummus Asbestos PI Trust.

**5.7 Claims Audit Program.** The Lummus Asbestos PI Trust with the consent of the TAC and the Lummus FCR may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays and verification of pulmonary function tests, as well as the reliability of evidence of Lummus Exposure. In the event that the Lummus Asbestos PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Lummus Asbestos PI Trust, it may decline to accept additional evidence from such provider.

Further, in the event that an audit reveals that fraudulent information has been provided to the Lummus Asbestos PI Trust, the Lummus Asbestos PI Trust may penalize any claimant or claimant's attorney by disallowing the Lummus Asbestos PI Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Lummus Asbestos PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.8 Second Disease (Malignancy) Claims.** The holder of a claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may file a new claim for a malignant disease (Disease Levels V – VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease.

**5.9 Arbitration.**

**5.9(a) Establishment of Arbitration Procedures.** The Lummus Asbestos PI Trust, with the consent of the TAC and the Lummus FCR, shall institute binding and non-binding arbitration procedures in accordance with the arbitration rules promulgated by the Trustee, with the consent of the TAC and the Lummus FCR, for resolving disputes concerning (i) whether a pre-petition settlement agreement with Lummus is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issues, (ii) whether the Lummus Asbestos PI Trust's rejection or denial of a Lummus Asbestos PI Trust Claim was proper, or (iii) whether evidence concerning the claimant's medical condition or exposure history meets the requirements of the Lummus TDP for purposes of categorizing a claim involving Disease Levels I – VIII or any other category established hereunder. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels IV – VIII.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.6. In the case of an arbitration involving the liquidated value of a claim involving Disease Levels IV – VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.2(b)(2). With respect to all claims eligible for arbitration, the claimant, but not the Lummus Asbestos PI Trust, may elect either non-binding or binding arbitration. The Arbitration Rules shall be promulgated, and may be modified from time to time, by the Lummus Asbestos PI Trust with the consent of the TAC and the Lummus FCR. Such amendments may include adoption of mediation procedures as well as establishment of a panel to review Extraordinary Claims pursuant to Section 5.3(a).

**PLAN EXHIBIT E — LUMMUS TDP**

**5.9(b) Claims Eligible for Arbitration.** In order to be eligible for arbitration, the claimant must first complete the Individual Review Process with respect to the disputed issue. Individual Review will be treated as completed for these purposes when an Lummus Asbestos PI Trust Claim has been individually reviewed by the Lummus Asbestos PI Trust and either (a) the Lummus Asbestos PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Lummus Asbestos PI Trust of the rejection in writing or (b) the Lummus Asbestos PI Trust has rejected the claim.

**5.9(c) Limitations on and Payment of Arbitration Awards.** In the case of a Lummus Asbestos PI Trust Claim involving Disease Levels I—III, the arbitrator shall not return an award in excess of the Scheduled Value for such claim. In the case of a non-Extraordinary Claim involving Disease Levels IV – VIII, the arbitrator shall not return an award in excess

of the Maximum Value for the appropriate Disease Level as set forth in Section 5.2(a)(3), and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Extraordinary Value for such a claim as set forth in Section 5.3(a). A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Lummus Asbestos PI Trust's original valuation of the claim.

**Section 5.10 Litigation**. Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to seek relief in the tort system pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Lummus Asbestos PI Trust only as provided in Section 7.7.

## SECTION VI

### Claims Materials

**6.1 Claims Materials**. The Lummus Asbestos PI Trust shall prepare suitable and efficient claims materials ("Claims Materials"), and shall provide such Claims Materials upon a written request to the Lummus Asbestos PI Trust. The proof of claim form to be submitted to the Lummus Asbestos PI Trust shall include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. A copy of the proof of claim form to be used initially by the Lummus Asbestos PI Trust for unliquidated Lummus Asbestos PI Trust Claims will be provided by the Lummus Asbestos PI Trust promptly after the Effective Date of the Plan. The proof of claim form shall require the claimant to designate whether such person's Lummus Asbestos PI Trust Claim is a Lummus Design and Construction Claim or a Lummus Feedwater Heater Claim; provided, however, that the Trustee shall have the right to challenge any such designation. The proof of claim form may be changed and additional proof of claim forms may be developed by the Lummus Asbestos PI Trust with the consent of the TAC and the Lummus FCR.

**6.2 Content of Claims Materials**. The Claims Materials shall include a copy of the Lummus TDP, such instructions as the Trustee shall approve, and a proof of claim form. If feasible, the forms used by the Lummus Asbestos PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations. Instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the Lummus Asbestos PI Trust may also obtain such information from electronic data bases maintained by any other asbestos claims resolution organization. However, the Lummus Asbestos PI Trust shall inform the claimant that it plans to obtain information as available from such other organizations and may do so unless the claimant objects in writing or provides such information directly to the Lummus Asbestos PI Trust. If requested by the claimant, the Lummus Asbestos PI Trust shall accept information provided electronically. The claimant may, but will not be required to, provide the Lummus Asbestos PI Trust with evidence of recovery from other asbestos claims resolution organizations; provided, however, that any person asserting that their claim qualifies as an Exigent Hardship Claim must certify to the Lummus Asbestos PI

**PLAN EXHIBIT E — LUMMUS TDP**

Trust the aggregate amount such person has recovered in respect of such claim from other asbestos claims resolution organizations.

**6.3 Withdrawal of Claims**. A claimant may withdraw a Lummus Asbestos PI Trust Claim at any time upon written notice to the Lummus Asbestos PI Trust and subsequently file another claim without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based the date of such subsequent filing. Except for Lummus Asbestos PI Trust Claims held by representatives of deceased or incompetent claimants for which court approval of the Lummus Asbestos PI Trust's offer is required, a claim will be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months after the claimant's receipt of notice of the Lummus Asbestos PI Trust's offer of payment or rejection of the claim. Upon written request and good cause, the Lummus Asbestos PI Trust may extend this period for up to an additional six months.

**6.4 Filing Requirements and Fees**. The Trustee shall have the discretion to determine, with the consent of the TAC and the Lummus FCR, (a) whether a claimant must have previously filed the claim in the tort system to be eligible to file the claim with the Lummus Asbestos PI Trust and (b) whether to require (and, if required, the amount of) any filing fee for any Lummus Asbestos PI Trust Claims.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1 Showing Required.** To establish a valid Lummus Asbestos PI Trust Claim, a claimant must meet the requirements set forth in the Lummus TDP. The Lummus Asbestos PI Trust may require the submission of x-rays, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the Lummus Asbestos PI Trust Claim and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

**7.2 Costs Considered.** Notwithstanding any provisions of the Lummus TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Lummus Asbestos PI Trust Claims so that the payment of valid Lummus Asbestos PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a Lummus Asbestos PI Trust Claim. The Trustee shall also have the discretion to make judgments regarding the amount of transaction costs to be expended by the Lummus Asbestos PI Trust so that valid Lummus Asbestos PI Trust Claims are not unduly further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Lummus Asbestos PI Trust whatever the costs, or to decline to accept medical evidence from sources that the Trustee have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6.

**7.3 Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Payment Percentage, the and the Claims Payment Ratio requirements set forth herein, the Trustee shall proceed as quickly as practicable to process and determine Lummus Asbestos PI Trust Claims, and shall make payments to holders of TDP Determined Lummus Asbestos PI Trust Claims in accordance with the Lummus TDP promptly as funds become available (and, if applicable, as such claims are liquidated hereunder), while maintaining sufficient resources to pay future valid TDP Determined Lummus Asbestos PI Trust Claims in substantially the same manner, and to reserve for future Trust Expenses.

## PLAN EXHIBIT E — LUMMUS TDP

Because the Lummus Asbestos PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustee, the purposes of the Lummus Asbestos PI Trust, the established allocation of funds to Category A Claims and Category B Claims, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Lummus Asbestos PI Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the Lummus FCR, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and may offer a Reduced Payment Option.

**7.4 Punitive Damages.** In determining the value of any Lummus Asbestos PI Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding the availability of such punitive or exemplary damages in the tort system.

In the event a personal representative or authorized agent makes a claim to the Lummus Asbestos PI Trust arising under the Alabama Wrongful Death Statute and the Claimant's Jurisdiction, as otherwise defined herein, would be the State of Alabama, then for purposes of evaluated said claim against the Lummus Asbestos PI Trust it shall treat the Claimant's Jurisdiction as being the Commonwealth of Pennsylvania, and said claimant's damages shall be evaluated by the Lummus Asbestos PI Trust pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles or the provisions of 5.2(b)(2) defining Claimant's Jurisdiction.

**7.5 Interest.**

**7.5(a) In General.** Except for a TDP Determined Lummus Asbestos PI Trust Claim involving Other Asbestos Disease (Disease Level I—Cash Discount Payment) which is not entitled to interest under any circumstances, interest shall accrue and be paid on all TDP Determined Lummus Asbestos PI Trust Claims as and to the extent provided in this Section 7.5(a) and in Section 7.5(b) or 7.5(c), as applicable, provided, however, that no claimant shall receive interest for a period in excess of seven (7) years. The applicable interest rate for Lummus Asbestos PI Trust Claims entitled to interest under Section 7.5(b) or 7.5(c), as applicable, shall be equal to one-half the interest rate earned by the Trust on cash and cash equivalents invested in the year preceding. The interest rate shall be variable and adjusted annually but not compounded.

**7.5(b) Interest on TDP Determined Lummus Asbestos PI Trust Claims.** Interest shall accrue on the Scheduled Value (and for purposes of distribution, shall be added to such Scheduled Value) of any TDP Determined Lummus Asbestos PI Trust Claim that meets the requirements of Disease Levels I-V, VII and VIII if and only if such claim is liquidated under Expedited Review, Individual Review, or by arbitration. Interest on a TDP Determined Lummus Asbestos PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such claim. Interest on a particular TDP Determined Lummus Asbestos PI Trust Claim that has not been paid within one year after the date on which such TDP Determined Lummus Asbestos PI Trust Claim was filed with the Lummus Asbestos PI Trust shall accrue during the period beginning on the date that is one year after the date on which such TDP Determined Lummus Asbestos PI Trust Claim was filed with the Lummus Asbestos PI Trust and ending on the date of payment of the amount due under the Lummus TDP in respect of such TDP Determined Lummus Asbestos PI Trust Claim; provided, however, that notwithstanding the foregoing, (i) no such interest will begin to accrue until one (1) year after the Effective Date and (ii) interest shall cease to accrue on a TDP Determined Lummus Asbestos PI Trust Claim at the time the Lummus Asbestos PI Trust makes a good faith offer to settle such TDP Determined Lummus Asbestos PI Trust Claim; provided that if such TDP Determined Lummus Asbestos PI Trust Claim is awarded a higher amount through arbitration than the

## PLAN EXHIBIT E — LUMMUS TDP

offer made by the Lummus Asbestos PI Trust, interest on that TDP Determined Lummus Asbestos PI Trust Claim will be calculated on the full amount of that arbitration award during the entire period for which interest would have been payable pursuant to Section 7.5.

**7.6 Suits in the Tort System.** If the holder of a disputed claim disagrees with the Lummus Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.9, the holder may file a lawsuit in the Claimant's Jurisdiction. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Lummus Asbestos PI Trust, all defenses which could have been asserted by Lummus) shall be available to both sides at trial; however, the Lummus Asbestos PI Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim was filed, the case will be treated as a personal injury case with all personal injury damages to be considered, even if the claimant has died during the pendency of the claim.

**7.7 Payment of Judgments for Money Damages.** If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment becomes final. Thereafter, the claimant shall receive from the Lummus Asbestos PI Trust an initial payment (subject to the Payment Percentage, the Maximum Annual Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the Lummus Asbestos PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration. The claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the Payment Percentage, the Maximum Annual Payment and the Claims Payment Ratio provisions above).

In the case of Lummus Asbestos PI Trust Claims involving Disease Levels I, II and III, the total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for such Disease Levels as set forth in Section 5.2(b)(3). In the case of claims involving a non-malignant asbestos-related disease that does not attain classification under Disease Levels I, II or III, the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable to the disease proven. In the case of non-Extraordinary claims involving severe asbestosis and malignancies (Disease Levels IV – VIII), the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.2(b)(3). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the Maximum Extraordinary Value for such claims set forth in Section 5.3(a). Under no circumstances shall interest be paid pursuant to Section 7.5 or under otherwise applicable state law on any judgments obtained in the tort system.

**7.8 Third-Party Services.** Nothing in the Lummus TDP shall preclude the Lummus Asbestos PI Trust from contracting with another asbestos claims resolution organization to provide services to the Lummus Asbestos PI Trust so long as decisions about the categorization and liquidated value of Lummus Asbestos PI Trust Claims are based on the relevant provisions of this Lummus TDP, including the Diseases Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.9 Lummus Asbestos PI Trust Disclosure of Information.** Periodically, but not less often than once a year, the Lummus Asbestos PI Trust shall make available to claimants and other interested parties, the number of claims by disease

levels that have been resolved both by individual review and by arbitration as well as by trial indicating the amounts of the awards and the averages of the awards by jurisdiction.

**7.10 Releases.** The Trustee shall have the discretion to determine the form and substance of the release to be provided to the Lummus Asbestos PI Trust. As a condition to making any payment to a claimant, the Lummus

**PLAN EXHIBIT E — LUMMUS TDP**

Asbestos PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, endorsement of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

### SECTION VIII

#### Miscellaneous

**8.1 Amendments.** Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of the Lummus TDP (including, without limitation, amendments to conform the Lummus TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the Lummus FCR pursuant to the consent process set forth in Sections 6.6 and 7.7 of the Lummus Asbestos PI Trust Agreement, except that amendments to the Claims Payment Ratio are governed by the restrictions in Section 2.5, and adjustments to and amendments of the Payment Percentage are governed by Section 4.2.

**8.2 Severability.** Should any provision contained in the Lummus TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Lummus TDP. Should any provision contained in the Lummus TDP be determined to be inconsistent with or contrary to Lummus' obligations to any insurance company providing insurance coverage to Lummus in respect of claims for personal injury based on Lummus Exposure, no payment shall be made by the Lummus Asbestos PI Trust in respect of any such claim from proceeds from said insurance coverage.

**8.3 Governing Law.** Except for purposes of determining the liquidated value of any Lummus Asbestos PI Trust Claim, administration of the Lummus TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Lummus Asbestos PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2(b)(2). Any reference to the tort system herein shall refer to the United States tort system.

**PLAN EXHIBIT E — LUMMUS TDP**

**PLAN EXHIBIT F**

**SUBJECT LUMMUS INSURANCE POLICIES**

**SUBJECT LUMMUS INSURANCE POLICIES**

| | | | |
|---|---|---|---|
| London Market | K16323 | 01/01/53 | 01/01/54 |
| London Market | K23217 | 01/01/54 | 01/01/55 |
| London Market | K31004 | 01/01/55 | 01/01/56 |
| London Market | K31004 | 01/01/56 | 01/01/57 |
| London Market | K31004 | 01/01/57 | 01/01/58 |
| London Market | CK2446 | 01/01/58 | 01/01/59 |
| London Market | CK2446 | 01/01/59 | 01/01/60 |
| London Market | CK2446 | 01/01/60 | 01/01/61 |
| London Market | K23218 | 01/01/54 | 01/01/55 |
| London Market | K31005 | 01/01/55 | 01/01/56 |
| London Market | K31005 | 01/01/56 | 01/01/57 |
| London Market | K31005 | 01/01/57 | 01/01/58 |
| London Market | K16324 | 01/01/53 | 01/01/54 |
| London Market | K23219 | 01/01/54 | 01/01/55 |
| London Market | K31006 | 01/01/55 | 01/01/56 |
| London Market | K31006 | 01/01/56 | 01/01/57 |
| London Market | K31006 | 01/01/57 | 01/01/58 |
| London Market | CK2447 | 01/01/58 | 01/01/59 |
| London Market | CK2447 | 01/01/59 | 01/01/60 |
| London Market | CK2447 | 01/01/60 | 01/01/61 |
| London Market | K10763 | 01/01/52 | 01/01/53 |
| London Market | K23220 | 01/01/54 | 01/01/55 |
| London Market | K31007 | 01/01/55 | 01/01/56 |
| London Market | K31007 | 01/01/56 | 01/01/57 |
| London Market | K31007 | 01/01/57 | 01/01/58 |
| London Market | K66620 | 01/01/61 | 01/01/62 |
| London Market | K66620 | 01/01/62 | 01/01/63 |
| London Market | K23221 | 04/12/53 | 01/01/54 |
| London Market | K23221 | 01/01/54 | 01/01/55 |
| London Market | K31008 | 01/01/55 | 01/01/56 |
| London Market | K31008 | 01/01/56 | 01/01/57 |
| London Market | K31008 | 01/01/57 | 01/01/58 |
| London Market | K49518 | 01/01/58 | 01/01/59 |
| London Market | K49518 | 01/01/59 | 01/01/60 |
| London Market | K49518 | 01/01/60 | 01/01/61 |
| London Market | K31009 | 01/01/55 | 01/01/56 |
| London Market | K31009 | 01/01/56 | 01/01/57 |
| London Market | K31009 | 01/01/57 | 01/01/58 |
| London Market | K49519 | 01/01/58 | 01/01/59 |
| London Market | K49519 | 01/01/59 | 01/01/60 |
| London Market | K49519 | 01/01/60 | 01/01/61 |
| London Market | K35897 | 12/22/55 | 01/01/56 |
| London Market | K35897 | 01/01/56 | 01/01/57 |
| London Market | K35897 | 01/01/57 | 01/01/58 |
| London Market | K49520 | 01/01/58 | 01/01/59 |
| London Market | K49520 | 01/01/59 | 01/01/60 |
| London Market | K49520 | 01/01/60 | 01/01/61 |
| London Market | K46966 | 01/01/58 | 01/01/59 |
| London Market | K46966 | 01/01/59 | 01/01/60 |
| London Market | K46966 | 01/01/60 | 01/01/61 |

**PLAN EXHIBIT F — SUBJECT LUMMUS INSURANCE POLICIES**

**PLAN EXHIBIT G**

**SUBJECT LUMMUS INSURANCE
SETTLEMENT AGREEMENTS**

SUBJECT LUMMUS INSURANCE SETTLEMENT AGREEMENTS

None as of August 30, 2005. To be updated as necessary and appropriate.


**PLAN EXHIBIT G — SUBJECT LUMMUS INSURANCE SETTLEMENT AGREEMENTS**

PLAN EXHIBIT H

## LIST OF HOLDERS OF SETTLED
## ASBESTOS CLAIMS

| Law Firm | Juris | Claimant |
|---|---|---|
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA1 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | |
| BRAYTON, PURCELL | CA2 | [Redacted—List of names |
| BRAYTON, PURCELL | CA2 | to be provided to the |
| BRAYTON, PURCELL | CA2 | Court on or before the |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | Lummus Confirmation Date |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | and filed under seal] |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| ROBINS, CLOUD AND LUBEL, LLP | TX3 | |
| SIEBEN, POLK, LAVERDIERE, JONES | MN1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | [Redacted—List of names to be provided to the Court on or before the Lummus Confirmation Date and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | [Redacted—List of names to be provided to the Court on or before the Lummus Confirmation Date and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NJ1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|----------|-------|----------|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

| Law Firm | Juris | Claimant |
|---|---|---|
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | [Redacted—List of names |
| WILENTZ, GOLDMAN, SPITZER | NY1 | to be provided to the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Court on or before the |
| WILENTZ, GOLDMAN, SPITZER | NY1 | Lummus Confirmation Date |
| WILENTZ, GOLDMAN, SPITZER | NY1 | and filed under seal] |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |
| WILENTZ, GOLDMAN, SPITZER | NY1 | |

**Exhibit C**
**to Disclosure Statement**

**Former Names Used by the Debtor and the Names of Entities Now**
**Dissolved or Merged into the Debtor**

| Debtor | Former Names Used By the Referenced Debtor And the Names Of Entities Now Dissolved Or Merged Into the Debtor |
|---|---|
| ABB Lummus Global Inc. | The Lummus Company<br>Lummus Crest Inc.<br>ABB Lummus Crest Inc.<br>ABB Lummus Global Construction Co. |

**Exhibit D**
to Disclosure Statement

**Curriculum Vitae of Richard B. Schiro, the Lummus Future Claimants' Representative**

Richard B. Schiro
Law Offices of Richard B. Schiro
3710 Rawlins Street
Suite 1350
Dallas, Texas 75219
(214) 521-4994 (telephone)
(214) 521-3838 (facsimile)
**rbschiro@schirolaw.com**

1988 to present:   Private law practice specializing in state and Federal commercial litigation, real estate and corporate transactional work, and business bankruptcy (both creditor and debtor). In addition, appointment as legal representative of future claimants in:

- Swan Transportation Company, Case No. 01-11690-JKF, United States Bankruptcy Court for the District of Delaware.

- JT Thorpe Company, Case No. 02-41487-H5-11, United States Bankruptcy Court for the Southern District of Texas, Houston Division.

- Utex Industries, Inc., Case No. 04-34427-H4-11, United States Bankruptcy Court for the Southern District of Texas, Houston Division.

1987-1992:    Active member of panel of trustees, United States Bankruptcy Court, Northern District of Texas (Dallas Division).

1981-1988:    Private business.

1977-1981:    Law professor, Southern Methodist University School of Law.

1973-1977:    Faculty member, Law Department, Wharton School, University of Pennsylvania.

1970-1973:    Private law practice specializing in commercial real estate transactions.

1968-1970:    VISTA Lawyer and Reginald Heber Smith Fellow.

Publications:   (i)    *Commercial Speech: The Demise Of A Chimera, The Supreme Court Review 45 (1976).*
(ii)   *Prospecting For Lost Profits In The Uniform Commercial Code: The Buyer's Dilemmas, 22 Southern California Law Review 6 (1979).*
(iii)  *Diversity In Television's Speech: Balancing Programs In The Eyes Of The Viewer, 27 Case Western Reserve Law Review 1 (Fall 1976).*

Education:    University of Chicago Law School, J.D. 1968
Fulbright Scholar, India 1964-65
Trinity College (CT), B.A. 1964

Member of the    Arkansas (1969)
Bar:    Pennsylvania (1971)
Texas (1981)

**Exhibit E**
to Disclosure Statement

**Biographical Data on Proposed Directors and Executive
Officers of the Reorganized Debtor**

**Samir Brikho — President and Chief Executive Officer, ABB Lummus Global Inc.** Samir began his career at ABB in 1983 serving as a project sales manager for gas turbines in the Middle East. During his tenure at ABB, he has advanced from project sales management positions to senior executive management positions within the ABB corporate framework. Since 2003, Samir has served as President and Chief Executive Officer of Lummus and as head of ABB's Oil, Gas, and Petrochemicals business. Samir received a masters of science degree in thermal technology from the Royal High School of Technology in Stockholm, Sweden and has subsequently graduated from several executive management courses and the Senior Executive Programme at Stanford.

**Jürg Seiler — Senior Vice President, Treasurer, and Chief Financial Officer, ABB Lummus Global Inc.** Jürg began his career at ABB in 1981 as Assistant Controller of Brown Boveri International. Since that time, he has advanced within the ABB corporate organizational structure assuming responsibility in auditing, controller, and financial officer positions. Since 2003, Jürg has served as the Senior Vice President and Chief Financial Officer of Lummus. Jürg graduated from the University of St. Gallen with a Licentiate of Business Administration and Economics.

**Khalid Farid — Executive Vice President, Strategic Business Development, ABB Lummus Global Inc.** Khalid began his career at Lummus in 1966 as a process engineer. Since then, he has progressed to senior positions of responsibility for both the Lummus EPC and Lummus Technology operations. Currently, Khalid serves as Executive Vice President, responsible for strategic business development for Lummus' overall business. Khalid received a master's degree in chemical engineering from New York University. He is a member of the American Institute of Chemical Engineers.

**Daniel Martin McCarthy — Senior Vice President and General Manager, Technology Division, ABB Lummus Global Inc.** Dan oversees the Lummus technology business. The technology division is responsible for all process licensing activities within Lummus, as well as the supply of specialty heat exchange equipment. The technology division has the following three technology joint ventures: Chevron Lummus Global (with Chevron Texaco), CDTECH (with Chemical Research and Licensing) and Novolen Technology Holdings CV (with Equistar). Dan has been involved in technology licensing general management since 1993. Prior to 1993, he was involved in Lummus marketing and licensing. Dan received a master's degree in chemical engineering from Manhattan College, and an MBA from Pace University.

**Ronald D. Dawson — Senior Vice President, Human Resources and Health, Safety, and Environmental, ABB Lummus Global Inc.** Ron joined Lummus in 1974 as an employment representative and EEO coordinator. His responsibilities expanded to include compensation, employee/labor relations, and health, safety, and environmental. In 1985, Ron became the director of EEO/Recruitment for Combustion Engineering. Two years later, Ron was appointed Director of Headquarters Human Resources for Combustion Engineering. In 1989, Ron returned to Lummus as the Vice President, Human Resources. In 1998, health, safety, and environmental was added to his responsibilities. In 2000, Ron became the Senior Vice President, Human Resources for the ABB Oil, Gas and Petrochemicals Division, in addition to his ongoing responsibilities with Lummus. Ron graduated from the University of Pennsylvania with a bachelor's degree in history. He is a member of the Vice Presidents Chapter of the Society for Human Resource Management (SHRM) and the Construction Personnel Executive Group (CPEG).

**Margaret Duplantier — Senior Vice President, General Counsel, Secretary, and Export Control Administrator, ABB Lummus Global Inc.** Margaret joined Lummus in 1992 as the assistant division counsel for Houston. Thereafter, Margaret became the Vice President General Counsel. In this role, Margaret leads the company's worldwide legal activities and export control, and participates in the overall guidance of the business worldwide. Prior to joining Lummus, Margaret spent a total of 12 years with Santa Fe International and American Ref-Fuel. Margaret received a bachelor's degree in philosophy from Newcomb College of Tulane University and subsequently received a juris doctorate degree from Tulane Law School. Margaret is licensed to practice law in California, Texas, Louisiana, and the District of Columbia.

**Michael J. Ford — Vice President and Controller, ABB Lummus Global Inc.** Mike joined Lummus in 1975 as a budget analyst. He spent four years in The Netherlands as Controller of the Dutch EPC office. In 1996, Mike was appointed Vice President and Controller, responsible for the worldwide accounting, systems, and treasury for Lummus. Prior to joining Lummus, Mike worked for General Electric in a number of financial positions, and graduated from GE's Financial Management Program. Mike received a bachelor's degree of business administration in accounting from Pace University.

**Debra Leary — Director of Tax, Houston EPC Division of ABB Lummus Global Inc.** Debbie joined Lummus in early 2004 to serve as Director of Tax. In this position, she is responsible for corporate U.S. taxes and also oversees some of the foreign offices' tax departments. Prior to joining Lummus, Debbie served in a Big Eight accounting firm and several large multinational corporations. She graduated from the University of Michigan with an MBA and subsequently received her master of science degree in taxation from De Paul University. She is a member of the Tax Executives Institute and American Institute of Certified Public Accountants.

**Michael Blaney — Vice President, Division General Counsel, Technology Division, ABB Lummus Global Inc.**
Mike joined Lummus in 1981 as an attorney. Mike has expertise in the areas of international and domestic contracts and licenses, joint ventures, merger/acquisitions/divestitures, litigation management, and corporate and government compliance programs. In his current role, Mike serves as Assistant General Counsel for Lummus, as well as General Counsel for BU Technology. Prior to joining Lummus, Mike served with Bell Laboratories and the Hudson County Prosecutor's office. Mike graduated from Holy Cross College with a bachelor's degree in English, and subsequently earned his juris doctorate degree from Seton Hall University. He was admitted to the New Jersey Bar in 1980 and is a member of the American Corporate Counsel Association.

**Curtis Culver — Vice President, Regional General Counsel, Houston EPC Division of ABB Lummus Global Inc.**
Curtis joined Lummus in 2000 as Vice President and Regional General Counsel for the Houston office. He is responsible for overall management of legal matters affecting all Houston based operations, including contract review, drafting and negotiations, litigation and arbitration management, claims administration, and general legal advise and counsel. Prior to joining Lummus, Curtis served as Assistant General Counsel for the Fluor Corporation. Curtis earned both a bachelor's degree in business administration and juris doctorate degree from the University of Arkansas. He is licensed to practice law in Texas, Oklahoma, Arkansas, and South Carolina.

**Exhibit F**
**to Disclosure Statement**

**Debtor's Liquidation Analysis**

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES

**CHAPTER 7 LIQUIDATION**
*($ in millions)*

| | Note | Chapter 7 Liquidation | |
| --- | --- | --- | --- |
| | | Low | High |
| **Calculation of Estimated Net Proceeds Available for Allocation** | | | |
| Estimated Value of Debtor and Subsidiaries | 1 | $ 300.0 | $ 350.0 |
| Less: Discount Factor | | (150.0) | (175.0) |
| Estimated Proceeds from Sale of Businesses | | 150.0 | 175.0 |
| Plus Other Assets: | | | |
| Insurance Recovery | 2 | 0 | 7.5 |
| Estimated Net Proceeds Available for Allocation | | 150.0 | 182.5 |
| **Allocation of Estimated Net Proceeds to Secured, Administrative and Priority Claims** | | | |
| Costs Associated with Chapter 7 Liquidation | 3 | (7.9) | (8.7) |
| Other Administrative Claims | 3 | (1.0) | (1.0) |
| Estimated Net Proceeds Available | | 141.2 | 172.9 |
| **Allocation of Estimated Net Proceeds** | | | |
| Intercompany Indebtedness | | (505.0) | (505.0) |
| Accrued Obligations | 4 | (30.0) | 0 |
| Assumed Lummus Asbestos PI Trust Claims | 5 | (38.0) | (38.0) |
| | | (573.0) | (543.0) |
| **Excess/Shortfall** | | ($ 431.9) | ($ 370.2) |
| Recovery to Holders of General Unsecured Claims | | 24.6% | 31.8% |

## Liquidation Analysis

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (1) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). **The analysis, including the Estimated Value of the Debtor and its Subsidiaries and the Estimated Proceeds from Sale of Businesses (as used herein), was prepared solely to assist in the determination of the Best Interest Test and should not be used or relied upon for any other purpose.**

The analysis assumes a hypothetical Chapter 7 liquidation is commenced on April 1, 2006. The analysis assumes the liquidation of the Debtor and its subsidiaries is effected through the orderly sales of the businesses as going concerns. Because the Lummus Asbestos PT Channeling Injunction would not be available in a Chapter 7 liquidation, the values realized from the orderly sale of the businesses would in all likelihood be reduced as a result of buyers' concerns regarding the risk of asbestos liability in the acquisition of assets. Further the lack of an Asbestos PT Channeling Injunction may preclude the orderly sale of the businesses as going concerns, in which case an actual liquidation of the assets would be required. The Debtor believes that the value of its businesses as going concerns, realizable through the cash flow generated by the businesses exceeds the value of its component assets. If an actual liquidation of the assets occurred, values realized would be further reduced and claims against the estate increased.

The net proceeds resulting from the disposition of the businesses of the Debtor and any available cash would be available first to pay the costs and expenses of liquidation and to satisfy any additional administrative and priority claims that might arise from the Debtor's liquidation under Chapter 7.

The Debtor's costs of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee and other professionals retained by the trustee including attorneys, financial advisors, and accountants, asset disposition expenses, litigation costs related to the resolution of asbestos and other claims, other expenses incurred in the Chapter 11 case allowed in the Chapter 7 case, and claims arising from the operations of the Debtor during the Chapter 11 case.

Any remaining net proceeds would be allocated to creditors in strict priority pursuant to the Bankruptcy Code and thereafter available for distribution to shareholders.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtor believes that confirmation of the Plan will provide each holder of an impaired claim that has not accepted the Plan with an amount that is not less than such holder would receive pursuant to the liquidation of the Debtor under Chapter 7.

**The liquidation analysis is based on the Debtor's Projections and a number of estimates and assumptions described below. Although developed and considered reasonable by the management of the Debtor, the Projections, estimates and assumptions are subject to significant economic, business, and competitive uncertainties and contingencies beyond the control of the Debtor and of its management. There can by no assurance that the values reflected in this liquidation analysis would be realized if the Debtor were in fact to undergo such a liquidation and actual results could vary materially and adversely from those contained herein. Accordingly, while the analysis is necessarily presented with numerical specificity, the actual liquidation value of the Debtor and net proceeds available to creditors may vary from that considered herein and such variations may be material.**

## Assumption Footnotes to the Liquidation Analysis

1.  In a Chapter 7 liquidation, it is assumed the businesses of the Debtor and its subsidiaries would be sold as going concerns for cash to one or more buyers. The proceeds from the sale of the businesses are assumed to be equal to the fair market value of the businesses, based on the Debtor's Projections, less a discount factor. Unlike a Chapter 11 reorganization, Chapter 7 does not provide for the issuance of the Lummus Asbestos P1 Channeling Injunction. Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code Section 363 or the availability of an injunction under Bankruptcy Code 105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that the asbestos liability would follow the assets sold. Further, the sale of businesses would take place on an accelerated basis with the attended time pressure and adverse publicity and sold "as is" without representations and warranties, resulting in substantial discounts to any going concern valuation.

2.  The Chapter 11 Plan of Reorganization provides for the payment of the Insurance Recovery Guaranteed Payment. In a Chapter 7 liquidation, it is assumed that provision will not be in effect. To the extent that Insurance Recoveries do not

aggregate $5 million, this asset will not be available in the Chapter 7 liquidation, as reflected in the Low Case. The High Case reflects the instance whereby insurance recoveries equal $7.5 million.

3.  Costs associated with a Chapter 7 liquidation are assumed to include trustee fees estimated at 3% of the value of the assets, brokerage fees for the sales of the businesses, and professional fees for legal, financial, and claims processing advisors. Other administrative costs reflect an estimate of allowed administrative costs incurred in the Chapter 11 proceeding and unpaid as of the date of the Chapter 7 liquidation. For purposes of this analysis, it is assumed that all professional fee holdbacks in the Chapter 11 have been paid prior to the commencement of the Chapter 7 liquidation.

4.  The analysis generally assumes the pre-payment of accrued pre-petition debts owed to ordinary course creditors and the payment of Claims in Class 1, Class 2, Class 3, and Class 4 as they come due prior to the Effective Date as reflected in the High Case. In the Low Case, it is conservatively estimated that ten percent of certain accrued obligations have not been paid in the ordinary course and are not otherwise assumed by the buyer.

5.  For purposes of this analysis, Lummus Asbestos PT Trust Claims are assumed equal the sum of the Lummus Note and the Insurance Recovery Guaranteed Payment.

**Exhibit G**
to Disclosure Statement

**Debtor's Financial Statements for**
**the year ended December 31, 2004**

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES

## INCOME STATEMENT

| ($000's) | Fiscal Year Ending December 31, 2004 |
|---|---:|
| Total revenues | $ 415,228 |
| Cost of sales | (389,772) |
| Gross profit | 25,456 |
| ABB Group internal fees | 10,382 |
| R&D, Selling, general and administrative expenses | (81,104) |
| | (70,722) |
| Income before taxes from equity accounted companies | 9,096 |
| Other Expenses | (2,808) |
| Restructuring costs | (18,804) |
| Earnings before interest and taxes | (57,782) |
| Interest Income/Expense | (19,192) |
| | 1,010 |
| Earnings before taxes | (75,964) |
| Taxes | (8,044) |
| **Net income** | $ **(84,008)** |

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES

### BALANCE SHEET

### AT DECEMBER 31, 2004

*($000s)*

**ASSETS**

| | | |
|---|---|---:|
| Cash and equivalents | $ | 26,357 |
| Trade receivables | | 103,785 |
| Non-trade receivables | | 56,161 |
| Sales in excess of invoices | | 112,075 |
| Work in process | | 57,469 |
| Prepaid expenses/accrued income | | (1,781) |
| **Total Current Assets** | $ | **354,065** |
| **Non-Current Assets** | | |
| Machinery and equipment — net of depreciation | | 6,738 |
| Deferred taxes — non-current assets | | (2,114) |
| Goodwill | | 80,651 |
| Investments and Other | | 78,501 |
| Capitalized software — net of depreciation | | 3,841 |
| **Total Non-Current Assets** | $ | **167,617** |
| **TOTAL ASSETS** | $ | **521,682** |

**LIABILITIES & EQUITY**

| | | |
|---|---|---:|
| **Current Liabilities** | | |
| Trade payables | $ | 77,706 |
| Invoices to come (trade) | | 205,192 |
| Billings in excess of sales | | 25,559 |
| Non-trade payables | | 43,091 |
| Provisions related to asbestos | | 32,981 |
| Other provisions | | 14,238 |
| Income taxes due | | (9,910) |
| Accrued expenses | | 30,998 |
| Short-term borrowings | | 360,182 |
| **Total Current Liabilities** | $ | **780,038** |
| **Non-Current Liabilities** | | **7,347** |
| **Total Liabilities** | | **787,385** |
| **Total Stockholders' Equity** | | **(265,703)** |
| **TOTAL LIABILITIES & EQUITY** | $ | **521,682** |

**Exhibit H**
**to Disclosure Statement**

**Debtor's Financial Projections**

**ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES**
**INCOME STATEMENT**
*($ in millions)*

| | Pre Petition Period | | | | Chapter 11 Period | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | | | | | 2006 |
| | Year | Q1 Act | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est |
| Booked | $ 415 | $ 54 | $ 61 | $ 77 | $ 113 | $ 305 | $ 35 |
| Booked % of Revenue | 100.0% | 100.0% | 70.1% | 70.6% | 70.6% | 74.4% | 28.5% |
| Unbooked | — | — | 26 | 32 | 47 | $ 105 | 88 |
| Revenue | $ 415 | $ 54 | $ 87 | $ 109 | $ 160 | $ 410 | $ 123 |
| % Growth Y-o-Y | | | | | | (1.2%) | |
| Cost of Sales | (390) | (38) | (70) | (88) | (143) | (339) | (105 |
| Gross Profit | $ 25 | $ 16 | $ 17 | $ 21 | $ 17 | $ 71 | $ 18 |
| Gross Profit % | 6.0% | 29.6% | 19.5% | 19.3% | 10.6% | 17.3% | 14.6% |
| Selling, General and Administrative | (60) | (7) | (13) | (12) | (10) | (42) | (10) |
| ABB Fees | (10) | (2) | (1) | (1) | (1) | (5) | (1) |
| Equity Income | 9 | 1 | 4 | 2 | 6 | 13 | 3 |
| Other Income/Expense[1] | (22) | 2 | (1) | — | — | 1 | — |
| Earnings Before Interest and Taxes | $ (58) | $ 10 | $ 6 | $ 10 | $ 12 | $ 38 | $ 10 |
| Interest Expense | (19) | (4) | (7) | (10) | — | (21) | — |
| Note Amortization | — | — | — | — | — | — | — |
| Restructuring Expense | — | — | — | (4) | (2) | (6) | (3) |
| Taxes | (8) | (3) | (2) | (2) | (2) | (8) | (2) |
| Other[2] | 1 | — | — | — | — | — | — |
| Net Income | $ (84) | $ 3 | $ (3) | $ (6) | $ 8 | $ 3 | $ 5 |
| SG&A % of Revenue | 14.6% | | | | | 10.2% | |
| EBIT % of Revenue | (14.1) | | | | | 9.3% | |

Notes:

(1) Includes corporate restructuring expenses of $18 million.
(2) Includes financial profit/loss relating to foreign exchange rate difference.

**ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES**
**INCOME STATEMENT**
*($ in millions)*

| | Post Effective Date Period | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | | | 2007 | | | | | 2008 | 2009 |
| | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est | Q2 Est | Q3 Est | Q4 Est | Year | Year | Year |
| Booked | $ 35 | $ 37 | $ 36 | $ 143 | — | — | — | — | — | — | — |
| Booked % of Revenue | 28.5% | 28.9% | 28.6% | 28.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0 |
| Unbooked | 88 | 91 | 90 | 357 | $ 133 | $ 133 | $ 134 | $ 132 | $ 532 | $ 593 | $ 649 |
| Revenue | $ 123 | $ 128 | $ 126 | $ 500 | $ 133 | $ 133 | $ 134 | $ 132 | $ 532 | $ 593 | $ 649 |
| % Growth Y-o-Y | | | | 22.0% | | | | | 6.4% | 11.5% | 9.4 |
| Cost of Sales | (108) | (107) | (106) | (426) | (113) | (113) | (114) | (112) | (452) | (505) | (556 |
| Gross Profit | $ 15 | $ 21 | $ 20 | $ 74 | $ 20 | $ 20 | $ 20 | $ 20 | $ 80 | $ 88 | $ 93 |
| Gross Profit % | 12.2% | 16.4% | 15.9% | 14.8% | 15.0% | 15.0% | 14.9% | 15.2% | 15.0% | 14.8% | 14.3 |
| Selling, General and Administrative | (10) | (10) | (10) | (40) | (11) | (10) | (11) | (10) | (42) | (45) | (46 |
| ABB Fees | (1) | (1) | (2) | (5) | (1) | (1) | (1) | (2) | (5) | (5) | (5 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| quity Income | 5 | 4 | 4 | 16 | 4 | 5 | 4 | 4 | 17 | 18 | 19 |
| ther Income/Expense(1) | — | — | — | — | — | — | — | — | — | — | — |
| arnings Before Interest and Taxes | $ 9 | $ 14 | $ 12 | $ 45 | $ 12 | $ 14 | $ 12 | $ 12 | $ 50 | $ 56 | $ 61 |
| terest Expense | (1) | (1) | (1) | (3) | (1) | (1) | (1) | (0) | (3) | (1) | (1 |
| ote Amortization | — | — | — | — | — | — | — | — | — | — | |
| estructuring Expense | (1) | — | — | (4) | — | — | — | — | — | — | |
| axes | (2) | (2) | (2) | (8) | (2) | (2) | (2) | (2) | (8) | (8) | (8 |
| ther(2) | — | — | — | — | — | — | — | — | — | — | |
| et Income | $ 5 | $ 11 | $ 9 | $ 30 | $ 9 | $ 11 | $ 9 | $ 10 | $ 39 | $ 47 | $ 52 |
| G&A % of Revenue | | | | 8.0% | | | | | 7.9% | 7.6% | 7.1 |
| BIT % of Revenue | | | | 9.0% | | | | | 9.4% | 9.4% | 9.4 |

Notes

(1) Includes corporate restructuring expenses of $18 million
(2) Includes financial profit/loss relating to foreign exchange rate difference.

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES
## BALANCE SHEET
*($ in millions)*

| | Pre Petition Period | | | | Chapter 11 Period | | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | | | | | 2006 |
| | Year Act | Q1 Act | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est |
| **ASSETS** | | | | | | | |
| Cash | $ 26 | $ 19 | $ 18 | $ 17 | $ 72 | $ 72 | $ 71 |
| Accounts Receivable Trade(1) | 104 | 96 | 110 | 111 | 89 | 89 | 100 |
| Accounts Receivable Non-Trade | 56 | 82 | 99 | 97 | 98 | 98 | 91 |
| Sales in Excess | 112 | 113 | 130 | 130 | 122 | 122 | 123 |
| Work in Progress | 57 | 125 | 125 | 126 | 126 | 126 | 123 |
| Prepaid | (1) | 6 | 4 | 3 | 5 | 5 | 4 |
| Total Current Assets | $ 354 | $ 441 | $ 486 | $ 484 | $ 512 | $ 512 | $ 512 |
| Property, Plant and Equipment | 7 | 5 | 5 | 6 | 5 | 5 | 3 |
| Deferred Tax Asset | (2) | (3) | — | — | — | — | — |
| Goodwill | 81 | 79 | 79 | 79 | 79 | 79 | 79 |
| Investments and Other | 78 | 83 | 82 | 82 | 81 | 81 | 81 |
| Capitalized Software | 4 | 3 | 3 | 3 | 4 | 4 | 4 |
| Total Non-Current Assets | 168 | 167 | 169 | 170 | 169 | 169 | 167 |
| Total Assets | $ 522 | $ 608 | $ 655 | $ 654 | $ 681 | $ 681 | $ 679 |
| **LIABILITIES & EQUITY** | | | | | | | |
| Accounts Payable Trade(2) | $ 78 | $ 67 | $ 41 | $ 10 | $ 41 | $ 41 | $ 36 |
| Invoices to Come | 205 | 236 | 225 | 225 | 215 | 215 | 215 |
| Billings in Excess | 26 | 30 | 10 | 10 | 10 | 10 | 8 |
| Accounts Payable Non-Trade | 43 | 55 | 73 | 73 | 73 | 73 | 73 |
| Asbestos Provision(3) | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Provisions | 14 | 14 | 30 | 27 | 24 | 24 | 24 |
| Accrued Expense | 30 | 23 | 23 | 23 | 23 | 23 | 23 |
| Accrued Interest | — | — | 2 | — | — | — | — |
| Accrued Professional Expense | — | — | — | — | 1 | 1 | 1 |
| Deferred Taxes | (9) | — | — | — | — | — | — |
| Advances from Customers | 1 | 11 | 10 | 10 | 10 | 10 | 10 |
| Non-Current Liabilities | 7 | 7 | 9 | 9 | 9 | 9 | 9 |
| Short-Term Borrowing(4) | 360 | 395 | 465 | 505 | 505 | 505 | 505 |
| DIP Loan | — | — | — | — | — | — | — |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Exit Facility | — | — | — | — | — | — | — |
| Lummus Promissory Note | — | — | — | — | — | — | — |
| Total Liabilities | $ 788 | $ 871 | $ 921 | $ 925 | $ 944 | $ 944 | $ 937 |
| Total Shareholder's Equity | $ (266) | $ (263) | $ (266) | $ (271) | $ (263) | $ (263) | $ (258) |
| Total Liabilities and Shareholder's Equity | $ 522 | $ 608 | $ 655 | $ 654 | $ 681 | $ 681 | $ 679 |

Notes:

(1) Reflects the collection of $22 million past due accounts receivable in the 4Q 2005.
(2) Reflects the payment $31 million accounts payable trade prior to the Petition Date.
(3) Reflects the extinguishment of the provision at the Effective Date.
(4) Reflects intercompany borrowings and the reclassification of $31 million accounts payable trade payment to the Exit Facility at the Effective Date.

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES
## BALANCE SHEET
*($ in millions)*

| | Post Effective Date Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | | 2007 | | | | | 2008 | 2009 |
| | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est | Q2 Est | Q3 Est | Q4 Est | Year | Year | Year |
| **ASSETS** | | | | | | | | | | | |
| Cash | $ 40 | $ 25 | $ 25 | $ 25 | $ 24 | $ 24 | $ 24 | $ 23 | $ 23 | $ 64 | $ 108 |
| Accounts Receivable Trade(1) | 109 | 109 | 111 | 111 | 114 | 112 | 111 | 113 | 113 | 115 | 117 |
| Accounts Receivable Non-Trade | 91 | 90 | 87 | 87 | 77 | 77 | 79 | 79 | 79 | 80 | 81 |
| Sales in Excess | 127 | 128 | 126 | 126 | 123 | 124 | 100 | 99 | 99 | 99 | 97 |
| Work in Progress | 125 | 123 | 121 | 121 | 91 | 92 | 91 | 93 | 93 | 95 | 100 |
| Prepaid | 4 | 3 | 3 | 3 | 2 | 4 | 2 | 2 | 2 | — | 1 |
| Total Current Assets | $ 496 | $ 478 | $ 473 | $ 473 | $ 431 | $ 433 | $ 407 | $ 409 | $ 409 | $ 453 | $ 504 |
| Property, Plant and Equipment | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | — | — |
| Deferred Tax Asset | — | — | — | — | — | — | — | — | — | | |
| Goodwill | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 |
| Investments and Other | 81 | 81 | 83 | 83 | 83 | 83 | 83 | 86 | 86 | 87 | 87 |
| Capitalized Software | 4 | 4 | 1 | 1 | 1 | 1 | 1 | — | — | — | — |
| Total Non-Current Assets | 167 | 167 | 165 | 165 | 165 | 165 | 165 | 166 | 166 | 166 | 166 |
| Total Assets | $ 663 | $ 645 | $ 638 | $ 638 | $ 596 | $ 598 | $ 572 | $ 575 | $ 575 | $ 619 | $ 670 |
| **LIABILITIES & EQUITY** | | | | | | | | | | | |
| Accounts Payable Trade(2) | $ 30 | $ 32 | $ 26 | $ 26 | $ 20 | $ 22 | $ 22 | $ 23 | $ 23 | $ 21 | $ 22 |
| Invoices to Come | 180 | 150 | 150 | 150 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Billings in Excess | 9 | 8 | 8 | 8 | 10 | 10 | 10 | 10 | 10 | 11 | 12 |
| Accounts Payable Non-Trade | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| Asbestos Provision(3) | — | | | | | | | | | | |
| Provisions | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Accrued Expense | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 |
| Accrued Interest | 0 | 1 | — | — | 0 | 1 | 1 | — | — | — | — |
| Accrued Professional Expense | — | — | — | — | — | — | — | — | — | | |
| Deferred Taxes | — | — | — | — | — | — | — | — | — | | |
| Advances from Customers | 9 | 9 | 8 | 8 | 10 | 11 | 10 | 9 | 9 | 10 | 10 |
| Non-Current Liabilities | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Short-Term Borrowing(4) | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 |
| DIP Loan | — | — | — | — | — | — | — | — | — | | |
| Exit Facility | 56 | 56 | 50 | 50 | 51 | 38 | 4 | — | — | — | — |
| Lummus Promissory Note | 28 | 28 | 26 | 26 | 26 | 26 | 26 | 24 | 24 | 21 | 19 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Liabilities ..................... | $ 916 | $ 887 | $ 871 | $ 871 | $ 820 | $ 811 | $ 776 | $ 769 | $ 769 | $ 766 | $ 766 |
| Total Shareholder's Equity ..... | $ (253) | $ (242) | $ (233) | $ (233) | $ (224) | $ (213) | $ (204) | $ (194) | $ (194) | $ (148) | $ (96) |
| Total Liabilities and Shareholder's Equity ........ | $ 663 | $ 645 | $ 638 | $ 638 | $ 596 | $ 598 | $ 572 | $ 575 | $ 575 | $ 619 | $ 670 |

Notes:

(1) Reflects the collection of $22 million past due accounts receivable in the 4Q 2005.
(2) Reflects the payment $31 million accounts payable trade prior to the Petition Date.
(3) Reflects the extinguishment of the provision at the Effective Date.
(4) Reflects intercompany borrowings and the reclassification of $31 million accounts payable trade payment to the Exit Facility at the Effective Date.

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES
## STATEMENT OF CASH FLOWS
*($ in millions)*

| | Pre Petition Period | | | Chapter 11 Period | | |
|---|---|---|---|---|---|---|
| | 2005 | | | | | 2006 |
| | Q1 Act | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est |
| **Cash from Operating Activities** | | | | | | |
| Net Income...................... | $   3 | (3) | (6) | $   8 | $   3 | $   5 |
| Reversal of Depreciation and Amortization........................... | 2 | — | — | — | 2 | — |
| Reversal of Deferred Taxes ...................................... | 10 | (3) | — | — | 7 | — |
| Subtotal ...................... | 15 | (6) | (6) | 8 | 12 | 5 |
| **Change in Assets & Liabilities** | | | | | | |
| Accounts Receivable Trade ...................... | 8 | (14) | (1) | 22 | 15 | (11) |
| Accounts Receivable Non-Trade ...................... | (26) | (17) | 2 | (1) | (42) | 7 |
| Sales in Excess ...................... | (1) | (17) | — | 8 | (10) | (1) |
| Inventories ...................... | (68) | — | (1) | — | (69) | 3 |
| Prepaids ...................... | (7) | 2 | 1 | (2) | (6) | 1 |
| Accounts Payable Trade ...................... | (11) | (26) | (31) | 31 | (37) | (5) |
| Invoices to Come ...................... | 31 | (11) | — | (10) | 10 | — |
| Billings in Excess ...................... | 4 | (20) | — | — | (16) | (2) |
| Accounts Payable Non-Trade ...................... | 12 | 18 | — | — | 30 | — |
| Asbestos Provision ...................... | — | — | — | — | — | — |
| Other Provisions ...................... | — | 16 | (3) | (3) | 10 | — |
| Accrued Expense ...................... | (7) | — | — | — | (7) | — |
| Accrued Interest ...................... | — | 2 | (2) | — | — | — |
| Accrued Professional Expense...................... | — | — | — | 1 | 1 | — |
| Advances from Customers...................... | 10 | (1) | — | — | 9 | — |
| Non-Current Liabilities...................... | — | 2 | — | — | 2 | — |
| Net Cash Provided by Operating Activities ............................ | (40) | (72) | (41) | 54 | (98) | (3) |
| **Cash from Investing Activities** | | | | | | |
| Net Capex/Depreciation...................... | 3 | — | (1) | — | 2 | 2 |
| Change in Investments and Other ...................... | (5) | 1 | — | 1 | (3) | — |
| Net Cash Provided by Investing Activities ............................ | (2) | 1 | (1) | 1 | (1) | 2 |
| **Cash from Financing Activities** | | | | | | |
| Change in Short-Term Borrowing ...................... | 35 | 70 | 40 | — | 145 | — |
| Change in DIP Financing...................... | — | — | — | — | — | — |
| Change in Exit Financing...................... | — | — | — | — | — | — |
| Change in Lummus Note ...................... | — | — | — | — | — | — |
| Net Cash Provided by Financing Activities ............................ | 35 | 70 | 40 | — | 145 | — |
| Other[1] ...................... | — | — | — | — | — | — |

| | | | | | |
|---|---|---|---|---|---|
| Net Cash Flow | (7) | (1) | (2) | 55 | 46 | (1) |
| | | | | | | |
| Beginning Cash | 26 | 19 | 18 | 17 | 26 | 72 |
| Cash Source (Use) | (7) | (1) | (2) | 55 | 46 | (1) |
| Ending Cash | $ 19 | $ 18 | $ 17 | $ 72 | $ 72 | $ 71 |

Notes:

(1) Includes financial profit/loss relating to foreign exchange rate difference and dividends paid/received.

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES
## STATEMENT OF CASH FLOWS
*($ in millions)*

| | Post Effective Date Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | | 2007 | | | | | 2008 | 2009 |
| | Q2 Est | Q3 Est | Q4 Est | Year | Q1 Est | Q2 Est | Q3 Est | Q4 Est | Year | Year | Year |
| **Cash from Operating Activities** | | | | | | | | | | | |
| Net Income | $ 5 | $ 11 | $ 9 | $ 30 | 9 | 11 | $ 9 | $ 10 | $ 39 | $ 47 | $ 52 |
| Reversal of Depreciation and Amortization | — | — | — | — | — | — | — | — | — | — | — |
| Reversal of Deferred Taxes | — | — | — | — | — | — | — | — | — | — | — |
| Subtotal | 5 | 11 | 9 | 30 | 9 | 11 | 9 | 10 | 39 | 47 | 52 |
| **Change in Assets & Liabilities** | | | | | | | | | | | |
| Accounts Receivable Trade | (9) | — | (2) | (22) | (3) | 2 | 1 | (2) | (2) | (2) | (2) |
| Accounts Receivable Non-Trade | — | 1 | 3 | 11 | 10 | — | (2) | — | 8 | (1) | (1) |
| Sales in Excess | (4) | (1) | 2 | (4) | 3 | (1) | 24 | 1 | 27 | — | 2 |
| Inventories | (2) | 2 | 2 | 5 | 30 | (1) | 1 | (2) | 28 | (2) | (5) |
| Prepaids | — | 1 | — | 2 | 1 | (2) | 2 | — | 1 | 2 | (1) |
| Accounts Payable Trade | (6) | 2 | (6) | (15) | (6) | 2 | — | 1 | (3) | (2) | 1 |
| Invoices to Come | (35) | (30) | — | (65) | (50) | — | — | — | (50) | — | — |
| Billings in Excess | 1 | (1) | — | (2) | 2 | — | — | — | 2 | 1 | 1 |
| Accounts Payable Non-Trade | — | — | — | — | — | — | — | — | — | — | — |
| Asbestos Provision | (33) | — | — | (33) | — | — | — | — | — | — | — |
| Other Provisions | — | — | — | — | — | — | — | — | — | — | — |
| Accrued Expense | — | — | — | — | — | — | — | — | — | — | — |
| Accrued Interest | 0 | 0 | (1) | — | 0 | 0 | 0 | (1) | — | — | — |
| Accrued Professional Expense | (1) | — | — | (1) | — | — | — | — | — | — | — |
| Advances from Customers | (1) | — | (1) | (2) | 2 | 1 | (1) | (1) | 1 | 1 | — |
| Non-Current Liabilities | — | — | — | — | — | — | — | — | — | — | — |
| **Net Cash Provided by Operating Activities** | (84) | (15) | 6 | (96) | (2) | 12 | 35 | 5 | 51 | 44 | 47 |
| **Cash from Investing Activities** | | | | | | | | | | | |
| Net Capex/Depreciation | — | — | 4 | 6 | — | — | — | 2 | 2 | 1 | — |
| Change in Investments and Other | — | — | (2) | (2) | — | — | — | (3) | (3) | (1) | — |
| **Net Cash Provided by Investing Activities** | — | — | 2 | 4 | — | — | — | (1) | (1) | — | — |
| **Cash from Financing Activities** | | | | | | | | | | | |
| Change in Short-Term Borrowing | (31) | — | — | (31) | | | | | | | |
| Change in DIP Financing | — | — | — | — | — | — | — | — | — | — | — |
| Change in Exit Financing | 56 | (0) | (6) | 50 | 1 | (12) | (35) | (3) | (50) | (0) | (0) |
| Change in Lummus Note | 28 | — | (2) | 26 | — | — | — | (2) | (2) | (2) | (2) |
| **Net Cash Provided by Financing Activities** | 53 | (0) | (8) | 45 | 1 | (12) | (35) | (5) | (52) | (3) | (2) |
| Other(1) | — | — | — | — | — | — | — | — | — | — | — |
| **Net Cash Flow** | (31) | (15) | (0) | (47) | (1) | — | — | (1) | (2) | 41 | 44 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash.............................. | 71 | 40 | 25 | 72 | 25 | 24 | 24 | 24 | 25 | 23 | 64 |
| Cash Source (Use) ......................... | (31) | (15) | (0) | (47) | (1) | — | — | (1) | (2) | 41 | 44 |
| Ending Cash................................... | $ 40 | $ 25 | $ 25 | $ 25 | $ 24 | $ 24 | $ 24 | $ 23 | $ 23 | $ 64 | $ 108 |

Notes:

(1) Includes financial profit/loss relating to foreign exchange rate difference and dividends paid/received.

## ABB LUMMUS GLOBAL INC. AND SUBSIDIARIES

## PRO FORMA FINANCIAL INFORMATION

The following projected pro forma financial information (the "Projections") was prepared for the sole purpose of evaluating the feasibility of the proposed plan of reorganization of ABB Lummus Global Inc. (the "Debtor") and should be read in conjunction with the assumptions, qualifications, and footnotes set forth herein, the Disclosure Statement, the Plan, and related documents. The Projections were prepared using the accounting policies generally employed in the preparation of the Debtor's financial statements.

The Projections reflect operations of the Debtor and its nondebtor subsidiaries (collectively, "Lummus" or the "Company") including the estimated financial effects of the Plan and present the estimated balance sheets, income statements and cash flow statements for the fiscal years ending December 31, 2005, 2006, and 2007, quarterly, and for the fiscal year ending December 31, 2008, annually, (the "Projection Period").

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting standards Board or the rules and regulations of the SEC. The Projections have not been audited or reviewed by the Debtor's independent accountants.

All estimates and assumptions underlying the Projections were developed by the management of Lummus. The assumptions disclosed herein are those that Lummus believes are significant to the understanding and evaluation of the Projections. While Lummus believes the assumptions underlying the Projections are reasonable when considered on an overall basis in light of current circumstances and expectations, such assumptions are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtor's management. Consequently, actual results will likely vary from that shown in the Projections and the variation could be material.

While Lummus believes that the assumptions underlying the Projections are reasonable under the circumstances, no assurance is given that any of the financial results set forth in the Projections will be realized. The Projections should not be regarded as a guarantee or warranty by Lummus or any other person as to their accuracy or that the Projections will be realized.

SIGNIFICANT ASSUMPTIONS

*General*

The Projections assume a filing date of the chapter 11 petition of ABB Lummus Global Inc. of October 1, 2005 and an effective date of the Plan of April 1, 2006 (the "Effective Date").

The Projections present the accounts of the Debtor and its non-filing subsidiaries. Nondebtor joint ventures are primarily accounted for using the equity method of accounting including Catalytic Distillation Technologies (CD Tech), Chevron Lummus Global LLC, Hua Lu Engineering Co., Ltd. and Advanced Polypropylene Company. Other non debtor-joint ventures are accounted for using the proportionate consolidation method of accounting including LGOC/Snamprogetti, ABB Lummus Snamprogetti USA, Lummus/Thyssen Rheinsthal Technick, LGI/Grootint and LGL/Andromeda.

Lummus utilizes the percentage of completion method accounting for its projects. Any single or group of projects may have a significant impact on the cash flow of the Company as the sources and uses of cash are highly project specific as to the timing and amount of (i) costs incurred, (ii) billings and (iii) cash receipts. As certain large projects wind down and Lummus continues its shift in business focus from large lump sum turnkey projects to more engineering services work with reimbursable contracts, the use of cash in the early years of the Projection Period and the variability in cash flow are projected to moderate over the Projection Period.

No acquisitions or divestitures are assumed during the Projection Period.

*Business Activities*

The Company supplies proprietary technology, and project management and engineering, procurement and construction (EPC) services to the oil and gas, refining and petrochemicals industries.

In its technology business, the Process Technology Division develops, licenses, and engineers proprietary process and heat transfer technologies, systems, and catalysts used for the refining, petrochemicals and gas processing industries. These technologies are either wholly owned by Lummus or jointly owned through joint venture agreements with other catalyst companies, manufacturers or other process licensing entities. The technologies are implemented through Lummus' EPC's

operations and/or licensed directly to facility owners or to other EPC contractors employed by such facility owners. The Heat Transfer Division supplies specialized heat transfer equipment and systems to the refining and petrochemical industries, including the supply of engineering services, fired heaters and other refining and petrochemical services. (The Process Technology and Heat Transfer Divisions, collectively the "Technology Business")

The Company's EPC services include project management, front end engineering design on either a reimbursable or lump sum turnkey basis for both downstream (refineries and petrochemical facilities) and upstream ( onshore/offshore oil and gas production and processing facilities) projects and worldwide.

*Market Drivers*

The Company's markets are driven by the following factors, among others:

- the worldwide price of crude oil and associated hydrocarbons

- the condition of the oil and gas and chemical industry

- capital expenditure budgets in downstream refining and petrochemical segments

- demand growth driven by major petrochemical facilities advantaged by low cost feedstock, scale and location close to market

- more stringent environmental regulations which impact transport fuel specifications

- the increasing demand for polyolefins and polymers by new project users and per capita consumption in developing countries

- the demand for natural gas worldwide as a clean fuel

*Revenue Assumptions*

The Projections assume that the EPC division will continue its strategic shift in business focus from large lump sum turnkey engineering, procurement and construction contracts to more engineering services work of narrower scope with reimbursable contracts. The change in focus is expected to reduce the risk of exposure to losses historically incurred by the Company in certain of its project-related long term fixed price contracts and to reduce the investment in working capital. Revenue in each of the operating divisions is projected to increase over the Projection Period based on the current backlog and the Company's expectation of unbooked projects based on the market environment.

*Margin Assumptions*

Cost of sales for booked projects is calculated based on the projected cost to complete with losses recognized as incurred. Cost of sales for unbooked projects is based on the Company's historical gross margin experience by division and job type. The projected gross margin range for the EPC division is approximately 5% to 10%. The projected gross margin range for the Technology Business is approximately 25% to 35%.

Gross profit margins are projected to increase from 6.0% in 2004 to 17.3% in 2005 as a result of the winding down of existing EPC projects and associated losses, and the release of certain project-related contingencies. Gross profit margins decline approximately 3.0% from 2005 to 2008 primarily as a result of a decline in the EPC division margin due to a change in the scope of projects and risk profile of projects.

*Other Income Statement Assumptions*

Sales, general and administrative ("SG&A") expense as a percent of revenue declines from 14.6% in 2004 to 10.2% in 2005 and 8.0% in 2006 as a result of the implementation of the Step Change Program established throughout ABB Ltd to reduce overhead costs and streamline operations. SG&A expense also includes allocations from ABB affiliates for overhead related expenses such as rent, insurance and benefits.

ABB Fees represent fees in connection with license and users fees for internal computer systems, and the use of the ABB trademark.

Equity income arises from the Debtor's 50% ownership in two separate joint ventures, CD Tech and Chevron Lummus Global LLC. Equity income is projected to increase slightly over the Projection Period due to growth in the respective joint venture's markets.

Other Income/Expense included minimal restructuring costs including costs related to staff reduction expenses as the Company shifts engineering work to low cost engineering centers located worldwide.

Interest Expense includes interest expense on the Exit Facility at the assumed rate of 5.65%, payable quarterly, and on the Lummus Promissory Note at the rate of 6%, payable annually.

Income Tax Expense reflects the payment of foreign withholding taxes.

*Balance Sheet Assumptions*

Cash balances include certain non-debtor overseas bank accounts. Additionally, in instances where the Company utilizes the proportionate consolidation method of accounting for its joint venture investments, the proportionate share of the joint venture's cash balance is reflected on the balance sheet.

Non-trade accounts receivable reflect primarily a loan to ABB Lummus Global Ltda. and are offset by non-trade accounts payable on the balance sheet. Project related foreign tax receivables, claims and miscellaneous other receivables are also included in this account.

Sales in Excess of billings represent project-related costs incurred plus gross profit earned by the Debtor not yet billed.

Work in Process ("WIP") represents project-related costs incurred but not yet earned and therefore remain unrecognized as a cost in the income statement.

Prepaid Assets primarily relate to insurance premiums, deposits and travel advances.

Investments and Other represent the ABB Lummus Global Inc.'s investments in joint ventures for which the equity method accounting is used. Such investments are primarily comprised of $26 million in CD Tech and $39 million in Chevron Lurnmus Global LLC at June 30, 2005. The Projections assume that cash dividends paid to are equivalent to earnings derived from the joint ventures. Investments and Other also includes intangible assets of approximately $13 million.

The Projections assume that approximately $31 million in pre-petition accounts payable will be paid in the third quarter of 2005. Approximately $10 million of accounts payable remain unpaid as of the petition date due to timing of invoices or disputes.

Invoices to Come relates to instances where the cost from a project has been earned although not yet invoiced by the vendor.

Billings in Excess represent project-related costs incurred and gross profit not yet earned but billed.

The Projections assume that the $33 million asbestos provision will be extinguished through the establishment of the ABB Lummus Global Inc. Asbestos PI Trust at the Effective Date. Other Provisions include $9 million related to the corporate restructuring plan, $3 million related to warranties, $20 million related to an account payable and $1 million in other miscellaneous items. During 2005, the reduction in Other Provisions is related to the provision for corporate restructuring.

Accrued Expenses relate to accruals for payroll, benefits, taxes, rent and other miscellaneous items.

Advances from Customer relate to payments received from customers pursuant to contractual agreements for start up costs, vendor or subcontractor down payments or other expenses required to initiate projects.

Non Current Liabilities include the impact of FAS 106 for retiree benefits

*Impact of chapter 11 Filing and Confirmation of the Plan Assumptions*

The Projections contemplate a prepackaged Chapter 11 bankruptcy filing. However, certain risks, including without limitation, the following, exist, the likelihood of occurrence and financial impact, if any, have not been included in the Projections:

- loss of customers

- loss of suppliers or C.O.D. terms

- customers draws on letters of credit

- bank requirements for collateral on existing letters of credit
- loss of surety bonds and letter of credit capacity

Chapter 11 expenses relate to professional fees incurred as a result of the filing. These costs, estimated at $10 million during the Chapter 11 period are reflected in the Income Statement and the accrual on the Balance Sheet.

Short Term Borrowings represent intercompany borrowings owed to ABB Treasury or any Entity of the ABB Group by ABB Lummus Global Inc. and includes Pre-petition Short-Term Working Capital Financing. Such Subordinated Intercompany Indebtedness and the Pre-petition Short-Term Working Capital Financing (as defined in the ABB And Non-Debtor Affiliate Settlement Agreement (Lummus)) are treated pursuant to the terms of such agreement.

The Company has approximately $146 million in outstanding project-related letters of credit (or other form of credit support) as of July 31, 2005 guaranteed by ABB Ltd. or its affiliates. The Projections assume no drawings on these letters of credit.

The Projections assume no borrowings under the DIP Loan.

The Projections assume an Exit Facility in an amount necessary to fund the operations of the Debtor and its subsidiaries and includes an assumed amount of $31 million in pre-petition accounts payable payments.

The Projections assume the issuance of the Lummus Promissory Note to the Lummus Asbestos P1 Trust at the Effective Date and a payment schedule in accordance with the terms of the Lummus Promissory Note. The asbestos provision is extinguished upon the issuance of the Lummus Promissory Note.